# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

Sammi H. Addahoumi

               Plaintiff,

     v.

Harris Pastides, Dennis Pruitt, Bobby Gist, Alisa Ligget, Maureen Grewe, Augusta Schneider, Timothy Bedford, Leslie G. Wiser, Jr., Josef Olmert, Jane Doe, Carl R. Wells and  Officer Newton,

               Defendants.

) Case No.
)                                   :
) **COMPLAINT FOR INJUNCTIVE**
) **AND DECLARATORY RELIEF**
) **AND DAMAGES**
)
) **JURY TRIAL REQUESTED**
)
)
)
)
)
)
)
)

## I.    INTRODUCTION

1.    Free speech controversies roiled American college campuses in the Fall of 2015, including high-profile demonstrations at the University of Missouri and Yale University.  These controversies followed similar eruptions at universities across the country in recent years arising from such issues as race relations, the regulation of offensive speech, restrictions on faculty speech, and the ability of students and faculty members to exercise their First Amendment rights outside of tiny designated areas on campus, ironically-named "free speech zones."  Even the most benign speech – including the ability to distribute copies of the U.S. Constitution – can be censored if conducted outside these quarantined areas, as occurred at University of Hawaii-Hilo and at Modesto Community College in California.  Meanwhile, at the University of South Carolina ("USC" or the "University"), a student learned that it is not safe even to talk about these various free speech controversies without risking enforcement under their school's speech code, the USC Behavioral Intervention Team,  and famous Carolinian Creed.

2.     The Plaintiff in this case – Sammi Hassan Addahoumi – found that he could suffer unchecked punishment for just trying to raise awareness among his fellow students by encouraging  freedom of speech. Addahoumi, who is an Arab American Muslim of Libyan origin, received dozens of notification letters from the University's "Behavioral Intervention Team" after he encouraged his USC classmates to participate in Free Speech during class discussions and outside of class using  University "Blackboard" email accounts and social media. Despite the fact that Addahoumi obtained prior approval and encouragement from the University after proudly disclosing the nature of academic freedom he advocated  would include expression that has been censored in the past (*e.g.* anti-war sentiment, criticism of the NSA domestic surveillance programs, disagreements with US foreign policy, pro-Palestinian sympathies).

3.     Notwithstanding his efforts to inform students, and in spite of his actions to inform faculty and administrators of the academic context in which each of the expressions of academic free speech arose, the USC Behavioral Intervention Team and Office of Student Conduct summoned Addahoumi for questioning, interrogation, and mandated mental assessment after contrived anonymous accusers complained that the subject matter offended them and that they felt "offended",  "harassed" and "concerned" about statements made by Plaintiff.

4.     The Behavioral Intervention Team (BIT), functioning based on model designed to convolute the roles of USC's Office of Student Conduct & Student Counseling, deliberately targeted Addahoumi merciless and maliciously with both disciplinary and academic sanctions  that amount to harassment while refusing even to clarify its Student Non-Discrimination and Non-Harassment policy that was the basis of Addahoumi repeatedly being summoned with notifications from the BIT and Office of Student Conduct.  The policy contains vague and broadly-worded provisions that forbid "unwelcome" or "inappropriate" "verbal conduct" (that is, speech) so that debates about protected speech on racism, the Middle East, US civil liberties, democracy, immigration, and religion could be subject to investigation, sanction, and censorship by university authorities.  A notation to the Carolinian Creed, incorporated into the University Policies and Procedures, states "Allegiance to these ideals [of our civility] requires each Carolinian to refrain from and discourage behaviors which threaten the freedom and respect every individual deserves."  These policies enable Defendant's to enrich themselves by facilitating a "heckler's veto" for other

students who believe they have a right not be offended by discussions of serious social issues.  And they exert a profoundly chilling effect, as penalties for violating the policies can include not only the summary  expulsion of individuals, but also forced psychiatric medications prescribed to rob both the dignity and credibility of students maliciously penalized with the stigma of mental illness.

4. This civil rights action seeks to protect and vindicate the First and Fourteenth Amendment rights of Sammi Addahoumi, and all students and faculty at the University of South Carolina.  The University's speech code and free speech zone policies unlawfully restrict the USC community's constitutional rights to free expression, and strike at the core mission of any university educating students. "State colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972).  Accordingly, the United States Supreme Court has held that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).   By bringing this case, the Plaintiff intends to reaffirm these basic constitutional values.

## II.    JURISDICTION AND VENUE

5.      This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

6.      This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      The Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and to issue the requested injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.  The Court is authorized to award attorneys' fees and costs pursuant by 42 U.S.C. § 1988.

8. Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the instant claim occurred within this District and because at least one Defendant resides in this District.

### III.     PLAINTIFF

9.      Plaintiff Sammi Addahoumi is a resident of Columbia, South Carolina.  He is the owner/operator Sammi's Deli and is currently placed on suspension by the University of South Carolina.

### IV.     DEFENDANTS

10. Defendant Harris Pastides is President of the University of South Carolina.  He is the university's chief executive officer, responsible for the University of South Carolina's administration and policy-making, and has ultimate authority to approve the policies and procedures challenged herein that were applied to deprive Plaintiffs of their constitutional rights.  Defendant Pastides acted under color of state law and is sued for injunctive relief in his official capacity.

11. Defendant Dennis Pruitt is Vice President for Student Affairs, Vice Provost and Dean of Students at the University of South Carolina.  Defendant Pruitt acted under color of state law and is sued for injunctive relief in his official capacity.

4

12.      Defendant Bobby Gist is the Executive Assistant to the President for Equal Opportunity Programs at the University of South Carolina.  Defendant Gist acted under color of state law and is sued in both his personal and official capacities.

13.      Defendant Carl R. Wells is the Assistant Director of the Office of EqualOpportunity Programs and Deputy Title IX Coordinator at the University of South Carolina.  Defendant Wells acted under color of state law and is sued in both his personal and official capacities.

14.  Defendants, Ligget, Grewe, Schneider,  Bedford, Wiser, Jr., Olmert and Doe were at all relevant times herein,  acting under the color and pretext of  their authority as agents and officers of the University of South Carolina.

15.Defendant, Officer Newton, was at all relevant times herein,  acting under the color and pretext of his authority as a police  officer of the University of South Carolina.

## STATEMENT OF FACTS:

16. Plaintiff Addahoumi was accepted to USC in the fall of 2012 and enrolled in the School of Arts and Sciences. His intended and declared major is Political Science with a minor in Middle Eastern Studies and Islamic World History. He was provided the requirements for both the minor and major and registered for classes to fulfill both based on the advice of Janis Lephart, his academic advisor.

17. In the fall of 2012, one of these classes included POLI 315 "Middle Eastern Politics taught byDefendant Dr. Josef Olmert. Plantiff enjoyed both the class and professor, with whom he shared an excellent relationship. Plaintiff excelled in class and in his assignments.

18. On the evening of September 13, 2012, Plaintiff sent an email via Blackboard to Defendant OLMERT expressing condolences for the loss of US Ambassador to Libya Christopher Stevens in Benghazi Libya.Plaintiff included in the email links to his CNN "ireports" as an example of his own personal experiences in Benghazi Libya.

19. In the fall of 2012, Plantiff also enrolled in POLI 391 "Terrorism" taught by Dr. Tobias Lanz. Again, Plaintiff both enjoyed and excelled in class. Utilizing the Blackboard system Plantilff sent numerous emails to his classmates as well as received them. B/c the events in Benghazi Libya occupied many classroom discussions, Plaintiff sent Dr. Lanz links to his CNN ireports as an example of his own personal experience in Benghazi. Dr. Lanz's Teacher Assistant, Josh, then took it upon himself to forward the links to Plaintiffs CNN ireports to the entire POLI 391 class, clearly seeing the academic value in the fee exchange of ideas.   At no point was Plaintiff told not to send emails to classmates. The exact opposite occurred as other professors praised Plaintiffs efforts and

encouraged him to share his work and ideas, even sharing links to his work themselves without any prompting from Plaintiff.

20.Plaintiff excelled during the Fall 2012 and completed the semester with his best GPA ever at USC.  After being advised again by Defendant Janis Leaphart, Plaintiff registered for the Spring 2013 semester at USC. Plaintiff again chose to enroll in another course taught by Defendant Olmert, POLI 415 Middle Eastern Politics.  This was due to many reasons. The course selection for Middle Eastern Studies and Islamic World History was extremely limited, with many courses required for the minor not offered on a regular basis. The few classes that were offered were taught by a small circle of the same professors due to lack of staff. In addition, Defendant Olmert's class was a requirement, not an elective, for his major and minor degree programs.

Above all, however, Plaintiff enjoyed his previous class with Defendant Olmert and was both inspired by and encouraged by Defendant Olmert to incorporate Libya in any papers or assignments.  Plaintiff again excelled in Defendant Olmert's class, in addition to his other courses which included History, Religion, and Anthropology.

21. Defendant Olmert began to email Plaintiff regularly, via Blackboard, about events in Libya due to Plaintiff's interest, experience, research, and expertise in Libya. Most of Defendant Olmert's emails to Plaintiff inquired as to Plaintiffs analysis of current events or news relating to Libya. As an undergraduate student hoping to pursue a lifelong career in academics studying, learning, teaching, and researching about Libya, Plaintiff felt honored to be contacted outside of class by his distinguished professor, Defendant Dr. Josef Olmert. Plaintiff respected Defendant Olmert and felt privileged to be asked for his analysis and opinions regarding Libya. Plaintiff never questioned the intentions of Defendant Olmert. Plaintiff spared no time, effort, or expense in researching for Defendant Olmert's class and treated Defendant Olmert's requests outside of class with equal importance. On January 24, 2013 Plaintiff received an email from Defendant Olmert requesting Plaintiff's opinion and analysis on Libya regarding sources for his research on Libya. Plaintiff, though busy with other coursework, dutifully and

carefully reviewed all available sources on Libya and provided them to Defendant Olmert as requested on January 28 2013, again feeling honored to have his distinguished professor, Defendant Dr. Josef Olmert, request Plaintiff's analysis

22. On February 6, 2013 Plaintiff became aware that Defendant Olmert had misled him and others at USC by claiming Plaintiffs analysis and work as his own.  During Plaintiff's Arabic 312 class, classmate Thomas Cox asked Plaintiff if he were speaking at an upcoming academic forum on Libya.  Plaintiff, having no prior notice of the MAIS "Roundtable on US-Libya" Relations, was both surprised and confused to learn that not only was Defendant Olmert to be the main speaker at this rare and respected event, but that Defendant Olmert had distributed Plaintiff's work and analysis, claiming it as his own, failing to credit Plaintiff much less have the courtesy to inform Plaintiff of the event. Plaintiff contacted Department Chair Kiel Downey to request permission to attend the event due to Plaintiff's interest in the subject matter, providing the same links to the same CNN ireports Plaintiff had sent to Defendant Olmert the previous semester.  Plaintiff also informed Kiel Downey that he was a student of Defendant Olmert and that Defendant Olmert had been provided the same links regarding plaintiffs research in Libya. Plaintiff attended the February 12 event after obtaining the required permission from Department Chair Kyle Downey. It was Plaintiff's intent and expectation to attend as a spectator, or as part of the listening audience, to an expert speaker discuss US-Libya relations as advertised in the handout.

23.Despite not informing Plaintiff of the event, Defendant Olmert opened the event by introducing Plaintiff, thanking Plaintiff for attending, and then asking Plaintiff to speak on Libya US relations. Despite not being prepared, Plaintiff provided an impromptu yet well received synopsis and was grateful for the opportunity to do so. Following the event, Plaintiff sent a Defendant Olmert to reassure him that such deception on his part was unnecessary, to which Defendant Olmert replied affirmatively. In addition, Plaintiff twice emailed his concerns and complaints to Department Chair Kiel Downey about the actions of Defendant Olmert, and both times Plaintiff was ignored.

24. Not only were Plaintiff's legitimate complaints ignored, but Defendant Olmert was allowed to target Plaintiff

in retaliation.  Defendant began belittling Plaintiff in class, refusing Plaintiff's participation in classroom

discussion, and only calling on Plaintiff to speak in class so that Defendant Olmert could rudely interrupt him.

Other classmates noticed a stark change in Defendant Olmert's attitude towards and treatment of the Plaintiff. This

unwarranted treatment of Plaintiff went on for weeks. Plaintiff was no longer able to participate freely in the

classroom discussion to the same extent as his classmates.  While most students may have taken other means,

Plaintiff decided not to pursue the matter of the MAIS briefing incident involving Defendant Olmert, as Plaintiff

had presented the facts very clearly to Department Chair Keil Downey only to encounter retribution from

Defendant Olmert.Plaintiff felt both embarrassed for and embarrassed by Defendant Olmert and made a conscious

decision to simply not take any more classes offered by him rather than waste time and effort on pursue complaints

USC had brushed aside as petty.   Not at all spiteful, Plaintiff attempted to maintain civility in his dealings with

Defendant Olmert both inside the classroom and out. Plaintiff excelled in Defendant Olmert's class as well as his

other courses.


25. On April 8, 2013, Plaintiff inquired in class why he was always interrupted by Defendant Olmert while other

students were not. Defendant then continued to interrupt plaintiff, not allowing him even to speak, effectively

yelling over Plaintiff while simultaneously yelling at Plaintiff. Plaintiff ended the exchange by submitting to

Defendant Olmert and simply dropped the subject. Class continued as normally as there was at no time a

disruption of class, save for the awkward embarrassment of Plaintiff as he suffered the condescending, patronizing

nature of Defendant effectively denying Plaintiff's freedom of speech while simultaneously squelching Plaintiff's

academic freedom to disagree with, much less challenge, ideas in the classroom.


26. On or about April 8, Defendant Olmert maliciously and vindictively filed a Behavioral Intervention Team

incident report about Plaintiff in retaliation for petty personal issues.  In doing so, Defendant Olmert activated a

system that to this day continues to deny Plaintiff numerous civil rights guaranteed to him under the United States

Constitution, the South Carolina State Constitution, and the University of South Carolina's own polices.

27. On April 13 2013, Plaintiff received an official email notification from the USC Behavioral

Intervention Team.  This email provided a link for Plaintiff that directed him to log on to a website using

his USC student credential.  Plaintiff had never heard of the Behavioral Intervention Team and was

unaware why he had received the notice.

The letter read as follows:

*"The University of South Carolina is concerned about the well-being of all of its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health and/or well-being in the USC community. I hope that your situation is improving. The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.*

*Due to these concerns and policies, you must meet attend two meetings. The first meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC). The second meeting will be with a member of the BIT. Your first meeting is in the CHDC with counselor, Lara Sheehi on the 7th floor of the James F. Byrnes building to begin your assessment.   Students must arrive 15 minutes early to the CHDC to complete paperwork. You should inform the receptionist that you received a BIT letter.Your second meeting is with a BIT member so that we can answer any questions and explain the concern and the next steps. This second meeting is with Alisa Liggett in the Byrnes Building Suite 201 (901 Sumter St.).*

*The total assessment will conclude after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community.*

*Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counseling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.*

*If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending your appointments, please call him/her at 803-777-5223 and request that they contact us with any information that you are willing to release.*

*If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services (SDS) accompany you, please contact our office and the SDS at 777-6142 at least 48 hours prior to your appointment time.*

*Our goal is to be educational and maintain the standards of the institution we share. If you would like additional information about your rights or the conduct process, please reference http://www.sc.edu/policies/staf626.pdf. We appreciate your cooperation and look forward to meeting with you.*

*If you have questions about your case or about your sanctions, please contact me immediately 803-777-4333. Additional information about policies and the conduct process can be found on-line at www.sc.edu/osc."*

Plaintiff was confused by the contents of the letter and alarmed at the vague accusatory statements.  Plaintiff took the very matter seriously and was further concerned after a detailed examination of the USC Behavioral Intervention Team website.  Not only did the letter accuse Plaintiff of dangerous or disruptive behavior, but outrageously implied that Plaintiff posed a threat himself and or others. In addition, Plaintiff was both embarrassed and offended by the unwarranted and defamatory implication that Plaintiff suffered from a mental disability. Among the numerous concerns, Plaintiff was further worried about the time and resources required to comply with letter.

28. According to the letter, Plaintiff was being penalized with mandated mental assessment, at least four mandating meetings, and, most alarming, the open ended vague wording asserted that additional required meetings would be at the discretion of USC "counselors". Plaintiff at this time was taking 18 hours, or six classes. This was more than full time and more than most USC students.  In addition, Plaintiff worked full time, as owner operator of Sammi's Deli.  Despite such obligations, Plaintiff was excelling in each of his classes, running a successful business, and pursuing additional research in regards to Libya. There were already numerous events, lectures, guest speakers at USC that plaintiff was unable to attend due to his busy schedule.  Despite having very little time and a demanding schedule, and despite the unwarranted, excessive, and punitive nature of the mandates, Plaintiff attended each required meeting.  Plaintiff did so only because the wording of the BIT notification stated he "must"

29.Plaintiff first met with Lara Sheehi.   Plaintiff asked Sheehi what he had done to warrant being contacted and penalized with mandated meetings. Sheehi informed Plaintiff that Defendant Olmert had filed the Behavioral

Intervention Team incident report regarding statements Plaintiff had made in Defendant Olmert's class.  Plaintiff explained the situation in detail, expressing his respect for Defendant OLMERT and disappoint in actions of Defendant Olmert that Plaintiff viewed as deceitful, dishonest, and unprofessional.  Plaintiff further expressed his belief that Defendant Olmert had maliciously filed a fictitiously alarming BIT report about Plaintiff both in retaliation for Plaintiff complaints as well as to intimidate Plaintiff in order to prevent any further complaints.Sheehi agreed with Plaintiff's opinion that Defendant Olmert had misused, if not abused, the BIT reporting feature.  Sheehi further concurred with Defendant's view that Defendant Olmert was trying to "create something out of nothing" and, as a result, informed Plaintiff that he did not need attend any further meetings with her. Plaintiff and Sheehi had a cordial, pleasant conversation on their shared and respective political opinions. Before Plaintiff departed, Sheehi again affirmed that there was no need to meet further regarding the matter, despite the BIT letter mandating a follow up meeting.

30. After meeting with Sheehi, Plaintiff met, as required, with Defendant Alisa Liggett. Defendant Liggett had the dual, if not convoluted, roles as both the Chair of the Behavioral Intervention Team as well as serving as the Director of Student Conduct.  Plaintiff again asked why he was contacted by the BIT and why he was compelled to attend mandated meetings and assessments.  Defendant Liggett explained to Plaintiff that the nature of the complaint against Plaintiff, as well as the identity of the complainant, were "confidential".  Defendant Liggett then informed Plaintiff that it was her job to follow up and investigate any complaints or reports made to the BIT and assured Plaintiff that she was "simply doing her job" and had "no choice" but to take every report very seriously. Defendant Liggett insisted she was "just following procedure" and told Plaintiff that he had "nothing to worry about" as long he did not "disruption the mission of USC".Defendant LIGGETT did define the "mission" of USC nor how Plaintiff had allegedly disrupted said "mission".Plaintiff explained to Defendant Liggett that he believed Defendant Olmert had filed a BIT report on Plaintiff to punish him in retaliation for his complaints against him. Defendant Liggett dismissed Plaintiffs concerns, again telling Plaintiff that it was a matter of "procedure" that he had been flagged and to "watch what he said" in class in order to avoid further "issues" or speech, that might "disrupt the mission of USC"Despite being offended by Defendant Liggett's condescending veiled and ambiguous

statements, Plaintiff was at all times cordial, honest, and direct, as Plaintiff took Defendant Liggett's word that she was "simply doing her job". At no time did Defendant Liggett say anything to Plaintiff about any emails sent by Plaintiff to any professors or classmates.

31.Unknown to Plaintiff at the time, a system had been activated whereby, his speech, school assignments, online activity ect., was to be scrutinized and which encouraged his professors, classmates and even family to monitor Plaintiff in an egregious invasion of privacy. This information sharing resulted in the breech of multiple laws and policies.After the mandated meetings with the BIT, Plaintiff continued his classes, excelling in each and every one. As the semester concluded, Plaintiff again achieved one of his highest GPA scores to date at USC. In addition, Plaintiff was preparing to return to Libya for the summer to study Arabic and conduct additional research as well as spend time with friends and family during the Ramadan holiday.

Despite his disappointment in the actions of Defendant Olmert and Plaintiff's embarrassment at being forced to submit to mandated assessments and meetings by the BIT due to the actions of Defendant Olmert, Plaintiff continued to be polite and cordial both in class and outside of class.Plaintiff continued to excel in his classes despite this unwarranted harassment from the Behavioral Intervention Team.

32.On May 7 2013 Plaintiff received an official USC email notification from the USC Office of Student Conduct. The email, subject "Official Correspondence from the Office of Student Conduct 2012212401", sent at 11:07 AM stated: *THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINAA letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality.*

On May 7 2013 Plaintiff also received an official USC email notification from Defendant Schneider, sent at 11:40 AM, with the subject "Important appointments for tomorrow". Defendant Schneider states:

*"Dear Mr. Addahoumi,*

*Please see the attached letter concerning your appointments for tomorrow. Please make sure to attend these appointments."*

The attached letter from Defendant Schneider's email to Plaintiff contained a yet another notification from Defendant Liggett and the Behavioral Intervention Team informing Plaintiff of more unwarranted, mandated meetings and forced psychological assessments.   The letter stated:

*May 7 2013*

**PERSONAL AND CONFIDENTIAL**

*Regarding Case Number: 2012212401*

*Dear Mr. Addahoumi*

*The University of South Carolina is concerned about the well-being of all of its students.  I have received information that you may have engaged in behavior(s) that have caused some concern about your safety, health, and/or well-being in the USC community.  I hope that your situation is improving. The University has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.*

*Due to these concerns and policies, you must meet attend two meetings. Their will be two meetings one will be with a member of the BIT and then the other meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC).  Your first meeting is in the CHDC with counselor, Bryant Kilbourn on the 7th floor of the James F. Byrnes building to begin your assessment on May 8, 2013 at 2:00pm.  Students must arrive 15 minutes early to the CHDC to complete paperwork.  You should inform the receptionist that you received a BIT letter.   Your second meeting with a BIT member so that we can answer any questions and explain the concern and the next steps.  The second meeting is on May 8 , 2013 at 3:30pm with Julia Thompson in the Byrnes Building Suite 201 (901 Sumter St.*

*The total assessment will conclude after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University Community.*

*Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counselling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.*

*If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending your appointments, please call him/her at 803-777-5223 and request that they contact us with any information that you are willing to release.*

*If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services (SDS) accompany you, please contact our office and the SDS at 777-6142 at least 48 hours prior to your appointment time.*

*Our goal is to be educational and maintain the standards of the institution we share. If you would like additional information about your rights or the conduct process, please reference http://www.sc.edu/policies/staf626.pdf. We appreciate your cooperation and look forward to meeting with you.*

*If you have questions about your case or about your sanctions, please contact me immediately 803-777-4333. Additional information about policies and the conduct process can be found on-line at www.sc.edu/osc."*

33. On May 7, 2013 Plaintiff received another email from Defendant Schneider. This was the second email of the day, a clear example of the excessive and thoughtless harassment of Plaintiff who had done absolutely nothing to warrant such intrusive manipulation of power. This second email, subject "ppt on May 14 at 2pm in Student Conduct Office", sent by defendant Schneider at 1:07 PM, less than two hours after her 11:40 AM email to Plaintiff, read:

*Please see the attached letter concerning your appointment on May 15 at 2pm in the Student Conduct office with Alisa Liggett.*

In addition to the obvious excessive nature of Defendant Schneider's harassment of Plaintiff with multiple disciplinary emails in a single day, Defendant Schneider did so with full knowledge that her actions were both malicious and unwarranted.  Defendant Schneider was too busy fabricating Plaintiff's mental health records and student conduct records to care that the subject line of her email and the body of that email gave two different dates for the exact same appointment. Defendant Schneider could have cared less if Plaintiff missed the very student conduct meeting she manufactured, as yet another letter could then be fabricated for failure to comply, or failure to appear. That such care is given to fatten Plaintiff's file yet such little care is afforded ensuring accuracy or factuality of Plaintiff's records is beyond suspect.  It clearly reflects an orchestrated attempt by Defendant Liggett, Defendant Schneider, Defendant Grewe, and others to compile a thick file against Plaintiff, however fabricated, for the intended use of defending themselves in court and tarnish Plaintiff's case should Plaintiff seek legal remedies against such civil conspiracy.

On May 8 2013 Plaintiff received yet another unwarranted and unwanted notification from USC Student Health Services. The email, subject "Secure Message from Student Health Services", sent at 4:43 PM read:

*You have an important secure message from the USC Student Health Services.*

*To access your secure messages, go http://www.sa.sc.edu/shs/msonline and log-in with your University assigned username and password.*

*Please remember to protect your health information and never*

On May 16, 2013 Plaintiff received yet another email from the USC Office of Student Conduct. The email, subject "Official Correspondence from the Office of Student Conduct 2012212401", sent at 10:19 AM read:

*THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA*

*A letter has been issued to you electronically by our office. Upon clicking the link below you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality*

34. On May 16, 2013 Plaintiff again received an official email from the USC Behavioral Intervention Team. The email, subject "Re: Mandatory appointment on May 24, at 11am", sent at 10:25 AM by Defendant Augusta Schnieder, informed Plaintiff that yet again, he would be forced to appear for unwarranted mandated mental assessments and multiple meetings with Defendant Liggett. Defendant Schnieder wrote:

*"Dear Mr. Addahoumi,*

*Please read the attached letter in concerning you BIT appointment in the Counseling and Human Development Center. Please make sure that you attend this meeting that has been made for you and arrive 15 minutes before 11 to fill in the appropriate paperwork."*

The email attachment consisted of a pdf file named "Sammi Addahoumi BITErracticBehhaviorLTR(Email)-1" and explained that these mandatory penalties were due to the fact that Plaintiff had "engaged in behaviors that had caused some concern about Plaintiffs wellbeing and safety of the community"

Again, numerous slanderous accusations were made about plaintiff, from being dangerous to having a mental disability.  Again Plaintiff was penalized with various unwarranted mandates in open ended vague stipulations by Defendant Liggett and the USC BIT. The letter read:

"***PERSONAL AND CONFIDENTIONAL***

*Regarding Case Number: 2012212401*

Dear Mr. Addahoumi,

The University of South Carolina is concerned about the well-being of all of its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health, and/or well-being in the USC Community. I hope your situation is improving.

The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.

Due to these concerns and policies, you must meet attend two meetings. The first meeting you have met with Alisa Liggett, a member of the BIT and then the second meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC). In your first meeting last week with the BIT member, Alisa Liggett answered any questions and explained the concern and the next steps.

Your second meeting is in the CHDC with counselor, Lara Sheehi on the 7th floor of the James F. Byrnes building to begin your assessment on May 24, 2013 at 11:00am. Students must arrive 15 minutes early to the CHDC to complete paperwork. You should inform the receptionist that you received a BIT letter. The total assessment will conclude after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community.

Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counseling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.

If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending your appointments, please call him/her at 803-777-5223 and request that they contact us with any information that you are willing to release.

If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services (SDS) accompany you, please contact our office and the SDS at 777-6142 at least 48 hours prior to your appointment time.

Our goal is to be educational and maintain the standards of the institution we share. If you would like additional information about your rights or the conduct process, please reference http://www.sc.edu/policies/staf626.pdf. We appreciate your cooperation and look forward to meeting with you.

If you have questions about your case or about your sanctions, please contact me immediately 803-777-4333. Additional information about policies and the conduct process can be found on-line at www.sc.edu/osc.

I look forward to meeting you

Alisa Liggett"


35. Plaintiff was extremely concerned about the nature of the BIT and sent an email to his professors and

classmates informing them of the Behavioral Intervention Program.  Plaintiff informed them that the BIT was

targeting him and appealed to both his classmates and professors for help in confronting the accusations made against Plaintiff. Plaintiff received various supportive responses from both his professors and classmates. Despite Plaintiffs obvious concerns and complaints regarding the USC BIT, Plaintiff complied with the requirements feeling he had no higher authority to appeal to as Defendant Liggett served as not only the Director of Student Conduct but also as the Chair of the Behavioral Intervention Team. While other students were busy studying for final exams, Plaintiff was forced to worry about the unwarranted and very real harassment imposed upon him by Defendant Liggett.

36. On May 23 2013 Plaintiff received yet another unwarranted and unwanted notification from the enterprise. The email from USC Student Health Services, sent at 10:54, subject "Appointment Reminder" read as follows:

*"This message is to remind you of your appointment scheduled with Student Health Services COUNSELING AND HUMAN DEVELOPMENT CENTER with SHEEHI, LARA at Byrnes 7th Fl. Counseling Location on:*

*Friday May 24, 2013 at 11:00 AM*

*To be prepared for your appointment:*

*Please bring your student ID card and arrive at least 15 minutes early for your appointment"*

Despite the procedure stipulated in the BIT letter, Plaintiff did not meet again with Sheehi. Plaintiff met only with Alisa Liggett who again assured plaintiff that she was "just doing her job". Again Plaintiff demanded to know why he was singled out for harassment by the BIT and inquired whether he had broken any rules or policies.Defendant Liggett informed Plaintiff that she was not accusing him of breaking rules, nor was it her intention even to decide if Plaintiff had broken any rules, Defendant LIGGETT informed Plaintiff that there were "concerns" about statements supposedly made by plaintiff to unnamed individuals at an unsaid time, at an unknown place about unrevealed subject matter. Defendant Liggett again warned Plaintiff to "watch what he said around campus".

In addition Plaintiff clearly and frankly asked Defendant LIGGETT if he was required to submit to her interrogations, which, he frankly informed her, he not only resented, but found insulting, excessively punitive, vaguely threatening, and above all, a significant waste of his time.

37. Plaintiff told Defendant Liggett that he did not have the time or the need to meet with her unless she could show him rules he had broken to warrant such meetings and that even then, he expected witness and details regarding any accusations.Defendant LIGGETT  responded to Plaintiff by informing him he would be charged with "failure to comply" if he failed to comply with any notices, recommendations or instructions from the USC Behavioral Intervention Team. Defendant Liggett said something about  "Best Practices". Because it had already been established that Plaintiff had broken no rules or codes, much less laws, and because it had already been established that the BIT system had already been misused to censor or silence Plaintiff, he knew Defendants actions were clearly not made in good faith, Plaintiff advised Defendant LIGGETT that her  "Best Practices" seemed very similar to that of the  "gestapo" or "Stasi".

38. Despite the unwarranted harassment by the BIT during exams, Plaintiff excelled in each class.  Plaintiff then left for Libya, spending the summer traveling around the country, as well as Italy, spending time with friends and family, in addition to conducting research. Part of this research involved the work of noted Libyan scholar and former diplomat Ethan Chorin.  Plaintiff contacted Chorin and developed a professional relationship that would lead to further collaboration.  In addition, while in Libya, Plaintiff posted numerous stories to his CNN ireports blog, many of which were featured on CNN US and CNN International, as well as being pick up by other news outlets.

39.As encouraged by other professors and by USC itself to publish research, Plaintiff sent emails to his former classmates with links to his work that had been featured on CNN.  Plaintiff's emails were not "mass emails", as different stories were sent to different classes depending on the subject matter, nor were the emails addressed or sent to anyone in particular, again being "class wide" emails. Even while in Libya, clearly engaged in earnest research, even while clearly celebrating a religious holiday with family, Plaintiff was still targeted and harassed by

the USC Behavioral Intervention Team.  Plaintiff was contacted by Defendant Grewe requesting his participation in a Behavioral Intervention Team survey. No other students were disturbed during their holiday and no other student was harassed in such manor.

40. On August 14, 2013 Plaintiff again received multiple "official correspondences" via USC email from the USC Behavioral Intervention Team and the Office of Student Conduct informing Plaintiff that he would once again be forced to attend mandated assessments and meetings with defendant Alisa Liggett.  Despite the fact that classes had not even begun, Plaintiff was already forced to submit precious his time & resources defending his speech without even being informed of what speech led to the mandated assessment.  This was the fourth such notification and the fourth time Plaintiff was penalized with mandated psychological assessments and unwarranted disciplinary proceedings and investigations

41. The August 14 2013 email from the Office of Student Conduct, subject "Official Correspondence from the Office of Student Conduct 2013004501", was sent at 9:57 AM and stated:

>   "A letter has been issued to you electronically from our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality"

The August 14 2013 email from Defendant Bedford, subject "Appt in CHDC 8/16/2013 at 2pm", was sent to Plaintiff at 10:02 am and instructed Plaintiff to "Please see the attached letter outlining the date and time of your appointments with the Chair of the Behavioral Intervention Team and Lara Sheehi at the CHDC on 8/16/13."

Defendant Bedford did not inform Plaintiff why appointments had been made nor who made the appointments, nor did Defendant inquire as to the convenience of this meetings, nor if Plaintiff could decline to attend. In addition, Plaintiff had no idea who Defendant Bedford was nor why Defendant Bedford thought he had the right to make medical decisions for PLAINTIFF, much less mandate mental health  appointments for Plaintiff. Defendant Bedford, a "certified life-coach" and "spiritual advisor", attached letter, filename "Sammi Addahoumi BIT letter", which stated:

*"Regarding Case Number: 2013004501*

*Dear Mr. Addahoumi,*

*The University of South Carolina is concerned about the well-being of all of its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health, and/or well-being in the USC Community. I hope your situation is improving.*

*The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.*

*Due to these concerns and policies, you must meet attend two meetings. The first meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC).*

*The second meeting will be with a member of the BIT*

*The total assessment will conclude after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community."*

42. Again Plaintiff met with Alisa LIGGETT and no one else despite the letter outlining a meeting with Lara Sheehi.

Again plaintiff was not told anything regarding exactly why he was being singled out nor what if any rule he had broken.

Again Plaintiff was told by Defendant LIGGETT that "she was just doing her job" and that "she had no choice but investigate" plaintiff based on the fact that someone had filed a behavioral intervention team report about him.

Plaintiff demanded to see the report yet was told by Defendant LIGGETT that it was an anonymous and confidential report.

Plaintiff asked why he was being harassed for no reason, and demanded know what rule he had broken to be investigated by both the Office of Student Conduct and the Behavioral Intervention Team.

LIGGETT replied "the students at USC are much younger than you and not as mature". Plaintiff was then again warned to "watch what he said" to avoid any problems

Furthermore Plaintiff was not told he could request a judicial hearing because he was not told that he has committed any offense.

Exasperated, Plaintiff asked Defendant LIGGETT what he had to do, or stop doing, to ensure he would not be subjected to further forced punitive meetings by either student conduct or the USC BIT. Defendant LIGGETT informed Plaintiff that "she did not make such decisions and was "just doing her job."

43. Plaintiff continued his studies,  selecting required classes towards his major in Political Science and minor in Middle Eastern Studies and Islamic World History.   As an elective Plaintiff chose POLI 391 Terrorism: Homeland Security, taught by Defendant Leslie Wiser.

Plaintiff did not know of Defendant Wiser and found no CV of his online, nor a picture. Plaintiff thought nothing more of this, assuming in good faith Defendant Wiser was a new faculty member.

Just as in the previous terrorism class taught by Dr. Tobias Lanz, Plaintiff throughly enjoyed Defendant Wiser's class and enjoyed participating in classroom discussions.

After a few weeks, however, it became clear to Plaintiff that defendant Wiser was simply using FBI training materials in class slides, not only without attributing the source, but claiming the work as his own. Plaintiff began to point this out in class, noting that much of the material was biased and known to be factually untrue. Due to Plaintiffs previous POLI 391 Terrorism class taught by Dr. Tobias Lanz, Plaintiff was well acquainted with training materials provided by the FBI and other agencies.


44. On October 11, 2013 Defendant Wiser told the class that in domestic terrorism cases, both the defense and the prosecution have equal access to expert witnesses and each had access to an equal amount of resources. Knowing this to be untrue, Plaintiff raised his hand, and after waiting for other students to speak, he was called upon by Defendant Wiser.Plaintiff calmly and politely asked Defendant Wiser if he were sure about his statement, that both prosecution and defense have equal access to resources in trial, whether terrorism related or not. Defendant Wiser insisted he was correct, to which Plaintiff replied " it is a well known fact that the prosecution has unlimited resources while the opposite is normally true for the defense.  On what planet is your statement accurate and why would you lie to the class about such a thing? Based on my research, most of the cases involved a paid FBI informant and raise serious issues of entrapment".

45. Before Plaintiff could finish his statement, and before Defendant Wiser could respond, Defendant Jane Doe suddenly stood up and began screaming at Plaintiff, telling Plaintiff she was "tired of him" threw her chair down, and ran screaming out of the room, slamming the door behind her.Plaintiff, to say the least, was stunned by this unprovoked outburst and unsure why he was the intended target.  Plaintiff looked to Defendant Wiser for a response, assuming the disruption had ended, however odd.

46. At that point Defendant Wiser ordered Plaintiff to leave the classroom and not come back.

Flabbergasted, embarrassed, and confused at why or how he was being blamed for the odd outburst of another classmate, Plaintiff told Defendant Wiser that he had paid for the class like everyone else and should not have to leave simply because another student screamed at him and then ran out of the room. Defendant Wiser suddenly became visibly angry when Plaintiff attempted to assert his rights, with Defendant Wiser yelling at Plaintiff to leave or the USC police would be called. .Plaintiff, certain he had done nothing, told Defendant Wiser that he would wait for the USC police outside so that defendant Wiser could continue class.Plaintiff did wait a full 15-20 minutes outside the CRJU building waiting to speak with USCPD. When USCPD did not arrive, Plaintiff filed his own Behavioral Intervention Team report about the incident.

47. Plaintiff filed a clearly worded report about the incident in full.  He knew Defendant LIGGETT had told him that it "was her job" to look into any reports and that "she had no choice but to investigate every complaint, and as such utilized the mechanism to address his very valid concerns about being forced to leave class under threat of arrest by Defendant Wiser.

To Plaintiff, this was highly unusual and offensive as he was excelling in the class, as well as his other classes and he wanted his complaints addressed.When Plaintiff filed his Behavioral Intervention Team report, he did so in good faith that his concerns would be addressed.  Yet the exact opposite occurred.

48. Despite making a complaint about the incident, Plaintiff soon received a long chain of abusive, threatening emails from Defendant LIGGETT. Instead of an email acknowledging Plaintiffs concerns, Plaintiff instead became

the target of Defendant LIGGETT and the Behavioral Intervention Team. Defendant Wiser and Defendant LIGGETT both misrepresented the entire as episode as the fault of the Plaintiff, charging Plaintiff with classroom disruption, threatening to fail Plaintiff and putting Plaintiff on "probation".When Plaintiff met with Defendant LIGGETT over the incident, Plaintiff told ALISA LIGGETT that he had done nothing wrong and had filed the BIT report to have his concerns addressed, not to be targeted for his concerns.Plaintiff was certain he had done nothing wrong and told Defendant LIGGETT exactly what occurred. Plaintiff was not told he could have a hearing to decide the issue.

49. Instead Defendant LIGGETT informed Plaintiff that she and Defendant Wiser had "worked out an agreement" for Plaintiff to "write a pass-fail research paper", that he was forbidden to return to Defendant Wiser's class,  and would arrested if he attempted to attend the class in which he was registered and had already paid for. Again Plaintiff insisted he had done nothing wrong and wished to continue the class like other students, that he enjoyed class, and that the class syllabus required he participate in classroom discussions as part of his grading requirements. Furthermore, Plaintiff reiterated that simply asking those present in class who caused the disruption would clearly show his statements to be true. In addition, Plaintiff told Defendant LIGGETT he had serious doubts that it was even legally acceptable for him to barred from class and that the incident had been purposely blown out of proportion considering his only "crime" was expressing unpopular political & religious statements that contradicted various factual claims made by defendant Wiser.

Plaintiff further informed Defendant LIGGETT that he had received hate mail peppered with threats from a student due to his opinions, but knowing he was over 10 years older than the sender, dismissed the crude and belligerent email as petty, immature  & ignorant.  The email had been "CC'ed" or "carbon copied" to everyone in class except Defendant Wiser, including his graduate student teaching assistant who, despite having duty to report such things to the University, had not done so.

50. Defendant LIGGETT completely dismissed his complaints, and even suggested his complaints were due "expected" due to his "class disruptions".Plaintiff was told by Defendant LIGGETT that the ad-hoc agreement was not optional, but mandatory, either Plaintiff agreed to write the paper and to not attend class or Plaintiff would be

given a "class disruption charge and receive a "WF".  In addition, Defendant LIGGETT said he should be "thankful"

that Defendant Wiser was being "gracious enough" to "even offer accommodations"  considering the alternative

would be a "more serious conduct charge and the automatic grade of "WF" or "Withdrew Failing" being assigned.

Plaintiff, after being informed by Defendant LIGGETT that he had no other options, felt obligated to submit to the

"accommodation" and write the paper.  Plaintiff was not allowed to return to class and felt ostracized, embarrassed,

and offended at being penalized even after he had clearly informed Defendant LIGGETT that the truth had been so

misconstrued as to allow Plaintiff to be penalized in such an egregious fashion.  Plaintiff had, in good faith, filed a

BIT incident report just minutes after the event, stating very clear exactly what had occurred. Plaintiff could not

ignore that he was repeatedly summoned by Defendant LIGGETT for "assessment" due to anonymously filed BIT

reports which Defendant LIGGETT insisted she had "no choice" but to investigate, yet she had willfully ignored

the BIT incident he had filed with the understanding that there would be "no choice" but for it to be investigated.

51. Plaintiff would be forced to take the midterm despite not being allowed to attend class for weeks. In addition,

Plaintiff did not receive a study guide for the midterm despite requesting the study guide and despite other other

students being given one in addition to an exam review Plaintiff was barred from participating in.Plaintiff scored

very highly on his mid term, missing only 1 out of 50 questions despite not being in class for over a month or having

access to review exam materials provided to all other students.  Despite not being allowed to attend class, Plaintiff

was required to meet Defendant Wiser after each class in his adjacent office to discuss his mandated  "pass-fail"

research paper.  Plaintiff, as at all times prior, continued to be polite and cordial during these interactions.  Defendant

Wiser, knowing that Plaintiff was extremely familiar with the subject matter,  asked Plaintiff to shape his research

paper into a  chapter for a book that Defendant Wiser had been asked to contribute to. Defendant Wiser also asked

Plaintiff to recommend any books he would need as sources for the research paper/chapter.  Plaintiff did as requested

and Defendant Wiser used his "petty cash" to purchase at least one, if not more, of the titles Plaintiff recommended.

During an initial meeting, Defendant Wiser stated that Plaintiff would go far in the FBI or other intelligence agency

due to his "obvious knowledge, experience, and enthusiasm" for the subject matter, but that "with Plaintiff's history

and background" he would "likely not have a chance" without "a well connected recommendation".   Plaintiff was

offended by this unsolicited comment and interpreted it as a hint, even a veiled threat to make Defendant Wiser "look good", or put extra effort, in the mandated research paper that had suddenly turned into a chapter for an edited book Defendant Wiser had be asked to contribute to. It did not escape Plaintiff that his opinions and perspectives were deemed knowledgable enough to be included in Defendant Wiser's project but were falsely portrayed as too "disruptive" to be expressed by Plaintiff in Defendant Wiser's class.In addition to his other classes and work schedule, the burden of this research paper weighed heavily on Plaintiff, as he he attempted to complete the paper in good faith based upon the agreed upon subject matter.


52. In Plaintiff's research of FISA courts for the mandated paper, Plaintiff was amazed to find an affidavit from Defendant Wiser. Plaintiff then became aware of Defendants close ties to the FBI, his long history, the fact that this information was withheld from the class, and the fact that Defendant Wiser was also serving as the "assistant Chief of Police for the City of Columbia Police Department during numerous investigations into officer misconduct in the department.

Plaintiff provided Defendant Wiser the research paper. Because the paper involved research from other classes, and involved topics of public concern, Plaintiff uploaded his published paper as a CNN ireport, in addition to sharing a link to the CNN ireport to his classmates via Blackboard as he had previously been encouraged to do so by other professors.

53. On March 24, 2014 Plaintiff received yet another notification from the Office of Student Conduct informing him of yet another mandated "follow up" appointment at 10:30 AM on March 26th 2014. Four hours later Plaintiff received another email from the Office of Student Conduct informing him that his mandated appointment had been rescheduled to 11:00 due to a "scheduling conflict". Plaintiff once again met with Defendant Liggett and once again Defendant LIGGETT refused to tell Plaintiff exactly what rule he had broken or how he had allegedly done so. Defendant LIGGETT informed Plaintiff that she was concerned about him "staying on the right track" and getting the "help and support he needed" regarding Plaintiffs mandated research paper.

54. Plaintiff Plaintiff told Defendant LIGGETT he needed her help obtaining a student judicial hearing.    Plaintiff also complained that his online grade for Defendant Wiser's class still indicated an "I" or incomplete instead of a grade despite despite the fact the paper had been turned in weeks before to Defendant. Wiser.Defendant LIGGETT told Plaintiff "he did not need a student judicial hearing" because "that would just make matters worse." Plaintiff instructed Defendant LIGGETT to "stop bothering him" with "harassing emails" that mandated he account for vague and unspecified charges.

55. On April 8th , Plaintiff received yet another notice from Defendant LIGGETT that he would be forced to attend mandated meetings and assessments due to an alleged violation of of the USC code of conduct.

56.Upon meeting with Defendant LIGGETT on April 11th, Plaintiff was told by he would be suspended for "computer misuse"  if he did not agree to whatever  "counseling" Defendant Liggett mandated with  Defendant Frierson. Plaintiff did not know who Defendant Frierson was nor why he was selected by defendant LIGGETT. Plaintiff had twice been forced to attend mandated psychological assessment.  Laura Sheehi had told him she found no concerns, as the issue "seemed to be a misunderstanding.  Despite this, Plaintiff was later forced into another psychological assessment with Bryant, who also told Defendant he saw no reason to continuing seeing Plaintiff

In addition, on the same document, Defendant Liggett, told Plaintiff to remove Defendant Wiser's name from Plaintiff's CNN ireport blog. Not only was Defendant Wiser a public official in his historic role as a "FBI celebrity" but Defendant Wiser also served as the Asst. Chief of the City of Columbia Police. As Plaintiff research paper focused on recent fusion of NSA, CIA, FBI, and local law enforcement integration tactics in a trend known as "Smart Policing" or "Community Policing" or "Evidence Led Policing", Plaintiff refused to change his report or edit his CNN ireport   blog.

57.Plaintiff  refused to sign the documents agreeing to the sanctions, and asked Defendant LIGGETT for a hearing. Defendant told Plaintiff  "that was not her decision to make" and that she "planned to continue the investigation" and "add a charge of failure to comply" if he did not agree to mandated counseling by Defendant Frierson.Plaintiff directly asked Defendant LIGGETT if his USC Blackboard emails to other students constituted computer misuse

and if so, why he was not informed during their numerous mandated meetings. In response Defendant LIGGETT told Plaintiff "he was not being punished for sending emails, as that would be a violation of his right to do so."

58. Plaintiff again asked Defendant LIGGETT for a student judicial hearing regarding charges, only to again be told by her that "she would investigate how to proceed".

59. On April 11th 2014 Defendant LIGGETT called Plaintiff to tell him that he was going to be suspended. Plaintiff, devastated by this news, wrote an email to Defendant LIGGETT, literally begging her to not suspend him, that he bore no ill will towards Defendant Wiser, and that he would agree to counseling so as not to be suspended. Plaintiff sent another email to Defendant LIGGETT expressing other issues outside of class, such as witnessing the recent tragic death of a neighbor and Plaintiff being worried about the welfare of his family in Libya. Plaintiff provided this information in a desperate attempt to both appeal to her humanity and to make clear to Defendant LIGGETT that her relentless harassment was unwarranted and distracting, yet petty compared to the very real issues of life and death Plaintiff's family constantly faced as the war zone in Benghazi rapidly devolved into a failed state.

60. Defendant Liggett's callous and cold assertions that Plaintiff was lying in an attempt "to provide excuses" for his "concerning behavior" disgusted Plaintiff, forcing him to provide his fathers phone number to verify and confirm his statements. In addition to Plaintiff's full time course load at USC, he continued to work in his restaurant full time, which allowed him to only see his father once a week for an hour on Fridays while attending religious services in their local mosque. Plaintiff assumed in good faith that Defendant Liggett intended to call his father, whom he trusted would simply verify his statements, removing any doubts expressed by Defendant LIGGETT.

Plaintiff's father did not mention receiving a call from Defendant LIGGETT, and being an adult who was 32 years old, Plaintiff did not feel the need to inform his inform his ailing father of his ongoing harassment by Defendant Liggett, which Plaintiff considered personal, private, and embarrassing in nature. In addition, Plaintiff did not wish to further burden his father who was at the time in constant pain due to cataracts to the extent that he could barely see and could not drive at night. In addition, Plaintiff's father also worked full time running multiple Sammi's Deli locations that Plaintiff had himself operated prior to resuming his studies at USC. As a result Plaintiff knew his father was forced to increase his work schedule so that his son could attend USC full time and complete his degree.

Plaintiff therefor made it a point do his absolute best to attempt to graduate as quickly as possible, as he knew both he and his father had made many sacrifices of time, money, and increased stress to achieve their shared dream of seeing Plaintiff graduate after the coming semester. Plaintiff knew his father was already overloaded and in constant pain and as a result, made it a point during their brief interactions to share how well he was doing academically and his preparations for graduation.

61. To confirm the violent situation in Libya, Plaintiff felt forced to provide Defendant LIGGETT the phone number of his father. Plaintiff did not consent to the release of any information to his father, and explicitly explained that Plaintiff had provided his father's number for the sole purpose of verifying the situation in Libya. Plaintiff had done so due to the fact that Defendant LIGGETT had previously accused Plaintiff of "making up stories sob stories" about Libya in addition to being accused of plagiarism by Defendant LIGGETT in Plaintiffs writing, all of which were baseless accusations but ones which Plaintiff felt compelled to refute by allowing his father to confirm events in Libya. Plaintiff did not provide Defendant LIGGETT a signed FERPA waiver to release any educational records nor did Plaintiff provide Defendant LIGGETT a signed HIPPA waiver to release any medical or counseling records to his father. Plaintiff provided only his fathers phone number with instructions clearly stating that Plaintiff was providing said info for expressed purpose of confirming his family situation in Libya, which was due solely to Defendant LIGGETT accusing Plaintiff of fabrications and exaggerations in his descriptions of events.

62. That same evening, after twice responding to Defendants LIGGETT telephoned notice of suspension by email and not receiving a response, Plaintiff examined the USC Code of Conduct in an attempt to find out exactly what rule he had broken, as Defendant LIGGETT told Plaintiff only that he was being suspended for "refusal to comply" to anymore mandated mental assessments by the Behavioral Intervention Team and Defendant Frierson and for "computer misuse" for "harassing emails".Plaintiff felt certain that he was being suspended for refusing to remove Defendant Wiser's name from Plaintiffs mandated research paper which Plaintiff had published on CNN ireport and for sharing his research paper wth classmates using the Blackboard USC student email system, In addition, Plaintiff

had earlier told Defendant that he refused to attend any more Behavioral Intervention Team's mandated meetings or forced mental assessments until she tell him exactly what rule he broken for such actions.

Plaintiff was forced to study the code of conduct, honor code, Carolina Creed and other policies in a futile attempt to understand exactly what rule or policy he had broken. Plaintiff could find no rule he had ever broken among USC's multiple policies, and was not informed what he had done which constituted computer misuse or "harassment."Plaintiff did read however that he was entitled to a student judicial hearing regarding any conduct charge. Plaintiff had previously asked Defendant for a hearing rather than being forced to meet with her repeatedly in mandated meetings and assessments. During not one of these dozens of mandated assessments or meetings was plaintiff told what rule he had broken. Nor was Plaintiff provided a copy of any complaints about him nor the identity of any accusers.

63. The next morning, Plaintiff emailed Defendant Liggett and requested a Student Judicial hearing, informing Defendant LIGGETT he was not even sure what rule he had broken. Until he received his requested hearing Plaintiff assumed he could continue class and did so.

Defendant LIGGETT responded to Plaintiff's request for a Student Judicial hearing by providing Plaintiff a list of "community providers" and stating that he "shouldn't have to deal with his stressors alone". Plaintiff had made clear to her previously that she and her unwarranted harassment was the only "stressor" Plaintiff experienced. Defendant LIGGETT did not even acknowledge plaintiffs request for a student judicial hearing.Plaintiff was by this time aware that Defendant LIGGETT was not working in good faith nor had she ever been.. Plaintiff responded with an email that politely and clearly repeated his request for a Student Judicial hearing

64. Days later Defendant LIGGETT relied with an email that stated, other things, his complaints needed to be forwarded to the EOP office and that a student judicial hearing would find Plaintiff guilty of " harassment" for "sending emails" which would "make things much worse" for Plaintiff.

Plaintiff was confused and distressed by Defendant Liggetts willful duplicity and condescending nature, purposely convoluted what should have been a simple request for a student judicial hearing with random patronizing references to highway travel, interlaced with accusations of harassment by email, while never actually even addressing the issue at hand, that Plaintiff desired a hearing for the sole reason as not to have Defendant LIGGETT make all decisions.

Plaintiff replied very clearly that if he was accused of harassment, then he demanded to know what rule he had broken and he demanded a student judicial hearing regarding the accusations, stating very clearly "give me a charge so that I may fight it".

65. Plaintiff intended to utilize the EOP for what he felt was harassment but felt he was forced until he completed the thee class left to graduate first, already aware that his complaints about Defendant LIGGETT has only intensified the severity and of her harassment of Plaintiff.

In addition, Plaintiff did not want to put his academic career and future at stake with only three classes left until graduation. As the harassment of plaintiff intensified, he coped with the emotional stress by reminding himself how close he was to graduate and how he would then try to hold defendants accountable for their actions. Plaintiff already was overburdened by the harassment much less the burden and risk of addressing the harassment in any fashion. Plaintiff had complained to administrators, students, faculty, and others at the school, only to be further subjected to harassment from Defendant LIGGETT and others.Defendant LIGGETT attempted to circumvent not only Plaintiff's attempts to obtain a hearing but also in his intent to utilize the EOP when he felt safe doing so.

66. USC EOP contacted Plaintiff about allegations relayed to it by Defendant LIGGETT. Plaintiff was suspicious of EOP involvement on his behalf which he had not requested, and worse, which was requested by Defendant LIGGETT to both circumvent his request for a hearing as well as to preempt his own complaints to the EOP about, among other things, being denied a hearing regarding charges of "harassment" for "emails. Plaintiff did not respond to EOP as he did not contact them initially. Plaintiff was essentially too overburdened by the harassment to have any time to effectively complain about the harassment, much less provide proof of harassment charges he had not made. While most student were allowed to focus on midterms and exams, internships and fellowships, or other

opportunities and obligations, Plaintiff was forced to preoccupy his time and mind with what was only the beginning of Defendants civil conspiracy to both target him and deny him his rights.  Plaintiff's USC transcript speaks not only for itself but reflects the actions of the Defendant LIGGETT and effectiveness of the Behavioral Intervention Team: formerly superb grades declined as the harassment intensified.

67. Plaintiff was not only afraid each time he spoke in class, but even attending classes became stressful when he had no idea who had accused him of harassment nor why. Anything Plaintiff said, wrote, or published could and usually did result in yet another Notice of Charge from either the BIT and or Student Conduct, both overseen and operated by Defendant LIGGETT.


68. On April 16 2014 Plaintiff received another notification from defendant LIGGETT stating that  appointment with Defendant Frierson had been made for him.This was despite the fact that Plaintiff had made it very clear to Defendant LIGGETT that he refused to comply with  any further  mandated treatment and that he demanded a student judicial hearing regarding the charges made against him for which the mandated mental assessments were a penalty.

Plaintiff chose to  ignore Defendant LIGGETT, as he was convinced he had done nothing wrong, nor did he need or desire any mental assessment or counseling from Defendant Frierson.  In addition, the fact that Defendant Frierson was off campus made Plaintiff extremely suspicious due to the fact that USC had dozens and dozens of counsellors, therapists, psychologists, and psychiatrists on campus for other students. In addition USC actively encouraged, to the point of selling, constant "buy-in" from students to utilize on campus mental health resources

Plaintiff chose to simply focus on his remaining exams and graduation by intentionally ignoring any correspondence from Defendant Liggett that did not involve his requested student judicial hearing.  By this point Plaintiff had planned to simply take his remaining 3 classes online in order to graduate, as he had no intention of subjecting himself to Defendant Liggett's threats and harassment for another semester.Plaintiff chose to disregard Defendant LIGGETT's threat that failure to attend mandated mental assessments by Defendant Frierson would result in immediate suspension on April 18, and again later on April 24th when this threat was repeated.

Plaintiff saw Defendant Liggetts failure to acknowledge his requests for a student judicial hearing a clear indication both that she did not take her job seriously, and that any offense allegedly committed by Plaintiff was not serious enough as to be credible to the scrutiny of a student judicial hearing.

69. On April 22 2014 Plaintiff again received a notification email from the Office of Student Conduct in which Defendant LIGGETT again threatens Plaintiff with immediate suspension if he failed to subject himself to mandated mental assessment by Dr. Frierson on Friday April 25, 2014. The "verbiage" of the email clearly indicates an evolving attempt to create a paper trail of fabricated proof to prevent being sued or even with the expectation of being sued. Phrases such as "this is the information you were expecting" attempt to build a false narrative to later be used to discredit plaintiff. In addition, Defendant LIGGETTs threats repeatedly reemphasis agreements that Plaintiff never made, whether agreeing to treatment for an alleged mental illness or acknowledging "responsibility" or guilt for any student conduct violations. This purposeful manipulation of "the verbiage" is known as Verbal Judo, an enterprise Defendant LIGGETT profits from by selling her expertise in manipulation under the guise of "deescalation tactics".

Another example of Defendants manipulation and misrepresentation is the statement " you asked me to call your father", as Plaintiff never once made any such request. Plaintiffs emails clearly show he provided his father's number to Defendant LIGGETT to verify Plaintiff's statements which Defendant LIGGETT alleged were "made up sob stories" about the dangerous situation faced by his family in Benghazi.

70. On May 2 2014, Plaintiff received yet another email from the Office of Student Conduct in which Defendant LIGGETT again threatened Plaintiff with immediate suspension after he refused to submit to forced mental assessment by Defendant Frierson. Plaintiff had no intention of complying with any mandated mental treatment as a penalty for contrived charges for which Plaintiff had been denied a student judicial hearing. Plaintiff had done nothing yet was repeatedly harassed with unwarranted threats by Defendant LIGGETT.In her email, Defendant LIGGETT informed Plaintiff that due to his "delay" in submitting to forced treatment by Defendant Frierson for an

alleged mental illness, that "any incidents" that "occurred" between then and the rescheduled mental assessment would result in a "one year suspension".

71. Plaintiff again reviewed all available USC polices and procedure and could find no definition of what exactly an "incident" was nor how he could avoid an "incident". Defendant LIGGETT then repeats the false statement that Plaintiff somehow asked her to call his father, completely ignoring Plaintiff's statement was clearly said under duress of her own threats and, even then, there was no authorization by Plaintiff to release any medical or academic records. Even a superficial reading of the actual email text clearly dictates that Plaintiff' provided his father's phone number only to verify his statements, made in good faith yet callously challenged by Defendant LIGGETT, regarding the dangers faced by his family in Libya.

72. Plaintiff became aware for the first time that Defendant LIGGETT had been calling his father for over a year before Plaintiff provided any contact info for any reason.

Defendant LIGGETT had maliciously and mercilessly lied to Plaintiffs father about subjects even now unknown to Plaintiff. False statements made to Plaintiffs father by Defendant LIGGETT included:

1.  the lie that Plaintiff had admitted to causing repeated classroom disruptions

2.  that Plaintiff had admitting to sending professors racist and Anti-Semitic emails in an attempt to harass and threaten them

3.  that Plaintiff was failing multiple classes

4.  that Plaintiff was suicidal, having hallucinations, and abusing drugs

5.  that Plaintiff had threatened himself and others with harm

6.  that Plaintiff had been excessive in his use of, and request for, voluntary mental health counseling that he himself initiated

7.  that Plaintiff had already been diagnosed as having multiple mental illnesses, including bipolar disorder, schizophrenia, and violent psychotic episodes

8.

9.  that Plaintiff had repeatedly asked Defendant LIGGETT for her help getting treatment for mental illness

10. That Plaintiff had asked Defendant LIGGETT for assistance  getting his father to help Plaintiff seek treatment his mental illness

11.  that plaintiff was expressing support for Islamic extremism or "terrorism" and had threatened other students, causing them to fear his presence in class

12. that Plaintiff was the subject of multiple criminal investigations by USCPD, SLED, and even the DHS and FBI

13. that Plaintiff would be arrested unless Plaintiff's  father ensured Plaintiff complied with a mental assessment by Defendant Frierson and completed  all recommended treatment by Defendant. Frierson.

14. That multiple professors had complained about Plaintiff displaying signs of mental illness

15. That multiple professors had complained about Plaintiff's conduct, resulting in multiple violations of the USC Code of Conduct

16. That Defendant LIGGETT would not suspend plaintiff if Plaintiffs father ensured Plaintiff attended "counseling" by Defendant Frierson

In addition, Defendant LIGGETT told Plaintiffs father not to speak to Plaintiff about her phone calls to Plaintiff or relay any information shared with him to Plaintiff, as it would "only make matters worse" since Plaintiff had "expressed fear of seeking his father's help in obtaining treatment"  for his "multiple mental illnesses".This unethical manipulation caused  incalculable harm to the relationship between Plaintiff and his father.

73. Defendant Liggett's malicious lies caused Plaintiffs father make various threats to Plaintiff if he failed to attend the mandated mental assessment by Defendant Frierson, including

1.  threatening to close Plaintiff's  Sammi's Deli location at 506 Beltline Blvd despite the fact Plaintiff had sole ownership  and operated the business independent of his father.  The lease for the property was in Plaintiffs father's name. Rent was deducted from the credit card sales via an NBSC account, to which both plaintiff and his father were cosigners

2. Threatening to shut off the electricity and water services at Plaintiffs house. Plaintiff owned his own house on 910 Lacy Street and paid all his own bills, yet said utilities were in Plaintiffs father's name and paid for using the same NBSC account mentioned above

3. Threatening to cancel Plaintiffs cell phone service, as Plaintiff utilized an "added line" to an AT&T business plan which was in Plaintiffs father's name yet paid for with the same NBSC account mentioned above.

4. Threatening to somehow "make Plaintiff homeless"

5. Threatening to ban Plaintiff from any other Sammi's Deli locations and any property owned by Plaintiff father including Plaintiffs father's house. This was despite the fact that Plaintiffs father's Sammi Deli location at 2009 Green Street as well as Plaintiffs father's rental property on 1926 Oak Street were both in Plaintiffs name.

6. Threatening to prevent Plaintiffs ability to see his younger brother as well as threatening to prevent Plaintiff from having any contact his uncle Mustafa Addahoumi, who was to arrive with his family to the US in a matter of weeks. This is despite the fact Plaintiff had himself developed the business plan and other required documents for the "investor visa" that facilitated their trip.

7. Threatening to make sure Plaintiff would be somehow cut off from any contact with his aunts, uncles, cousins and other relatives in Libya with Plaintiffs father threatening to relay    inform them of Plaintiffs "shameful" actions relayed to him by Defendant LIGGETT

Plaintiff initially refused this coercion, attempting to reason with his father, ultimately stating that he preferred to be homeless, alone, or even imprisoned rather than submit to forced treatment for mental illness he did not have.

Plaintiff believed strongly in his freedom of conscious, repeatedly telling his father he "preferred to spend his life in chains rather than allow anyone to chain my mind".

This attempted resistance only intensified Plaintiffs father demands, and as a result, Plaintiff finally had enough and submitted to his father's demands.

74. On May 12th 2014  Plaintiff asked both his father and family attorney, Gary White, to accompany him to the mandated mental assessment by defendant Frierson.

Plaintiff's attorney was unable to attend due to a prior court engagement on behalf of another client.

Plaintiffs father agreed to accompany Plaintiff to the mandated appointment with Defendant Frierson. Plaintiff wanted his father to serve as witness and wished to prove to his father that he had not only done nothing wrong but, more importantly, had nothing to hide from his father.

Plaintiff felt his father was being so manipulated by Defendant LIGGETT that he, whether consciously or subconsciously, hoped a diagnosis of mental illness would absolve him of being a "bad parent", with Defendant Liggetts fabrications and lies being attributed to Plaintiff mental illness rather than reflecting upon Plaintiffs father.


On the morning of May 14, 2014, Plaintiff and Plaintiff's father arrived at USC specialty clinic.

Defendant Frierson informed Plaintiff that his father was not allowed to serve as a witness, could not accompany him, would be forced to wait in the lobby.

At no time was plaintiff informed why Defendant Frierson was selected. Plaintiff was told only that he was being "assessed" by Defendant Frierson.

On every single USC behavioral Intervention Team notice received by Plaintiff, the word "assessment" describes the actions of USC student health services.

Those actions included only two "assessments" one meeting with Lara Sheeni and one meeting with Bryant Kilborne.

Both clinical psychologists, Sheehi and Kilbourn saw no need to pursue any further contact or counseling and both agreed the Behavioral Intervention Team had been misused if not abused as he showed no signs indicating any need for any punitive psychological treatment or mandated counseling.

Defendant LIGGETT purposely deceived Plaintiff by describing as " counseling" what was actually criminal threat assessment by Forensic Psychiatrist who would penalize Plaintiff with not only an "assessment", but maliciously misdiagnose him to penalize Plaintiff with the stigma of being labeled mentally ill.

75. Plaintiff agreed to the mandated "assessment" under extreme duress due to duplicitous coercion by Defendant LIGGETT and even then, Plaintiff's consented to what was portrayed as "counseling".Plaintiff was not informed of his right to have an attorney present nor was Plaintiffs father allowed to serve a witness.For over an hour and a half, Plaintiff was interrogated about every statement he had made, every word he had said or written whether in class or off campus, whether online or in class assignments.

Plaintiff  was forced to defend his speech and writings as Defendant Frierson interrogated Plaintiff about various "incidents" based on information supplied by Defendant LIGGETT.   Plaintiff was forced to defend his blog posts to CNN iReports, to YouTube, to Facebook, and to Twitter.

Plaintiff was forced to defend his schoolwork, research papers, and selection of subject matter.

Plaintiff was forced to self incriminate himself with honest candid statements he would have alternately chosen not to discuss if made aware that his statements could be used against him, whether statements were used as evidence of guilt or evidence of mental illness.

Plaintiff was badgered, taunted, demeaned, ridiculed, and called "crazy" by Defendant Frierson during a forced interrogation duplicitously coerced under the guise of "therapy".

Plaintiff was informed during this interrogation that Defendant Frierson "was not normally sent college students" and that he had become involved because "this had become a big deal", informing Plaintiff that police and law enforcement had instigated criminal investigations due to the misinformation and false reports of Defendant Liggett. It is clear from the  interrogation record  that Plaintiff is completely unaware of any investigations nor why he was being investigated, as this was the first time Plaintiff was informed that Defendant LIGGETT had reported Plaintiff to law enforcement.

Plaintiff is forced to defend his research by somehow proving to Defendant Frierson that his research topics, including the militarization of local police departments, drones, police misconduct, the misappropriation of City of Columbia water and sewage fee revenue and other subject matter, were not "crazy".

76. To date Plaintiff has been denied  access to his own mental health records as Defendant Frierson refused to afford  Plaintiff the common decency of even knowing what mental disability Defendant Frierson had diagnosed Plaintiff with.

When Plaintiff returned to request his  medical records from Defendant Frierson, Plaintiff was instructed to wait in the USC specialty clinic waiting room.

After nearly an hour  Defendant Frierson  entered the waiting room.

As Defendant Frierson entered the room, Plaintiff greeted him, rose from his chair where he had been waiting, and approached Defendant Frierson.

Plaintiff  outstretched  his hand in order to shake the hand of Defendant Frierson.

Defendant Frierson suddenly flinched his entire body and spastically raised both arms to his head as if he thought Plaintiff was attempting to strike him.

Plaintiff again outstretched his hand

Defendant Frierson would not shake Plaintiff's hand.

Plaintiff stepped back, embarrassed and worried by the fact Defendant Frierson seemed to somehow think Plaintiff was so  dangerous and/or  violent and/or  crazy as to punch people in the face for no apparent reason.

Plaintiff asked Defendant  Frierson for the results of his mandated mental "assessment" .

Defendant Frierson told Plaintiff that the medical records "could not be shared" with Plaintiff and that Defendant Frierson would only release Plaintiffs records to "his provider". Plaintiff had no "provider" and was uninsured.

As far as Plaintiff was  aware, Defendant Frierson was his mandated  "provider",

Plaintiff asked Defendant Frierson why he was being refused access to his own medical records.

Defendant Frierson informed Plaintiff that any notes or records of Plaintiffs interrogation were not the property of Plaintiff, with Defendant Frierson stating he, in fact, had sole ownership of any records.

Plaintiff was duplicitously coerced into a forensic psychiatric criminal risk assessment, the results of which were predetermined by Defendant LIGGETT to maliciously misdiagnose Plaintiff with mental illness based upon fabricated and subjective criteria. Plaintiff has been forced to "play" the role of detective, Doctor, and lawyer in

piecing together what mental illnesses he was labeled with by Defendant Frierson. Plaintiff is thus far aware that Defendant Frierson labeled him as having "Bipolar Disorder", having "psychotic episodes", having "hallucinations" and as being "suicidal", among multiple other unknown diagnoses of "dangerous" mental illnesses

None of these inferences can be drawn from anything Plaintiff said during his interrogations and no evidence supporting Defendant Frierson's decision to diagnose Plaintiff with multiple mental illnesses can be found in the statements made by Plaintiff during the one sole "assessment" of him by Defendant Frierson. Defendants orchestrated an elaborate civil conspiracy to break multiple laws, regulations, policies, and codes of professional conduct in order to deny plaintiff's rights to due process, free speech, freedom of Liberty, freedom to obtain public education, freedom of equality, and even his freedom of conscience as his very freedom of thought was subject to gross abuses of psychiatry. Such collusion under the guise of "medicine" is akin to the tactics utilized by Nazi and Soviet psychiatrists to facilitate the genocide and mass murder of those diagnosed as "mentally defective", whether Jews or political dissidents.To date, Defendant Frierson has denied Plaintiff any access to any information whatsoever regarding Defendant Frierson's decision to label Plaintiff as mentally ill, whether results of the assessment, any diagnosis made, or even any treatment options or recommendations.

Despite this gross abuse of power and egregious denial of Plaintiffs right to access his own medical records, Plaintiff would have been crazy to expect anything less from Defendants.

 Unbeknownst to Defendant Frierson, Plaintiff recorded his entire interrogation in full.

Despite Defendant Frierson's predetermined intent to deny Plaintiff access any information regarding the results of the mandated assessment, Defendant Frierson, after refusing to allow Plaintiffs father to witness the assessment, casually informed Plaintiff that "nothing they spoke about would be confidential" and that "anything Plaintiff said" would be "shared".

Plaintiff immediately began an audio recording on his Windows Surface Pro 2 tablet, asking Defendant Frierson to repeat and clarify his statement regarding confidentiality, or more accurately, the lack thereof. The audio recording speaks for itself.Plaintiff felt utterly violated on various levels by the abusive, demeaning, and manipulative tactics employed by Defendant Frierson. As a result, Plaintiff felt he had no choice but to withdraw from USC and transfer

his credits to another university or simply take his remaining classes online, as Plaintiff was  determined to never again subject himself to the humiliation and degradation of Defendants merciless  harassment.

77. Plaintiff immediately uploaded the full recording of the entire interrogation to the CNN iReport website, in a blog entitled "Last Free Lecture at USC". Plaintiff then shared a link to his CNN ireport with classmates using his USC Blackboard student email account.

In addition, Plaintiff sent a link to his recording of the interrogation to Defendant Liggett, informing her not to contact him again due to his decision to leave the university as a result of her harassment.

78. On May 16 2014, Plaintiff was on campus for his second "senior meeting", during which it was again confirmed that Plaintiff needed to complete only three more classes in order to graduate. In addition Plaintiff had scheduled an appointment that afternoon  with Defendant Leaphart, his academic advisor, to discuss how Plaintiff could complete his remaining three required classes online so Plaintiff could still graduate yet avoid returning to campus and suffering any further harassment from Defendants. After his "senior check" meeting, Plaintiff walked to the Thomas Cooper library to read while waiting   for his academic advisement  appointment.

79. At 2:09 PM Plaintiff received yet another notification from the USC Office of Student Conduct. The email, sent by Defendant Grewe, read as follows:

*Cc:       "LIGGETT,     ALISA"     <ALISAC@mailbox.sc.edu>,      "THOMPSON,     J.     LICORISH"*
*<LICORISH@mailbox.sc.edu>*

*"Sammi,*

*It appears that per the letter attached, you have been notified by Ms. Liggett that you have been suspended and should not be on campus or you can be arrested for trespassing. It has come to our attention that you were on campus this morning. Please note, if you are on campus again without written permission from Ms. Liggett, you will be arrested for trespassing.*

*Maureen Grewe*

*Coordinator for Student Conduct & Behavioral Intervention"*

Defendant GREWE's choice of words clearly indicate, but purposely do not state, that this is the first notice to Plaintiff that he had been suspended, "as per the attached letter"

In addition this was the first time Plaintiff was told that he was not allowed on campus.

The attached letter, from director of USC Office of Student Conduct Defendant LIGGETT read as follows:


*Regarding Case Number: 2013187501*

*Dear Mr. Addahoumi*

*Thank you for meeting with me regarding an incident report suggesting that you may have been responsible for violating USC's Student Code of Conduct. These student conduct meetings were designed to educate students about community standards and to hold students accountable when those standards are breached. I hope it achieved that purpose.*

*In that meeting you acknowledged the essential accuracy of the report and agreed to have the resulting Code of Conduct charges resolved through a conduct hearing.*

*Your Code of Conduct charges and findings are as follows:*

*1. Misuse of Identification or University Resources - Computers -- You agreed to complete the following sanctions:*

*You are suspended from the University of South Carolina beginning May 13, 2014 and continuing through December 10, 2014. You are required to vacate the campus by May 13, 2014. You are prohibited from returning to campus or USC property without written permission from this office. Failure to comply with this request may result in your arrest for trespassing.*

*To begin the re-enrollment process you must schedule a re-enrollment meeting for 30 minutes with your conduct administrator prior to your registration hold being removed. In that meeting you will discuss your progress and your goals for the new semester.*

*Students who miss a Fall or Spring semester must complete the online application at www.sc.edu/admissions by the following deadlines:*

*Spring: November 1*

*Summer I: May 1*

*Summer II: June 1*

*Fall: July 1*

*With respect to the information listed above, the following additional sanctions/stipulations apply:*

*1. Sammi has agreed to willingly engage in any amount of counseling stipulated by the university. Sammi will complete an assessment with Dr. Richard Frierson by Friday April 18 at a time to be communicated to him once we are able to contact Dr. Frierson.*

*Failure to complete this assessment within the week will result in immediate suspension on April 18.*

*2. Sammi will complete all treatment recommendations from Dr. Frierson. A delay of more than two weeks in beginning the treatment recommendations could result in a prolonged suspension.*

*Sammi is ineligible to re-enroll until he has provided documentation of completion to the student conduct office.*

*This resolution is in conjunction with case 13-1730.*

*Failure to complete these sanctions will result in a hold being placed on your registration and an additional charge of "Failure to Comply", which can result in further sanctions.*

*If you have a documented disability that would require accommodations to complete these sanctions, please contact the Office of Student Disability Services at 777-6142.*

*If you have questions about your case or about your sanctions, please contact me immediately. Additional information about policies and the conduct process can be found on-line at www.sc.edu/osc.*

*Sincerely*

*Alisa Cooney Liggett*

*Executive Director of Student Conduct and Academic Integrity*

79. Defendant Liggett makes multiple false statements in her letter, including but limited to:

    1. the blatantly false claim that Plaintiff in any way "acknowledged the essential accuracy of the report",
    2. the blatantly false claim that Plaintiff "agreed to have the resulting Code of Conduct charges resolved through a conduct hearing"
    3. the blatantly false claim that Plaintiff "agreed to complete the following sanctions"
    4. the blatant lie that Plaintiff "agreed to willingly engage in any amount of counseling stipulated by the university".

Plaintiff had, from the very  beginning, contested all charges and denied any guilt regarding any and all accusations.

Plaintiff repeatedly, to the point of exhaustion, asked for begged for, and demanded his right to a student judicial hearing. These requests were repeatedly either denied, ignored, or circumvented by Defendant LIGGETT

Plaintiff at no time agreed to any sanctions whatsoever. The exact opposite is true as Plaintiff repeatedly demanded a student judicial hearing specifically due to the fact Plaintiff contested and disagreed with any and all sanctions

Plaintiff at no time agreed, in any way shape or form, to comply with any "treatment" or "counseling" mandated by the university. The exact opposite was true, as Plaintiff demanded a student judicial hearing the charges for which said "counseling" was a punishment.

Most discerning is the April 11th date of the letter compared to the May 16 date of the email containing the letter. For over a month, Plaintiff was not given notice of his suspension.  In addition Plaintiff had repeatedly demanded a student judicial hearing, only to be denied by Defendant LIGGETT, not because he had already been suspended, but because "his complaints needed to be addressed by the EOP office".

Most alarming, Defendant LIGGETT made multiple statements to both Plaintiff and Plaintiffs father that Plaintiff would not be suspended if he agreed to submit to the "assessment" by Defendant Frierson.  It was specifically  due to these promises that Plaintiffs father had so forcibly coerced Plaintiff to submit to Defendant Frierson's assessment, that is, the agreement that Plaintiff would not be suspended if he submitted to the assessment.

Plaintiff was not informed of any avenues to appeal his suspension, nor was Plaintiff even made aware of what exactly he had done to be suspended.

Banned from campus under threat of arrest, Plaintiff was unable to clear his good name on campus.  In addition Plaintiff was denied access to his USC student email account, leaving him unable to communicate with professors or USC administrators to seek their help disputing the false claims made by Defendant Liggett.

Plaintiff had previously complained about the harassment by Defendant Liggett to multiple professors who had urged Plaintiff "not to worry" and to "focus on graduating".

In denying Plaintiff his right to a student judicial hearing, in addition to making multiple false statements know to be untrue, Defendant LIGGETT completely disregarded USC's "rights to charges student" in the conduct process.


80. On May 26, 2014, Plaintiff received yet another email from Defendant LIGGETT. The letter read as follows:

*Regarding Case Number: 2013187501*

*Dear Mr. Addahoumi*

*Thank you for attending your appointment with Dr. Frierson on May 14, 2014. As you are aware, in addition to being suspended, the stipulations agreed upon in the resolution of cases 2013-1875 and 1730 include;*

*"1. Sammi has agreed to willingly engage in any amount of counseling stipulated by the university. He will complete an assessment with Dr. Richard Frierson by Friday April 18."*

*2. Sammi will complete all treatment recommendations from Dr. Frierson. A delay of more than two weeks in beginning the treatment recommendations could result in a prolonged suspension.*

*3. Sammi is ineligible to re-enroll until he has provided documentation of completion to the student conduct office."*

*Dr. Frierson's required recommendations based on the evaluation include:*

*1. You are to receive further evaluation and treatment by a psychiatrist. You must comply with the psychiatrist's treatment plan which will likely include regular follow-up appointments and psychiatric medication. Documentation verifying that you are compliant with all treatment plans will be required.*

*2. Prior to returning to campus you must demonstrate abstinence from illicit substances by agreeing to three separate drug screens to be obtained at times determined by the university. Additional random drug screens will be required should you return to campus.*

*Please schedule your first appointment no later than June 2, 2014, if you have not already done so. Failure to begin treatment immediately could result in a prolonged suspension. You will not be eligible for re-enrollment until documentation has been received verifying that you are compliant with all treatment plans.*

*I remain appreciative of the desire for help that you expressed to me in our last meeting and via email. This will make the process meaningful, healing, and productive.*

*If you have any questions about these requirements please do not hesitate to contact me. Lastly, I will remind you that your presence on campus without pre-approval from the student conduct office will result in arrest if you are found by the police and with additional Code of Conduct charges of Failure to Comply, thus further extending the suspension term.*

*I wish you well,*
*Alisa Cooney Liggett*
*Executive Director of Student Conduct and Academic Integrity*


81. Defendant LIGGETT again made multiple false statements, including but not limited to:
    1. indicating that Plaintiff was in any way "aware" of either his suspension or any penalties.
    2. Repeating the false claim that Plaintiff had in any way agreed to any sort of "counseling" by, much less "recommendations" of Defendant Frierson.

In addition, Defendant LIGGETT repeatedly changes both the charges against Plaintiff as well as the supposed penalties, in this case suddenly injecting mandated drug testing.  For whatever reason, Defendant LIGGETT makes the assertion that Plaintiff  must first "refrain from substance abuse" before being readmitted to the university.  This was baseless, unwarranted, and without cause or reason, as it served only to increase the harassment by compounding the level of humiliation and submission required for Plaintiff be considered for readmission


Defendant LIGGETT continued to contact Plaintiffs father as her harassment of Plaintiff did not end with Plaintiff's suspension. Defendant LIGGETT sent numerous emails not only to Plaintiffs father but also Plaintiffs uncle, Mustafa Addahoumi, as well as Plaintiffs aunt, Debbie Balinger, in which she not  threatens Plaintiffs family, but carefully instructs Plaintiffs father that Plaintiff must either  be involuntary committed to a mental institution or involuntary confined with a "protective order.  The email reads as follows:

*Subject: immediate need to get Sammi hospitalized*

*Hassan,*

*Thank you for taking my call.*

*Please allow me to stress to you one more time that if you and Sammi's aunt do not take control of the situation now and Sammi does something bad, he will be arrested, jailed, unable to return to any school, and the courts will decide his treatment plan. Right now, you can control all of this.*

*I know this is difficult, but Sammi told me in the Spring semester that he didn't know how to tell you he needed help. He wants your help, he said this to me himself.*

*There are two options for you and his aunt:*

*1. Go to Columbia Area Mental Health (803-898-8888 or 803-898-4800 or visit the Emergency Services unit at 2715 Colonial Dr. (Bull St. to Colonial Dr.) turn into the CAMHC, sign at the bottom of the hill)*

*a. Ask them to help you with Emergency commitment papers*

*i. It is important for you to go together with Sammi's aunt so that both of you can contribute the change you've seen in Sammi and the specifics you witnessed when he was yelling that he wanted to kill someone the other night*

*ii. This is the gentlest approach*

*2. Call Columbia Police Department*

*a. Ask the for an Emergency Protective order. Sammi's aunt should be with you to detail what you each have seen for this too. Tell them they can call the campus police for additional information about the concerns and our police will help answer the questions they have so that they have enough information to invoke the protective order.*

*Hassan, this cannot wait. If you need any assistance in doing this please call me, Alisa at 777-4333 or call Jessica at 777-8400. You have waited to see if he will get better for months and he has gotten much worse as a result. Do not wait another day. He asked for it himself.*

*Alisa*

Needless to say, this was an unwarranted and malicious attempt to further manipulate Plaintiffs father based simply on statements that Plaintiff had expressed to his father about how the  the actions of USC were "killing him", i.e. destroying his life and future for no reason.

82. Plaintiff, in an attempt to rectify the situation, submitted to additional psychiatric assessments by Dr. Steele. In his report, Dr. Steele clearly stated that Plaintiff posed no risk either to himself or others, and that Dr. Steele saw "nothing which should prevent Plaintiff from returning to USC to complete his studies".

In addition, Plaintiff submitted to drug testing, with the results

Plaintiff supplied this information to the USC Behavioral Intervention Team only to be further rebuked, being informed that Defendant LIGGETT and Defendant Bedford were not in agreement with Dr. Steele and that, despite the recommendations of Dr. Steele, Plaintiff would have to submit to forced psychiatric medication before being considered for readmission to USC.

Plaintiff, via his attorney, made multiple appeals regarding his suspension, yet all were rebuked with the demand that Plaintiff submit to forced psychiatric medication before any appeal would be considered.

83. All members of the University community (should be allowed) the broadest possible latitude to speak, write, listen, challenge, and learn." (Thus), making it clear, "it is not the proper role of the University to attempt to shield individuals from ideas and opinions they find unwelcome, disagreeable, or even deeply offensive.

USC professes the recognition of human dignity and respect within an environment that provides the free exchange of ideas and education opportunities, but contrarily proceeded in silencing, threatening, interrogating and ignoring a member of the student body.

Right now, we have an environment where students and faculty members all feel that if you say something that somebody else disagrees with, that you are going to have, or may have to, answer for it, and that's a problem. It's a problem for the free exchange of ideas. It's a problem for everything college is supposed to be.As a result of these invasive inquiries, threats, and removals, Plaintiff was embarrassed and humiliated before his peers and professors; experienced serious panic attacks; and was prevented from attending his classes and from completing assignments timely.

84. A student can violate STAF 6.24 by engaging in "unwelcome" or "inappropriate" verbal conduct (meaning "speech"). The prohibitions in STAF 6.24 include "objectionable epithets, demeaning depictions," "unwelcome and inappropriate letters, telephone calls, electronic mail, or other communication," "repeated inappropriate personal comments," speech that employs "sexual innuendos and other sexually suggestive or provocative behavior," and even "suggestive or insulting gestures or sounds." STAF 6.24 defines none of these terms.

Likewise, under the Carolinian Creed, members of the community are obliged not to engage in speech or behavior that may "compromise or demean the dignity of individuals or groups," including such things as taunting, teasing, baiting, ridiculing or insulting others. The Carolinian Creed not only requires members to avoid such expression, but states that students "have an affirmative obligation to confront and challenge, respond to or report the behaviors whenever or wherever they are encountered." Under the STAF 6.24 "Complaint Procedures," students who are the subject of complaints must go through "Resolution Procedures" even if their speech is constitutionally protected under the First Amendment of the U.S. Constitution. If a complaint is not resolved informally pursuant to the "Resolution Procedures," the complainant has the right to initiate formal proceedings.


Sanctions for individual violations of STAF 6.24 may include expulsion, suspension, conduct probation, conditions or restrictions on University privileges, written warnings, fines or restitution, housing sanctions, required attendance at educational or community service events, and "any other sanctions deemed appropriate by the EOP Office and OSC."

Whenever an informal resolution of a complaint is achieved under STAF 6.24, the EOP Office must make a written report of the resolution that is filed with a copy of the

complaint. If the complaint is not settled by informal resolution, the EOP Office proceeds to a formal resolution.

If the EOP Office finds no reasonable cause to believe that illegal discrimination or harassment has occurred, it will dismiss the complaint and advise the complainant that if he or she is dissatisfied with the decision, a complaint can be filed with the Office of Civil Rights of the United States Department of Justice.

Where the EOP Office finds that a complaint does not make out a case of illegal discrimination or harassment, it may elect to inform the University community of the occurrence(s) "in order to educate the community about issues presented by the behavior and reaffirm the University's commitment to equal opportunity." STAF 6.24, §

II.B.2.b.i.  Theoretically, the EOP Office could use such occasions to educate the University community about the school's commitment to freedom of expression as guaranteed by the United States Constitution, but the policy says nothing about doing so.

85. That on _____, 2015 in the afternoon, Plaintiff was at the Wendy's Restaurant on Assembly Street off of, but near the University of South Carolina, when he was approached by Defendant Officer Newton.

86. That Defendant Newton approached Plaintiff at Wendy's and would not allow him to leave as he questioned Plaintiff for over an hour.

87. That the Defendant despite there being no evidence that Plaintiff was trespassing on University of South Carolina property and 17-13-30 of the S.C. Code of laws prohibiting Defendant from an arrest for an offense not committed in his view, arrested Plaintiff for trespassing after notice, telling him someone had said they had seen Plaintiff on campus.

88. That Defendant proceeded to place handcuffs on Plaintiff and took him to jail.

89. That the Defendant, upon information and belief knew the Plaintiff had in the past been critical of The University of South Carolina and was out to teach him a lesson.

90. That the charges were tried on the 29th day of September, 2015, before a jury and the Honorable Magistrate Judge Cuff.

91. That Defendant failed to produce any evidence against Plaintiff moved for dismissal pursuant to 17-`13-30 and for lack of prosecution. Whereafter, the court directed a not guilty verdict in the
 absence of any evidence of trespass.


**FOR A FIRST CAUSE OF ACTION**

**(Breach of Contract)**

(Suspension Without Notice or Hearing)

92. Plaintiff realleges each fact set forth above in this complaint and incorporates them herein by reference

93.The University of South Carolina's policies and procedures posted to www.sc.edu and the verbal contracts made by defendants establish a binding agreement between USC and Plaintiff.Under these contracts, USC and defendants must follow the procedures they have established for student discipline and suspension.

94.USC and defendants failed to follow these binding policies and procedures.

95.By breaching these contracts, USC and Defendants caused Plaintiff to suffer the following special damages: (a) lost wages, (b) loss of over $13,000 in student loans Plaintiff is still obliged to repay despite being denied his degree, (c) the inability to pursue post graduation research projects regarding Libya which were offered to Plaintiff by various academic entities.By breaching these contracts, USC and Defendants caused Plaintiff to suffer general and compensatory (or consequential) damages, which include, but are not limited to: (a) loss of academic benefits of the classes he was unable to complete, (b) lost wages, (c) gross emotional harm, and (d) medical bills

The actions of USC and Defendants constitute a breach of contract and Plaintiff is entitled to compensatory and consequential damages in an amount to be determined by a jury.

## FOR A SECOND CAUSE OF ACTION

### (Breach of Contract)

(Disclosure of USC counseling Center Records and release of USC academic records)

96. Plaintiff realleges each fact set forth above in this complaint and incorporates them herein by reference.

97.The policies and procedures regarding the confidentiality and privacy of student academic and medical records also constitute binding contractual commitments.Under these contracts, USC and Defendants must follow the procedures they have established for the retention of confidential student information.

98. USC and Defendants failed to follow these binding policies and procedures.

99. By breaching these contracts, USC and defendants caused Plaintiff to suffer the following special damages, which include, but are not limited to: (a) lost wages, (b) the loss of over $13,000 in student loans Plaintiff is obliged to repay.

**FOR A THIRD CAUSE OF ACTION**
**Violation of Right to Free Speech Under the First and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(Defendants LIGGETT and Wiser)**

100. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

101. The First and Fourteenth Amendments extend to campuses of state colleges and universities. *Healy v. James*, 408 U.S. at 180. The First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). Our institutions of higher learning play a central role in a system of freedom of expression because "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180. In this regard, "[t]he first danger to liberty lies in granting the State the power" to limit freedom of expression in contravention of the "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995).

102. To say that the Plaintiff cannot even discuss free speech controversies without triggering complaints and an investigation under USC's policies is an affront to both the mission of the University and to the purpose of the First Amendment. "[T]he mere dissemination of ideas – no matter how offensive to good taste – on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). The Supreme Court has long recognized that "words are often chosen as much for their emotive as cognitive force," and that "we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Cohen v. California*, 403 U.S. 15, 26 (1971). The First Amendment forbids the government from censoring speech based on "personal predilections," and "the State has no right to cleanse the public debate to the point where it is grammatically palatable to the most squeamish among us." *Id.* at 21, 25. "There is no categorical 'harassment

exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).

103. By investigating Plaintiff's involvement in Free Speech, Defendants have explicitly and implicitly chilled Plaintiffs' free expression as well as that of all USC students.  "Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference in these matters." *Sweezy v. State of N.H.*, 354 US. 234, 249 (1957).  The Supreme Court has long recognized the "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association" that is the "more immediate and substantial" result of governmental investigations into lawful expressive activities. *Gibson v. Florida Legis. Investigation Comm.*, 372 U.S. 539, 556-57 (1963).

104. To require Plaintiff  or other students to submit to an official inquiry about their Free Speech based on claims that other students felt "offended" or "harassed" subjects the Plaintiff to a "heckler's veto."  However, the courts have long made clear that the First Amendment prevents speakers from being silenced or sanctioned simply because listeners may object to their speech.  *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228 (6th Cir. 2015) (*en banc*). Defendant LIGGETT acknowledged that the basis for conducting her investigations into Plaintiff's  involvement in the Free was complaints regarding the content Plaintiffs' speech pursuant to USC policies.

105. Defendants violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Plaintiff under 42 U.S.C. § 1983.

106. The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief. Additionally, Plaintiff experienced emotional injury as a consequence of being denied his  First Amendment rights.

**FOR A FOURTH CAUSE OF ACTION**
**Fifth and Fourteenth Amendment Due ProcessRights**
**(42 U.S.C. § 1983)**
**(Defendants Liggett,Pruitt, Grewe, Schnieder, and Bedford)**

107. Plaintiff repeats and reallege each of the foregoing allegations in this Complaint.

108. The First Amendment does not permit the government to subject speech to overly broad regulation. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Any regulation that does so is invalid "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression [.]" *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003).

109. USC's Student Non-Discrimination and Non-Harassment Policy, STAF 6.24, is unconstitutional because it prohibits "unwelcome" and "inappropriate" speech, including "objectionable epithets, demeaning depictions," "unwelcome and inappropriate letters, telephone calls, electronic mail, or other communication," "repeated inappropriate personal comments," speech that employs "sexual innuendos and other sexually suggestive or provocative behavior," and even "suggestive or insulting gestures or sounds."

110. In addition, under the Carolinian Creed, members of the community are obliged not to engage in behavior that may "compromise or demean the dignity of individuals or groups," including such things as taunting, teasing, baiting, ridiculing or insulting others.

None of these terms are narrowly limited or defined.

111. By subjecting speech to possible review and punishment based on such expansive terms, USC policies stifle robust debate and disregard the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at .

112. Furthermore, the policy impermissibly imposes "special prohibitions on those speakers who express views on disfavored subjects," namely those whose opinions are believed to "unwelcome" or "inappropriate" or containing "sexual innuendo and other sexually suggestive or provocative behavior." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992).

113. The broad and undefined terms of STAF 6.24 and the Carolinian Creed vest University officials with unbridled discretion in their ability to review and restrict student speech.

114. The University of South Carolina's policies governing expression are

unconstitutionally overbroad, do not serve a significant governmental interest, are not narrowly drawn, and impermissibly restrict student and student expression. They burden far more speech than is necessary to serve the asserted interest of minimizing discrimination and harassment at the university. Defendants' policies also are unconstitutionally vague in violation of the First Amendment and of the due process guarantee of the Fourteenth Amendment to the U.S. Constitution. A state enactment also is void for vagueness if the prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion. *Grayned v. City of Rockford*, 408 U.S. 104, 108 1972). The terms of STAF 6.24 and the Carolinian Creed are generalized, subjective, and incapable of precise definition or application. The policy does not define the nebulous terms that can be used to restrict speech.

115. As a direct result of the Defendants' Student Non-Discrimination and NonHarassment Policy and the Carolinian Creed, and policies regarding the USC Behavioral Intervention Team, students and faculty at USC are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

117. As a consequence of the Defendants' violation of Plaintiffs' and other similarly situated students and faculty's First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury *per se*, Plaintiff is entitled to declaratory and injunctive relief, actual damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**FOR A FIFTH CAUSE OF ACTION**
**Violation of Right to Free Speech Under the Plaintiffs' First and**
**Fourteenth Amendment Rights (42 U.S.C. § 1983) – Free Speech Zone Policy**
**(Defendants Pastides and Pruitt)**

118. Plaintiff repeats and reallege each of the foregoing allegations in this Complaint.

119. Through policy and practice, including enforcement of STAF 3.17 and STAF 3.25, Defendant has promulgated and enforced a *de facto* Free Speech Zone policy that prohibits free expression on all but a tiny

fraction of the University of South Carolina campus, despite the fact that the university has many open areas and electronic forums that are suitable for expressive activities.

120. Restricting all First Amendment activity to designated "solicitation areas" impermissibly restricts student expression, does not serve a significant government interest, and is unconstitutionally overbroad.

121. Students have a First Amendment right to engage in expressive activities and to distribute written materials in the public areas of a state college without obtaining advance permission from government officials. *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981); *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667 (1973).

122. A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality. *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009).

123. Advance notice and permitting requirements are presumptively invalid because of the significant burden they place on free speech. The Supreme Court has labeled prior restraint on speech as "the essence of censorship." *Near v. Minnesota*, 283 U.S. 697, 713 (1931). Such restrictions are "the most serious and the least tolerable on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

124.Any such permitting requirement violates the First Amendment unless it contains narrow, objective, and definite standards to guide the licensing authority.

 *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969).

125. Restrictions on expressive activity are void for vagueness if their terms are not clearly defined such that a person of ordinary intelligence can readily identify the standards to be applied. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

126. Regulations that grant an administrative body or government official unfettered discretion to regulate the licensing of activities protected by the First Amendment are unconstitutional. *Kunz v. New York,* 340 U.S. 290, 294 (1951). Such unrestricted discretion increases the likelihood that the government official may discriminate based

upon the content of the "speech" or the viewpoint of the speaker. *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 763-64 (1988).

127. Regulations requiring a permit and fee before authorizing public speaking are prior restraints on speech that are presumptively unconstitutional. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

128. Any regulation that imposes a fee upon the exercise of First Amendment rights must be content-neutral, strictly limited to recouping actual administrative costs, and bounded by narrowly drawn, reasonable and definite standards.

129. Through policy and practice Defendants have promulgated and enforced a Free Speech Zone policy that prohibits free expression on all but a fraction of the USC campus, despite the fact that the University has many open areas and sidewalks that are suitable for expressive activities.

130. Defendant Pastides is responsible for USC's administration and policy-making and has ultimate authority to approve the *de facto* Free Speech Zone policy challenged herein.

131. Defendant Pruitt authorized the *de facto* Free Speech Zone policy challenged herein.

132. As a consequence of the Defendants' violation of Plaintiffs' and other similarly situated students' First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## FOR A SIXTH CAUSE OF ACTION

### Declaratory Judgment and Injunction (28 U.S.C. § 2201, et seq.)

133. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

134. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning Plaintiffs' rights under the United States Constitution. A judicial declaration is necessary and appropriate at this time as to Counts I through II above.

135. Plaintiff is seeking a judicial determination of his rights against Defendants as they pertain to Plaintiffs' right to speak without being subjected to unconstitutional speech policies that impose prior restraints on speech, give school officials unfettered discretion whether to allow expression and under what conditions, and that are vague, overbroad, and not narrowly tailored to serve a substantial governmental interest.

137. To prevent further violation of Plaintiff's constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the University of South Carolina's Student Non-Discrimination and Non-Harassment Policy and the Carolinian Creed and Behavioral Intervention Team policies are unconstitutional, both on their face, and as applied to the Plaintiff.

138. To prevent further violation of Plaintiff's constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the University of South Carolina's Free Speech Zone Policy unconstitutional on its face.


139. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, this Court should issue a permanent injunction prohibiting the Defendants from enforcing their restrictions on USC faculty and students' expressive activities to the extent they are unconstitutional, to prevent the ongoing violation of constitutional rights. University of South Carolina faculty and students are suffering irreparable harm from continued enforcement of unconstitutional policies, monetary damages are inadequate to remedy their harm, and the balance of equities and public interest both favor a grant of injunctive relief.


### FOR A SEVENTH CAUSE OF ACTION

**(Violation of Fourth Amendment, unreasonable arrest)**

**(42 USC § 1983)**

140. Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth verbatim.

141. That Defendant violated the rights of the Plaintiff under the Fourth Amendment to the U.S. Constitution not to be arrested in violation of the law and not to be arrested without probable cause.

142. As a direct result and consequence of the aforestated actions of the Defendants, the Plaintiff was deprived of his liberty and freedom of movement, he incurred legal fees including bond money, attorney fees and travel expense, he suffered mental anguish, distress and physical discomfort.

## FOR AN EIGHTH CAUSE OF ACTION

### (Violation of Fourth Amendment, unreasonable prosecution)

### (42 USC § 1983)

143. Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth verbatim.

144. That Defendant unreasonably and without probable cause in violation of the Fourth Amendment to the U.S. Constitution prosecuted Plaintiff.

145. That as a direct result and consequence, the Plaintiff was deprived of his liberty, dignity and identity was publicly humiliated and experienced emotional distress and outrage.

## FOR A NINETH CAUSE OF ACTION

### (Violation of First Amendment, Punishment of Speech)

### (42 USC § 1983)

146. Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth verbatim.

147. That Defendants have violated the rights of the Plaintiff under the First Amendment to the U.S. Constitution to be free to speak and criticize government officials, by punishing his exercise thereof.

148. As a direct result and consequence of the aforestated actions of the Defendants, the Plaintiff was deprived of his liberty, was selectively prosecuted, and experienced emotional distress and outrage.

## FOR A TENTH CAUSE OF ACTION

### (Abuse of Process)

149. Plaintiff herein repeats and reiterates each and every allegation contained in the preceding paragraphs as though set forth verbatim.

150. That Defendants initiated and pursued legal process against the plaintiff, not for the purposes intended, but for ulterior purposes including intimidating him from complaining about their actions, exercising his free speech and coercing him to submit to violation of his privacy.

151. As a direct result and consequence of the aforestated actions of the Defendants, the Plaintiff was deprived of his liberty, was selectively prosecuted, and experienced emotional distress and outrage.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Sammi Hassan Addahoumi, respectfully requests that the Court enter judgment against Defendants and provide Plaintiff the following relief:

A.    A declaratory judgment stating that Defendants' Student Non-Discrimination and Non-Harassment Policy and Behavioral Intervention Team policies, facially and as-applied to Plaintiff, is unconstitutional facially and as applied, and that they violated Plaintiff's rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

B.    A permanent injunction restraining enforcement of Defendants' unconstitutional Student Non-Discrimination and Non-Harassment Policy and its underlying enforcement practices, including the Behavioral Intervention Team

C.    An injunction requiring the Defendants to remove any notation of the complaints against Plaintiff from University records;

D.    A declaratory judgment that Defendants' review of Plaintiff's expressive activity violated their First and Fourteenth Amendment rights;

E.    Monetary damages in an amount to be determined by the Court to compensate Plaintiff for the impact of a deprivation of fundamental rights;

26

F.    Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988, and other applicable law; and

G.     All other further relief to which Plaintiff may be entitled.

H.     The immediate reinstatement of Plaintiff as a student at USC so that he may complete the three remaining classes needed for him to graduate

Respectfully submitted,

By: s/ Wm. Gary White, III

Wm. Gary White, III 2009 Lincoln Street

Columbia, South Carolina 29201

(803)767-3953

Columbia, South Carolina                              Fed. ID #3130

May 16, 2016