**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Sammi H. Addahoumi, | ) | C.A. No.: 3:16-cv-01571-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | AMENDED COMPLAINT |
| | ) | |
| Harris Pastides, Dennis Pruitt, Bobby Gist, | ) | JURY TRIAL REQUESTED |
| Alisa Liggett, Maureen Grewe, | ) | |
| Augusta Schneider, Timothy Bedford, | ) | |
| Leslie G. Wiser, Jr., Josef Olmert, | ) | |
| Scott Prill, Carl R. Wells, Officer J. | ) | |
| Newton, Richard L. Frierson, and the | ) | |
| University of South Carolina Board of | ) | |
| Trustees | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INTRODUCTION**

"They who have put out the people's eyes, reproach them of their blindness."

*John Milton*

1.       Courts have consistently held that constitutional rights apply with equal force to protect students attending public universities as to protect those in society at large. Students do not sacrifice core constitutional liberties as a condition of matriculation to our nation's public colleges and universities.  The Supreme Court has made clear that the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker,

2.       The Court's warning of the repercussions of censorship in higher education cannot be overstated: "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." Id.

Accordingly, "[m]ere unorthodoxy or dissent from the prevailing mores is not to be condemned." Id. At 25

3. Despite these clearly established precedents, the University of South Carolina Defendants continue to flagrantly violate Mr. Addahoumi's clearly established First, Fifth, and Fourteenth Amendment rights.   At issue are numerous USC policies and procedures, and practices, particularly the USC Behavioral Intervention Team policy, STAFF6.29 (Student Health Condition Disturbances Policy), which encourages students and staff to anonymously report offensive, yet constitutionally protected speech to administrators and law enforcement through its so-called "Behavioral Intervention Team" (BIT).

4. The Behavioral Intervention Team (BIT) monitored and investigated Mr. Addahoumi's speech, directing the attention and resources of law enforcement and student conduct administrators towards Mr. Addahoumi's expressions of constitutionally protected free speech.

5. The USC Behavioral Intervention Team (BIT) promotes increased monitoring, reporting, and recording of benign student behavior both on and off campus. The USC BIT model identifies "harmful debate" — whatever that is — as a risk factor worth monitoring. It also lists wearing "hoodies" as a warning sign that justifies surveillance.

6. Universities already wield considerable power to deal with truly threatening student behavior. Because the doublespeak of the USC BIT has bastardized the verbiage of *in loco parentis* into "Big Brother" Best Practices, the concern that USC has might abuse its power by invading student privacy and curtailing protected student speech has already proven justified.

7. There was no oversight to determine who reviewed the BIT reports, what categories of "concerning" or "erratic" behavior the BIT were charged with addressing, and absolutely no indication whether the university acknowledges that the system generates a tension with free

speech and academic freedom. The USC BIT reported Mr. Addahoumi's speech to members of law enforcement and campus security officers, even though the BIT deliberately solicit reports of a wide variety of noncriminal speech and activity.

8.  The USC BIT mandates that faculty and student staff report what they view as "erratic behavior", however subjective and ill defined.

9.  The University of South Carolina Behavioral Intervention Team practice of broadly and vaguely defining and identifying "concerning" or "erratic" behavior has exposed a wide range of protected speech to punishment.

10.  Even where the BIT purported only to provide "education" or "counseling" to Mr. Addahoumi, instead of formal punitive sanctions (such as suspension or expulsion), this response was undertaken by student conduct administrators, not educators, and more closely resembled a reprimand.

11.  In attempting to quarantine Mr. Addahoumi's expressive activity as "diseased or disturbed, distressed and dysregulated", the USC BIT disregarded the First Amendment in a misguided attempt to rid campus of protected expression. This was particularly true when Mr. Addahoumi engaged in speech that administrators subjectively deemed "unbecoming," or "concerning".

12.  The Defendants duplicitously coerced Mr. Addahoumi, under extreme duress, into unknowingly submitting himself to a forced forensic psychiatric violent risk assessment without obtaining the required informed consent from Mr. Addahoumi. This assessment was falsely portrayed as "counseling" to cloak the actual legal nature of the procedure. This psychiatric assessment and the resulting misdiagnosis was performed by Defendant Richard Frierson.

13. Prior to utilizing the services of Dr. Frierson however, Defendant's utilized the NABITA model, developed at USC, to diagnose Mr. Addahoumi's protected speech as "dysregulated, distressed and disturbing" using the NABITA Threat Assessment Tool.

14. The NABITA Threat Assessment Tool does not include a classification for "no risk". Defendants utilized this tool despite this ominous error. This resulted in every complaint filed against Mr. Addahoumi to result in an official investigation, with an accompanying case number assigned to each allegation.

15. The negative impact of this diagnostic labeling of Mr. Addahoumi is troubling, to say the least. The context of the diagnosis, in which Mr. Addahoumi speech and writings were assumed to be abnormal, resulted from interpreting all of Mr. Addahoumi's behaviors or verbalizations in light of the defective NABITA model.

16. The misuse and abuse of USC's STAF6.29 policy resulted in Defendant Frierson's malicious diagnosis and in Defendant's numerous bad-faith referrals. This bias toward abnormality subsumed other observations to the point that Mr. Addahoumi's "normal" behaviors were ignored, overlooked, misinterpreted, and misrepresented.

17. Additionally, once Defendants' utilized on Mr. Addahoumi their unwarranted assessments using their own conjured NABITA model, it was very difficult for Mr. Addahoumi, his professors, or his legal counsel to shift their focus away from those alarmist assessments. This situation reduced Mr. Addahoumi's fellow self-esteem, stigmatized him, ostracized him, and negligently traumatized Mr. Addahoumi.

18. Defendants, though the USC BIT, created their own reality for all involved, influencing others' perceptions of Mr. Addahoumi and his behavior, despite both initial and later evidence that contradicted their diagnosis.

19. Because the NABIT BIT model used is promoted by and underpinned by its own self-references, located the sources of aberration within Mr. Addahoumi, once those contacted by Defendants believed that they had an understanding of Mr. Addahoumi, it was difficult for those around Mr. Addahoumi, to concede that his behavior was benign, or to entertain alternative or different views.

20. Mr. Addahoumi was subjected to such sanctions as a result of Defendants reporting, investigating, and punishing Mr. Addahoumi's protected Free Speech.

21. This continuing violation of Mr. Addahoumi's rights does not result from a lack of legal clarity; as explained above, the law is well-established with regard to the rights owed students on public campuses. Rather, the ongoing denial of Mr. Addahoumi's rights to due process and freedom of expression arises from the false sense of impunity felt by USC administrators.  Because serious abuses too often fail to result in any legal consequences, they continue unabated.

22. The USC Behavioral Intervention Team, armed with vague, open-ended definitions of "concerning" and "erratic" behavior (including online activities), staffed by law enforcement and student conduct administrators, and without regard to freedom of expression, represent an eminent risk to free and open discourse on the USC campus and in the USC classroom.

23.  The USC Behavioral Intervention Team creates— indeed, is intended to create—a chilling effect on campus expression.  Even if the USC Behavioral Intervention Team does not have the power to take punitive action, (which it indeed does) the prospect and actuality of repeated official investigations made Mr. Addahoumi to be more cautious about what opinions he dared to express.

24. Beyond First Amendment concerns, encouraging USC students and faculty to anonymously report one another to administrators for subversive, concerning, or offensive views is illiberal, and antithetical to a campus open to the free exchange of ideas.

25. The posture taken by the USC Behavioral Intervention Team has created profound risks to freedom of expression, freedom of association, and academic freedom on campus.

26. The unchecked abuse of the USC Behavioral Intervention Team enterprise by Defendants has resulted in a phenomenon which can only be described as a "moral panic". In such a state of panic, students wanted to know whose fault it was that they were offended and were more likely to compromise our fundamental values and prudence for the promise of safety.

27. Such societal panic began to believe that no one was safe from Mr. Addahoumi, that Mr. Addahoumi's perceived mental illness was getting worse, and that there were even more violent incidents to come.

28. Furthermore, the USC Behavioral Intervention Team not only attributed Mr. Addahoumi's offensive speech to an underlying mental illness, it utilized that same perceived disability to diagnose Mr. Addahoumi as "disturbed", "distressed", "dysregulated" and dangerous, with the ultimate goal of bypassing policies mandating due process in order to vindictively and summarily suspend Mr. Addahoumi.

29. In denying Mr. Addahoumi any semblance of due process, Defendants inappropriately used the USC discipline code to leverage "voluntary" action such as attending unnecessary counseling or taking not only unwarranted, but dangerous psychiatric medications.

30. The training materials and marketing pamphlets of the USC BIT both serve to exacerbate societal stigmatization of students on campus who struggle with mental illness, in addition to labeling students with unorthodox views as not only dangerous, but mentally disturbed.

31. The actions and policies of the USC BIT have not only stigmatized such students, but have also added an academic veneer to stereotypes of perceived dangerousness. Such anxiousness has manifested into a campus societal overreaction that attributes dangerousness to all students regarded as having a mental illness.

32. The Supreme Court further wrote in *Healy*, "The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." 408 U.S. at 180–81 (citing Keyishian, 385 U.S. at 603).

33. In addition, the Court has ruled "[T]he mere dissemination of ideas—no matter how offensive (or "concerning") to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" Papish v. Bd. of Curators of the Univ. of Mo., 410 U.S. 667, 670; 93 S. Ct. 1197, 1199 (1973).

34. Without regard to First Amendment rights, USC Defendants have disregarded existing law in an effort to rid campus of speech that they find offensive, makes them uncomfortable, or possibly interferes with their own financial gain.

35. In Davis v. Monroe County Board of Education, 526 U.S. 629; 119 S. Ct. 1661 (1999), the Supreme Court held that for speech to be considered "hostile environment" harassment in the educational setting, it must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." (Davis, 526 U.S. at 633.9)

36. This civil rights action seeks to protect and vindicate the First, Fifth, and Fourteenth Amendment rights of Sammi Addahoumi, and all students and faculty at the University of South Carolina. The University's policies unlawfully restrict the USC community's constitutional rights to free expression, and strike at the core mission of any university educating students.

37. "State colleges and universities are not enclaves immune from the sweep of the First Amendment."  Healy v. James, 408 U.S. 169, 180 (1972).  Accordingly, the United States Supreme Court has held that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 487 (1960).

38.  By bringing this case, Mr. Addahoumi intends to reaffirm these basic constitutional values.

39. This action also seeks declaratory and injunctive relief and damages for discrimination against Sammi Addahoumi on the basis of perceived disability in violation of the Americans with Disabilities Act, the Fair Housing Amendments Act of 1988 (FHAA), and Section 504 of the Rehabilitation Act of 1973.

40. Defendants further discriminated against Mr. Addahoumi by conditioning his re-admission to the university on his agreement to conditions not imposed on students who are not regarded as having a disability.

41.  Finally, Defendants refused to provide Mr. Addahoumi an accommodation in its rules, policies, practices or services that was necessary to afford him an equal opportunity to use and enjoy the classroom.

42. Mr. Addahoumi also brings claims for violation of his privacy and for infliction of emotional distress.

43. Mr. Addahoumi is a person regarded as having a disability.  Mr. Addahoumi has a well-documented history with the Defendants of being a person regarded as having a disability within the meaning of the ADA, Section 504 of the Rehabilitation Act, and the FHAA.

44. Defendants have repeatedly regarded Mr. Addahoumi as a person with a disability, substantially limited in his ability to care for himself.

45. As a student admitted to the University of South Carolina Political Science program, Mr. Addahoumi has met the essential eligibility requirements for enrollment.  As such, Mr. Addahoumi "qualified" to participate in Defendants' programs, services, and activities.  Mr. Addahoumi is not and has never been a threat, either to himself or to others.

46. FERPA transferred privacy rights to Mr. Addahoumi when he reached the age of 18 and when he attended school beyond the high school level. Parents do not have the right to review their child's college records without the written permission of the student.

## I.    JURISDICTION AND VENUE

47. This action arises under the United States Constitution, particularly the First, Fifth, and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

48. This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

49. The Court has authority to grant the requested declaratory judgment pursuant to U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and to issue the requested injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

50. The Court is authorized to award attorneys' fees and costs pursuant by 42 U.S.C. § 1988.

51. Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the instant claim occurred within this District and because at least one Defendant resides in this District.

## II.    PLAINTIFF

52. The Plaintiff Sammi H. Addahoumi is a resident of Columbia, South Carolina.  He is the owner/operator Sammi's Deli and is currently placed on suspension by the University of South Carolina.

### III.    DEFENDANTS

53. Defendant Harris Pastides is President of the University of South Carolina.  He is the university's chief executive officer, responsible for the University of South Carolina's administration and policy-making, and has ultimate authority to approve the policies and procedures challenged herein that were applied to deprive Plaintiffs of their constitutional rights.  Defendant Pastides acted under color of state law and is sued for injunctive relief in his official capacity.

54. Defendant Dennis Pruitt is Vice President for Student Affairs, Vice Provost and Dean of Students at the University of South Carolina.  Defendant Pruitt acted under color of state law and is sued for injunctive relief in his official capacity.

55. The University of South Carolina Board of Trustees is responsible for the development and enforcement of all USC policies and procedures.  The Board of Trustees has been vested by the State of South Carolina with the ability to sue as well as be sued.  The Defendant Board of Trustees acted under color of state law and is sued in both their personal and official capacities.

56. Defendant Bobby Gist is the Executive Assistant to the President for Equal Opportunity Programs at the University of South Carolina.  Defendant Gist acted under color of state law and is sued in both his personal and official capacities.

57. Defendant Carl R. Wells is the Assistant Director of the Office of Equal Opportunity Programs and Deputy Title IX Coordinator at the University of South Carolina.  Defendant Wells acted under color of state law and is sued in both his personal and official capacities.

58. Defendant Alisa Cooney Liggett is the Director of the USC Office of Student Conduct and Chair of the Behavioral Intervention Team (BIT).  Defendant Liggett has been part of the USC BIT since its inception and personally develops interventions for students flagged by or reported to the USC BIT.  The Office of Student Conduct acts as the central reporting place for all referrals to the USC Behavioral Intervention Team.  Members of the BIT facilitate inappropriate

interventions in hopes of maximizing the number of student referrals whose behaviors require conduct intervention. Defendant Liggett acted under color of state law and is sued in both her personal and official capacities.

59. Defendant Maureen Grewe served as the Coordinator for USC Office of Student Conduct and the USC Behavioral Intervention Team from June 2011 to February 2015.    Defendant Grewe assisted in managing the USC student conduct system, adjudicated student conduct cases and tracked sanction completion, developed and coordinated educational programs and workshops on student conduct and ethics, advised the Carolina Judicial Council, assisted with the management of the Behavioral Intervention Team (BIT), represented the BIT in student assessment meetings, responded to BIT referrals and to community members making referrals, coordinated campus partnerships in response to BIT referrals and intervention "opportunities", assisted with recruitment and training of conduct administrators, and "promoted adherence to the principle of the Carolina Creed". Defendant Grewe acted under color of state law and is sued in both her personal and official capacities.

60. Defendant Augusta Schneider is the Office and Business Manager for the USC Office of Student Conduct and Academic Integrity. Defendant Schneider acted under color of state law and is sued in both her personal and official capacities.

61. Defendant Timothy Bedford served as Case Manager for the University of South Carolina Behavioral Intervention Team from August 2013 to December 2015.   Defendant Bedford provided case management and organization for USC students in "distress", providing triage, coordinating interventions, assisting in care plan development, and assisting students in complying with recommendations and adhering to University policies.  Defendant Bedford served as a liaison between the Behavioral Intervention Team and various campus resources and

stakeholders and provided support and outreach to the USC faculty and staff involved when "students of concern" are identified and "support" is needed. Defendant Bedford conducted evaluation and assessment procedures for the USC Behavioral Intervention Team process and created recommendations based on these findings. Defendant Bedford acted under color of state law and is sued in both his personal and official capacities.

62. Defendant Leslie G. Wiser, Jr served as the Deputy Chief of the City of Columbia Police Department (CPD) from 2011 until 2013. During this time, there were major scandals in the CPD, including what became known as "Black Ops", which instigated an FBI investigation, and in which Defendant Wiser was a direct participant. While on the city payroll in 2013, Defendant Wiser also served as an adjunct USC professor in the School of Criminal Justice, a position which he used to lend academic credibility to the federal "Smart Policing Initiative" experiment to which USC and the City of Columbia supplied matching funds. Defendant Wiser served as head of the Newark, N.J., FBI field office before being forced into early retirement in 2007 due to a major scandal which exposed Defendant Wiser's FBI office working in partnership with the NYPD to illegally spy on innocent Muslim Americans who had not committed any crime, nor were suspected of any crime. Defendant Wiser and the NYPD used undercover agents in mosques, Muslim owned and or operated businesses, Muslim private schools, and on local university campuses to spy on and surveil Muslim students and student organizations. Defendant Wiser acted under color of state law and is sued in both his personal and official capacities.

63. Defendant Josef "Yossi" Olmert serves as an adjunct professor in the USC political science department. Defendant Olmert fled to the U.S. from Israel to escape corruption and bribery charges by the state prosecutor in what became known as the "Holyland" scandal, the largest corruption scandal in Israeli history. As a result of accepting bribes on behalf of Defendant

Olmert, his brother, and former Israeli Prime Minister, Ehud Olmert was sentenced prison. Defendant Olmert is a self-proclaimed "disciple of Jabotinsky", or far right Israeli political extremist. Defendant Olmert acted under color of state law and is sued in both his personal and official capacities.

64. Defendant Scott Prill is the Deputy Chief of Police for the USC Division of Law Enforcement and Safety (USCPD).   Defendant Prill reported Mr. Addahoumi to Federal Bureau of Investigation (FBI) on multiple occasions.   Defendant Prill referred Mr. Addahoumi to Defendant Frierson for a forensic psychiatric violence risk assessment in a memorandum dated April 14, 2014. Defendant Prill acted under color of state law and is sued in both his personal and official capacities.

65. Defendant Richard L. Frierson is the program director for the Forensic Psychiatry Fellowship at the University of South Carolina School of Medicine.   Defendant Frierson was paid by Defendants to perform an involuntary forensic psychiatric violent risk assessment on Mr. Addahoumi without his consent and without his informed consent. Defendant Frierson was at all relevant times herein, acting under the color and pretext of their authority as agents and officers of the University of South Carolina. Defendant Frierson acted under color of state law and is sued in both his personal and official capacities.

66. Defendant, Officer J. Newton arrested Mr. Addahoumi on February 5, 2015 for allegedly trespassing.   Defendant Newton did not witness Mr. Addahoumi allegedly trespass, nor did Defendant Newton have a warrant to arrest Mr. Addahoumi, as required by South Carolina law. Defendant Newton was at all relevant times herein, acting under the color and pretext of his authority as a police officer of the University of South Carolina. Defendant Newton acted under color of state law and is sued in both his personal and official capacities.

67. The Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act serve as "non-discrimination" statutes based on a civil rights model.

## STATEMENT OF FACTS

68. This case seeks relief against the University of South Carolina and various individuals for the callous way in which they treated a student whom they negligently mandated seek medical help as a result of Mr. Addahoumi exercising his freedom of expression.

69. Yet rather than act to help, support or comfort Mr. Addahoumi for his perceived disability, USC Defendants disciplined him, threatened him with not only criminal prosecution, but involuntary committal to a mental institution, and ultimately ended his college career at the school of his choice.

70. The disparate treatment of Mr. Addahoumi based on his viewpoints even as a perceived disability is untenable under well-established and longstanding law. The right to speak one's mind without fear of official reprisal for transgressing vague and subjective standards is beyond question on an American public campus such as the University of South Carolina.

71. Because today's students are tomorrow's leaders, protecting this right is of paramount importance to our nation as a whole. For these reasons, the University of South Carolina's meager understanding of the expressive rights of Mr. Addahoumi, and all USC students, must be reversed and remanded.

72. The Board of Trustees and the president of the university are ultimately responsible for governing the university.  The Division of Student Affairs and Academic Support administer the student conduct system. The Vice President for Student Affairs and Academic Support, in turn,

designates the Office of Student Conduct with administrative authority and responsibility for Student Conduct policies and procedures.

73. This responsibility includes formulating and implementing policies and procedures, in cooperation with other appropriate University bodies, for the consideration of conduct violations and the imposition of sanctions in an efficient, consistent, fair, legal, and educationally meaningful manner.

74. Mr. Addahoumi returned to USC in the Fall of 2012 to complete his degree in political science, specifically to study in the Islamic World Studies Program in Walker Institute of International and Area Studies.  Mr. Addahoumi strived to continue graduate study research involving Libya at the USC Rule of Law Collaborative program. Mr. Addahoumi hoped to attend the USC School of Law, with the goal of participating the International Law program, in conjunction with the Rule of Law Collaborate.

75. Mr. Addahoumi was focused on working in cooperation with faculty and research units to facilitate research on international public policy issues and undertake special research projects for governmental and nongovernmental organizations, foundations, and public sector agencies, particularly involving Libya and North Africa.

76. Mr. Addahoumi first attended USC as a freshman in the Fall of 2001. While attending USC in the Fall of 2003, Mr. Addahoumi opened his own restaurant and bar in Five Points, Dream Wings, which he later converted to the Sammi's Deli location he owns and operates today with his father, Hassan Addahoumi, who, in 1985, opened his first Sammi's Deli location, naming it after his son.

77. From 2004 to 2010, Mr. Addahoumi and his father expanded their business to include seven Sammi's Deli locations in all areas of Columbia, SC, opening a new Sammi's Deli location each

year.  Mr. Addahoumi and his father hoped to expand further by opening additional Sammi's Deli Franchise locations in Columbia, Charleston, and Clemson, SC.

78. In April of 2011, Mr. Addahoumi traveled to Benghazi, Libya and opened a customs brokerage and consulting business, Al Hurrah International Inc., eventually living and working in Benghazi for over 6 months.

79. While in Libya during the Arab Spring of 2011, Mr. Addahoumi also submitted several photographs, videos, essays, interviews, and blogposts to CNN iReport, many of which were aired on CNN, CNN International, Cnn.com, and other local media outlets like WIS and WLTX in Columbia, SC.

80. Mr. Addahoumi has traveled extensively in Libya, Tunisia, Egypt and Italy, living, working and traveling around North Africa several times.  For example, in 2006, Mr. Addahoumi spent three months backpacking across Tunisia and has traveled to Libya on six different occasions since America renewed diplomatic relations with the country in 2006. Because Mr. Addahoumi's family had been deeply impacted by diplomatic relations, or the lack thereof, between Libya and the United States, Mr. Addahoumi became very interested in the workings of American diplomacy.

81. During his travels, Mr. Addahoumi often found that he was almost always the first American that many Libyans, Tunisians, or Egyptians had ever met, spoken with, or known.  He was not unaffected by this reality. While traveling in Tunisia and Libya, Mr. Addahoumi often checked in with the American Embassy, usually visiting in person, and in the case of Tunisia, utilizing the U.S. Embassy library on several occasions.  Mr. Addahoumi has visited the U.S. Embassy in Tripoli, Libya, twice, even swimming in the pool the embassy shared in the Corinthia Hotel.

82. Because of his background, and because Mr. Addahoumi felt comfortable traveling, living, and working in areas such as Benghazi, Mr. Addahoumi pursued a career with the U.S. State Department of State as a Service Officer or Foreign Service Specialist. Mr. Addahoumi knew that in order to achieve this goal, he would need to first study, research, and analyze Libya, the United States of America, and the relationship between the two countries. For this purpose, Mr. Addahoumi returned to the University of South Carolina.

83. Upon his readmission USC in the Fall of 2012, Mr. Addahoumi utilized his Blackboard USC student email account to share links to his Cnn.com blogposts with his professors. Often, Mr. Addahoumi's professors would then forward the links to the entire class, recognizing the academic nature and academic context of Mr. Addahoumi's speech and writings.

84. For example, on September 13, 2012, Josh Derouch, Graduate Assistant to Dr. Tobias Lanz, sent the following email to all POLI 391 Terrorism class participants:

"Ladies and Gentlemen,

Our first test is upon us. It will be held in class on Tuesday. Test format will be identification and short answer. If you have questions come see me at my office, 353 Gambrell, office hours are 200- 330.

Also I have posted a link on BB that was found by Sammi Addahoumi and is worth watching. It shows images of Libya and Benghazi before the attack. Provides context and shows that one must be careful about generalizing a population of people in the wake of such traumatic events.

Good luck and have a nice weekend.

Josh".

85. In another example, on April 1, 2013, Dr. Chakarava, Mr. Addahoumi's POLI 492 African Politics professor, sent the following email to the entire POLI 492 class via Blackboard. The email, subject heading "CNN iReport links- thanks to Sammi", read as follows:

"Students,

As promised, here is the link to Sammi's report filed for CNN iReport that we watched in class.

http://ireport.cnn.com/docs/DOC-655198 (you can click on "delimansc" for more reports filed by him).

Big thanks to Sammi for sharing these experiences with us.

All best,

Dr. C"

86. Often Mr. Addahoumi's classmates would utilize their own Blackboard USC student email to respond or to communicate with Mr. Addahoumi. For example, on April 10, 2013, an ARABIC 312 classmate sent Mr. Addahoumi the following email:

"Wow okay.   That sounds like a good idea. I'll see what I can do!   I also want the Arabic program to be much stronger at USC".


87. As part of these communications, Defendant Olmert began to email Mr. Addahoumi regularly, via Blackboard, about events in Libya due to Mr. Addahoumi's interest, experience, research, and expertise in Libya.

88.  Most of Defendant Olmert's emails to Mr. Addahoumi inquired as to his analysis of current events or news related to Libya.

89. As an undergraduate student hoping to pursue not only graduate studies, but a lifelong career in academics studying, learning, teaching, and researching about Libya, Mr. Addahoumi felt

honored to be contacted outside of class by his distinguished professor, Defendant Dr. Josef Olmert.

90. Mr. Addahoumi respected Defendant Olmert and felt privileged to be asked for his analysis and opinions regarding Libya. Mr. Addahoumi never questioned the intentions of Defendant Olmert. Mr. Addahoumi spared no time, effort, or expense in researching for Defendant Olmert's class and treated Defendant Olmert's requests outside of class with equal importance.

91. On January 24, 2013 Mr. Addahoumi received an email from Defendant Olmert requesting his opinion and analysis on Libya, specifically regarding sources for his research on Libya.

92. Mr. Addahoumi, though busy with other coursework, dutifully and carefully reviewed all available sources on Libya and provided them to Defendant Olmert as requested on January 28 2013, again feeling honored to have his distinguished professor, Defendant Dr. Josef Olmert, request his analysis.

93. On January 27, 2013 Mr. Addahoumi sent Defendant Olmert an email via Blackboard in response to required readings assigned by Defendant Olmert in POLI 483.  The email read as follows:

"Hello Dr. Olmert,

I hope all is well.  I found the assigned readings to be of great interest, particularly where is concerned Tunisia.  Before Americans were allowed back into Libya in 2006, Tunisia, Morocco, and Egypt were my preferred stomping grounds.  I spent a summer backpacking across Tunisia…best 4 months of my life.  I included a few shots of interest.

Grand Mosque at Kairoun, the 4th holiest city in Islam

Camels on the beach at Jerba..apparently working on their tan

Bey Palace in Tunis

Taking a bath at Carthage

View from the top of Le Kef

Spot where the original Star Wars was filmed….I think it was the Tunisian heat that may have induced "Howard the Duck"…

Yours truly breaking camp after another night on the beach..

Hitchhiked by way from Tunis to Douz..and slept under the stars in between…often with other French wanderers doing the same thing I was…but more often solo.

Crazy huh?

See you in class." (Exhibit P)

94. Mr. Addahoumi attached his own photos from Tunisia described in the above email, as all were locations mentioned or referred to in the POLI 381 readings assigned by Defendant Olmert. Mr. Addahoumi felt not only comfortable, but privileged to provide Defendant Olmert such feedback from classroom assignments, which, in Mr. Addahoumi's view, was what Defendant Olmert initially reached out to him requesting.

95.

96. On January 29, 2013 Mr. Addahoumi sent the following email to Defendant Olmert on behalf of another classmate:

Hello Dr. Olmert,

The young woman whose daughter (or son-in-law) is in the Diplomatic Corps..I believe her name is "Jen"...she was also in last semesters course...

i ensured her that I would forward her your syllabus....if I could find her email address....which she did give me.

Any chance she may be on your Rolodex somewhere....maybe

near your friend Arianna?

I surely would like to get her that syllabus...

Thanks

Sammi Addahoumi

PS: I loved Arianna on Green Acres.....oh wait...never mind. Fah!"

97. In the post script of the email described above, Mr. Addahoumi jokingly referred to Arianna Huffington, who Defendant Olmert had mentioned in classroom discussions. Also, Defendant Olmert is a contributor for the Huntington Post website. Upon information and believe, Mr. Addahoumi is not the only person to have noticed that Eva Gabor and Arianna Huffington sounded uncannily similar.

98. Defendant Olmert promptly responded to Mr. Addahoumi's email request. The January 29, 2013 email stated "Sammy, Forwarded to her. See u morrow". Minutes later, Mr. Addahoumi replied to Defendant Olmert in an email, stating "Thanks for your time, as always."

99. On February 1, 2013 Mr. Addahoumi received another unsolicited email from Defendant Olmert requesting information regarding Libya. The email, with the subject heading "Your Opinion" read as follows:

"Sammy

There is a very bad report

Published by Vatican of

Ethnic cleansing of

Christians in Libya

What do you think?"

100.     Later that evening, Mr. Addahoumi responded to Defendant Olmert's email request described above. Mr. Addahoumi wrote as follows:

 "Hello Dr. Olmert,

I will check out the report and get back to you......though my initial thoughts are that it is an alarmist rephrasing of the large amount of racial tension that swept Libya during and post Revolution.  The "Christians" are surely the same Black Africans who were serving as migrant labor in Libya, and then, rightly or wrongly, accused of being with Gaddafi or even a mercenary.

Yes.  There was unjustifiable racial violence...but it only coincidentally involved Christians.

You should know that the Holy Sea is typically...less than forthright...when dealing with the truth.

Sammi Addahoumi"

101.     Minutes later, Defendant Olmert responded affirmatively in a reply email to Mr. Addahoumi. Defendant Olmert wrote "On the Holy See, I agree completely!".

102.     On February 4, 2013 Mr. Addahoumi sent Defendant Olmert a follow-up email with an updated response to Defendant Olmert's February 1 email request described above. Mr. Addahoumi's email included a more thorough contextual analysis of Defendant Olmert's request for information regarding Libya.  Additionally, Mr. Addahoumi playfully commented on a map of the Middle East which Defendant Olmert had emailed the POLI 483 class. Mr. Addahoumi wrote as follows:

Hello Dr. Olmert,

The PERSIAN GULF?!

I am offended.  Fah!

Regarding the Vatican Report...

Replace "Black Africans" with Egyptian Copts. Same Story.

Sad yet placidly observed instance of purging those who (were perceived to have) allied themselves with the former regime.  All too familiar story of a majority oppressed while special or preferential treatment is given to minority groups with real or perceived connections to those in power.

Not so much anti-Christian as it is anti-anyone who is not (perceived to be) Libyan...religion aside.

Think of the Muslims of Tawergha...outside Misrata.

Sincerely,

Sammi Addahoumi".

103.    On February 6, 2013 Mr. Addahoumi became aware that Defendant Olmert had misled him and others at USC by claiming Mr. Addahoumi's analysis and work as his own.  During Mr. Addahoumi's Arabic 312 class, classmate Thomas Cox asked him if he were speaking at an upcoming academic forum on Libya.

104.    Mr. Addahoumi, having no prior notice of the MAIS "Roundtable on US-Libya Relations", was both surprised and confused to learn that not only was Defendant Olmert to be the main speaker at this rare and respected event, but that Defendant Olmert had distributed Mr. Addahoumi's work and analysis, claiming it as his own, failing to credit Mr. Addahoumi, much less have the courtesy to inform him of the event.

105.    Mr. Addahoumi contacted Department Chair Kiel Downey to request permission to attend the event due to his interest in the subject matter, providing the same links to the same CNN ireports he had sent to Defendant Olmert the previous semester.

106.    Mr. Addahoumi also informed Kiel Downey that he was a student of Defendant Olmert and that Defendant Olmert had been provided the same links regarding his research in Libya.

107.    Mr. Addahoumi attended the February 12 event after obtaining the required permission from Department Chair Kiel Downey. It was Mr. Addahoumi's intent and expectation to attend as a spectator, or as part of the listening audience, to an expert speaker discuss US-Libya relations as advertised in the handout.

108.    Despite not informing Mr. Addahoumi of the event, Defendant Olmert opened the event by introducing Mr. Addahoumi, thanking him for attending, and then asking him to speak on Libya US relations.

109.    Despite not being prepared, Mr. Addahoumi provided an impromptu yet well received synopsis and was grateful for the opportunity to do so. Following the event, Mr. Addahoumi sent an email to Defendant Olmert to reassure him that such deception on his part was unnecessary, to which Defendant Olmert replied affirmatively.

110.    In addition, Mr. Addahoumi twice emailed his concerns and complaints to Department Chair Kiel Downey about the actions of Defendant Olmert. Mr. Addahoumi was ignored both times.

111.    Not only were Mr. Addahoumi's legitimate complaints ignored, but Defendant Olmert was allowed to target him in retaliation.

112.    Defendant began belittling Mr. Addahoumi in class, refusing Mr. Addahoumi's participation in classroom discussion, and only calling on him to speak in class so that Defendant Olmert could rudely interrupt him.

113.    Other classmates noticed a stark change in Defendant Olmert's attitude towards and treatment of Mr. Addahoumi.

114.    This unwarranted treatment of Mr. Addahoumi went on for weeks. He was no longer able to participate freely in the classroom discussion to the same extent as his classmates.

Mr. Addahoumi decided not to pursue the matter of the MAIS briefing incident involving Defendant Olmert, as Mr. Addahoumi had presented the facts very clearly to Department Chair Keil Downey only to encounter retribution from Defendant Olmert.

115.    Mr. Addahoumi felt both embarrassed for and embarrassed by Defendant Olmert and made a conscious decision to simply not take any more classes offered by him rather than waste time and effort on pursue complaints USC administrators chose to ignore.    Not at all spiteful, Mr. Addahoumi attempted to maintain civility in his dealings with Defendant Olmert both inside the classroom and out.

116.

117.    On February 12, 2013 Mr. Addahoumi emailed Defendant Olmert in response to the POLI 483 required readings he had assigned for the following day. Mr. Addahoumi had taken the time to read and reflect on books, academic journals, and other publications that represented the broadest possible array of competing viewpoints from which Mr. Addahoumi could examine the topic at hand.    Mr. Addahoumi was dismayed as he learned that Defendant Olmert had not made similar efforts towards objectivity regarding the sources selected for required, assigned reading materials.    Mr. Addahoumi wrote the following at 2:32 PM:

"Hello Dr. Olmert,

I hope all is well.  I was very disappointed by the LONGRIGG reading...full of lies, half-truths, and Francophile propaganda.

His notions lead one to believe that the crimes against humanity now taking place in the region...are due to ignorant Arabs and grimy Limeys...who refused to allow the French to complete their "selfless humanitarian" campaign in the Maghreb and Africa.

Reminds me of other works that should be relegated to the historical waste bin as they are proven to be plagiarized propaganda... like "From Time in Immemorial"....and "the Protocols of the Elders of Zion".

The world has enough problems.  Leave the dissemination of such 'knowledge" to those who do it best:  uneducated bigots who push brochures at gun show and flea markets.
Glad I didn't waste money on actually buying it...very rare that I actually feel DUMBER after reading.

Sammi Addahoumi"

118.     Minutes later, Defendant Olmert responded to Mr. Addahoumi's critical review of the selected author.  Defendant Olmert emailed Mr. Addahoumi the following response at 2:38 PM:

SANNI

IT IS INTERESTING TO READ IT

YOU ARE ALWAYS WELCOME TO MAKE YOUR POINTS IN CLASS, BUT

THE BOOK WAS SUPPOSED TO TELL US ABOUT FRENCH POLICY IN THE CONTEXT

OF THE SECTARIAN ISSUE,

WITHOUT LEADING ANY PREJUDICE!

THYE WORD "LEAVE" THE DISSEMINATION ETC IS REFERRING TO ME? I HOPE

NOT, BECAUSE IF IT DOES IT WILL BE "SOMEWHAT" IMPOLITE

ON YOUR PART!"

119.     That same day, Mr. Addahoumi emailed a reply to Defendant Olmert's response and the statements therein.   In good faith, with good humor, and out of sincere concern, at 2:54 PM Mr. Addahoumi wrote:

"Touchè.   A disclaimer on the syllabus...could ensure that it would be read from such a perspective, such as…

 Clash of Civilizations*

*Neocon ploy to maintain control through fear.  Disproved by Arab Spring where Arab/Muslims took to the streets en mass to announce that they actually DO want Democracy and Rule of Law....or, for our conversation, Liberté, égalité, fraternité.

Sammi Addahoumi"

120.    In response, Defendant Olmert replied to Mr. Addahoumi with another email.  At 3:03
PM Defendant Olmert wrote:

"Sammi

Remember that u also
Have khoury
In the list
With a different perspective!...
Also , I do not like
Neo - cons !...
Wrote against them
See u in class!"

121.    Mr. Addahoumi felt a sincere respect towards Defendant Olmert and was genuinely
appreciative that Defendant Olmert had taken the time to thoughtfully respond to his
concerns in a good natured, "back and forth" dialogue.  Mr Addahoumi continued the
February 11, 2013 email conversation with a 3:14 PM reply to Defendant Olmert in which
Mr. Addahoumi wrote:

"I don't care what Noam Chomsky says…
You are a gentleman and a scholar.
See you in class.

Sammi Addahoumi"

122. Defendant Olmert concluded the email conversation at 3:23 PM, sending Mr. Addahoumi
a conclusory, yet conciliatory, email in which Defendant Olmert wrote "YOU ARE
GETTING BETTER...IN CLASS".

123.    Mr. Addahoumi continued to reach out to his professors in efforts to build bridges and
connect to those with whom he felt might have shared interests.  For instance, on February 28,

2013 Mr. Addahoumi emailed his POLI 103 African Politics professor, Dr. Charkravarty, and wrote the following:

"Hello Professor Charkravarty,

I sent this email some time ago, though I think it may not have made it to you...so here it is forwarded. It refers to information that I offered concerning the upcoming section on the Arab Spring.

Libya serves an often unacknowledged role in the development...or lack thereof in Africa, especially as Gaddafi focused on Africa as the Arab Islamic Middle East wrote him off.

I have spent a lot of time in Libya, particularly for 6 months during the Feb. 17th Revolution. I will send you more info that I have found concerning Gaddafi's often unseen hand in Africa.

Thanks,

Sammi Addahoumi

(begin forwarded previous message)

Hello,

I hope all is well.

I enjoyed the documentary on Sakarah very much. He was repeatedly compared to Che' , yet he seems more akin to Mossedq of Iran in my opinion...and apparently France agreed. Surely, Gaddafi had his hands somewhere in the death of Thomas Sankarah...it is inevitable given the time frame and geography.

About material for the Arab Spring, I submitted a few reports to CNN while I was in Benghazi during the Revolution that you may find of interest.

http://ireport.cnn.com/docs/DOC-655198

There you can find links to the other reports that I have submitted under "more from Delimansc"

I own and operate, with my father, Sammi's Deli, hence "delimansc".

also..

 http://www.youtube.com/watch?v=czXJmrgu4mg

and for every report that I filed, there were a dozen more which I did not for various reasons...mainly bandwith.

Thank You,

Sammi Addahoumi

P.S. Here are two other resources that I have found which are of great use in understanding the situation in Libya...one by Al-Jazeera

 http://www.youtube.com/watch?v=y4_dW6Lj8nY

http://www.youtube.com/watch?v=7heWIuEJcS4"

124.     On March 5, 2013, Dr. Chakrava responded to Mr. Addahoumi's email described above. In her email Dr. Charkvary wrote:

"Sammi,

Did not receive the earlier email, but this is great.  Would you be agreeable to showing one or two of your reports to the class? It will be good for the students to see someone among them so engaged and in the thick of things.

Let me know.

 All the best,

Dr. C".

125.     Mr. Addahoumi responded to Dr. Chavarkty's request immediately.   Honored, Mr. Addahoumi wrote:

Hello Professor,

I would be honored to give a short presentation of my experiences during the Arab Spring.

Just keep me posted as to where it could best be adapted to the lesson plan.

Thanks

Sammi".

126.    On Mar 25, 2013 Mr. Addahoumi received the following email from Dr. Charvarty:

"Sammi,

Are you still available/ willing to talk to the class for maybe 5-10 minutes on your experiences?

Can you do this for class tomorrow? I don't want a formal, rigid presentation--only something informal but nonetheless, a clear and crisp presentation on your experiences.

If this is too short a notice, which of your videos would you want shown to the class?

Please let me know.

Thanks,
Dr. C "

127.    Mr. Addahoumi responded immediately with an email in which he wrote:

Hello,


I hope all is well.  Tomorrow is fine.  I will prepare something short & sweet and plan on arriving a bit early.


Thank you for the opportunity.


Sammi Addahoumi".


128.    In addition, Mr. Addahoumi continued to utilize the Blackboard student email system to

communicate with his classmates in various courses. For example, on March 6, 2013, Mr.

Addahoumi sent an email to his POLI 482 classmates via Blackboard. This email, also sent

to Defendant Olmert, contained the subject heading "Please watch and I promise to shut up". Mr. Addahoumi's email contained only a link to a documentary, "Occupation 101", which highlighted human rights violations committed by the state of Israel against Palestinians and against Palestinian activists. Mr. Addahoumi felt it easier and more respectful, and more productive, to send an email to the class rather than attempt to debate Defendant Olmert in class.

129.     On April 15, 2013, Defendant Olmert rudely barked at Mr. Addahoumi's classmate, Carlos, shrilly demanding that Carlos "stop smiling".

130.     Carlos and other classmates were smiling after Mr. Addahoumi had respectfully noted the implausibility of various claims in the preceding lecture dictated by Defendant Olmert. After each lecture, Defendant Olmert called on students at random to discuss the required readings, the lecture, and current events. Rather than choosing to respond to Mr. Addahoumi's comments or to reinforce his lecture remarks with supporting facts, Defendant Olmert instead chose to vent his frustration and anger on Mr. Addahoumi's classmate, Carlos.

131.     Mr. Addahoumi did not feel comfortable with Defendant Olmert picking on Carlos, embarrassing him in front of the entire class, specifically because Mr. Addahoumi knew Carlos was struggling in the class, and because Carlos had previously confided in Mr. Addahoumi that he had a learning disability, when, as he often did, Mr. Addahoumi offered to collaborate on an upcoming research paper.

132.     Mr. Addahoumi felt it was bad enough that Defendant Olmert was allowed to rudely chastise and mock him in front of the POLI 381 class. However, Mr. Addahoumi felt it intolerable that Defendant Olmert could and did treat Mr. Addahoumi's classmates in such an

unprofessional manner. Because Defendant Olmert's behavior had been allowed to continue, Mr. Addahoumi felt responsible for not addressing the issue directly.

133.     After that class Mr. Addahoumi sent an email to his POLI 412 classmates via Blackboard. This email, also sent to Defendant Olmert, read as follows:

"First no open dialogue. Now no facial expressions. Here is the next lesson plan lest we seek 'A Common Word Between Us' http://www.nytimes.com/2013/04/15/opinion/hunger-striking-at-guantanamo-bay.html.

Just weeks ago we were told that Communism, Socialism, and Marxism had no history in the Jewish state. That anything to the contrary was anti-Semitic propaganda to discredit American support of Zionism.  The topic was not up for discussion.

Today we learned that the area of Occupied Palestine, under the Zionist government, is, in fact, the only place in all of the Middle East where all three flourished.

Also, in today's class, we learned that, although Arabs killed Arabs, and the British killed Arabs, at no time did Zionists kill Arabs...Muslim or Christian.

What will we (not) learn tomorrow?

I have been silenced. And now Carlos does not own his own facial muscles, nor the yearning cerebral mass to their rear.

Demand 'A Common Word Between Us'....or enjoy your tube".

134.

135.     On March 19, 2013, Mr. Addahoumi received his first email from USC Defendants. The email from Tobin Lovell was unsolicited and targeted Mr. Addahoumi specifically, as it was not sent to all USC Students. The official USC Counseling Services notice encouraged Mr. Addahoumi to utilize "Confidential Stress and Depression Screening". Upon information and

belief, Mr. Addahoumi had been flagged by the USC Behavioral Intervention Team and USC Student Counseling as a result of Defendant Olmert reporting Mr. Addahoumi to USC officials in response to Mr. Addahoumi exercising his freedom of speech.

136.    Mr. Addahoumi excelled in Defendant Olmert's class as well as his other courses.   On April 8, 2013, Mr. Addahoumi inquired in class why he was always interrupted by Defendant Olmert while other students were not.

137.    Defendant Olmert then proceeded to continuously interrupt Mr. Addahoumi, not allowing him even to speak, effectively yelling over Mr. Addahoumi while simultaneously yelling at him.

138.    Mr. Addahoumi ended the exchange, submitting to Defendant Olmert, and simply dropped the subject. Class continued as normal, as there was at no time a disruption of class, ever, save for the awkward embarrassment of Mr. Addahoumi as he suffered the condescending, patronizing nature of Defendant Olmert.

139.    Defendant Olmert denied Mr. Addahoumi his freedom of speech while simultaneously denying his academic freedom to disagree with, much less challenge, ideas in the classroom by reporting Mr. Addahoumi's protected speech to USC administrators and law enforcement officials.

140.    Mr. Addahoumi continued to utilize the Blackboard student email system to communicate with classmates in various courses.   For instance, on April 10, 2013 Mr. Addahoumi wrote the following in an email to an Arabic 301 classmate:

"I need you to ask Dr. Sheehi about the Egyptian Arabic class.  Just express interest.  It doesn't matter if you actually want to take the class or not.  If not enough people express interest in the class, they will drop the class and not even offer it.  The bigger the Arabic program at USC, the

stronger.  The stronger, the more reputable…prestigious: 'oh you studied Arabic at USC?  Their program is very strong.'

vs

'USC…?  Is Strom still governor?'

Believe me, I have heard stranger things from recruiters"

141.    Mr. Addahoumi began to grow concerned about the course listings for the upcoming semester.  He observed that fewer and fewer classes were being offered which fulfilled requirements for the Islamic World Studies minor.  He contacted several of his professors and other USC faculty regarding his concerns.  Mr. Addahoumi also expressed concerns about Defendant Olmert's classroom environment.

142.    For example, on April 14, 2013, Mr. Addahoumi contacted Dr. Mumia Huq, his esteemed Anthropology professor.  In his email to Dr. Huq, Mr. Addahoumi wrote:

"Hello Dr. Huq

I hope that all is well and that you are in good health.
Something has come to my attention that I cannot ignore.  I see that you are not offering a course next semester that deals directly with Islam, but instead one focusing on women's studies.

I realize that you are a cultural anthropologist and not a political scientist.  I cannot express enough, however, that your classes are the only ones at USC that offer any strain of truth and effectively expose all others as talking heads spinning Anti-Semitic hate, fear, and distrust.  You force students to think in terms that contradict the distorted indoctrinations of the media, think tanks, politicians, and other professors.

I know that I am not the only one who has taken note.

I do not know what your course load has been in the past, but I interpret the loss of your Islamic anthropology course offerings to be the most ominous sign...along with many others...that our area of study is under attack from those in the ivory tower who  have  constructed a slow, quiet death for the program.  They shrink course offerings, saying there is no interest...while every single class that I have taken on the subject has been maxed out with few or no openings.

I find guest speakers crammed into little rooms that overflow with interested students...instead of auditoriums or meeting rooms assigned to speakers on other disciplines.

If they say there is no interest....i can think of no greater gulf between the subject that knows and the object that is known.

I am also aware that, as a student, I cannot be fired, laid off, or robbed of my academic credibility in ways that a faculty member @ USC might be after opening their mouths to protest this agenda....so long as I keep the argument respectful.

Perhaps I could say things that you and others cannot....in the student newspaper...in the State newspaper...or even in front of the State house steps.

Am I correct in gauging this silent war on Islamic/Arabic/Middle Eastern studies?

I do not need your validation, but I would certainly appreciate your thoughts.

Students are being robbed of courses they need and professors are being robbed of livelihoods that they need just as much, if not more.

I can always sign up for another class...
But professors bills don't wait.

If I can be frank, your class is the only one that does not slip in Anti-Semitic material to a class too young to be unaware that the term has many facets.


Seeking the good and my own enchanted modern,

Sammi Hassan Addahoumi".


143.    In addition, on April 14, 2013, Mr. Addahoumi also contacted Dr. Osama Wahb to discuss his concerns about the vindictive, spiteful treatment he suffered from Defendant Olmert, both inside and outside the classroom.

144.    More importantly, Mr. Addahoumi reached out to Dr. Wahb in an attempt to share his complaints specifically related Defendant Olmert's teaching materials. Mr. Addahoumi returned to USC not only to complete his undergraduate degree, but also to learn as much as he possibly could before his eventual return to Libya. While Mr. Addahoumi disagreed ideologically with

Defendant Olmert, he viewed Defendant Olmert's opposing views as an asset which helped to challenge, test, and strengthen the validity of his own beliefs, ideas, theories, and practices.

145.    It was not Defendant Olmert's ideology that worried and troubled Mr. Addahoumi. Rather, it was the unavoidable fact that Defendant Olmert allowed, and was permitted to allow, his own ideologically driven agenda to invade, occupy, and overrun the USC classroom. The First Amendment was routinely inadvertently or purposefully violated by Defendant Olmert.

146.    The Defendants' practice of willfully overlooking and purposely disregarding these violations created, compounded, and exacerbated levels of stress and anxiety, both inside and outside the POLI 483 classroom, as Mr. Addahoumi felt an increasingly burdensome sense of responsibility to speak up for not only his own constitutional rights, but for the rights of his POLI 483 classmates, other USC students, and even his USC professors.

147.    Mr. Addahoumi specifically sought out Dr. Wahb after searching within the political science department for professors or faculty that worked within his own fields of interest. Mr. Addahoumi contacted several USC professors and faculty simply to introduce himself, while he contacted others specifically regarding Libya or North Africa.  In each case, Mr. Addahoumi sent a brief email that expressed his interest in the professors' publications, research, academic works, and overall field of study.  Each and every email Mr. Addahoumi sent included the same offer and request. Mr. Addahoumi requested to help in their work in any way possible, whether research, data collection, publication, or even licking envelopes, and offered an invitation to Libya

148.    Mr. Addahoumi sought out Dr. Wahb after studying the Fall 2013 course listings. Mr. Addahoumi found that Dr. Wahb was scheduled to instruct POLI 483, the same course Mr. Addahoumi was then taking with Defendant Olmert.  Mr. Addahoumi asked Dr. Wahb if he

would be using the same sources and required readings as Defendant Olmert.  Mr. Addahoumi wished to compare or contrast, the sources, required readings, or syllabi for POLI 483 of Dr. Wahb to that of Defendant Olmert. In his initial email to Dr. Wahb, Mr. Addahoumi wrote as follows:

"Hello,

My name is Sammi Addahoumi and I am currently taking the POLI 483 class this Spring.

I think, rather I know, that there has been a mix up with the course listings and have tried to bring it to the attention of the professor but to no avail.

I am currently participating in a class that meets on Mon. and Wed. @ 5:30 on 2nd floor of Gambrell Hall, room 201. I enrolled in, and dutifully paid for, a class that was clearly listed as POLI 483 Middle East Politics.

It is clearly, however, a creative writing class, and a bad one at that.

Though I could be wrong.

You see, I don't really know the difference between creative writing and fantasy fiction.

So it could be either one.

I do know that what is being disseminated in that classroom has nothing at all to do with the syllabus, much less the politics of the Middle East.

It is diarrhea of the mouth being composted as fertilizer for the brave men and women who wear the uniform of the United States of America and the innocent civilians they encounter.

But I digress.

My question is this: Will your syllabus be the same?

Same readings?

I would like to either take the course again, according to the provided course objectives and

course outcomes, but with a lesson plan and instructor that is not Anti-Semitic.

I know the weight of my words. And the weight of my burden to seek good and admonish evil. The hate that spews from that room at the very least violates academic integrity. At most it legitimates and condones ethnic, religious, and cultural ignorance, belligerence, animosity, and violence.

If you are unable to offer any insights, I urge you to please forward as necessary. All other avenues have been exhausted.

Thank You,

Sammi Addahoumi"

149.    Mr. Addahoumi took great interest in Dr. Wahb's research on the Muslim Brotherhood, focusing on the Egyptian party and the rich history of Islamic scholarship at Al Azhar University in Cairo.  Mr. Addahoumi has lived and traveled extensively in Egypt and has spent the majority of several summers in Alexandria, including 2011, when he twice drove from Cairo to Benghazi via the Sollum border crossing.

150.    The Egyptian issues examined by Dr. Wahb mirrored those which Mr. Addahoumi deemed central to his own research and studies regarding Libya. These included drafting a new constitution, grappling with the role Sharia law should play, balancing popular opinion with the need to protect the rights of women and religious minorities, reforming the security sector, and establishing order and the rule of law conducive to restoring a stable environment for business, tourism and foreign investment.  Of these topics, Mr. Addahoumi was primarily focused on Libyan civil-military relations and reform of the Security Police, the economy and the business environment

151. Dr. Wahb and Mr. Addahoumi continued to correspond with each other about Mr. Addahoumi's expressed concerns and eventually set up meeting to discuss the issues. The research of Dr. Wahb reminded Mr. Addahoumi of a book he was reading at the time, "The Muslim Brotherhood", authored by Allison Pargeter. Mr. Addahoumi had previously read Allison Pargeter's work on Libya. Mr. Addahoumi inquired as to whether Dr. Wahb had read her latest book on the Muslim Brotherhood. On April 15, 2013 Mr. Addahoumi accepted Dr. Wahb's invitation to meet with him. Mr. Addahoumi wrote:

"Professor Wahba,

Thank you for your time and effort. I would be honored to meet with you. I do, however, have a POLI 103 class which begins @ 2:00 but can rush to you immediately afterwards.

I think we may have some things in common....

US foreign policy and Arab Politics with emphasis on Egypt as it relates to state-formation; transitions to democracy; regime change; political liberalization; social change; civil society; NGOs, ethno-cultural, national, and religious minorities; opposition politics; political Islam; Islamist movements, opposition, confrontations & containments, ect.

I hope to soak up all that I can....and take it right through Sollum with me.

I am reading Allison Pargeter's new edition of her book on the Ikwan and was curious if you were familiar with it..

Her recent book on Libya gave caused me to seek it out...like other things related to the area.

I did not wish to appear self-righteous in proclaiming to seek things, or defend things that certainly need no defender or protection. I hope that you understand.

Thank you again for your time.

Sammi Addahoumi

152. Dr. Osama Wahb responded to Mr. Addahoumi on April 16 2013, at 11:PM. The email read as follows:

"Hello sammi

No need to rush! Let us meet 3:30 if that suites you, to allow you enough time to come to Gambrell.

And yes, I have read Alisson's book! In fact, she is a friend of mine.

I look forward to meeting you."

153.    Mr. Addahoumi met with Dr. Wahb in his office to discuss his concerns about Defendant Olmert as well as to discuss other shared interests. In the meeting, Dr. Wahb acknowledged the validity of Mr. Addahoumi's concerns and informed Mr. Addahoumi that he would relay his concern and comments to others in the political science department in an effort to address Mr. Addahoumi's complaints,

154.    On April 18, 2013 Dr. Wahb sent Mr. Addahoumi a courtesy email in which he wrote:

"Hello Sammi,

It was nice meeting you today and I applaud your tenacious decision to come back to USC after several years. Good luck and I look forward to having you in my class next semester.

I wish you all the best with your studies and please let me know if I can be of any assistance.

Regards,

Osama

Osama Wahba, PhD Candidate

University of South Carolina

Walker Institute of Int'l & Area Studies

440 Gambrell Hall, Columbia, SC 29208

United States

wahbao@mailbox.sc.edu".

155.    On April 23, 2013 Defendant Josef "Yossi" Olmert filed a Behavioral Intervention Team Incident Report with Defendant Alisa Liggett, via Defendant Maureen Grewe. Defendant Olmert filed this BIT report specifically about Mr. Addahoumi's speech and in retaliation for Mr. Addahoumi's complaints.

156.    Told from the perspective of Defendant Liggett, the report described a phone call she received on morning April 23, 2013 from Defendant Olmert.

157.    According to Defendant Grewe, Defendant Olmert "expressed considerable concern" about, Mr. Addahoumi, "who is in part Libyan".

158.    The report not only emphasized that Mr. Addahoumi is Libyan, but further emphasized that Defendant Olmert is the brother of the former Israeli Prime Minister, Ehud Olmert.

159.    The report alleges "something has changed," and that Mr. Addahoumi had "become in the past "six weeks or so" very "vitriolic" and agitated, and has "expressed hatred" at the instructor and Israel apparently both inside and outside the classroom.

160.    The report alleged that Mr. Addahoumi at least once "yelled and screamed in the classroom," and has recently been "emailing students in the class" and "attacking/criticizing" Defendant Olmert "and Israel".

161.    Defendant Grewe stated "I asked Olmert specifically if he felt threatened or fearful and while I did not get a straight answer, I think he does feel threatened; although what explicitly expressed was concern for the student, not for himself."

162.    The incident report is troubling for many reasons. At no time did Mr. Addahoumi ever yell or scream in class, not in Defendant Olmert's class or any other.  Mr. Addahoumi actively participated in classroom discussion, though only when called upon, or prompted by the instructor.  Mr. Addahoumi was disappointed by the complete absence of anything that rose to the level a heated academic debate, and frustrated by the complete apathy of most classmates towards class participation.  There were many times that Mr. Addahoumi offered input in class discussion simply because he literally felt sorry for the instructor and more often than that because Mr. Addahoumi wanted his money's worth.

163.    Mr. Addahoumi has dozens of recorded classes with Defendant Olmert to disprove this dramatic allegation of "yelling and screaming" in class. Mr. Addahoumi enrolled in both POLI 483 and POLI 412 with Defendant Olmert. Mr. Addahoumi utilized a Windows tablet PC and Microsoft One Note software features to record each of Defendant Olmert's lectures, while simultaneously taking handwritten notes.

164.    Mr. Addahoumi did the same in each and every class he took, except for Defendant Wiser's CRJU 491 class.  On the first day of class Defendant Wiser oddly informed the class that recording his lectures was prohibited.   Mr. Addahoumi often sent class-wide emails sharing the

One Note notebooks in response to other class-wide emails requesting note from other classmates. (Exhibit)

165. Defendant Grewe's report explicitly targets Mr. Addahoumi's speech and not his conduct, noting that Mr. Addahoumi was "emailing students in the class" and "criticizing Defendant Olmert." The report further targets Mr. Addahoumi's speech by stating that his speech "had become "vitriolic" and "agitated", and has "expressed hatred" at "the instructor and Israel apparently both inside and outside the classroom".

166. In his POLI 483 syllabus, Defendant Olmert states "Class participation will take into account 2 main elements:  first, attendance in class, and second, students' participation in class discussions on the reading material".

167. The report makes clear that at no time did Defendant Olmert consider Mr. Addahoumi a threat. Defendant Maureen Grewe inserted her own highly subjective and malicious opinion: "I asked Olmert specifically if he felt threatened or fearful and while I did not get a straight answer, I think he does feel threatened; although what he explicitly expressed was concern for the student, not for himself."

168. Defendants did not provide a copy of the incident report to Mr. Addahoumi, nor was Mr. Addahoumi made aware of any investigation regarding the allegations in the complaint.  Mr. Addahoumi was not even made aware of Defendant Olmert's BIT incident report.

169. On May 7, 2013, due to the actions of Defendant Olmert and Defendant Grewe, Mr. Addahoumi received an Official Correspondence from the USC Office of Student Conduct. The email was sent at 11:07 am and included the Case Number 2012212401. The Official Notice of Charge read as follows:

"THIS IS AN OFFICAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDCUT AT THE UNIVERSITY OF SOUTH CAROLINA.

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Message link:
https://publicdocs.maxient.com/view.php?inst=UnivofSouthCarolina&code=Zq8wFY7so27RNg2V043YQDFTOPg7vIdD

Office of Student Conduct
and the Office of Academic Integrity
901 Sumter Street Suite 201
Columbia, SC 29208
(803) 777-4333
osc@sc.edu".


In addition to the email described above, on May 7th, 2013, due to the actions of Defendant Olmert, Mr. Addahoumi received an email letter from Defendant Schneider at 11:12 AM on behalf of the USC Behavioral Intervention Team which read "Dear Mr. Addahoumi, Please read the attached letter concerning your appointments for tomorrow. Please make sure to attend these appointments.

Augusta Schneider

Business and Office Manager

University of South Carolina

Office of Student Conduct and Academic Integrity"

170.     The email from Defendant Schneider included a Notice of Charge from the USC BIT which read as follows:

"Regarding Case Number.  2012212401
Dear Mr. Addahoumi,

The University of South Carolina is concerned about the well-being of all of its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health and/or well-being in the USC community. I hope that your situation is improving. The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.

Due to these concerns and policies, you must meet attend two meetings. Their (sic) will be two meetings one will be with a member of the BIT and then the other meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC). Your first meeting is in the CHDC with counselor, Bryant Kilbourn on the 7th floor of the James F. Byrnes building to begin your assessment on May 8, 2013 at 2:00pm. Students must arrive 15 minutes early to the CHDC to complete paperwork. You should inform the receptionist that you received a BIT letter. Your second meeting is with a BIT member so that we can answer any questions and explain the concern and the next steps. This second meeting is on May 8, 2013 at 3:30pm with Julia Thompson in the Byrnes Building Suite 201 (901 Sumter St.).

The total assessment will conclude after four meetings at intervals to be determined by a counselor
at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community.

Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counseling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.

If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending your appointments, please call him/her at 803-777-5223 and request that they contact
us with any information that you are willing to release.

If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services (SDS) accompany you, please contact our office and the SDS at 777-6142 at least 48 hours prior to your appointment time.

Our goal is to be educational and maintain the standards of the institution we share. If you would like additional information about your rights or the conduct process, please reference

http://www.sc.edu/policies /staf626.pdf. We appreciate your cooperation and look forward to meeting with you. If you have questions about your case or about your sanctions, please contact me immediately 803-777-4333. Additional information about policies and the conduct process can be found online line at www.sc.edu/osc."

171.    Yet again at 11:40 AM, just minutes after sending the Notice of Charge described above, Defendant Schneider sent Mr Addahoumi yet another email from her own email address rather the Student Conduct Office email.  The email read as follows:

"Dear Mr. Addahoumi

Please read the attached letter concerning your appointments".

172.    Mr. Addahoumi had no idea who Defendant Schneider was.

173.    Mr. Addahoumi had never met Defendant Schneider

174.    Mr. Addahoumi had never given Defendant Schneider consent to make medical appointments, much less mental health appointments or decisions, for him or about him.

175.    On the afternoon of May 7, 2013 Mr. Addahoumi, in response to the email described above, sent an email to Defendant Schneider which clearly stated his refusal to participate in any way with the Behavioral Intervention Team.  Mr. Addahoumi found the very notion of a "Behavioral Intervention Team" to be at best a conspicuous euphemism for "behavioral control" and at worst a mechanism for "thought control". Mr. Addahoumi wrote the following:

"Hello, I will be unable to attend your scheduled meetings without further details.  Before any meeting, there must be a clear indication of any infractions or specific issues, in addition to naming all parties concerned. Your letter is far too open ended. If these meetings are somehow required for me to attend…in order to continue at USC…I will be happy to address the issue with the instruction of my legal counsel. Thanks for your concern."

176.    In response to Mr. Addahoumi's email, Defendant Liggett called him to inform him that if he did not attend the mandated assessment, he would receive a charge of "failure to comply" and would be subject to the resulting additional sanctions.

177.    In addition to calling Mr. Addahoumi, Defendant Liggett also called Mr. Addahoumi's

father, leaving a message on his father's voicemail in which she stated the following:

"Hello, my name is Alisa Liggett and I am calling regarding Sammi.  As a student, I am calling
from USC and this is the only number he has left as a contact phone number. So, I am just
returning a call regarding an email he sent yesterday to our office manager. Our number is 777-
4333 and I just wanted to respond to that, so if you can let him know or have him call us and
update his phone number, that would be great. Thank You, bye."

178.    Defendant Liggett willfully breached FERPA by calling Mr. Addahoumi's father in an

attempt to manipulate his father. While illegal, the USC BIT model encourages

179.    Defendant Liggett rather dramatically misrepresented herself as being a USC student. In

addition, Defendant Liggett lied about his father's cell phone number being the only contact

number provided by Mr. Addahoumi.  Defendant Liggett had already called Mr. Addahoumi on

his cell phone to inform him that he would receive a charge of "failure to comply" if he did not

attend the mandated assessment. It is clear from her statements that Defendant Liggett knew very

well that she was calling Mr. Addahoumi's father. The context of Defendant Liggett's statements

made clear that she knew she was not leaving a voice message on Mr. Addahoumi's phone.

180.    On the evening of May 7th, Mr. Addahoumi forwarded the Official Notice of Charge to

his classmates.  Mr. Addahoumi did so to both complain about the putative process and inform

others of the USC BIT. Along with the Behavioral Intervention Team letter (which Mr.

Addahoumi thought preposterous), Mr. Addahoumi wrote the following to his classmates:


"Please forward as necessary.

I wish you the best of luck in all of your endeavors.  I have tried to share what little I have managed to learn with all those who would listen.

And I stand by every word.

My hand goes up a lot in class and perhaps I am heavy on emails…

But more often than not, I do so not because I have anything profound to say, but because I cannot help but act when other people's potentially profound insights are so quickly disregarded and tossed aside, for I know that one day…this day…the right of my own ideas to exist will be the one in need of defense…when I cannot speak for myself…whether because there is not enough time in class…or in court.

What can you do?

http://www.housing.sc.edu/bit/index.htm

Submit your thoughts.  Tell them exactly how I have affected the classroom environment.

Be brutally honest.


Go Cocks.

Mind the Gap….
On the Underground as well as between the knowing subject and the object that is known.
I have refused the meeting.  Read the fine print, if you can find it, about those who refuse…the feeding tube."

181.     In response to Mr. Addahoumi's class-wide email transcribed above, Mr. Addahoumi received several supportive responses his fellow classmates and even from USC faculty.

182.     For instance, on May 7, 2013, one classmate wrote "What the hell is going on with the university? They think you negatively affected the classroom?  Also the link provided no longer works."

183.     In addition, Mr. Addahoumi received a response from Prof. Nadia Jilani.  In her May 10, 2013 email, Prof. Jilani wrote:

"Hi Sammi,

I'm sorry I got your email a bit late. Please let me know if there is anything I can do to help. I have found you to be an excellent student and would stand by that statement in front of a committee.  I tried to click on the link in the email, but it did not work, so I don't exactly know what it led to or if it was intended for me.  I have also been meaning to email you because I forgot to return the book you lent me. Let me know when you're available and I'll return it.

Thanks,

Nadia Jilani"

184.     On May 8th 2013 Mr. Addahoumi was forced to meet with Defendant Liggett for over an hour.  Defendant Liggett did not provide Mr. Addahoumi copies of any complaints, nor did Defendant Liggett even inform Mr. Addahoumi of any complaints made about him. Defendant Liggett repeatedly stated that she and others "were worried" and "were concerned" about Mr. Addahoumi.

185.     Mr. Addahoumi asked Defendant Liggett how he could avoid another such waste of his time.  Defendant Liggett replied that was not her decision to make and that she was "just doing her job".  Because Mr. Addahoumi had received notices from three different offices, the Office of Student Conduct, the Behavioral Intervention Team, and the USC Counseling Center, Mr. Addahoumi was unsure of exactly what capacity Defendant Liggett was acting in and with what authority.

186.     In addition, despite the fact that the BIT notice of charge stipulated that Mr. Addahoumi was required to meet with clinical psychologist Bryant Kilbourne, Mr. Addahoumi met only with Defendant Liggett.

187.     On May 8, 2013, Mr. Addahoumi received yet another official notice from USC Defendants. The email, with the subject heading "Secure Message from Student Health

Services", read "You have an important secure message from USC Student Health Services", and included another copy of the Behavioral Intervention Team Notice of Charge. In effect, this did not even provide one day's notice of the meeting.

188.　　Mr. Addahoumi continued to utilize the Blackboard student email system to interact and exchange information with classmates, despite the perversely deceptive actions taken by Defendants to prevent him from doing so. Mr. Addahoumi advocated not only for his ability to share information, but simultaneously struggled for the inseparable right that he and others have to receive information.  Many classmates contacted Mr. Addahoumi using Blackboard email and expressed their own unsolicited comments or opinions.  For example, in a May 13, 2013 email to Mr. Addahoumi, Arabic classmate Thomas Cox wrote:

"Sammi,

السلام عليكم، يا أخي.  Thank you for the kind words and I hope your trip to Libya goes well.  I do hope that we stay in touch in future - best of luck with the consulting firm and  please let me know how it progresses.  It was great getting to know you this semester and إن شاء الله, our paths will cross again.
مع السلام
　Thomas Cox".

**First Behavioral Intervention Team Assessment**

189.　　On May 15, 2013 Mr. Addahoumi reached out via email to Prof. Nadine Jilani about his concerns and complaints regarding the USC Behavioral Intervention Team. Mr. Addahoumi wrote:

"Hello Professor,

I hope all is well.

I thought that you might find the "B.I.T." Program at USC as interestingly...Orwellian...as I did.

After experiencing how USC strives to protect it' "mission".....2013 feels a lot like 1984.

No harm done.  When they twist my arm...I just scream louder. Olmert flagged me as "disrupting the mission".

So for his final exam essay...i decided to hold nothing back.

Check "Kabbalah".

Every time I read it...i can't help but think that this message needs to get out.

Olmert gave it a 25/25....after of course, claiming to have not received it.  A case of denial if I have ever seen it.

If black America and Christian America knew the truth....they would see themselves as Palestinians....and Zionism would be relegated to the history books...instead of the newspapers. \
I have found that Edward Said and Bob Marley shared the same powerful message...though both were cut down in the prime of their lives.....To chant down Babylon...is to chant down Zion.

I am leaving for Benghazi soon.  I may or may not return for Fall....as USC has little left to offer me in the way of classes".

190.      On May 16, 2013 Mr. Addahoumi received a response from Prof. Nadia Jilani to the email described above.  Professor Jilani wrote:

"Thanks for sending this to me, Sammi.  It is an excellently written essay.  I was wondering if you've had a chance to look at the graphic novel "Footnotes in Gaza" by Joe Sacco.  It is excellent and you might find it an informative and entertaining read on your trip back to Benghazi.  Its 1/2 journalism and 1/2 political cartoon.  Anyway, I'm glad you stood up for yourself and for the people of Palestine.  Please be safe and keep doing what you're doing.

We need more people like you in the world.

Nadia Jilani".

191. Also on May 16, 2013, Mr. Addahoumi received yet another Official Correspondence from the Office of Student Conduct.  The Official Correspondence, sent at 10:19 AM, which included the subject headline "Case Number 2012212401", read as follows:

"THIS IS AN OFFICIAL CORRESPONDANCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA.

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Message link:
https://publicdocs.maxient.com/view.php?inst=UnivofSouthCarolina&code=Rkw4Ezk0YlM9ELVcR1gCz7vas2DbunHl

------------------------------------
Office of Student Conduct
and the Office of Academic Integrity
901 Sumter Street Suite 201
Columbia, SC 29208
(803) 777-4333
osc@sc.edu".

192.    The Official Correspondence from the Office of Student Conduct included a link directing Mr. Addahoumi to a Behavioral Intervention Team Notice of Charge which read as follows:

"PERSONAL AND CONFIDENTIAL

Regarding Case Number 2012212401

Dear Mr. Addahoumi,

The University of South Carolina is concerned about the well-being of all its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health and/or well-being in the USC community. I hope that your situation is improving. The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.

Due to these concerns and policies, you must attend two meetings. The first meeting you have met with Alisa Liggett, a member of the BIT and then the second meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC). In your first meeting last week with the BIT member, Alisa Liggett answered any questions and explained the concerns and the next steps. Your second meeting is in the CHDC with counselor Lara Sheehi on the 7th floor of the James F. Byrnes building to begin your assessment on May 24, 2013 at 11:00 AM. Students must arrive 15 minutes early to the CHDC to complete paperwork. You should inform the receptionist that you received a BIT letter.

The total assessment will include after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community.

Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counseling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.

If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending appointments, please call him or her at 803-777-5223 and request that they contact us with any information that you are willing to discuss.

If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services accompany you, please contact our office and the SDS at 777-4333 at least 48 hours prior to your appointment time.

Our goal is to be educational and maintain the standards of the institution we share. If you would like additional information about your rights or the conduct process, please reference http://www.sc.edu/polices/staf626.pdf . We appreciate your cooperation and look forward to meeting with you.

If you have questions about your case or about your sanctions, please contact me immediately at 803-777-4333. Additional information about policies and the conduct process can be found online at www.sc.edu/osc .

I look forward to meeting you

Alisa Liggett"

193.     On May 16, 2013, in addition to the emails described above, Mr. Addahoumi also received an email from Defendant Augusta Schneider, which also insisted Mr. Addahoumi comply with the mandated May 24th appointment and assessment. Defendant Schneider's email included the subject heading "Re: Mandatory appointment on May 24, at 11 AM. The email from Defendant Schneider also included an attached copy of the Behavioral Intervention Team letter notice of charge described above. Defendant Schneider's email to Mr. Addahoumi stated:

"Dear Mr. Addahoumi,

 Please read the attached letter concerning you BIT appointment in the Counseling and Human Development Center. Please make sure that you attend this meeting that has been made for you and arrive 15 minutes before 11 to fill in the appropriate paperwork.

 Thank you,

 Augusta Schneider

Business and Office Manager

\University of South Carolina

Office of Student Conduct and Academic Integrity

901 Sumter Street, Suite 201

James F. Byrnes Building

Columbia, SC 29208

803-777-4333 Fax 803-777-1393".

194.     Because Mr. Addahoumi had already been told by Defendant Liggett that any refusal to attended mandated Behavioral Intervention Team appointments would result in an additional Code of Conduct charge for "Failure to Comply", and because the subject heading of Defendant Schneider's own email clearly stated that the May 24th appointment was "mandatory", Mr.

Addahoumi wryly responded to Defendant Schneider's email.  In this email to Defendant Schneider, Mr. Addahoumi sardonically wrote the following:

"Your Empress,

I would not miss it for the world

Sammi Hassan Addahoumi".

195.    Mr. Addahoumi sarcastically addressed Defendant Schneider as "Your Empress", both because of the totalitarian and dictatorial nature in which he viewed the USC BIT, and in reference to the Latin meaning of Defendant Schneider's name, Augusta, which means "empress".  Because Mr. Addahoumi had already been told he had no choice whether or not to attend the assessment, he wryly responded that he "would not miss it for the world" (because he had not a choice).

196.    Defendant Schneider responded to Mr. Addahoumi with an email saying "Thank You!". Mr. Addahoumi sent a reply email to Defendant Schneider in which he clarified both himself and her Pyrrhic victory.  Mr Addahoumi replied  "As if I had a choice".

197.  On May 21, 2013 Mr. Addahoumi sent Defendant Schneider an email regarding his "mandated appointment" and the vagueness of the charges he was accused of.   Mr. Addahoumi wrote:

"A disruption to the mission?

Please define your mission …so that I might better define my disruption of it.

I am all ears."

198. On the afternoon of May 23, 2013, Mr. Addahoumi sent a class-wide email to his classmates in which he again included the forwarded email from Defendant Schneider

with the accompanying Notice of Charge from the Behavioral Intervention Team.   Mr.

Addahoumi's class-wide email included the subject heading "I AM BEING FILTERED".

199. Mr. Addahoumi received multiple supportive emails in response.  On May 23, 2013, Mr.

Addahoumi responded to a reply from Prof. Nadia Jilani in which she offered him her

support. In Mr. Addahoumi's response email to Prof. Jilani's reply, Mr. Addahoumi wrote

as follows:

"Hello Professor Jilani,

Please do pardon the delay.  I have been a bit preoccupied but certainly took your message to heart and I am more than appreciative of your offers of assistance.

As far as the "book" (plagiarized Zionist propaganda…and poorly written, no less), I haven't been losing sleep over the book…or at least not due to its absence.

The initial link I provided was correct but not functioning: http://www.housing.sc.edu/bit
Look at #2 on the list provided on the BIT website.  Dr. Olmert flagged me.

1984 meets 2013.

Not that I deny being a threat to his mission.

If you are really interested read up on the "behavioral intervention team" program at USC.

I am not an expert….

But it seems odd that those who would so fanatically oppose any kind of gun control legislation…or even background checks for weapons that even the Army should not have…
That they could so brilliantly conceive of a program such as the BIT in a passionate effort to prevent the next antisocial video game junkie from going postal on innocent students.

But I digress…

There is one thing you can do to help if you are still around campus.

I have a second and final meeting with Big Brother tomorrow.
I just found out that he is in fact a she…Mrs. Sheehi…almost certainly the wife of the Arabic language program director and gifted author, Professor Stephen Sheehi.

An odd twist of fate to say the least.

Please leave the book in her office box or in her hand as soon as you find the time….but no rush.

Lara Sheehi
Byrnes Building 7th floor
901 Sumter Street

Across from the Horseshoe.
Thanks,

Sammi Hassan Addahoumi"

200.     On May, 23, 2013, Mr. Addahoumi received yet another Official Notice from USC Student Health Services.  The email notice, with the subject headline "Appointment Reminder", read as follows:

"This message is to remind you of your appointment scheduled with Student Health Services COUNSELING AND HUMAN DEVELOPMENT CENTER with SHEEHI, LARA at Byrnes 7th Fl. Counseling Location on:

Friday May 24, 2013 at 11:00 AM

To be prepared for your appointment:

Please bring your student ID card and arrive at least 15 minutes early for your appointment

To CANCEL this appointment please log on to:

https://myhealthspace.ushs.sc.edu or call 803-777-3175

If you do not show up for your appointment, or do not give at least 24 hours advance notice of cancellation, you may be subject to a no-show fee.

Please remember to protect your personal health information and never give your username and password to anyone; including your parents. Student Health Services will never ask you for this information.

Student Health Services offers general medical care, comprehensive womens care, laboratory, radiology and physical therapy services, a pharmacy, an allergy/immunization and travel clinic, sports medicine clinic, counseling and psychiatric services, health education and wellness programs, and sexual assault and violence education services. We hope you will use our services during your time at the University of South Carolina and let us know how we may assist you in meeting your academic goals.

This email has been automatically generated. Please Do NOT REPLY".

201.    On May 24, 2013 Mr. Addahoumi was forced to meet with USC clinical psychologist Lara Sheehi. In her psychological assessment of Mr. Addahoumi, Dr. Sheehi wrote, "Sammi had particular questions re: the confidentiality agreement in the intake package, highlighting that he had not come to the CHDC out of his own accord, i.e., he was mandated by OSC via BIT as a result of a complaint from a professor". (Exhibit H)

202.    Regarding Mr. Addahoumi's concerns, Dr. Sheehi wrote, "Explained confidentiality to Sammi, as well as some of the questions he had re : the paperwork, e.g., if he was going to be charged for a session, etc. Also validated his worries re: people having access to his records, especially as an Arab male in the United States in the current sociopolitical culture. Explained to him how his records are protected by law, nonetheless." (Exhibit H)

203.    Regarding Mr. Addahoumi's understanding of the incident in question, Dr. Sheehi wrote, "Sammi reports that this current BIT session is a result of him raising his voice in class when a professor of his failed to mention an essential point in history re: Lebanese confessional violence and equated the civil strife in Lebanon with the "Muslims not being able to get along with the Christians." Sammi reports that he felt this message was inaccurate and a dangerous one to give to American students who already have been taught that Muslims are the root of all problems. (Exhibit H)

204.    Dr. Sheehi further observed "Sammi reports that he had never had difficulty with this professor in the past, despite the professor being the brother of Ehud Olmert, the prime minister

of Israel (i.e., having a particular agenda and bias while teaching a Middle Eastern class)". (Exhibit H)

205.     In her assessment of Mr. Addahoumi, Dr. Sheehi wrote, "Sammi acknowledges that his frustration made him raise his voice, however, he indicates that he did not yell and felt as though "he had won, because the second I raised my voice louder than his, it seemed like I was this angry Arab man, oh watch out." He believes that his professor "used the system" (i.e., BIT) against him for this reason. He denies any retaliation via grading by his professor." (Exhibit H)

206.     In her evaluation of Mr. Addahoumi, Dr. Sheehi further wrote, "He indicates having had no difficulty with any professors in the past and in fact having students inquire about some of his points after the class. He reports having been broadsided by this report. Sammi indicates that he works for his father's business, a chain of deli's around Columbia. He has recently returned to school after having taken a break for some time to work with his father. He states that he has been very happy at school, has been doing well, and is surprised that this situation has come up." (Exhibit H)

207.     In her final psychological assessment of Mr. Addahoumi, Dr. Sheehi concludes, "Sammi was oriented to all spheres. He was cooperative despite being somewhat put off by the complaint by his professor and being distrustful of the university system. He specifically placed this within the environment of fear and distrust related to his being a Muslim Arab who is also outspoken. Sammi acknowledged his raising his voice in class and recognizes that the dynamic of the class made this happen, but is very respectful of his professors and the university system and recognizes any wrongdoing on his part." (Exhibit )

208.    Most importantly, Dr. Sheehi clearly indicated that, "It is important to note that the professor Sammi was in class with is a very well-known and powerful Zionist that was an important functionary of the Israeli government; it appears that these dynamics may have also been at play in the classroom". (Exhibit H)

209.    Regarding the need for Mr. Addahoumi to be further monitored or assessed, Dr. Sheehi succinctly concluded, "After assessment today, it does not appear that Sam mi needs any further follow-up via BIT. He indicates willingness to come back at his own volition if needed and was given my card and contact information. He signed a release form to allow me to contact OSC re: his attendance and my recommendations. No further follow-up is necessary at this time". (Exhibit H).

210.    After meeting with Dr. Sheehi, Mr. Addahoumi was then forced to again meet with Defendant Liggett.  Despite the fact that Dr. Sheehi already confirmed Defendant Olmert had reported Mr. Addahoumi to the Behavioral Intervention Team, Defendant Liggett refused to acknowledge exactly why Mr. Addahoumi had been forced to meet with her, instead insisting that unnamed persons had expressed "concern" about him and that she, Defendant Liggett was simply doing her job, as she had no choice but to investigate each and every complaint her office received.

211.    When Mr. Addahoumi asked to review a copy of the complaint filed against him, Defendant Liggett refused his request, insisting that such information was "confidential".

212.    A "Case Resolution Form" regarding the incident was not provided to Mr. Addahoumi until almost three years later, on May 11, 2016. The case resolution form revealed that Defendant Maureen Grewe had conducted a "hearing" on June 3, 2013 in which she found Mr. Addahoumi "responsible", or guilty, of "erratic behavior".

213.    Mr. Addahoumi had never spoken with or met with Defendant Grewe and had no idea who Defendant Grewe was.  Mr. Addahoumi was not informed of the hearing, much less allowed to attend or contest the hearing. Despite these facts, the document incorrectly states "student agrees to these findings and sanctions."

214.    The document also alleges that "Parent/Guardian" was not contacted, despite the fact that Defendant Liggett did, in fact, contact Mr. Addahoumi's father without his knowledge or permission.

215.    Under the heading "Rational", Defendant Grewe stated "Attended the appointments and is continuing to see Lara (Sheehi)", despite the fact that Mr. Addahoumi was forced to attend the appointments under threat of sanctions and despite the fact that Dr. Sheehi herself had determined that no additional appointments were necessary, and as a result, Mr. Addahoumi met with Dr. Sheehi only once.

216.    Unknown to Mr. Addahoumi at the time, a system had been activated whereby, his speech, school assignments, class attendance, online activity ect., was to be scrutinized with hypervigilance with and which encouraged his professors, classmates, and even family to

monitor him in an egregious invasion of privacy. This information sharing resulted in the breech of multiple laws and USC policies.

## Behavioral Intervention Team Incident Report #2

217.    On April 13, 2013 Mr. Addahoumi discovered that his bicycle had been removed from a bike rack in front of the Thomas Cooper library. In place of his bicycle, a notice was left that his bike had been removed by USC parking services. Despite the notice, Mr. Addahoumi was told that USC parking services had no record of his bike and had not removed it. As a result, Mr. Addahoumi filed a report with USCPD that his bike had been stolen and provided USCPD with the notice left by USC parking services and pictures he had taken of the area where his bike had been stolen.

218.    Because Mr. Addahoumi was overseas conducting research in Libya over the summer break, he was unable to follow up with USCPD about the case regarding his stolen bicycle.

219.    In addition to the burdensome penalty of involuntary psychological examinations by the USC Behavioral Intervention Team Defendants, Defendant Liggett and others also forced Mr. Addahoumi to submit to mental and behavioral conditioning under the ACE.  On June 4, 2013 Mr. Addahoumi received an email which stated:

"Dear ADDAHOUMI , SAMMI HASSAN,

This email confirms that your appointment with Corcoran, Jamie has been scheduled for 6/4/2013 at 12:00 PM for ACE Coaching.

Your appointment will take place at the SSC/TCLibrary.

To cancel your appointment before the scheduled time, please log into the online system again.

Please note: if you do not attend your appointment or cancel it less than 24 hours before your scheduled time, the appointment will be considered "missed." After a missed appointment, you may be unable to schedule another appointment.

Thank you,

Student Success Center

220.     On[sa1] August 13, 2013 Defendant Scott Prill of USCPD filed a Behavioral Intervention Team Incident Report about Mr. Addahoumi's protected Free Speech. In the report, Defendant Prill alleges, "Mr. Addahoumi arrived at USCPD to check on the status of a report that he filed in April 2013 for a bicycle that was stolen from Thomas Cooper Library. Addahoumi also provided me with a new date that the incident occurred. He also stated that he completed his own investigation and showed me pictures of the bike rack and a call box camera at the incident location. I told him I would check on the status of his report and return to speak with him momentarily." (Exhibit I)

221.     Defendant Prill misrepresented several facts regarding the incident. Mr. Addahoumi did not provide a "new date that the incident occurred." Upon information and belief, Defendant Prill included this statement in an effort to excuse USCPD's failure to investigate the matter.

222.     Defendant Prill further alleged, "When I returned I informed Addahoumi that due to the length of time since the incident, video was no longer available from the new date that he provided. Addahoumi had a difficult time understanding that the video was gone and became upset claiming that the police did not want to take time to help him with his case. Addahoumi then proceeded to describe a scenario where a student had "had enough" and became an Active Shooter in a building on campus. Addahoumi then claimed that "there would be clues" and that

video footage would appear from our-system showing the suspect's behaviors months and years prior to the incident.

223.    Defendant Prill further wrote "I then informed him again that unfortunately, we have a limited capacity for video on our system and that video is purged after a certain period. Addahoumi then informed me that he was in Benghazi during Summer 2013. He mentioned how police do not investigate crimes there and he proceeded to show me a picture of an apparent bomb scene. He then enlarged the picture and zoomed in on a camera located on the comer of the building. Addahoumi then stated that Benghazi officials claimed they could not locate a suspect." (Exhibit I)

224.    Mr. Addahoumi did not have a "difficulty understanding" Defendant Prill.  He simply did not believe Defendant Prill.

225.    At no time did Mr. Addahoumi mention anything about an "active shooter", as the phrase itself was one that he had no knowledge of, period. When told that USCPD did not have policies regarding the retention of data, i.e. storage of surveillance camera footage, Mr. Addahoumi simply replied, "That's impossible. What if there were a shooting or some other emergency on campus?"

226.    Defendant Prill further alleged, "Addahoumi then continued to talk about his case claiming that a member of Parking Services or Landscaping took his bicycle because it was expensive. I asked him if he had any proof and he could not provide any. Addahoumi then mentioned that he was a "mad man" and that he wished the police would take "five minutes" to investigate his case. I spoke to him a little longer about the video footage and he left the location." (Exhibit I)

227.    Defendant Prill willfully misrepresented the actual facts of the exchange with Mr. Addahoumi as well as the actual facts regarding Mr. Addahoumi's stolen bicycle case. Mr. Addahoumi did not blame any USC department for "stealing his bike".

228.    Mr. Addahoumi provided USCPD with a USC Parking Services notice that was left in the exact same spot from which bicycle went missing. Such a notice is typically left by USC Parking Services removes an abandoned bicycle at the end of each semester.

229.    Mr. Addahoumi assumed in good faith that USC had mistakenly removed his bicycle. Only after receiving the runaround at multiple departments, did Mr. Addahoumi file a report with USCPD about his bicycle being stolen.

230.    Regarding any effects/impacts of the behavior, Defendant Prill alleged, "When Addahoumi mentioned the Active Shooter scenario it raised my alarm because that is not typically a scenario that will spontaneously be thought of when someone is trying to explain their point. I became more alarmed when Addahoumi showed me the picture of the bomb scene in Benghazi to further explain his point about video footage." (Exhibit I)

231.    Again, at no time did Mr. Addahoumi mention the words "active shooter". period.  As Defendant Prill stated, "That is not typically a scenario that will spontaneously be thought of when someone is trying to explain their point".  The term "Active Shooter" originated not from Mr. Addahoumi, but from USCPD's own "Active Shooter" response training.  Defendant Prill injected this term and projected this training onto Mr. Addahoumi.

232.    Mr. Addahoumi did show Defendant Prill pictures he had taken of the area from which his bicycle was stolen. While scrolling through these photos, Mr. Addahoumi did show Defendant Prill a news article he had posted to CNN covering a bomb blast the previous month while Mr. Addahoumi was in Benghazi, Libya.

233.     Mr. Addahoumi did so only in response to Defendant Prill repeatedly demanding why Mr. Addahoumi had not followed up on his missing bicycle over the summer.  Mr. Addahoumi simply intended to show that he was overseas and preoccupied, yet fully intent to follow up on the outcome of their investigation.

234.     Regarding any other information about the individual that might be relevant, Defendant Prill admitted that, "Addahoumi has been to the police department numerous times about his stolen bicycle and he has become irate each time claiming that we are not doing our jobs." (Exhibit I)

235.     As a result of Defendant Prill's libelous accusations, two FBI agents interviewed Mr. Addahoumi at his home regarding the incident.  Mr. Addahoumi was cooperative and friendly with the FBI agents, telling them exactly what happened.

236.     Defendant Prill knowingly misrepresented the contextual and factual nature of his exchange with Mr. Addahoumi, with Defendant Prill's own dramatic, if not manic, paranoia projected onto Mr. Addahoumi to fabricate the need for numerous further unwarranted investigations and sanctions against Mr. Addahoumi.

237.      Defendant Prill maliciously inflated Mr. Addahoumi to the level of somehow being, at best, a danger to himself and others, and, at worst, a threat to national security.

238.     In addition to prompting an FBI investigation, the statements and actions of Defendant Prill resulted in Mr. Addahoumi receiving yet another notice from the USC Behavioral Intervention Team Defendants, mandating not only disciplinary sanctions, but involuntary psychological assessments and further investigations.

239.     On August 13, 2013, Mr. Addahoumi received an Official Notice of Charge which stated the following:

"Regarding Case Number: 2013004501

Dear Mr. Addahoumi,

The University of South Carolina is concerned about the well-being of all of its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health and/or well-being in the USC community. I hope that your situation is improving. The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.

Due to these concerns and policies, you must meet attend two meetings. The first meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC). The second meeting will be with a member of the BIT. Your first meeting is in the CHDC with counselor, Lara Sheehi on the 7th floor of the James F. Byrnes building to begin your assessment on August 16, 2013 at 2:00 pm. Students must arrive 15 minutes early to the CHDC to complete paperwork. You should inform the receptionist that you received a BIT letter. Your second meeting is with a BIT member so that we can answer any questions and explain the concern and the next steps. This second meeting is on August 16, 2013 at 4:00 pm with Alisa Liggett in the Byrnes Building Suite 201 (901 Sumter St.).

The total assessment will conclude after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community.

Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counseling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.

If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending your appointments, please call him/her at 803-777-5223 and request that they contact us with any information that you are willing to release.

If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services (SDS) accompany you, please contact our office and the SDS at 777-6142 at least 48 hours prior to your appointment time.

Our goal is to be educational and maintain the standards of the institution we share. If you would like additional information about your rights or the conduct process, please reference http://www.sc.edu/policies/staf626.pdf. We appreciate your cooperation and look forward to meeting with you.

If you have questions about your case or about your sanctions, please contact me immediately 803-777-4333. Additional information about policies and the conduct process can be found on-line at www.sc.edu/osc.

I look forward to meeting you.

Sincerely,

Alisa Liggett

Chair of Behavioral Intervention Team".

**Behavioral Intervention Team Mandated Psychological Assessment # 2**

240.    Due to the USC Behavioral Intervention Team Incident Report maliciously filed by Defendant Prill, Mr. Addahoumi was forced to submit to yet another involuntary psychological assessment by Dr. Bryant Kilborn on August 13, 2013.

241.    In his evaluation of Mr. Addahoumi, Dr. Kilborn wrote of Mr. Addahoumi, "He reported assuming he had been referred to the CDHC through BIT due to his recent interactions with USCPD but was unsure exactly what may have warranted concern."

242.    In his assessment of Mr. Addahoumi, Dr. Kilborn wrote, "He volunteered that he had been in frequent contact with the USC PD regarding his missing / stolen bicycle. He stated that he was assertive and frustrated that the PD had closed his case and was acting dismissively towards him and his concerns. He stated he was particularly frustrated due to the fact that a campus video camera was positioned near his bicycle when it was stolen but that the USC PD claimed that the

recordings are purged regularly and could not be recovered; which Sammi insisted that there must be some way to recover the data despite the PD's denial of this".

243.    Dr. Kilborn further wrote, "The therapist informed him that the officer he was interacting with reported him to BIT because Sammi said that when students become upset there may become an 'active shooter' and then showed the officer pictures of a bomb site in Lybia as Sammi had recently returned to the US from there.

244.     Dr. Kilborn clearly wrote that "Sammi stated that he was not threatening the officer nor did he currently or ever have any violent thoughts or intentions towards others; he stated that he was trying to explain that the police would be able to find video in these sorts of situations (shootings, bombings) and therefore must have access to the video of the time when his bike was stolen".

245.     Further, Dr. Kilborn concluded, "He denied any past and present suicidal or homicidal ideation, plan, or intent. He denied violent thoughts, past violent incidents, or any violent past crimes. He stated that he was arrested for driving without a license- in the - past due to being overseas and his US license expired.

246.     In evaluating Mr. Addahoumi, Dr. Bryant wrote, "He and the therapist discussed the possible cultural variables that may be impacting him on campus, including his ethnic heritage and name, which likely influence others' perception of him, fairly or unfairly. They discussed how he may be able to navigate interpersonal interactions with this awareness. The therapist reminded him that should he become distressed he can utilize the services of the CHDC as a way to cope and potentially avoid another BIT incident".

247.     In his final assessment of Mr. Addahoumi, Dr. Kilborne concluded that, "Sammi does not appear to be a danger to others or a risk to himself based on his self-report of current mood and cognitions, explanation of his previously concerning statements, and his denial of past violent thoughts and actions. Cultural factors may influence others' perception of him, elevating his assertive or abrasive behavior to the assumption of a dangerous threat in the view of others".

248.     Immediately afterwards, Mr. Addahoumi was then again forced to meet with Defendant Liggett for over an hour. At no time was Mr. Addahoumi told what policy he had violated. Mr. Addahoumi requested a copy of any complaints or "concerns" filed against him and for the

identity of his accusers. Dr. Kilbourne provided Mr. Addahoumi only the vague statement that the mandated assessment was a result of his interaction with USCPD. Defendant Liggett, however, refused Mr. Addahoumi's numerous requests, and instead insisted that such information was "confidential", before mentioning that the complaints were "anonymous".

249.    In addition to the punishment of Behavioral Intervention Team sanctions and mandates, Defendant Prill, Defendant Liggett, and other Defendants also charged Mr. Addahoumi with violating the USC Code of Conduct.

250.    On August 14, 2013 Mr. Addahoumi received an official Notice of Charge from the Office of Student Conduct. The subject heading of the official USC email stated "Official Correspondence from the Office of Student Conduct 2013004501".

251.    The 9:57 AM Notice of Charge email read as follows:

"THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA.

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience

difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Message link:

https://publicdocs.maxient.com/view.php?inst=UnivofSouthCarolina&code=63vWUk8mT0DaK4mYermWEpSTCbtS7nF8

Office of Student Conduct
and the Office of Academic Integrity
901 Sumter Street Suite 201
Columbia, SC 29208
(803) 777-4333
osc@sc.edu".

252.     In addition the inordinate number of notices and emails described above, on August 14, 2013 Defendant Bedford sent Mr .Addahoumi yet another email which again demanded involuntary compliance with vague mandates.  Defendant Bedford's 10:02 AM email stated:

"Dear Mr. Addahoumi,

Please see the attached letter outlining the date and time for your appointments with the Chair of the Behavioral Intervention Team and Lara Sheehi at the CHDC on 8/16/13. Thank you so much.

Tim Bedford".

253.     The attached letter described by Defendant Bedford was an Official Notice of Charge from the USC Behavioral Intervention Team. The Official USC letterhead read as follows:

"August 14, 2013

Sammi Addahoumi

Sent electronically to addahoum@email.sc.edu

PERSONAL AND CONFIDENTIAL

Regarding Case Number: 2013004501
Dear Mr. Addahoumi,

The University of South Carolina is concerned about the well-being of all of its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health and/or well-being in the USC community. I hope that your situation is improving. The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.

Due to these concerns and policies, you must meet attend two meetings. The first meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC). The second meeting will be with a member of the BIT. Your first meeting is in the CHDC with counselor, Lara Sheehi on the 7th floor of the James F. Byrnes building to begin your assessment on August 16, 2013 at 2:00 pm. Students must arrive 15 minutes early to the CHDC to complete paperwork. You should inform the receptionist that you received a BIT letter.Your second meeting is with a BIT member so that we can answer any questions and explain the concern and the next steps. This second meeting is on August 16, 2013 at 4:00 pm with Alisa Liggett in the Byrnes Building Suite 201 (901 Sumter St.).

The total assessment will conclude after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community.

Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counseling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.

If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending your appointments, please call him/her at 803-777-5223 and request that they contact us with any information that you are willing to release.

If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services (SDS) accompany you, please contact our office and the SDS at 777-6142 at least 48 hours prior to your appointment time.

Our goal is to be educational and maintain the standards of the institution we share. If you would like additional information about your rights or the conduct process, please reference http://www.sc.edu/policies/staf626.pdf. We appreciate your cooperation and look forward to meeting with you.

If you have questions about your case or about your sanctions, please contact me immediately 803-777-4333. Additional information about policies and the conduct process can be found on-line at www.sc.edu/osc.
I look forward to meeting you.

Sincerely,

Alisa Liggett

Chair of Behavioral Intervention Team".

254.    On August 15, 2013, at 10:54 AM, Mr. Addahoumi received yet another unsolicited email from Defendants and the USC Student Health Services office.   The official USC email contained the subject heading "Appointment Reminder" and stated the following:

"This message is to remind you of your appointment scheduled with Student Health Services COUNSELING AND HUMAN DEVELOPMENT CENTER with SHEEHI, LARA at Byrnes 7th Fl. Counseling Location on:

Friday August 16, 2013 at 2:00 PM

To be prepared for your appointment:

Please bring your student ID card and arrive at least 15 minutes early for your appointment

To CANCEL this appointment please log on to:

https://myhealthspace.ushs.sc.edu or call 803-777-3175

If you do not show up for your appointment, or do not give at least 24 hours advance notice of cancellation, you may be subject to a no-show fee.

Please remember to protect your personal health information and never give your username and password to anyone; including your parents. Student Health Services will never ask you for this information.

Student Health Services offers general medical care, comprehensive women's care, laboratory, radiology and physical therapy services, a pharmacy, an allergy/immunization and travel clinic, sports medicine clinic, counseling and psychiatric, health education and wellness programs, and

sexual assault and violence education services. We hope you will use our services during your time at the University of South Carolina and let us know how we may assist you in meeting your academic goals.

This email has been automatically generated. Please Do NOT REPLY".

255.    Mr. Addahoumi continued his studies, selecting required classes towards his major in Political Science and minor in Middle Eastern Studies and Islamic World History.    As an elective, Mr. Addahoumi enrolled in POLI 391: Terrorism and Homeland Security, taught by Defendant Leslie Wiser.    In addition, Mr. Addahoumi enrolled in POLI 391: Dictatorships, instructed by Prof. Clay Fuller.

256.    On September 20, 2013, Defendant Wiser filed a Behavioral Intervention Team Incident Report about Mr. Addahoumi's speech. In his report, Defendant Wiser alleges, "Mr. Addahoumi has been disruptive in class (Terrorism and Homeland Security CRJU 491T) by speaking without being recognized in order to advance his view of foreign affairs."

257.    Defendant Wiser further alleges, "I thought I had managed these in-class disruptions, but Mr. Addahoumi sent an inappropriate email on Blackboard on 9/17 to the entire class and to me, which was brought to my attention this morning. The email was disrespectful towards me, challenging my qualifications to teach and suggesting I had an agenda".

258.    Defendant Wiser also alleged that, "In the email, he said, "bin Laden was 100% made by America" and "Hamas was created by Israel." He denounced one topic I covered as "Zionist propaganda." After reading it, other students in the class today expressed safety concerns about Mr. Addahoumi to the Staff".

259.    Defendant Wiser then admitted that, "A staff member made me aware of Facebook postings by Mr. Addahoumi that show individuals holding firearms and making hand gestures. I

have contacted the EOC Office and Student Conduct, both of which recommended I report this incident via BIT".

260.    In the accompanying "Case Resolution Form", Defendant Liggett wrote, "Resolved through soft intervention with course instructor. Also, Scott Prill and the FBI looked into the matter and saw no threat".

261.    Defendant Wiser filed both a Behavioral Intervention Team Incident Report and a Student Conduct incident report in an attempt to investigate and sanction Mr. Addahoumi's protected speech.

262.    Mr. Addahoumi was not provide copy of Defendant Wiser' s report, nor was Mr. Addahoumi even informed of its existence, being unaware of either the complaint or any resulting investigation.

263.    Defendant Wiser and USC BIT Defendants chose to ignore the fact that even if Mr. Addahoumi's "email was disrespectful towards" him, or did "challenged his qualifications to teach" or "suggest he had an agenda", all were protected speech.

264.    Defendant Wise claimed a "staff member" had "made him aware" that Mr. Addahoumi was somehow a terrorist based on alleged Facebook photos, though Defendant Wiser conveniently fails to name who the "staff member" was, and how or why Defendant Wiser was "made aware".

265.    Upon information and belief, there are thousands of USC students whose Facebook photos include either "hand gestures", or "firearms", or both.

266.     Despite this obvious fact, Defendant Wiser reported only Mr. Addahoumi

267.    Defendant Wiser failed to report that the "hand gestures" in question were "peace" signs, or that the alleged "firearms" include a single member of the (US armed) Libyan National Army, with a single rifle, in front of a huge, beautiful, American flag.

268.    In other words, Defendant Wiser knowingly misrepresented the context of screenshots from video content that had previously been aired on CNN for being so obviously pro American, as the armed man proudly declared "I love America" and "I love Obama".

269.    In the accompanying "Case Resolution Form", Defendant Liggett wrote, "Resolved through soft intervention with course instructor. Also, Scott Prill and the FBI looked into the matter and saw no threat".

270.    Defendant Wiser reported Mr. Addahoumi's harmless and protect speech to not only the USC Behavioral Intervention Team and Office of Student Conduct, but went so far as to involve Defendant Prill, USCPD, and even the FBI.

271.    Again, for absolutely no reason whatsoever, Defendants chose to not only expend valuable resources to investigate Mr. Addahoumi's speech themselves, they chose to report Mr. Addahoumi the FBI and other law enforcement agencies.

272.    Defendant Wiser then encouraged other students in Mr. Addahoumi's CRJU class to harass, intimidate, and report Mr. Addahoumi to law enforcement officials.

273.    On September 23, 2013, Mr. Addahoumi received a threatening email from classmate Wesley Bird, via Blackboard, which stated:

"YOU'RE A FUCKING DUMBASS.  HOW ABOUT YOU SHUT YOUR FUCKING PIE-HOLE AND DROP OUT OF THE CLASS. WE, (trust me, WE) ARE SO FUCKING TIRED OF YOU OPENING UP YOUR DISRESPECTFUL AND IGNORANT MOUTH IN CLASS. YES, I KNOW WHO YOU ARE, AND THE NEXT TIME YOU OPEN YOUR MOUTH TO CORRECT A PROFESSOR AT USC, DISRUPTING HIS LECTURE AND OUR CLASS IN DOING SO, I'LL BE GLAD TO TELL YOU TO SHUT THE FUCK UP.  YOU ARE A NOBODY.  GET THAT THROUGH YOUR POMPOUS AND PRETENTIOUS SMUG LITTLE PEABRAIN."

274.    Wesley Bird "CC'd" or "Carbon Copied" every single member of Defendant Wiser's CRJU class, including Tara Martin, Defendant Wiser's teaching assistant.  The only person not "CC'd" was Defendant Wiser. Despite having a duty to report such obvious harassment, Tara Martin failed to do so.

275.    In response to the disturbing email from Wesley Bird, Mr. Addahoumi also sent an email his CRJU 391 classmates.  Unlike Wesley Bird however, Mr. Addahoumi also included Defendant Wiser among the email recipients as a matter of courtesy.

276.    Mr. Addahoumi's email read as follows:

"Terrorism sucks.  It sucks so much that no war, no army, nor any weapon has ever been able to defeat it.  But don't get depressed…or mad…or let our government start another war.  There is something we can do.

We can think critically.  We can ask questions. We can ask critical questions about how and why terrorism occurs.  We can accept statements not as true, but only true until proven false.

Unfortunately, this requires reading.

 Usually lots of it.

Terrorists know people don't like to read.  In fact, they count on it. That, in fact, is why terrorism continues.  People don't like to read.  Simple as that.

If people read more, whether their Koran, Bible, Torah, history books, or even the newspaper, we might actually have a chance against an enemy that preys on our ignorance.

However, because not everything that we read is true, to the extent that it may even be false, reading is, unfortunately not going to be enough.

Terrorists know that some people can read a book cover to cover and no idea what the book is really about. The fight against terrorism necessitates not only reading, but analyzing concepts, themes, arguments and ideas for validity.

Those who profit from terrorism really, really do not want you to read the section entitled "After Indochina" on the second page in the attached document.  Seriously, wars have been fought over it.

Oh, yeah, and contrary to the video shown in class, there actually was a warrant to arrest Osama Bin Laden in Sudan in 1998.  It was an Interpol warrant issued by none other than the late, not so great, Muamar Gaddafi of Libya.

Also note that the video referred to Abdullah Azaam as a 'creature' and that the nose of the actor playing Bin Laden was oddly distorted, like the wicked witch from Oz.  Just saying.

Azaam taught Bin Laden first, not in Afghanistan with the CIA, but in a Saudi classroom.  The textbooks they used, which refer to non-Wahhabis as 'apes, monkeys, and pigs', are still being circulated not only in Saudi Arabia, but around the globe by the House of Saud.

And who is Saudi Arabia's best friend?

See what I mean when I say thinking critically?

And Vienna is in Austria, not Poland. Anyways, Muslims today care as much about the gates of Vienna as they do about the medieval apostasy of Ibn Tamayyia…..which is none.

They care and worry about the CIA funding terrorism.  Just like us.

Don't shoot the messenger…though some are taking aim.  Here is a bonus to the attachment."

277.      Mr. Addahoumi included in the email a scholarly article from an academic journal about US involvement in Afghanistan during the Cold War.  In addition, Mr. Addahoumi included a copy of the email sent to him by Wesley Bird.

278.      Mr. Addahoumi's comments about Vienna referred to a lecture Mr. Wiser had made essentially claiming that Muslims were still trying to take over Europe as they had during the Battle of Vienna in 1683.  During the lecture, Defendant Wiser repeatedly stated that Vienna was in Poland.  Mr. Addahoumi, out of courtesy, did not correct or interrupt Defendant Wiser in class, contradictory to Defendant Wiser's allegations in his complaints about Addahoumi.

279.      The next morning, August 24, 2013, Mr. Addahoumi printed the email and delivered a copy to Defendant Liggett as a complaint, dropping it off in the Office of Student conduct when told Defendant Liggett was not in the office at the time.

280.      Mr. Addahoumi heard nothing back from Defend Liggett and received no response from the Office of Student Conduct regarding his complaint.

281.      On September 12, 2013 Mr. Addahoumi received an email from POLI 391: Dictatorships classmate Hanna Kim, who wrote:

"Thanks!

I'm glad somebody is helping me organize what I've been thinking all along into words.

Hope to hear and see more of your opinions in class".

282.    On September 16, 2013 Mr. Addahoumi sent an email to Prof. Fuller in which Mr.

Addahoumi wrote:

Hello Professor Fuller,

I found  the questions to be fair, given the assigned readings.  I have been wondering how

exactly to approach foreign elements that prop dictators up.  Summarizing the Saudi winning

coalition at face value is easy enough…but what if the real winning coalition really consists of

another (American) government or corporation (big oil)?

Surely someone has had the same question about Syria in regards to who exactly is really

keeping the dictator in power?  So far, I have seen only a scant reference to the fact that foreign

powers may place a dictator in power and/or sustain him.

Keep in mind that "fair" is a relative term.  If I am able to answer all of your given questions

regarding Saudi Arabia, as anticipated, I would have way more than enough material to start my

own think tank.  The last thing the world needs is one more think tank.  If anything, I might

suggest a required reflection on how America helps or hinders assigned dictatorial regimes.

P.S.  I am in the market for a Libyan wife…who may have a sister for you.

But do not get your hopes up.  Saadi Gaddafi took the Amazonian Harem with him to Niger.

Talk about stealing from the people…

Thanks,

Sammi

283.    On September 27, 2013, Defendant Mr. Addahoumi received an email from Defendant

Scott Prill, Associate Director of the USC Division of Law Enforcement and Safety. The email,

sent at 6:08 pm, read as follows:

"Sammi

I received a message that you wished to discuss your bicycle theft case and other concerns about how the case is being handled.  If you would like to set something up next week, I would be happy to meet with you.  Let me know some available dates/times and we will try and get something scheduled.

Have a good weekend.  Scott".

284.    Defendant Prill did not inform Mr. Addahoumi who he received said message from or why USCPD was contacted on his behalf.    Defendant Liggett knowingly communicated confidential and false information to Defendant Prill.

285.    Defendant Prill had already reported Mr. Addahoumi to the FBI, resulting in two FBI agents questioning Mr. Addahoumi in is home. The FBI agents instructed Mr. Addahoumi to avoid the USCPD and further instructed him not to return to the USCPD headquarters regarding his stolen bicycle.

286.     As a result, and in response, on October 1, 2013, at 4:21PM, Mr. Addahoumi responded to Defendant Prill's unsolicited email. The email, with the subject heading of "Re: Bicycle Theft Case", read as follows:

"بسم الله الرحمن الرحيم"

Hello Officer Prill,

Thank you for the time and effort extended towards my concerns.  I have repeatedly requested such standard procedural courtesy of effort, to the effect that I have spent hours putting together items which leave absolutely no other doubt than that the lack of initial effort was systematic and institutional. I request direct and uninhibited access to your victims services or corresponding, legally required, ombudsman. As all the catered seminars and training workshops make for little

time or resources to actually protect or serve the public, here is what an ombudsman, a concept

derived from the earliest Islamic form of Sharia mandated caliphate government, actually means.

http://www.justice.gov/usao/eousa/vr/

I investigated.  I gathered evidence.  I collected witness statements.  I collected expert

statements, official University of South Carolina documents and statements, personal statements.

provided motives.  I outlined and pooled suspects.  I reconstructed the crime scene.  I itemized

the chain of events, giving:

a.    Exact coordinates of MULTIPLE cameras with ABSOLUTELY THE BEST AND

CLEAREST ANGLE TO VIEW crime scene.  If the suspect walked 2 feet back from the crime

scene, he WOULD HAVE HIT THE CAMERA...WHICH MAINTAINS A CONTINUOUS 360

degree unobstructed view of said crime scene.

b.  EXACT DATE, down to the minute, that crime took place.

c.  Expert advice on logistics and semantics of surveillance technology and the latest standard

storage applications. I would be more than happy to resupply to your department any number of

these documents, though unless some obstruction of justice has occurred, said documents should

be  waiting  neatly  and  plentifully  in  the  form  in  which  they  were  submitted,  which,  after

deliberating over, you have come to the conclusion that any attempt to pursue the matter is

undesirable.

Check the date. Check video.

As I tried to explain to your officers, USC STAFF, STUDENTS, and PARENTS would be

alarmed to know that allocated resources which should legally ensure compliance with various

statutes and requirements, say, how long state or public official documents must be stored and

secured  so  that  that  they  are  accessible  in  the  event  of  a  crime......that  those  resources  are

misappropriated to the extent that minimal legal requirements that protect the public are not bring met....in behavior institutionalized throughout the department itself.

I will look forward to hearing from victim's services.

Thanks again

Sammi Hassan Addahoumi".

287.    The 2013-2014 Carolina Community Coalition of the University of South Carolina Student Life office has posted its Coalition and Subcommittee Member List. On the Steering Committee, Defendants Les Wiser, Alisa Liggett, Scott Prill and are named[sa2].

288.    Also on Oct 1, 2013, at 5:35 PM, Mr .Addahoumi wrote to his longtime family attorney Gary White to express his legal concerns over his treatment by the Defendants and the legality of the USC BIT in general.  Mr. Addahoumi wrote:

"Something I threw at USCPD after specifically requesting in writing,  in person, to make an appointment with victim services.  It was repeatedly expressed to the officer on duty that the request was to go DIRECTLY to victim services.

 More clearly made was the point that the victim felt targeted and victimized, and as so, insisted that involved officers should only be made privy to request AFTER victim services determined, through meeting or discussing case and concerns with victim, that further victimization was not a threat.

Any  ideas  on  the  actual  legalities  regarding  the  concept  victim  services  or some other ombudsman, independent mediation/oversight?

No hurry or even a reply needed.

Just curious about your thoughts.

I included a touch of Islam to push my previous written grievance , that my requests for access to victim service advocacy resulted in the USCPD to contact the FBI...who came to my door to interrogate me concerning my trip this summer to celebrate Ramadan with my family, a religious requirement if able to do so.

The 2 FBI agents told me "that it would be a good idea to stay away from the USCPC office (on campus) to avoid them (the FBI) from having to come back."

This was after another Orwellian social control mechanism, the B.I.T. program at USC, has twice proved ineffective in keeping me quiet.

 In case you are curious, they literally had to change number two (2) at the top of the page to specifically "online behavior" that "disrupts" the "mission of the faculty" due to my actions.

Previously, last semester, it was worded "harmful or threatening online activities".

This is because last semester, I used the student email system to inform 2 different classes in which I was enrolled that the professor was purposely teaching creative writing in what was supposed to be a class labeled Middle Eastern politics.

My own investigation found that the professor is actually the very close brother of former Israeli prime minister, convicted and jailed for corruption, Ehud Olmert.

He is also the author of a book, written in 1984 for Zionist propagation among southern evangelicals, that accuses Arabs of racial inferiority and encourages readers to develop meetings with Christian officials and neighbors to read and discuss "conversation points" which are provided in each chapter for that purpose.

I shared, after each class, links to academic works or new articles that often invalidated his entire lecture, simply based on easily accessible and widely accepted historical documents.

And I repeatedly added the fact that, while of course it would never be a problem for a Jew to teach Middle Eastern history, politics, or religion, there was an undeniable conflict of interest allowing a professed Zionist extremist to indoctrinate racial propaganda under the guise of "Middle Eastern Studies".

Not unlike having a media director for Al Qaeda teaching Jewish history or politics.

Shit is bound to get lost in translation and kids today can't interpret it as invalid...because it is coming from the "expert teacher".

Go Cocks!

Sammi


289.    On October 10, 2013 Mr. Addahoumi received yet another email from Defendant Grewe and USC BIT Defendants.  The email stated:

"Hello,

I hope your semester is going well! Good luck on midterms and enjoy fall break. If you could please take 3-4 minutes to fill out this survey letting us know how your experience was with the Behavioral Intervention Team (BIT) was, it would be greatly appreciated!
http://studentvoice.com/usc/bitalcohol1314

Many thanks,

Alisa Liggett, Chair of BIT

Tim Bedford, Case Manager for BIT

Maureen Grewe, Coordinator for BIT

PLEASE NOTE:

The information transmitted in this email is intended only for the person(s) or entity(ties) to which it is addressed and may contain confidential and/or legally privileged material. If you received this in error, please contact the sender and delete the material from any computer. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited".

290.    Mr. Addahoumi still had absolutely no idea who Defendant Bedford was.   Mr. Addahoumi has never once met or spoken with Defendant Bedford.  Mr. Addahoumi did not consent in any way, shape, or form to Defendant Bedford's actions as he his USC BIT "case manager".   Mr. Addahoumi never, in any way, consented to the release, much less to the management of, his educational records, discipline records, or medical records to Defendant Bedford.

291.    Mr. Addahoumi still had absolutely no idea who Defendant Grewe was.  Mr. Addahoumi has never once met or spoken with Defendant Grewe.  Mr. Addahoumi did not consent in any way, shape, or form to Defendant Grewe 's access to his educational record, his medical records, or his disciplinary records.  Mr. Addahoumi never, in any way, consented to the release, much less to the management of, his educational records, discipline records, or medical records to Defendant Grewe.

292.

293.    On October 11, 2013 Defendant Wiser told the class that "in domestic terrorism cases, both the defense and the prosecution have equal access to expert witnesses, each had access to an equal amount of resources and that paid FBI informants did not raise any issues of entrapment in such cases.

294.    Knowing this to be untrue, Mr. Addahoumi raised his hand, and after waiting for other students to speak, he was called upon by Defendant Wiser.

295.    Mr. Addahoumi calmly and politely asked Defendant Wiser if he were sure about his statement, that both prosecution and defense have equal access to resources in trial, whether terrorism related or not.

296.    Defendant Wiser insisted he was correct, to which Mr. Addahoumi replied "it's a well-known fact that the prosecution has unlimited resources while the opposite is normally true for the defense.  On what planet is your statement accurate and why would you lie to the class about the legal concerns raised in such cases?  Research shows that most of the cases involved paid FBI informants and raise serious issues of entrapment".

297.    Before Mr. Addahoumi could finish his statement, and before Defendant Wiser could respond, student Jane Doe suddenly stood up and began screaming at Mr. Addahoumi, telling him she was "tired of him" as she threw her chair down, ran screaming out of the room spastically flailing her arms s in every direction, before violently slamming the door behind her.

298.    Mr. Addahoumi, to say the least, was stunned by this unprovoked outburst, bewildered and unsure why he was the intended target.  He looked to Defendant Wiser for a response, assuming the disruption had ended, however odd.  Mr. Addahoumi was concerned that Jane Doe was hyperventilating yet he was certain the episode had nothing to do with him.

299.    At that point Defendant Wiser ordered Mr. Addahoumi to leave the classroom and not come back.

300.    Flabbergasted, embarrassed, and confused at why or how he was being blamed for the uncontrolled outburst of another classmate, Mr. Addahoumi told Defendant Wiser that he had paid for the class like everyone else and should not have to leave simply because another student screamed at him and then ran out of the room.

301.    Defendant Wiser became visibly angry when Mr. Addahoumi attempted to assert his rights, with Defendant Wiser yelling at him to leave or the USC police would be called.

302.    Mr. Addahoumi, certain he had done nothing wrong, told Defendant Wiser that he would wait for the USC police outside so that Defendant Wiser could continue class.

303.     Mr. Addahoumi waited a full 15-20 minutes outside the CRJU building intending to speak with USCPD. When USCPD did not arrive, Mr. Addahoumi filed his own Behavioral Intervention Team report about the incident.

304.     Mr. Addahoumi filed a clearly worded report about the incident in full. He knew Defendant Liggett had told him that it "was her job" to look into any reports and that "she had no choice but to investigate every complaint, and, as such, Mr. Addahoumi utilized the mechanism to address his very valid concerns about being forced to leave class under threat of arrest by Defendant Wiser.

305.     To Mr. Addahoumi, this was highly unusual and offensive as he was excelling in the class, as well as his other classes and he wanted his complaints addressed. When Mr. Addahoumi filed his Behavioral Intervention Team report, he did so in good faith that his concerns would be addressed, yet the exactly opposite occurred.

306.     Mr. Addahoumi wrote, "Professor" or rather Agent Wiser, has direct conflict of interests in teaching a class on "terrorism". He is an FBI agent who also contracts as a private security consultant based on his involvement with the FBI.

307.     Mr. Addahoumi further wrote, "In regarding the subject matter, he has targeted Islam and Arabs using populist and widely discounted sources rather than academically credible and widely available material".

308.     Mr. Addahoumi also wrote, "Such an involvement with the FBI or other organizations has led any and all lectures to be merely regurgitation of overly biased, discriminatory, and agenda led opinion rather fact."

309.     Mr. Addahoumi complained, "Instead of being a judge or non-biased 3rd party, he is teaching the class in relation to the one sided perspective of parties interested in persecuting

Arab and Muslims. It is a class of biased opinions and dis proven allegations rather than academic facts".

310.     Regarding any effects/impacts of the behavior, Mr. Addahoumi wrote, "Students are lied to repeatedly, making the learning environment impossible without a critical assessment of his teaching materials and lectures based on widely agreed upon academic criteria".

311.     Regarding any attempts to address the behavior, Mr. Addahoumi wrote, "Repeated attempts have been made with no effect, despite reluctantly addressing obvious discrepancies when they have been brought to light only under after my own suggestion based on my own intensive reviews of the wide ranging subject matter."

312.      Mr. Addahoumi complained, "The truth only comes out when I bring it out.  His lectures are biased to the point of targeting Muslim, Arab, or even African-American students."

313.     Regarding any other information about the individual that might be relevant, Mr. Addahoumi complained, "All of his material is provided by the FBI or associated agencies, resulting in far from academic elements, even a market or profit driven approach that perpetuates stereotypes to further FBI interests. We should be learning how to protect the Constitution rather than learning from agencies seeking to weaken it."

314.     Regarding his relationship to the subject of the BIT complaint, Mr. Addahoumi complained, "I paid for and enrolled in the class to fill academic requirements but such a thing requires academics and not special interests monopolizing the learning environment".

315.     Mr. Addahoumi concluded his BIT complaint, stating "Here is the truth: Somehow all of this escapes his lecture on the topic and he refused to allow me to present it as contradicting his conflicted interest, and forced me to leave the classroom: http://www.theguardian.com/world/2012/mar/20/fbi-informant".

316.     Mr Addahoumi's complaint was submitted via Maxient and routed to Defendant Tim Bedford.

317.     Despite the fact that Defendant Bedford chose to deem every single complaint against Mr. Addahoumi actionable, Defendant Bedford chose to not only ignore Mr. Addahoumi's complaints, but to retaliate against Mr. Addahoumi by pursing sanctions against him for submitting his BIT incident report.

318.     Minutes after Mr. Addahoumi submitted the above Behavioral Intervention Team incident report, he received an email from Defendant Liggett with an official notice from the USC Office of Student Conduct and Academic Integrity. The official notice from Defendant Liggett read as follows:

"THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Message link:

https://publicdocs.maxient.com/view.php?inst=UnivofSouthCarolina&code=mlOh8E4wjD0ML

OSXrzHyBNHr2EwGttQo

Office of Student Conduct
and the Office of Academic Integrity
901 Sumter Street Suite 201
Columbia, SC 29208
(803) 777-4333
osc@sc.edu

319. The Maxient link directed Mr. Addahoumi to a Shibboleth authorization page, allowing

access an Official USC Notice of Charge document in which Defendant Liggett wrote:

"Regarding Case Number 2013063501

Dear Mr. Addahoumi

Based on the severity of the ongoing alleged classroom disruption and on the alleged incident

occurring this morning, you will not be permitted to attend CRJU 491 until these allegations are

resolved. Failing to comply with this directive will result in an additional Code of Conduct

charge. If someone in the class feels threatened and calls the police because you are not

permitted to be present, it could result in arrest.

I want to reiterate what I left on your voicemail. Your removal from the course is a possibility if

you are found in violation of the Code. If you are removed on Monday, you will receive a WF.

If you remove yourself today, by withdrawing on VIP, you will receive a W. Person to person, I

urge you to weigh the gamble of adding an F to this situation.

I attempted to contact you by phone at noon to be sure you received this and so that we could

talk about it, but it appears you have forwarded your voicemail to the restaurant's voicemail and

out of respect for you, I did not want to leave details of this information there.

I will see you for our meeting on Monday at 3:30pm.

Sincerely,

Alisa Cooney Liggett

Executive Director of Student Conduct and Academic Integrity".

320.    In her Official USC Notice of Charge, Defendant Liggett attempted to silence Mr.

Addahoumi's protected Free Speech and deny his Constitutional rights to due process by

threatening Mr. Addahoumi with a failing grade, additional "Code" charges, and even arrest.

321.    Defendant Liggett attempted to intimidate Mr. Addahoumi into withdrawing from his

CRJU class, threatening not only to not remove him herself, but also record a grade of F on his

transcript if he failed to do so.

322.    Defendant Liggett attempted to intimidate Mr. Addahoumi into withdrawing from the

class because, since no conduct violation had actually occurred, Defendant Liggett could not

forcibly remove Mr. Addahoumi from the class, much less give him a failing grade after doing

so.

323.    Defendant Liggett, at best, willfully misrepresented the facts, and at worst, duplicitously

provided false information regarding both the incident and her actions.  Defendant Liggett's own

statements contradict themselves.  Defendant Liggett first claimed "I want to reiterate what I left

of on your voicemail", only to then claim "I attempted to contact you by phone at noon to be sure

you received this and so that we could talk out it, but it appears you have forwarded your

voicemail to the restaurant's voicemail and out of respect for you, I did not want to leave details

of this situation there."

324.    Defendant Liggett did not, in fact, make any attempt to call Mr. Addahoumi, nor did

Defendant Liggett leave any voicemail messages for Mr. Addahoumi.  Upon information and

belief, Defendant Liggett knowingly called Mr. Addahoumi's father, whose phone number was provided as an emergency contact. Despite Defendant Liggett's claim that she did not want to leave a voicemail "out of respect" for Mr. Addahoumi, she did, in fact, not only call Mr. Addahoumi's father multiple times, but knowingly left several messages on Mr. Addahoumi's father's voicemail.

325. At no time did Mr. Addahoumi provide a FERPA waiver to Defendant Liggett, nor did Defendant Liggett request a FERPA waiver. At no time did Mr. Addahoumi provide consent or permission for Defendant Liggett to contact his father and at no time did Defendant Liggett request said required consent or permission to discuss or share Mr. Addahoumi's educational record.

326. Defendant Liggett's contradictory statements can only be reconciled with the knowledge that Defendant Liggett purposely and willfully feigned ignorance in calling Mr. Addahoumi's father, leaving numerous voicemail messages, as she carefully created her own paper trail of plausible deniability. This is but one example of Defendants sadistically bureaucratic "Risk Management" focus on paperwork and record keeping to fabricate support for Defendants' own highly subjective, baseless narrative.

327. Thirty minutes after submitting his Behavioral Intervention Team incident report, Mr. Addahoumi received an email from Defendant Schneider. The email, sent at 10:27 AM October 11, 2013, stated the following:

"Good Morning Mr. Addahoumi. I have attached an initial appointment letter from the Department of Student Conduct. Alisa Liggett would like to meet with you on Monday at 3:30 PM. Please read the attached letter."

328.     The attached Official USC Notice of Charge letter read as follows:

"Regarding Case Number 2013063501

Dear Mr. Addahoumi,

The mission of Student Conduct and Academic Integrity is to promote individual student development and a campus climate of civility and accountability.  We aim to advance responsible community citizenship through promotion of the Carolina Creed.  Our office has recently received information suggesting you may have been involved in or been a witness to an alleged violation of the Student Code of Conduct.  The information concerns an incident that occurred on in (sic) class.

  A meeting has been set for you on October 14, 2013 at 3:30 pm in the Student Conduct office in the James F. Byrnes Building (at the open end of the Horseshoe) in Suite 201.  In the meeting we will discuss the incident report, what happened, your rights, your assessment of how your actions did or did not uphold the Carolina Creed, and (should you be found responsible for a violation) the resolution options available.

Failure to keep your appointment may result in a hold on your registration, an additional Code of Conduct charge of Failure to Comply, and/or completing the hearing without the benefit of your participation."

At 12:07 PM on October 11, 2013, Mr. Addahoumi received yet another official email notification from the USC Office of Student Conduct. and USC BIT Defendants   The official Notice of Charge stated:

"THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID

number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Message link:
https://publicdocs.maxient.com/view.php?inst=UnivofSouthCarolina&code=dJIMSA0GSkwQK
DcoyjCeaFgOW84gAerV

Office of Student Conduct
and the Office of Academic Integrity
901 Sumter Street Suite 201
Columbia, SC 29208
(803) 777-4333
osc@sc.edu

329.

330. On October 14, 2013 Mr. Addahoumi was yet again forced to meet with Alisa Liggett.
Defendant Liggett handed Mr. Addahoumi a piece of paper and told him to sign his name on the document.  Mr. Addahoumi refused to sign the document and repeatedly asked Defendant Liggett for a Student Judicial Hearing, conducted by the Carolina Judicial Council.  Defendant Liggett told Mr. Addahoumi that if he refused to sign the document, she would be forced to continue "the investigation", which would turn the case, which she viewed as "resolved", and "educational", into a "bigger more serious matter".

331. Mr. Addahoumi responded to this doublespeak, or Verbal Judo, by again demanding his right to a Carolina Judicial Council hearing instead of having Defendant Liggett conduct her own Kafkaesque "administrative hearing".

332. Defendant Liggett then informed Mr. Addahoumi that because he refused to sign the document, she would be "forced to continue the investigation".    Mr. Addahoumi concluded the meeting by telling Defendant Liggett not to contact him again, period, for any reason, other than to discuss his Student Judicial Council hearing.

333.    On October 15, 2013, Mr. Addahoumi received yet another official notice from the Office of Student Conduct and Academic Integrity. The email from Defendant Schneider included a letter Defendant Liggett which read as follows:

"Regarding Case Number 2013063501

Dear Mr. Addahoumi,

Thank you for meeting with me regarding an incident report suggesting that you may have been responsible for violating USC's Student Code of Conduct.  These student conduct meetings were designed to educate students about community standards and to hold students accountable when those standards are breached.  I hope it achieved that purpose.

In that meeting you acknowledged the essential accuracy of the report and agreed to have the resulting Code of Conduct charges resolved through a conduct hearing.

Your Code of Conduct charges and findings are as follows:

1. Disruptive Activity – Classroom Disruption –Responsible

You must complete the following sanctions:

You are restricted from CRJU 491.  Your presence in CRJU 491 without express written consent of the Office of Student Conduct and Academic Integrity will constitute a failure to comply and will result in immediate disciplinary action up to and including summary suspension from the University.

You must complete a period of Conduct Probation beginning October 14, 2013 and continuing through October 14, 2014. During this probationary period, any additional violations of University policy result in more severe sanctions, including suspension from the University.

With respect to the information listed above, the following additional sanctions/stipulations apply:

Sammi will not return to the classroom, but has willingly offered to propose an alternative plan to Professor Wiser to finish the course in an independent study style in which he either completes synopsis/analysis of the daily readings and completes the online tests, or completes a literature review with parameters agreed upon by both.

Failure to complete these sanctions will result in a hold being placed on your registration and an additional charge of "Failure to Comply", which can result in further sanctions.

If you have a documented disability that would require accommodation to complete these sanctions, please contact the Office of Disability Services at 777-6142.

If you have questions about your case or about your sanctions, please contact me immediately. Additional information about policies and the conduct process can be found online at www.sc.edu/osc.

Sincerely,

Alisa Cooney Liggett

Executive Director of Student Conduct and Academic Integrity"

334.    If Defendant Liggett's statements were reduced to one word, that word would be "inexplicable". Defendant Liggett knowingly and maliciously misrepresented the actual facts of the incident in the official Notice of Charge described above. Defendant Liggett provided

information she knew to be false and included multiple statements she knew to be untrue about Mr. Addahoumi and about statements Mr. Addahoumi had supposedly made.

335.     In the official Notice of Charge, Defendant Liggett wrote "In that meeting, you acknowledged the essential accuracy of the report".   First, this was not only untrue, but impossible, as Mr. Addahoumi was never provided a copy of said report, nor of the content of said report, nor even told who filed said report.  For this and many other reasons, it would have been impossible for Mr. Addahoumi to have "acknowledged the essential accuracy of the report".

336.     Secondly, there is more than sufficient documentation that Mr. Addahoumi knew and stated he had done nothing wrong, much less violated any "Codes", whether Academic or Disciplinary.   Yet in the official Notice of Charge sent to Mr Addahoumi, Defendant Liggett wrote that Mr. Addahoumi had "agreed to have the resulting Code of Conduct charges resolved through a conduct hearing."

337.     Defendant Liggett knew her statement was false and willfully misrepresented the undisputable fact that Mr. Addahoumi denied all charges. Mr. Addahoumi had objected to being removed from his CRJU 491, as he knew he had done nothing wrong, and repeatedly denied any charges relating to the incident.  Ample documentation exists of Mr. Addahoumi's numerous requests for a "Carolina Judicial Council" hearing regarding the charges.

338.     In the official USC Notice of Charge, Defendant Liggett, did not in any way define "Disruptive Activity".

339.      Defendant Liggett did not in any way inform Mr. Addahoumi what alleged actions of his constituted a "Classroom Disruption".

340.    Defendant Liggett threatened Mr. Addahoumi with "summary suspension" if he attempted to attend a class in which he had registered, already paid for, and was in all aspects qualified for. Upon information and believe, the term "summary suspension" was not found in any publically available USC policy or procedure.

341.    Defendant Liggett not only maliciously sanctioned Mr. Addahoumi by finding him "Responsible" or guilty, of alleged "Disruptive Activity", Defendant Liggett also sanctioned Mr. Addahoumi with a "period of Conduct Probation" lasting one full year.  As a result of this "period of Conduct Probation" incidental, petty, above all, false, complaints about Mr. Addahoumi resulted in severe punishment not conferred on other USC students for the same or similar allegations.

342.    In the official Notice of Charge and Notice of Responsibility sent to Mr. Addahoumi, Defendant Liggett further wrote that "Sammi will not return to classroom, but has willfully offered a propose an alternative plan to Professor Wiser to finish the course in an independent study style".  Defendant Liggett knew her statement to be false.

343.    At no time did Mr. Addahoumi agree to, much less "willingly offer", an "alternative plan" to finish the course.  Mr. Addahoumi was ordered by Defendant Liggett either to write a "Pass/Fail" research paper instead of attending class, or she, Defendant Liggett, would sanction Mr. Addahoumi with not only violations of Student Conduct charges, including "Failure to Comply", but also assign an F for the class on Mr. Addahoumi's University academic transcripts.

344.     Mr. Addahoumi continued to utilize his Blackboard student email to communicate with his professors from various courses.  For example on October 21, 2013, sent an email to his POLI 391: Dictatorships instructor, Prof. Clay Fuller, with the subject heading "Self-Censorship", in which Mr. Addahoumi wrote:

"Professor Fuller,

I found today's lecture interesting to say the least.  I am sure you know as well as I do about the not so friendly competition that our largest recipient of foreign aid perpetuates as state policy: STRATFOR vs. DEBKA.

Rosen, as we know, was one of many Israeli spies that operate in absolute plain sight.  Ehud Olmert's brother is teaching POLI 483 and POLI 449 here at USC for crying out loud.  But I digress.

I don't think foreign aid has anything to do with helping anyone or even maintaining corrupt dictators.  You hit around the financial aspect, but I really think that the real truth is in plain sight.  It's not so much about making money as it is about maintaining a system.  Aid, in any form, will not come without making sure capitalistic neo-liberal economic polices are enforced, no matter how much the US protects it's own markets with import tariffs.

All of the aid, in whatever form, simply creates and attempts to maintain an artificial demand for the Dollar.

It is literally so worthless that we have trouble giving it away.  It can only be maintained so long as massive debt is generated, which if not unsustainable in and of itself, must be further buttressed by ever expanding (occupied) markets.  It's just not going to work in the long run.

SHOCK THERAPY.  The Chicago Boys.  We should talk more about what America is willing to do to make sure the capitalist monster doesn't go hungry.

Hunger is for the ethnic.  Whether due to neo-con bombs or neo liberal stocks and bonds, it gnaws the same.

Giving Iran the bomb is a bad idea.    The Bland Corporation has a not so kosher Dr. StrangeLove, who will not be outdone this time…the prophecy of Greater Israel commands it. False Flag in the making.

Did I miss the super microscopic asterisk  in the STRATFOR quotes on globe graphic in the video FOREIGN AID that you showed in class?

take another look at Afghanistan and then Israel.  And then back at Afghanistan…and look back at Israel.

C'mon.  If you wanna beat the Mossad, you gotta have better facts than that.  Oh wait…you can't beat the Mossad.

PS game theory is fun because it is cloaked Kabbalah.  Think about it. Openly eliminating chance, while openly harnessing it.  Kinda like harnessing evil rather than defeating it.  Think of Stratfor and Debka, if they could even be compared, integrity speaking, on the same basic level: Information warfare mercenaries.

I have nothing against think tanks.  It just seems that once you declare yourself an expert in something, you must, by definition, be less knowledgeable in other fields.  One cannot be an expert in everything.  That denial results in an irreducible divide between the subject that knows and the object that is known.

Come to Benghazi and we'll get you a nice Libyan wife.


Sammi Addahoumi".

345.    Later that same day, October 21 2013, Prof. Fuller responded to Mr. Addahoumi's email. Prof. Fuller wrote:

"Hi Sammi,

Hahaha, try explaining all that to an undergraduate level class. It doesn't work. Trust me.

You make some good points. It sounds to me like, theoretically, you probably fall more in the

constructivist/critical camp. Would that be accurate?

Are you planning on graduate school? You could probably do really well at Ohio State.

constructivism can be really effective when done right. Have you ever read anything by

Alexander Wendt?

BTW, what is Debka? I'm obviously looking it up now, but I must admit I've never heard of it.

Clay R. Fuller".


346.	On October 22, 2013, Mr. Addahoumi received yet another notice from the Office of

Student Conduct. The email, with the subject heading "Student Conduct Process Assessment",

read as follows:

"Dear Student,

Upon review of our files it appears you recently met with a staff member at the University of

South Carolina regarding a violation of university or housing policies."

347.	The email did not state what violation Mr. Addahoumi supposedly violated or even the

purpose of the email, other than to harass him.

348.	Due to the unknown nature of numerous investigations of Mr. Addahoumi by

Defendants, there were numerous opportunities and programs that Mr. Addahoumi was unable to

participate in.  On November 14, 2013 Mr. Addahoumi informed Melissa Cole that he would be

unable to attend a CIA recruiting event if he were forced to preregister, for fear of Defendants

interfering and defaming him in the process.  There were numerous similar recruitments for

organizations such as the US State Department and US Foreign Services and the FBI that Mr.

Addahoumi feared attending due to the false records Defendants were compiling and did compile to defame him and disqualify him from such programs.

349.     Mr. Addahoumi not only reached out to USC students and faculty using his Blackboard student email, he also contacted local and national politicians.   This exercise of both his constitutional and academic freedom was, however, severely restricted by Defendants' constant and burdensome sanctions, involuntary assessment s, and mandated meetings.

350. For example Mr. Addahoumi attempted to reach out to S.C. Sen. Lee Bright and his campaign staff in effort to address specific issues that Mr. Addahoumi felt to be emerging national, state, and local trends.

351.     On October 30 2013 Mr. Addahoumi emailed Michael Stevens and specifically highlighted two trends that would later emerge as powerful social and political forces, the Confederate flag and the rise Black Lives Matter. Mr. Addahoumi wrote:

"Hey Brother,

Pardon the delay, but I have been trying to tie up some loose ends on campus.  I cannot guarantee that I can meet today, so I would rather not hold you up...though please do not let that stop you from trying out the Deli for lunch.

I will, however, be in touch with you as events unfold.  I am very interested in how your campaign values the Confederate flag vs.  the incalculable resources that could be mobilized if it were put at the forefront as an issue.

The best argument is against Graham's own statements about Bush's "clarity" in the war on "terror".

To connect the civil rights abuses promoted by Graham to the civil right struggles of African Americans, whether the wiretapping of MLK or the dogs used to attack protestors/prisoners or the racial profiling...

The black church as a force of mobilization is one that begs to be explored.  They need only to be presented with the connection between the civil rights struggle...with the civil rights struggle of today.

The black church is much less susceptible to Graham's AIPAC agenda rhetoric, especially if the state facilitated oppression of Palestinians can clearly be accurately compared to the apparent state facilitated oppression of Black America.

I can do that.  The question is if your campaign is ready to "shake things up".

I include an example as an attachment.
Here you have Graham going after a certain segment of society.
Are you willing to target the other only segment the population that can counter this?

As in guerrilla warfare, is it numbers and tactics, not treasuries, that will win this battle.
But you must give your fighters an ideology worth fighting for.
Graham sells an ideology of fear.
Your best bet is the ideology of reality.

I will be in touch.

Sammi".

Sent from my iPhone

Begin forwarded message:

**From:** "LEAPHART, JANIS" <LEAPHART@mailbox.sc.edu>
**To:** "POLINOTE@LISTSERV.SC.EDU" <POLINOTE@LISTSERV.SC.EDU>
**Subject: Re: Interns for Senator Graham**

Information attached above.

352.

353.

354.    On October 30, 2013, Mr. Addahoumi received an email from Jan Smoak with the subject heading "Checking back in-Critical Languages deadline approaches".  The email read "Sammi, We just wanted to touch base with you regarding the upcoming Critical Language Scholarship deadline. Given your interest, we hope you are planning to apply."

355.    Due to the unwarranted stress and deadlines imposed upon Mr. Addahoumi by Defendants, Mr. Addahoumi was unable to participate, despite such programs being the very reason he returned to USC.

356.    On October 30, 2013, Mr. Addahoumi received an email from Prof. Mohammed Gassi, his Arabic professor, requesting and thanking Mr. Addahoumi for sharing links with the class. The email read "Marhaba Ya (Hello) Sammi, Shukran Jazeelan (thank you very much).  I just sent it (the links) to students.  When you send me the (additional links) I'll forward it to them. Thank You Again."

357.    On A

358.     On March 15, 2014, Defendant Leslie Wiser filed and yet another Behavioral Intervention Team Incident Report about Mr. Addahoumi's protected Free Speech.

359.    In his report, Defendant Wiser alleges, "Mr. Addahoumi sent me an email threatening to sue me if I did not give him a passing grade for a paper he submitted in the email. The paper refers to me as a sociopath and dishonest. The level of hate demonstrated in the paper and its rambling nature are disturbing". (Exhibit D)

360.    Defendant Wiser further alleges, "Given the wide mood swings I have observed, especially between our last meeting and the 3/15 email, I have serious concerns about Mr. Addahoumi's stability. You may recall that Mr. Addahoumi was removed from my class during the Fall semester because of his disruptive behavior". (Exhibit D)

361.    In his report, Defendant Wiser admits, "I agreed to allow him to finish the course by submitting a paper. I thought he and I had agreed on a topic, and I have earlier email documentation of my guidance to him. (Exhibit D)

362.    Defendant Wiser further alleges, "I had not made a demand for the paper's submission. I am now concerned for my safety and that of my family. I have not responded to Mr. Addahoumi's email. I can attach documents (including documentation of guidance for his assignment) but I do not see a place on this form to do so." (Exhibit D)

363.    Defendant Wiser included the original text from Mr. Addahoumi's email, which read:

 "I wish things could have been different. Here is the paper which i owe you. As we discussed no rubric for the paper, I took it upon myself to tell the story that explains exactly why you did not want me in your class. Truth is very very dangerous. This is passing paper. IF you decide to make things difficult by failing me, you can add one more lawsuit that you will face in the city if Columbia. I wish you well. And I wish we could have made beautiful music together instead of this awful noise." (Exhibit D)

364.    The Behavioral Intervention Team document clearly states that Mr. Addahoumi was charged with "Erratic behavior", not under the Office of Student Conduct, but under the Behavioral Intervention Team. (Exhibit D)

365.    Despite charging Mr. Addahoumi with "erratic behavior" under the BIT, Defendant Liggett proceeded later on April 11th 2014 to charge Mr. Addahoumi with "Computer Misuse" under the Office of Student Conduct for the very same incident.

366.    Defendant Wiser at best misrepresents the facts and at worst blatantly lies in claiming that he had not requested or demanded the said research paper from Mr. Addahoumi as several emails exchanged between Mr. Addahoumi and Defendant Wiser make clear.  For example, a December 6, 2013 email from Defendant Wiser to Mr. Addahoumi, with the subject heading "Status", clearly stated "I haven't heard from you.  How are you progressing?"

367.      Defendant Wiser also misrepresents the nature of research paper topic. Defendant Wiser did not at all recommend any topics whatsoever.  There was no defined rubric for the mandated paper whatsoever.  The only terms defined by Defendant Wiser and Defendant Liggett regarding the paper laid out that the paper was "Pass/Fail", or that Mr. Addahoumi would not be graded on the traditional A-F scale, but instead would either receive a "S" for "Satisfactory" or a "U", for "Unsatisfactory", as per USC policy.

368.      Mr. Addahoumi alone suggested and decided upon topics for the mandated research paper. On October 23, 2013, Mr. Addahoumi emailed Defendant Wiser and stated: "I am open for whatever you suggest, or would be happy to toss a few options out.  A 9/11/12 Report would be interesting.  Sort of an update of the Commission's Report."

369.      On March 24, 2013, Mr. Addahoumi received yet another unsolicited and harassing official USC notification from Defendant Liggett. In her 4:07 PM email, with the subject heading "Meeting March 26", Defendant Liggett wrote:

"Mr. Sammi Addahoumi,

This email is in regards to your appointment for March 26. Your appointment has been moved back to 11:00 AM due to a scheduling conflict. If you have any questions feel free to call us back at (803) 777-4333

Thanks,

Student Assistant

Office of Student Conduct and Academic Integrity".

370.      On Mar 26, 2014, at 2:16 PM, Defendant Liggett sent Mr. Addahoumi yet another unsolicited email.  Defendant Liggett wrote:

"Hi Sammi,

The front desk staff said you were insistent last week about scheduling meeting and not wanting

to wait, but between our 11 and 11:30 meeting time today, there was no sign of you.  I see the

papers you left later, but still am left not knowing what the meeting was about.

Please let me know so that I know whether we need to reschedule.

Thanks,

Alisa."

371.     On April 6, 2014, Mr Addahoumi graciously received several responses from students

commenting on his class-wide email sent earlier that day.   For example, at 2:19 PM Lisa

Ridgeway wrote:

"fyi sammi...i was able to record the class based on a disability so u are wrong in that regard.

Everyone agreed that you should have been removed from the class long before you were

because of your crazy rants and disrespect for everyone. I used to eat at your deli before you

were in my class but i will not financially support someone who clearly has such disdain for my

country. Get a life, man!!".

372.     At 4:32 PM William Lafemina wrote:

"That was one of the worst news stories I've ever read. Maybe it could make a cool science

fiction book. Please stop using the class email roster to email us these. If I wanted to read your

crazy conspiracies I would.

Sent from an unassuming USC student".

373.     At 5:07 PM previous POLI 391: Terrorism Homeland Security classmate James Meredith

wrote:

"If you believe in this so much you should develop solid leads and hook up with Jody Barr of WIS News.  He's a good reporter that does really well with stories like this.  If you could really put this together you might be able to convince some people.  Here is his email.

jodybarr@wistv.com

Might I suggest speaking to him in person or delivering him a personal package with your findings".

374.

375.      On April 7, 2014, USCPD Defendants filed a Behavioral Intervention Team Incident Report. The report alleged, "two concerned students arrived at USCPD to report a suspicious e-mail sent by an ex-classmate (Addahoumi)". (Exhibit D)

376.      The report further alleged, "The e-mail included a link to a CNN iReport article that Addahoumi wrote. In the article, Addahoumi accuses his previous USC instructor (Leslie Wiser) of committing murder, among other conspiracies".  (Exhibit D)

377.      The report states that, "Addahoumi has sent e-mails to the entire class (CRJU T491)". A link to Mr. Addahoumi's CNN iReport was included. USCPD case number is 14-00723. USCPD also has a copy of the article on file." (Exhibit D)

378.      Regarding any "effects/impacts of the behavior", the report alleges, "The two students who complained stated that they feel uncomfortable being in the same class as Addahoumi. The statements in the CNN iReport article could negatively affect the named parties". (Exhibit D)

379.      The report was submitted from IP address 129.252.14.19 and routed to Tim Bedford (Behavioral Intervention Team Case Manager)

380.    The April 7th, 2014 Behavioral Intervention Team incident report was never provided to Mr. Addahoumi.   Mr. Addahoumi was not even told about the incident report.  Mr. Addahoumi was not able to contest the claims made in the incident report, nor was Mr. Addahoumi informed of who filed the report, when it was filed, why it was filed, or made aware of any investigation regarding the incident report.

381.    The incident report compiled and investigated by Defendants contained multiple misrepresentations of fact and includes not only contradicting, but also blatantly false statements. Defendants began the official complaint with the allegation that "two concerned students arrived at USCPD to report a suspicious e-mail sent by an ex-classmate (Addahoumi)".   The statement makes clear that the complainants are "ex-classmates" of Mr. Addahoumi, only to then allege that "the two students who complained stated that they feel uncomfortable being in the same class as Addahoumi".

382.    Defendants unconvincingly misrepresented the clear fact that students who were not even classmates with Mr. Addahoumi could not possibly have "felt uncomfortable being in the same class as Addahoumi".   The claim that "the statements in the CNN iReport article could negatively affect the named parties" would be laughable had Defendants not deemed the allegation actionable enough to investigate, bring charges against, and sanction Mr. Addahoumi.

383.    On April 6, 2014, Michael Hill filed a Behavioral Intervention Team Incident Report about Mr. Addahoumi's speech. Mr. Hill alleged, "Although I am a faculty member, I recently took Arabic 201 for credit at USC.  I received a very distressing mass email from a student who was in that class via Blackboard. My reading of the email is that it shows signs of mental distress and may indicate that the student has impaired judgment. The email mentions another instructor at USC".

384.     Mr. Hill further admits, "I do not have any professional qualifications to judge the student's state of mind, but as a faculty member I am very concerned. The email consisted only of a link to this website".

385.     At the end of Mr. Hill's submitted report, he included not only the website link to Mr. Addahoumi's CNN ireport blog post, but also the full text of the post. In his blogpost essay, Mr. Addahoumi wrote:

"Les Wiser or Special Agent Leslie Wiser or Special Agent in Charge Leslie Wiser or Assistant Deputy Chief Wiser or Deputy Chief Wiser or Chief of Operations Wiser or Fusion Center Executive Wiser or lnfraGard insider Wiser or Counter Espionage Agent Wiser or Terrorism Analyst Wiser, or Super Spy Catcher Wiser, or any given lie Leslie G. Wiser, Jr thinks will be most profitable for him on any particular day, is in no way an academic Dr. Harry Pastides owes me a refund and the University of South Carolina should be ashamed because the Wiser sold to me under the lie of 'Professor' Wiser.

One the first day of class in CRJU 391, the first thing "Professor" Wiser s1id was not hello or good morning. The very first words that came out of his mouth were none other than 'There will be absolutely no recording".

Despite making a lucrative career destroying the United States Constitution, we will find that there is only one instance in which you will not Leslie G. Wiser, Jr. shoving "INFORMATION SHARING" down the throats of helpless, innocent, unknowing American citizens on behalf of foreign technology firms, offshore corporations, corrupt police, or for foreign intelligence agencies. The only time Leslie G. Wiser, Jr. does not believe molesting the U.S. Constitution with Information Sharing is when it is his information that is shared."

386.    Mr. Addahoumi published his concerns, complaints, observations, and research results regarding the increased crime rate in Columbia and on to what extend the crime rate had been affected by Mr. Wiser's Smart Policing experiment.  Mr. Addahoumi wrote:

"The reason that the violence not only continues, but exponentially increases, to due to several reasons, all of which should be clear, but that somehow, even to USC President Dr. Harry Pastides, has failed to see as obvious, that the Smart Policing program he runs in collaboration with the Columbia Police Department is not only failing to prevent crime, it has exponentially increased and exacerbated crime to levels unheard of in our city. Kind of like Benghazi.

Thank You, Leslie G. Wiser, Jr., for you and your Geospatial Smart Policing Initiative has allowed, validated, encouraged, and demanded that computers loaded with logical errors and biasedly written code (Predpol) can, must replace the very human, experienced, and very qualified seasoned City of Columbia Police officers who, after serving for decades, are humiliated in petty unwarranted firings or forced into a silent retirement. We now have regular shootings and Mexican gangs and Hell's Angels, murdered bastions of the community, and it only costs the City of Columbia your salary and those of your entire criminal gang.

We have lost Columbia's finest and replaced them machines designed to turn people into statistics. There is a reason that the CPD has purged by half the number of highly experienced officers like Office Ida Greene, Officer Anthony Williams, and Officer Shannon Williams. This is because each of them, and each and every one like them that has been denied dignity, much less respect, each are targeted specifically for the fact that they have decades of experience as your neighbors and they know the law, and therefore the

community trusts them, as we indeed should, for they have proven themselves worthy of such trust. Leslie G. Wiser Jr. has purposely not filled vacant positions so that there is more money to buy more invasive surveillance technologies formally reserved for authoritarian dictators and Communist secret police, though they make no secret of ordering from the same catalogue".

387.     Mr. Addahoumi expressed his alarm at dangerous results of the collaboration, specifically internships and job placement practices, between USC and the City of Columba Police Department involving Defendant Wiser:

"The selective few who do get hired are unqualified in nearly every single aspect, with job positions literally being rewritten to accommodate incompetence. 'Les' Wiser has decided to fill what he believes are 'his' ranks with criminals, void of any moral standards, who even the United States military found to be too much of a liability, such as Robert Navarro, Tim Scott, and Ruben Santiago.

Some, specifically Ruben Santiago, were too unethical for the military, but perfect for mercenary armies such as the former Blackwater. While his City of Columbia press release upon hiring does note his position as a team leader in Afghanistan, it fails to mention that Ruben Santiago was a 'team leader' for Blackwater mercenaries who are now convicted war criminals, banned in the United States and prohibited from doing business with American companies".

388.     Mr. Addahoumi further expressed the dire concerns that his observations and research had validated to the point of being an imminent threat to public safety.  Mr. Addahoumi wrote:

"Chief of Columbia City Police Department Leslie G. Wiser, Jr., has succeeded in his task of militarizing the City of Columbia Police Department, replacing experienced and committed officers and their proven character, morals, dignity, and commitment with mercenaries who should be committed, unable to restrain themselves even to the standards of a broken military, where all of them originated. The military of today is not the military that shaped men like Tom Sponseller.

Mission creep has become America's foreign policy in the same way that the City of Columbia Police Department, with its alphabet soup of gestapo-like task forces, has emaciated itself of any sense of mission.  The CPD only keeps financial default and federal lockdown at bay by using both Underage Drinking and racially profiled fine revenues to cover the misappropriated and stolen Homeland Security Grant money that Leslie Wiser blew on expensive Tower Dumpers or Packet Interceptors.

They cannot yet legally use Hospitality Tax money on Tower Dumpers and Packet Interceptors, so they must juggle the Homeland Security Grant money and the Hospitality Tax money into vague 'public safety' expenses. This does not usually end well, as once the absolute power of such machines (Predpol, IBM) is used, it is addictive like a drug, driving officials power mad with paranoia until the next fix, or upgrade".

389.    Regarding the authoritarian and racially bias code written into surveillance, case management, and datamining technology (Predpol, IBM) that serves as the core basis of the Smart Policing experiment, Mr. Addahoumi exercised his First Amendment right to express, and publish, his research by writing:

"Subsidiaries of Harris Computing and the former Blackwater have offshore accounts who balances no doubt fluctuate with the crime levels in 5 points, with violence increased each and every time a new upgrade needs to be purchased".

390.     Mr. Addahoumi's objectively unbiased, sincerely researched, and presciently accurate observations in his essay included not only what he wrote of the widening phenomenon of police brutality, but also what Mr. Addahoumi determined to be the nationally universal underlying cause. Mr. Addahoumi wrote:

"This is not unrelated to what has eaten away at the American Military. Indeed, Tom Sponseller, the G.I., is not the same as Randy Scott, G.I. for something very important was lost along the way: accountability.

 Something has changed in the nature of the men who go to war and return criminalized, having lost all respect for women, the rule of law, or the rights of civilians.

This is because most of them were commended for shooting, bombing, or torturing

civilians in their prior positions of employment, and promoted for covering up sexual assault.

The worst of the worst, a unit from Ft. Bragg, just happen to be the City of Columbia's Police Department 'Battle Buddy' and mentor while doing tactical training at Fort Jackson.

If anyone is wondering why Randy Scott, as proxy Chief of Police for 'Deputy' Chief of Police Leslie G. Wiser, Jr., could threaten to kill the families of insubordinates with whom he was having unprofessional extramarital affairs, and there were at least three, and think it was acceptable, just look to the commander of his mentor and Black Ops 'battle buddies' unit from Ft. Bragg, who did ungodly things to a young, vulnerable female soldier and is only worried about having his pension reduced".

391.     Mr. Addahoumi further wrote:

The City of Columbia Police Department has gone unchecked in their systematically predetermined plan to actually create crime in 5 Points. The do this because as a hospitality

district, 5 points qualifies for millions of Hospitality Tax dollars, to the effect that every shooting, every fight, every public disturbance that ends with the USC President demanding more action is like a cash cow or winning lottery ticket for those proffering off such misery and Chief Les Wiser in power. Lies are sold to a frightened public without recourse, much less shame.

But that is only the beginning of an infinitely lucrative fraud of Homeland Security grant money, as the cameras and tools of authoritarian martial law (Predpol) are billed once to the city of Columbia and then billed again to the Department of Homeland Security".

392.    Mr. Addahoumi further wrote:

"It is telling that the City of Columbia pays over and over again in each budget for the cameras but does not own them.  What that nearly a million dollars in tax payer money doesn't gets in cameras, it gets in the form of plausible denial for City of Columbia Police and officials when a need arises for the cameras to be conveniently "not working".

With every spike in crime, and every high profile reaction to it, there are more and more funds for Leslie Wiser to provide patronage to his wide reaching network of essentials who keep the dictator in power, be they his lackey mercenaries or lord of war private security and software contractors at the lnfraGARD DHS SLED Fusion Center Annex. It should be telling that dark mysterious Annexes are popping up in my home Columbia, SC just like they are in my home away from home, Benghazi, Libya".

393.    In direct contrast to allegations that Mr. Addahoumi "accused Wiser of murder and other conspiracies", the actual statements written by Mr. Addahoumi contradict such claims. Mr. Addahoumi simple wrote:

"Les Wiser used the Sponseller murder to fire and hire those who refused to accept his illegal and immoral incompetence. The reason Ida Green did not visit the crime scene is because she was on official leave, out of state. As a police officer with professional integrity, she held to city policy and respected the chain of command.

The people who checked the building personally were Wiser and Santiago yet they accused Ida Green of giving false information which they, Wiser and Santiago, themselves provided, giving false information to her while knowing in full certainty that it was false and that when

Randy Scott asked her, she would, as planned, give Randy Scott the false information they themselves supplied, thereby creating a reason for her dismissal".

394.    Regarding any effects/impacts of the behavior, Mr. Hill stated, "This has been sent to students who were in Arabic 201 in Fall 2013."

395.    Regarding whether he had any other information about the individual that might be relevant, Mr Hill stated, "This is a current student at USC. I have no other information."

396.    In regards to his relationship to the student, Mr. Hill admitted, "This student was in the same class as me in Fall 2013. I have had several conversations when running into him outside of class".

397.    This incident report was submitted to Defendant Tim Bedford (Behavioral Intervention Team Case Manager)

398.    This report was modified, or edited, by Tim Bedford on April 7, 2014 at 9:44:13 am.

399.    Defendants assigned the case number 293187501 to Michael Hill's incident report.

400.    As a result of Michael Hill's complaints about Mr. Addahoumi 's protected free speech, Mr. Addahoumi received yet another Notice of Charge from Defendant Grewe and USC BIT Defendants.

401.    On April 8, 2013 at 10:27 AM, Mr. Addahoumi received an email from the USC Office of Student Conduct with the subjected heading "Official Correspondence from the Office of Student Conduct 2013187501".  The email stated:

"THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Office of Student Conduct

and the Office of Academic Integrity

901 Sumter Street Suite 201

Columbia, SC 29208

(803) 777-4333

osc@sc.edu".

402.    In addition, at 10:29 AM on April 8, 2014, as a result of Michael Hill's complaint about

Mr. Addahoumi's protected free speech, Mr. Addahoumi received yet another Official Notice of

Charge from Defendant Grewe.  In her email, sent to Mr. Addahoumi from Defendant Grewe's

official USC email, Defendant Grewe wrote:

"Hello

Please read the attached letter.

Maureen Grewe

Coordinator for Student Conduct & Behavioral Intervention

University of South Carolina

901 Sumter Street, Suite 201

Columbia, SC 29208

Office: 803.777.4333/ Fax 803.777.1393

grewe@mailbox.sc.edu

PLEASE NOTE:

The information transmitted in this email is intended only for the person(s) or entity(ties) to
which it is addressed and may contain confidential and/or legally privileged material. If you
received this in error, please contact the sender and delete the material from any computer. Any
review, retransmission, dissemination or other use of, or taking of any action in reliance upon,
this information by persons or entities other than the intended recipient is prohibited".

403.    Defendant Grewe's April 8, 2013 email to Mr. Addahoumi included an attached Official

USC Notice of Charge letter from the Office of Student Conduct and Academic Integrity

Division of Student Affairs and Academic Support.  The Official Notice of Charge read as

follows:

"Office of Student Conduct and Academic Integrity

Division of Student Affairs and Academic Support

Sammi Addahoumi

Sent electronically to addahoum@email.sc.edu

PERSONAL AND CONFIDENTIAL

Regarding Case Number: 2013187501

Dear Mr. Addahoumi,

The mission of Student Conduct and Academic Integrity is to promote individual student development and a campus climate of civility and accountability. We aim to advance responsible community citizenship through promotion of the Carolinian Creed.

Our office has recently received information suggesting you may have been involved in or been a witness to an alleged violation of the Student Code of Conduct. This information concerns an incident that occurred on April 6, 2014.

A meeting has been set for you on April 11, 2014 at 9:00am in the Student Conduct office in the James F. Byrnes Building (at the open end of the Horseshoe) in Suite 201. In this meeting we will discuss the incident report, what happened, your rights, your assessment of how your actions did or did not uphold the Carolinian Creed, and (should you be found responsible for a violation) the resolution options available.

Failure to keep your appointment may result in a hold on your registration, an additional Code of Conduct charge of Failure to Comply and/or completing the hearing without the benefit of your participation.

If your case involves a violation of the alcohol policy and you are under the age of 21, please know in advance that you will be making a phone call to your parents during this meeting.

If you have a disability and would benefit from reasonable accommodations or having a representative from Student Disability Services (SDS) accompany you, please contact our office

and the SDS at 803-777-6142 at least 48 hours prior to your appointment time. If you have a

verifiable class conflict with this appointment time, please call 777-4333 to reschedule at least 24

hours before your appointment.

Our goal is to be educational and maintain the standards of the institution we share. If you would

like additional information about your rights or the conduct process, please reference

http://www.housing.sc.edu/osc/pdf/StudentCodeofConductFINAL.pdf. We appreciate your

cooperation and look forward to meeting with you.

Sincerely,

Alisa Cooney Liggett

Executive Director of Student Conduct and Academic Integrity

404.    On April 11, 2014 Mr. Addahoumi was once again forced to meet with Defendant

Liggett as mandated in the Official USC Notice of Charge described above.  Defendant

Liggett did not provide Mr. Addahoumi a copy of any complaints filed against him.

Defendant Liggett did not even clarify for Mr. Addahoumi who exactly had accused him or

what exactly he had been accused of.

405.    Defendant Liggett once again insisted that any complaints or reports filed against Mr.

Addahoumi were "confidential" and refused to provide Mr. Addahoumi any details other

than repeatedly insisting that "her primary job was to uphold the mission of USC", and that

Mr. Addahoumi's alleged actions "disrupted the mission of USC", while at no time offering

any definition of exactly what the "mission of USC" was.

406.    Because Defendant Liggett refused to inform Mr. Addahoumi of exactly what he had been accused of or exactly who had accused him, Mr. Addahoumi requested, then demanded, a Carolina Judicial Council hearing regarding any accusations, allegations, or charges made against him.

407.    Defendant Liggett insisted that such a hearing was "unnecessary" and further insisted that such a hearing "would only make matters worse" for Mr. Addahoumi.  Defendant Liggett informed Mr. Addahoumi that she had "already resolved the issue" by conducting an "administrative hearing" in which she had already "examined all the evidence against Mr. Addahoumi" and already "investigated the serious complaints about Mr. Addahoumi".

408.    Mr. Addahoumi then respectfully informed Defendant Liggett that he did not trust her to make decisions for him or about him, nor did he consent to her any authority make any decisions for or about him.  Mr. Addahoumi demanded that Defendant Liggett put in writing his repeated requests for a Carolina Judicial Council conduct hearing.

409.    Mr. Addahoumi then requested he be assigned another student conduct administrator to oversee his Carolina Judicial Council hearing process.

410.    Defendant Liggett harassed, belittled, and antagonized Mr. Addahoumi for over an hour. After Mr. Addahoumi, in exasperation, got up to leave her office, Defendant Liggett provided Mr. Addahoumi a document to sign "in order to verify his compliance".

411.    Mr. Addahoumi asked what exactly was meant by "verify his compliance" considering his repeated requests for a Carolina Judicial Council hearing.

412.    Defendant Liggett answered Mr. Addahoumi's direct question by nonchalantly responding that she needed his signature "just to show you were here" and "just to show that you cooperated…and came to see me".

413.    Mr. Addahoumi sat back down and carefully read the document before agreeing to

provide his signature.  The document read:

"Case Resolution Form

Charges/Issues:  Misuse of Identification or University Resources – Computers

Parental Notification: No

Sanctions/Actions:  Suspension effective May 13, 2014 until December 10, 2014

Additional Sanctions/Stipulations:

1. Sammi has agreed to willingly engage in any amount of counseling stipulated by the

university.

Sammi will complete an assessment with Dr. Richard Frierson by Friday April 18 at a time to be

communicated to him once we are able to contact Dr. Frierson.

Failure to complete this assessment within the week will result in immediate suspension on April

18.

2.  Sammi will complete all treatment recommendations from Dr. Frierson. A delay of more than

two weeks in beginning treatment recommendations could result in a prolonged suspension.

Sammi is ineligible to re-enroll until he has provided documentation of completion to the student

conduct office.

This resolution is in conjunction with case 13-1730.

Rational:

This offense is in violation of two charges of Student Code of Conduct's Misuse of Computer

Resource policy:

a.  Failure to adhere to the university's Network Access and Acceptable Use Policy which states,

'Dissemination of unofficial, unsolicited mass communications via University Information

Technology assets is prohibited.  Violation of any portion of this policy may result in immediate loss of access to University information technology assets, initiation of legal action by the University, and/or disciplinary action.'

b.  Using computer resources to harass others or in ways that violate institutional computer use policies.

Sammi said that he is not out to get Mr. Wiser and that the posting was a mistake.  As such, it is the recommendation from Ms. Liggett, not a requirement from the University, that he act in congruence with his statements by either:

1.  Removing the post

2.  Keeping the post up, but removing any individual's names, thus allowing his opinions regarding his concerns about CPD to be heard.

Ms. Liggett will not follow-up on this but will allow Sammi to determine the course.

414.    Mr. Addahoumi refused to sign the document.  Defendant Liggett informed him that failing to sign the document would result in "additional charges of failure to comply"

415.    As a result of Defendant Liggett's threats, Mr. Addahoumi "checked" the option on the document which stated "Student requests a CJC hearing" and then provided his signature.  Mr. Addahoumi then asked Defendant Liggett when he could expect the CRC (Carolina Judicial Council) hearing process to begin.  Defendant Liggett replied that she would "continue to investigate the matter" and would "contact him" with "additional instructions".

416.    On April 11, 2014, at 11:20 AM, Mr. Addahoumi received yet another Official Notice of Charge from USC Office of Student Conduct Defendants The email contained the subject heading "Official Correspondence from the Office of Student Conduct" and read as follows:

"THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Pick up your letter

Office of Student Conduct and the Office of Academic Integrity

901 Sumter Street Suite 201

Columbia, SC 29208

(803) 777-4333

osc@sc.edu".

417.    On April 11, 2014, at 11:21 AM, Mr. Addahoumi received yet another email from Defendants in the Office of Student Conduct. The email, with the subject heading "Official Correspondence from the Office of Student Conduct (case number) 2013187501", read as follows:

"THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA.  A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality.  Office of Student Conduct and the Office of Academic Integrity."

418.    The April 11, 2014 email from Defendant Alisa Liggett included an official letter from the USC Office of Student Conduct and Academic Integrity. The official letter, authored by Defendant Liggett, stated the following:

"Regarding Case Number: 2013187501

Dear Mr. Addahoumi,

Thank you for meeting with me regarding an incident report suggesting that you may have been responsible for violating USC's Student Code of Conduct. These student conduct meetings were designed to educate students about community standards and to hold students accountable when those standards are breached. I hope it achieved that purpose.  In that meeting you acknowledged the essential accuracy of the report and agreed to have the resulting Code of Conduct charges resolved through a conduct hearing.

Your Code of Conduct charges and findings are as follows:

1. Misuse of Identification or University Resources – Computers. You agreed to complete the following sanctions:

You are suspended from the University of South Carolina beginning May 13, 2014 and continuing through December 10, 2014. You are required to vacate the campus by May 13, 2014. You are prohibited from returning to campus or USC property without written permission from this office. Failure to comply with this request may result in your arrest for trespassing.

To begin the re-enrollment process you must schedule a re-enrollment meeting for 30 minutes with your conduct administrator prior to your registration hold being removed. In that meeting you will discuss your progress and your goals for the new semester. Students who miss a Fall or Spring semester must complete the online application at www.sc.edu/admissions by the following deadlines:

Spring: November 1

 Summer I: May 1

Summer II: June 1

Fall: July 1

With respect to the information listed above, the following additional sanctions/stipulations apply:

1. Sammi has agreed to willingly engage in any amount of counseling stipulated by the university. Sammi will complete an assessment with Dr. Richard Frierson by Friday April 18 at a time to be communicated to him once we are able to contact Dr. Frierson. Failure to complete this assessment within the week will result in immediate suspension on April 18.

2. Sammi will complete all treatment recommendations from Dr. Frierson. A delay of more than two weeks in beginning the treatment recommendations could result in a prolonged suspension. Sammi is ineligible to re-enroll until he has provided documentation of completion to the student conduct office.

This resolution is in conjunction with case 13-1730.

Failure to complete these sanctions will result in a hold being placed on your registration and an additional charge of "Failure to Comply", which can result in further sanctions.

If you have a documented disability that would require accommodations to complete these sanctions, please contact the Office of Student Disability Services at 777-6142.

If you have questions about your case or about your sanctions, please contact me immediately. Additional information about policies and the conduct process can be found on-line at www.sc.edu/osc.

Sincerely,

Alisa Cooney Liggett

Executive Director of Student Conduct and Academic Integrity.

419.     On the afternoon of April 11, 2013, after receiving the Official Notice of Charge and sanctions from Defendant Liggett, Mr. Addahoumi contacted Defendant Liggett via telephone and via email.  Mr. Addahoumi repeatedly asked, even begged, Defendant Liggett to accommodate his request for a Carolina Judicial Council hearing.  Mr. Addahoumi informed Defendant Liggett that her actions were nothing short of harassment so perverse and persist as to deny him access to pursue his education.

420.     At 2:46 PM April 11, 2013, Mr. Addahoumi sent an email to Defendant Liggett in which Mr. Addahoumi wrote:

"Mrs.  Liggett,

I have come to find that I was not entirely honest you.  I have not slept well at night since I witnessed the violent gruesome death of my neighbor Mandy Kennedy this past week.

 I see her bloody face when I close my eyes.

I have no idea what I am doing and I do not even remember sending out the link.

I did not want to admit it, but I cannot handle the violent deaths in my family in Libya and the increasingly violent threats to my family in Libya and the stress created by you at school.

 I did not go to class for days after I saw Mandy get run over.

I think it was a breaking point.

I need help, not a suspension.

Please be in touch.

Sammi Addahoumi

803 237 6116".

421.    To verify the harmful effects of stress and anxiety caused by Defendant Liggett's mistreatment of him, Mr. Addahoumi provided the phone number of his father, Hassan Addahoumi.  Mr. Addahoumi's father had verbally noticed that his son never seemed to have any free time that semester, and had been increasingly stressed in the period since the Spring 2014 semester began.

422.    The next morning, on April 12 ,2013, Mr. Addahoumi again contacted Defendant Liggett and requested a Carolina Judicial Council hearing.  In the 11:43 AM email to Defendant Liggett, Mr. Addahoumi wrote:

"Mrs. Liggett,

Once again, thank you for your call.

After looking over the paperwork and having a better idea from you over the phone regarding what exactly my infraction was, I would certainly much rather have my fate in the hands of 12 of my peers.

I am actually still quite confused as to the exact nature of the violation.  I urge you to reconsider, and if not, please adjust the process so that the hearing among my peers is an option.

Thank You again,

Sammi Addahoumi

And with which dean would I address my concerns about Mr. Wiser's lack of teaching credentials and the prejudiced nature of lesson plains?".

423.     On Monday, April 14 2013, at 5:49 PM, Defendant Liggett sent Mr. Addahoumi an email in which she stated the following:

"Hi Sammi

After our phone call I asked a social worker for some numbers of community providers.

Attached are some options:

1). Dr. Thomas Martin 771-7521

2). Dr. Bradley Clayton 732-9329

3). Dr. Geoffry McKee 251-3499

Please do not try to go through all of this without assistance.  Neither you, your family, or I want you to feel that you can't manage these overwhelming stressors when there are so many providers who can help."

424.     On Monday, April 14, 2014, at 10:32 PM, Mr. Addahoumi responded by again contacting Defendant Liggett to once again request a Carolina Judicial Council hearing. Mr. Addahoumi's email to Defendant Liggett clearly and unequivocally stated the following:

"Mrs. Liggett,

Thank you for your concern.  Once again, I am still unaware of the nature of my violation, as it was not made clear.  Please find time tomorrow as I have a fourteen-day window in which to file grievances.  I must be clear:  at no time was I informed of exactly what code I allegedly violated, nor how exactly how said policy was violated, nor was I afford even proper documents which would have allowed for my own retrospection or contestation. The horrors of war, the horror of death, I have seen and been made stronger for it.   That being said, the blatant and unaddressed racially and religiously centered verbal and psychological abuse, however, are recognized as crimes even in times of war.

After examining your paperwork and reality of the situation, there is no doubt that I approached you with my complaints of being targeted by both Josef Olmert and Leslie Wiser.  Instead of acknowledging my very valid concerns regarding the both individuals specifically targeting me due to my race, my religion, my beliefs, and my background, and my character.

Once, again, given the circumstances, I humbly request you either reconsider your actions or initiate a review among my peers.    Only one person has to see what I have with dire urgency brought to your attention repeatedly:  That other than the 2 documented racial, ethnic, and religious attacks that were clearly documented and ignored, no other issues with any other professors or staff has occurred, nor will it.  This due to the fact that all of my other professors have absolutely no reason to hate, target and victimize an earnest student just for being Arab, Muslim, Libyan, or of mixed race and/or cultural background, for aside from the two documented exceptions, the faculty at USC are professional educators with all of the academic and moral integrity due such positions.

Indeed, make no mistake, the situation was allowed by you to degenerate into problem I now face, whereby such concerted neglect has threatened my very emotional, mental, and physical well -being.

Please address these concerns as soon as possible and consider this last attempt I will make to remedy the situation at your office level, as my repeated yet ignored requests have begun to take their toll in scale of grievance and academic consequences, whereby your failure to properly address my complaints of discrimination has affected my ability to concentrate on my academic coursework.

Give me a charge so that I can fight it, otherwise, please address the hostile environment that has been repeatedly brought to the attention of your office.  I do not feel safe, physically or mentally, while my concerns are ignored.  Please consider this correspondence my final attempt to solve the matter without due representation.

Thank you again,

Sammi Addahoumi

(803) 237-6116

Neale Lourie, Lourie Law Firm, LLC

1450 Harden Street Extension

Columbia, SC 29201

(803) 753-1856".

425.    On April 15, 2014 at 12:17:39 PM Defendant Alisa Liggett sent Mr. Addahoumi an email in response to his repeated requests for a Student Judicial Hearing. Defendant Liggett's email, with the subject heading "Re: Sammi Addahoumi", condescendingly stated the following: "Sammi,

Please read this with the intention I intend, which is to spend your energy productively, not to be snarky (my primary concern).

To request a CJC student conduct hearing regarding computer misuse et al charges as an avenue to address your concerns about being targeted is akin to taking I-95 south to get to Spartanburg. You will spend a lot of time and frustration trying to get somewhere and realize you have gotten no closer because it cannot possibly get you to your destination.

The office of Equal Opportunity Programs investigates allegations that involve being treated differently because of race and/or religion. A panel of three 19-22 year olds and two faculty/staff members cannot do that.  What they will focus the hearing on is whether emailing two classes you were not enrolled in using university resources is against the verbage of the policy (the policy is word for word in your letter and email).  Then they will address whether the fact that three recipients of it felt scared enough to report it to authorities warrants further code violations. They would have read the posting that is accusatory and decide whether it warranted a harassment charge.  So this conduct case that is otherwise resolved would get bigger and bigger, and you would not accomplish the options that you just listed below.  Because the panel do not deal with disciplining faculty.

Worst case scenario they suspend you immediately and you lose the semester.  You told me that finishing this semester was the most important thing on Friday, so I'm worried that now you would risk it.  If you lost it, and they couldn't address the issues you so desperately want addressed, the situation is worse.  You are getting on the on ramp Sammi, and I just want you to check your map.

Alisa"

426.     On April 15, 2014 at 4:34 PM Mr. Addahoumi received yet another email announcing

programs and opportunities that Mr. Addahoumi was prevented from participating in due to the

burdens, sanctions, anxiety, and stress imposed upon him by Defendants. The email announced:

"The Career Center will be hosting US Department of State Diplomat in Residence Julie
Ruterbories tomorrow, April 16, for an "Ask an Expert" session.
Please visit the Career Center, 6th Floor of the BA Building, anytime between 1:00 pm – 3:00 pm
to check in at the front desk and we will direct you to the waiting area to meet with Julie.

Please come prepared with questions to take advantage of her vast expertise in working with the
US Department of State!

Julie A. Ruterbories began serving as the U.S. Department of State Diplomat in Residence for
the Southern Mid Atlantic Region in September 2012. Ms. Ruterbories is a Senior Foreign
Service Officer with 21 years of experience in Europe, Central Asia, the Caucasus and
Washington, D.C. During these tours she advanced foreign policy interests across a broad range
of issues, including democratization and human rights, trade and investment, and immigration.
She began her Foreign Service career as a consular officer at the U.S. Embassy in Bishkek and
served additional consular tours in Baku, Azerbaijan; London, England; Skopje, Macedonia; and
Pristina, Kosovo. In Washington, Ms. Ruterbories served as a congressional liaison officer,
where she was awarded the Secretary's Award for Public Outreach. She also served in the State
Department's Operations Center. In addition, she worked as Special Assistant to the Assistant
Secretary for Consular Affairs from 2006 until 2009.

Ms. Ruterbories earned an undergraduate degree in History and Soviet Studies from Georgetown
University and a graduate degree in International Affairs from Columbia University. She speaks
several foreign languages, including German, Dutch, French, Spanish, Russian and Macedonian.

Melissa A. Cole
Career Development Coach, College of Arts & Sciences
H. William Close Building, 6th Floor
Columbia, SC  29208
Phone:  803-777-7280".

427.

428.     At the direction of Defendant Liggett, on April 16, 2014 at 9:27 AM, Mr. Addahoumi

received an unsolicited and bad-faith email from Defendant Sheppard.  In his email to Mr.

Addahoumi, Defendant Sheppard included the subject heading "Discrimination Complaint" as

well as a sadist scoring of "Importance:  High".  Defendant Sheppard shamelessly wrote:

"Dear Mr. Addahoumi,

Our office has been notified of your allegations of discrimination against you by members of the University faculty, staff, and/or student population.

We are the office that is responsible for investigation of these types of allegations and we would like for you to contact us as soon as possible to schedule a time to discuss your situation.

 Please contact myself or Dr. Carl Wells here in our office at the number listed below.

We look forward to hearing from you regarding this matter.

Kevin Russell Sheppard, Sr.

Office of Equal Opportunity Programs
University of South Carolina
1600 Hampton Street, Suite 805
Columbia, SC 29208
803-777-3854
803-777-2296 FAX
sheppard@mailbox.sc.edu".

429.        On April 16, 2014 at 5:20 PM, Mr. Addahoumi received yet another unsolicited harassing email from Defendant Liggett.  In her email to Mr. Addahoumi Defendant duplicitously included the subject heading "Appointment We Discussed" and wrote:

"Hi Sammi,

Thank you for being patient as we scheduled your appointment with Dr. Frierson.  To accommodate your class schedule and to honor Sammi's Deli lunch rush, we have scheduled your appointment for next Friday, April 25 at 9am.

His address is:

 15 Richland Medical Park Dr, Columbia, SC 29203

The language in the letter states that "Sammi has agreed to willingly engage in any amount of counseling stipulated by the university.  Sammi will complete an assessment with Dr. Richard Frierson by Friday April 18 at a time to be communicated to him once we are able to contact Dr. Frierson.  Failure to complete this assessment within the week will result in immediate suspension on April 18."  As you can predict, both of those dates will change to April 25.

Thank you,

Alisa".

430.    Just minutes later on April 16, 2014, at 5:26 pm, Mr. Addahoumi received yet another email from Defendant Liggett, though this time Defendant included the subject heading "Updated address for next Friday, 3555 Harden Street Extension, Suite 301".   Defendant Liggett wrote:

"Sammi,

Just received an updated address in the instant I hit send. The (seemingly closer to you) address is: 3555 Harden Street Extension, Suite 301. Please disregard the previous address.  Thank You, Alisa."

431.    Defendant Liggett again failed to inform Mr. Addahoumi why she had arranged a mandated appointment and time, much less request his consent.  Defendant Liggett again willfully attempted to cloak the nature of the appointment.

432.    On April 22, 2014 Mr. Addahoumi received yet another email notice with a letter from Defendant Liggett under the heading of the USC Student Conduct and Academic Integrity Division of Student Affairs and Academic Support. (Exhibit Z)

433.    In this letter, indistinguishable from a Behavioral Intervention Team notice, Defendant Liggett wrote "I am concerned since I emailed you this information, which you were expecting, last Wednesday and haven't heard from you".

434.    Defendant Liggett continued, "My concern is that you will not make this appointment, which took maneuvering since Dr. Frierson didn't have openings for weeks."

435.    Defendant Liggett further threatened, "There is no uncertainty that this appointment should be your number one priority to staying in school".

436.    Defendant Liggett continued, "I cannot be more clear Sammi, if you do not attend, you will be suspended on Friday.  It's too easy, and you're too mature to just let it go by".

437.    Defend Liggett, most alarming, wrote," Especially after you looked me in the eye and said that you knew it would be beneficial and that you would "do anything . . . go to counseling every week".

438.    Defendant Liggett knowingly and willfully misrepresented the forensic psychiatric violent risk assessment as "counseling".  In her email to Mr. Addahoumi, Defendant Liggett wrote:

"Hi Sammi,

I am concerned since I emailed you this information, which you were expecting, last Wednesday and haven't heard from you. My concern is that you will not make this appointment, which took maneuvering since Dr. Frierson didn't have openings for weeks.

There is no uncertainty that this appointment should be your number one priority to staying in school.

I cannot be more clear Sammi, if you do not attend, you will be suspended on Friday. It's too easy, and you're too mature to just let it go by.

Especially after you looked me in the eye and said that you knew it would be beneficial and that you would "do anything . . . go to counseling every week".

 I fear this disappearing could be your pattern, but the stakes are too high for that in this scenario.

You asked me to call your father, which I did. I am trying, but if you know now that you are not going to go, please have the courtesy to tell me so that Dr. Frierson can open that appointment time for people who are trying to see him.

Friday, April 25

9am

3555 Harden Street Extension, suite 301

If transportation is an issue, please let me know.

Thank you,

Alisa"

439.    Defendant Liggett threatened Mr. Addahoumi, writing "I fear this disappearing could be your pattern, but the stakes are too high for that in this scenario".

440.    Defendant Liggett falsely stated, "You asked me to call your father, which I did".

441.    At no time did Defendant Liggett respond to Mr. Addahoumi's repeated requests and demands for a Carolina Judicial Council Hearing.

442.    Instead, Defendant Liggett continued to cloak the true legal nature of Defendant Frierson's forensic psychiatric violent risk assessment.  Defendant Liggett wrote "I am trying but

if you know now that you are not going to go, please have the courtesy to tell me so that Dr.

Frierson can open that appointment time for people who are trying to see him".   There *are no*

"people who are trying to see" Defendant Frierson.  Given the role of the forensic psychiatrist

and the role of the forensic psychiatric violent risk assessment, Defendant Frierson has no

patients, only clients.

443.      Defendant Liggett then dictated "Friday, April 25 9am 3555 Harden Street Extension,

suite 301. If transportation is an issue, please let me know".

444.      At the direction of Defendant Liggett, on April 25, 2014 at 9:27 AM, Mr. Addahoumi

received an unsolicited email from Defendant Sheppard, with the subject heading

"Discrimination Complaint".   In his official USC email notice to Mr. Addahoumi, Defendant

Sheppard wrote:

"Mr. Addahoumi,

I am just following up with you regarding your allegations of discrimination here at the

University of South Carolina. We have not heard from you and we would like to speak with you

about this matter. Please contact our office immediately.

Thank you.

Kevin Russell Sheppard, Sr.

Office of Equal Opportunity Programs
University of South Carolina
1600 Hampton Street, Suite 805
Columbia, SC 29208
803-777-3854
803-777-2296 FAX
sheppard@mailbox.sc.edu".

445.      On April 28 2014 Mr. Addahoumi sent an email to Prof. Fowler to in which Mr.

Addahoumi wrote:

"Professor Fowler,

It would seem as though you do not keep an office on campus.

I would like to speak with you or your TA when you are available

I was informed by Allisa Ligget that because I refused to participate in USC counseling mandated on the insistence of Leslie Wiser, I was immediately suspended from the University and would be arrested for trespassing if I came on USC property.

I have sought legal remedies and said suspension has been delayed until after exams, though the few days I missed were crucial.

Thank you

Sammi Addahoumi

803 237 6116".

446.     On May 2, 2014, Mr. Addahoumi received yet another official Notice of Charge from Defendant Liggett and the USC Defendants.  The email was sent at 2:43 PM and included the subject heading "Official Correspondence from the Office of Student Conduct 2013187501". The email from the USC Office of Student Conduct Defendants stated:

"THIS IS AN OFFICIAL CORRESPONDENCE FROM THE OFFICE OF STUDENT CONDUCT AT THE UNIVERSITY OF SOUTH CAROLINA

A letter has been issued to you electronically by our office. Upon clicking the link below, you will be taken to a screen displaying your name and requesting an access code to ensure confidentiality. Confirm that your name appears on the screen, and then enter your student ID number (which may be your VIP ID) as the access code. If you are receiving this notice in your capacity as a leader of a campus organization, you should contact our office immediately to request the appropriate access code for your organization.

Your letter will appear in PDF format and should be printed or saved for your records. It will remain accessible through this link for 30 days. If the letter fails to appear, you may need to use a different computer or install the free Adobe Acrobat Reader. If you continue to experience difficulty accessing your letter or wish to confirm the legitimacy of this message, please contact our office at (803) 777-4333.

Pick up your letter

Office of Student Conduct

and the Office of Academic Integrity

901 Sumter Street Suite 201

Columbia, SC 29208

(803) 777-4333

osc@sc.edu".

447.    On May 2, 2014 Mr. Addahoumi received yet another unsolicited harassing email from Defendant Liggett.  In her 3:17 PM email to Mr. Addahoumi, Defendant Liggett included the subject heading "Appointment rescheduled for May 14 at 9am" and wrote:

"Dear Sammi,

Your appointment with Dr. Frierson has been rescheduled for May 14 at 9am.

The same stipulations apply as before. Failure to complete the assessment on this day will result in immediate suspension.

 His address again is:

3555 Harden Street Extension, suite 301

You had agreed to engage in any amount of counseling stipulated by the university, so it was troubling to learn that you told Dr. Frierson that you were scheduled during exams when the university's exam schedule was five days after your appointment date.

Your ability to remain in school will require more cooperation on your part.

Due to the delay in your fulfillment of the required appointment, any incidents between now and completion of the assessment will result in immediate suspension for one calendar year from the date of the incident.

I do not want this to occur, but we had a simple agreement that you could finish the semester only if you completed the assessment and any recommendations by Dr. Frierson, and thusfar (sic) you are barely holding up your end of our agreement.

Per your request, I am happy to speak with your father again and will notify him of this date as well.

With anticipation of your recommitment to cooperation,

Alisa Liggett

Executive Director of Student Conduct and Academic Integrity".

448.    Mr. Addahoumi continued to utilize his Blackboard student email to communicate with classmates in various courses.  Additionally, other students continued to utilize their Blackboard email to communicate with Mr. Addahoumi.  For example, on May 4, 2014, sent Mr. Lyles Addahoumi an email in which he wrote:

"Nice article. I like your writing style".

449.    On May 5, 2014, Don Fowler filed a Behavioral Intervention Team Incident Report that complained of receiving a "disturbing email from Sammi yesterday which included a link to a writing he apparently authored".   (Exhibit C)

450.    Don Fowler further alleges, "Sammi's behavior has become increasingly odd in the past year, but yesterday's email came after no contact with him since early January.  The piece of writing he attached in this email contained many elements which raised my level of concern, for many reasons. Also, it contained references to a number of faculty as well as references to statements made by Dr. Pastides. Frankly, all of this could signify nothing, but it could also be very significant.  I am also going to make a call to the above number to give a 'heads up' on this report." (Exhibit C)

451.    Most telling regarding the frivolous and petty nature of the complaint, in response to the question "What is the purpose of this report?" Don Fowler answers frankly with "I am not sure". (Exhibit C)

452.    After filing a Behavioral Intervention Team Incident Report about Mr. Addahoumi's protected free speech, after and learning from Defendant Liggett that Mr. Addahoumi was unaware he had been summarily suspended from USC, Prof. Don Fowler had the sadist nerve to write Mr. Addahoumi an email in which Prof. Don Fowler wrote:

"Mr. Addahoumi,

Best wishes to you in your new position as a graduate of the University.

Don Fowler".

453.    On May 7, 2014, as a result of Prof. Don Fowler reporting Mr. Addahoumi's protected free speech to the USC Behavioral Intervention Team Defendants, Mr. Addahoumi received yet another email from Defendant Schneider informing him of a mandated appointment with

Defendant Liggett in the Student Conduct office. Defendant Schneider did not state why Mr. Addahoumi was required to meet with Defendant Liggett. The email stated:

"Please read the attached letter concerning your appointment on May 15th, at 2:00pm in the Student Conduct office with Alisa Liggett."

454.    This email was yet another unwarranted interruption to Mr. Addahoumi's studies and preparation for final exams. While other students were allowed to focus on their exams, Mr. Addahoumi was forced to worry about meeting unwarranted and burdensome appointments mandated by Defendants.

455.    Unaware that Prof. Don Fowler had reported his research paper to the BIT and unaware that Prof. Don Fowler's complaint about Mr. Addahoumi's protect free speech was the cause of the May 7, 2013 Notice of Charges from Defendant Grewe, and unaware that he had been summarily suspended without due process, Mr. Addahoumi rather pitifully replied to Prof. Don Fowler with an email in which Mr. Addahoumi wrote:

"Thank you so much for your time inside the classroom as well as out.
Love and Respect,

Sammi Addahoumi".

456.    At the demand of Defendants and under extreme duress, Mr. Addahoumi met with Defendant Frierson and Stephanie Chapman for an evaluation on May 15, 2014. Mr. Addahoumi did so only after Defendant Liggett put a "registration hold" on his educational record. As a result of this registration hold, Mr. Addahoumi was unable to register for the single Fall 2014 computer science class required for him to graduate in December of 2014.

457.    Mr. Addahoumi contacted Other offices and departments to inquire how to remove the registration hold. Each time, Mr. Addahoumi was told that only Defendant Liggett had ability, or the authority, to remove the registration hold. Each time, Mr. Addahoumi was instructed to

contact Defendant Liggett to remove the registration hold. When Mr. Addahoumi asked Defendant Liggett why she had place a hold on his ability to register, Defendant Liggett informed Mr. Addahoumi that a hold had been placed on his registration because Mr. Addahoumi had not complied with the mandated "counseling" with Defendant Frierson.

458.    On information and belief, Defendant Frierson is a Licensed Master Social Worker, not a licensed clinical social worker, thus he is not permitted to diagnose or treat mental illness. Stephanie Chapman was not professionally licensed by the State of South Carolina. Therefore, in breach of their agreement, Defendants did not have Mr. Addahoumi evaluated by qualified professionals.

459.    Even worse, Mr. Addahoumi was never made aware of true legal nature of the forensic psychiatric violent risk assessment. Defendants specifically avoided the legally and ethically required consent and informed consent by masking the nature of the involuntary assessment as "counseling".

460.    Mr. Addahoumi felt so utterly violated by Defendants that he felt compelled to shower afterwards. The sadist actions of Defendants dehumanized him, cause and continued to cause Mr. Addahoumi intense grief, indignation, wounded pride, shame, despair, humiliation, embarrassment.

461.     Mr. Addahoumi experienced near paralyzing fright, nervousness, grief, anxiety, worry, and overall mortification, as Defendants spared no effort in literally terrorizing Mr. Addahoumi.

462.    On May 14 2013, as a direct result of such dehumanization, Mr. Addahoumi decide to withdraw from the University of South Carolina.

463.         On May 14 2013 at 7:08 PM Mr. Addahoumi sent an email, with the subject heading

"Before It's News", to Defendant Liggett in an attempt to make himself very clear.  Mr.

Addahoumi wrote:

"I thought you might enjoy this while the public has to wait for it to upload to CNN.

Cause I like you.

http://ireport.cnn.com/docs/DOC-1133027

Don't call me.  I will (not) call you.

The University of South Carolina does not know what it lost today.

I do not waste time with hate.  There is far too much of that on campus.  Please do not waste

your time targeting me, today, tomorrow, or ever again.

If the assistant of the good psychiatrist is single however, tell her I may rethink the arranged

marriage.

Otherwise we have no further reason to communicate.

If you see me at Whole Foods, pretend that you did not.

You will not be looking at someone who has any intention of ever associating himself with the

University of South Carolina ever again, outside of researching and exposing every person who

has failed to do their job at USC, including yourself.

I study Libya.  Hate is taught at USC.

Sammi Hassan Addahoumi".


464. On May 15 2013 at 11:33 AM Mr. Addahoumi emailed Defendant Sheppard and made

his indignation perfectly clear.  Mr. Addahoumi wrote:

"Mr. Sheppard

I have indeed been discriminated against, though I have not contacted your office because I do not feel that the absolute hatred that I have experienced at USC is anything that your office is willing to investigate.  I love the University of South Carolina and it is my home, though I have found myself driven away due to my religion, my race, and my political beliefs, to the extent that I plan on withdrawing in full before taking legal measures.

Alisa Liggett, Leslie Wiser, and Josef Olmert have worked as hard as possible to drive me to this point.

I wish to work with your office in matter but only under circumstances where I can be assured that these three individuals will not influence the proceedings in any way.

If you want the background of my case, you must listen to this

http://ireport.cnn.com/docs/DOC-1133027

If your office does not find elements of discrimination in this conversation, there is no need to waste your time further, and I will be forced to proceed to the next legal avenue.

I would like to meet with your office AFTER the time has been taken to analyze the recording for I do not have the heart to repeat it.

I have a meeting today with Mrs. Liggett to which I have no intention of attending. Not today, nor ever, ever again.

She worked against me from day one.

There are so many wonderful academics and administrators that I really hate to bring a suit against the University as a whole.  Literally every single experience I have had outside of these three individuals has been enriching and I therefore do not believe the hate and discrimination is systemic, yet it is cruelly systematic. It is present and it is enough to have me take my credits and

go somewhere where I am not a target. Even if I have to leave the credits at the door. The situation has become that unbearable.

Most importantly I feel Mrs. Liggett contacted you both in an effort to preempt my concerns, to discredit me, and to distract me during exams.

Sammi Addahoumi

803 237 6116"

465.    From the late evening of May 15 2013,  into the early morning of May 16 2013, Mr. Addahoumi upload the entire recording of his involuntary forensic psychiatric violent risk assessment to his www.cnn.com blog at http://ireport.cnn.com/docs/DOC-1133027 and shared a link to the blogpost with USC classmates and professors at 2:01 AM via Mr. Addahoumi's Blackboard student email.  Mr. Addahoumi chose the title "Last Free Lecture at USC".

466.    As soon as 2:21 AM Monday May 16, 2014 Mr. Addahoumi began to receive feedback from his classmates.  For example, at 2:21 AM Arabic 121 classmate, Myles Hilliard responded to Mr. Addahoumi using his Blackboard student email.  Myles Hilliard wrote:

"Hey Sammi

I have read some of your posts on cnn ireport and am just interested about it all.

It sounds like you'll be in Columbia in the fall so I wanna meet up and hear about all of this stuff.  Also, what do you mean "Last Free Lecture at USC?

Myles".

467.    On May 16, 2014, Defendant Maureen Grewe sent Mr. Addahoumi an email notifying him that he was suspended from the University and was charged with a disciplinary violation. That is, USC punished Mr. Addahoumi for exercising constitutionally protected First

Amendment rights.  Mr. Addahoumi had not engaged in any behavior that endangered himself or others. The email sent by Defendant Grewe included a letter from Defendant Alisa Liggett that charged Mr. Addahoumi with violating the School Code of Conduct by engaging in "Computer Misuse".

468.    He was put on "administrative suspension" by the University, evicted from his campus, prohibited from attending classes, and barred from USC property and events.  Mr. Addahoumi was warned that if he came onto campus for any reason, he would be considered a trespasser and could be arrested.  USC suspended Mr. Addahoumi as a pretext both for exercising his freedom of speech and for refusing mandated medical treatment for his perceived disability. USC has not rescinded the order barring Mr. Addahoumi from campus.

469.    Although he has been cleared by numerous doctors to return to school, USC continues to treat Mr. Addahoumi like a criminal, barring him from visiting friends or attending public events on campus.

470.    The letter delivered by Defendant Grewe charged Mr. Addahoumi with violating Student Code of Conduct policy (Staf6.24), entitled "Computer Misuse." That guideline provides that, "Behavior of any kind that imperils or jeopardizes the health or safety of any person or persons is prohibited. This includes any actions that are endangering to self or to others."

471.    At neither the time Defendant Grewe delivered that letter, nor at any time before, had Mr. Addahoumi engaged in any behavior that violated Staf6.24. The letter stated that as a result of Mr. Addahoumi's alleged violation, he was placed on suspension, effective immediately and he was barred from campus immediately.

472.    The letter further stated that Mr. Addahoumi was "barred from entry into or on University-owned or leased property, and from attendance at events sponsored by USC or any of

its recognized campus organizations." Finally, the letter warned Mr. Addahoumi that "if you come onto campus for any reason, you will be trespassing and may be arrested. Additional judicial action may also be taken by the University."

473.    The letter informed Mr. Addahoumi that he was excluded from classes and from any activities on campus. Many events on campus are open to the public, but the letter barred Mr. Addahoumi to these events, too. A hold was placed on his record to prevent him from registering or attending classes and a notation was made on his transcripts that noted he was suspended for disciplinary reasons.

474.    The decision was not an individualized assessment based on objective medical evidence, rather, it was based on prejudice and stereotypes. Mr. Addahoumi's readmission was conditioned upon his compliance with the conditions in the agreement.  These conditions are not imposed upon students that are not disabled, that do not have a history of disability, or who are not perceived as disabled.

475.    Defendant Liggett advised Mr. Addahoumi that he could fight the charges, but if he lost, the charges would go on his record and he could be suspended or expelled. Defendant Liggett indicated that Mr. Addahoumi had little chance of success if he fought the charges.

476.    Defendant Liggett's statement that Mr. Addahoumi had little chance of success fighting the charges was untrue. Liggett knew or should have known that her statement was untrue.

477.    Defendant Liggett informed both Mr. Addahoumi and his father that Mr. Addahoumi would not be suspended or barred from USC property if he submitted to an "appointment" with Defendant Frierson. Defendant Liggett statements that Mr. Addahoumi would not be suspended were untrue. Liggett knew or should have known that her statements were untrue

478.     Students accused of the most serious violations of the Code of Conduct, who are subject to eviction from University property or suspension from the University are entitled to adjudication before the USC Carolina Judicial Council.  Students charged with lesser violations are afforded the same rights to adjudication before the Carolina Judicial Council.

479.     USC students charged with lesser violations of the Code of Conduct are also entitled to an informal disciplinary conference, or a non-adversarial meeting with a University Administrator.

480.     USC provided none of these rights or procedures to Mr. Addahoumi, instead the university had Mr. Addahoumi "administratively suspended" without either notice or due process or notice of method to appeal.

481.     The letter also informed Mr. Addahoumi that he was prevented from registering for classes until he successfully completed all prescribed medical treatment, and provided medical documentation that he has been symptom free for six months and had "the ability to live independently and to perform successfully in a university environment."

482.     If he met those terms and complied with the barring order, he could request clearance from the University Counseling Center.

483.      If and when clearance was recommended, Defendant Liggett would "consider reexamining" the case and any pending charges against Mr. Addahoumi. See Exhibit

484.     The letter from Defendant Liggett also conditioned Mr. Addahoumi's readmission to USC subject to conditions not imposed on students who do not have a disability, who do not have a record of disability, or who are not regarded as having a disability.  Mr. Addahoumi continues to be adversely affected by the acts, policies, and practices of Defendants and/or their agents.

485.     Defendants did not conduct any individualized assessment of Mr. Addahoumi prior to suspending him on or before April 11, 2014.  Defendants evicted Mr. Addahoumi both because they regarded him as a person with disability and in retaliation for Mr. Addahoumi's decision to exercise his constitutional rights to freedom of speech.

486.     Before a request for readmission could be considered, Mr. Addahoumi would also have to submit "information and medical documentation regarding "compliance" with Defendant Frierson's "treatment recommendation".

487.     A policy of automatically evicting students at a moment of great vulnerability constitutes intentional discrimination on the basis of perceived mental disability.  In any event, Mr. Addahoumi is entitled, as a matter of reasonable accommodation, to have his active student status immediately restored, as a result Defendants disability discrimination and a failure to make a reasonable accommodation are violations of a variety of federal, state, and local statutes, including the Fair Housing Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973.

488.     On the afternoon of May 21, 2013 two USCPD officers, including Jessica Velders, came to Mr. Addahoumi's off-campus private residence in the Olympia neighborhood of Columbia, S.C.  Mr. Addahoumi was sitting in his study, pouring over documents, emails, and records, in a desperate attempt to understand exactly what he had done that constituted "computer misuse". After loudly and conspicuously banging on Mr. Addahoumi's door several times, as if about to burst inside, Mr. Addahoumi answered the door and politely asked the two USCPD officers what they wanted and why they were harassing him in his private residence.

489.     Mr. Addahoumi had not been on, or even near, USC property since receiving the May 16, 2014 email from Defendant Grewe that finally informed him that he had been suspended over a

month before, on April 11, 2014, yet never told. Despite having a prescheduled advisement appointment with Janis Leaphart later that afternoon, Mr. Addahoumi left campus immediately, in a notably extreme and anxious haste.

490.     In both Defendant Grewe's May 16, 2014 email and in the attached April 11, 2014 Notice of Suspension from Defendant Liggett, it was made clear that Mr. Addahoumi would be arrested if he stepped foot on USC property. Since receiving notice of these threats, Mr. Addahoumi had gone out of his way to avoid USC property while traveling between his work and home.

491.     Despite not having been on USC property for over a week, the two USCPD officers issued Mr. Addahoumi a trespass notice, or warning.

492.     The official USCPD citation is troubling for many reasons. First, such an initial warning citation is typically given once a person actually trespasses, whether intentionally or not. Mr. Addahoumi had not trespassed. As described above, he had not been on USC property since receiving notice from Defendant Grewe of his summary suspension and unjustified banishment from campus.

493.     USC Defendants took such action to ensure that if Mr. Addahoumi actually did trespass, whether intentionally or unintentionally, he would be immediately arrested rather than issued a trespass warning as per ordinary procedure.

494.     Second, the official USCPD trespass citation was egregiously pre-written in a most "John Doe warrant" fashion, as the date, written in blue ink pen, was simply filled in on the prewritten citation, which is written in black ink pen.

495.    Irritated at being harassed at his home, and indignant to be cited a warning for a trespass offense he had not even committed, Mr. Addahoumi demanded the two USCPD officers leave him alone unless they had actual cause to investigate or question him.

496.    At that point, USCPD officer Jessica Velders taunted Mr. Addahoumi with the vaguely threatening statement "Don't worry, we have more than just this piece of paper (the trespass citation), we have a huge stack of folders with evidence against you."

497.    USCPD officer Velders did not state what accusation these supposed "huge stacks of evidence" supported or why the USCPD was "stacking" or gathering, evidence against Mr. Addahoumi.

498.    Also on May 21, 2014, Defendant Janis Leaphart filed a Behavioral Intervention Team Incident Report about Mr. Addahoumi's speech. Defendant Leaphart's extensive report was two full pages in length and reads like a canned affidavit or even a confession.  The date of the "incident" is listed as May 16, 2014, while Defendant Leaphart did not bother to file the BIT incident until May 21, 2014.

499.    Defendant Leaphart alleges "It was very difficult to ascertain exactly what assistance he wanted from me". (Exhibit K) In her exhaustive report, Defendant Leaphart admits that Mr. Addahoumi had only one single class left required to graduate. Defendant Leaphart also confirmed that Mr. Addahoumi had been "administratively suspended". (Exhibit K)

500.    Despite Defendant Leaphart previous claim that, "It was very difficult to ascertain exactly what assistance he wanted from me", she followed by clearly stating she knew exactly what assistance Mr. Addahoumi wanted from her. Further, Defendant Leaphart clearly admitted that Mr. Addahoumi was unaware of his suspension. (Exhibit K)

501.    According to Defendant Leaphart, "During our lengthy conversation, I did attempt to refocus Sammi's attention on what he needed to complete to graduate (3 hours in math/analytical reasoning). He did share that he didn't know when or if he could complete his degree (I had noticed the "administrative suspension" note on his transcript when I reviewed his transcript in preparation for our meeting). In response, I shared that (Doug Roberts) and I would be ready to assist him with this." (Exhibit K)

502.    Defendants assigned the case number 2013187501 to Mr. Addahoumi's speech as a result of Defendant Leaphart's report.

503.    Also, and almost simultaneously, on May 21, 2014 Doug Roberts filed a Behavioral Intervention Team Incident Report about Mr. Addahoumi's protected free speech.  As with the BIT report described above, despite the "incident date" being listed as May 16, 2014, Doug Roberts did not file the BIT incident report until a week later, on May 21, 2014

504.

505.    On May 25, 2014, Defendants Alisa Liggett and Maureen Grewe filed a Behavioral Intervention Team Incident Report about Mr. Addahoumi's speech.

506.    In her official USC Incident Report, Defendant Maureen Grewe wrote, "The above listed USC student, Sammi Addahoumi, has made a significant amount of postings to twitter regarding conspiracy theories and may be dealing with untreated mental health issues. This report is to make sure that the University is aware of this student's activity online and for them to determine whether or not he is a risk to his own safety or the safety of campus". (Exhibit F)

507.    At the bottom of her complaint Defendant Grewe included a selection of Mr. Addahoumi's Twitter posts including:

A. "How did NSA& @UofSC "Prof."Leslie Wiser take controlOFColulmbiaCity PoliceDepartment? http://ireport.cnn.com/docs/DOC-1117362 ... Sabotage pic.twitter.com/NXqR5FA78P" 2:11 PM - 25 May 2014

B. "Fear Nothing&they can take nothing from you.Stay human or die trying.Arabists MUST interpret MORE than words.
Worlds." - 11:04 AM - 25 May 2014 https://twitter.com/delimansc/status/4    70581147739492352

C. "So @JodyBarrWIS USC "Professor"Leslie G. Wiser,Jr Wiser"retired"NEWARK NJ FBI 2escapeMUSLIM HARASSMENT investigation pic.twitter.com/yVXKpfEtTt" - 11:15 PM - 24 May 2014 https://twitter.com/delimansc/status/470402800338624512

508.    Defendant Liggett also stated in her complaint that, "Addahoumi posted a copy of a letter previously sent to him by the Office of Student Conduct" in his Twitter postings. (Exhibit F)

509.    On May 27, 2014, Mr. Addahoumi was forced to send his father, Hassan Addahoumi, family attorney, Gary White, and his uncle Mustafa Addahoumi to the USC conduct office in the hope of simply gaining a clear understanding of what exactly he had been suspended for. Mr. Addahoumi did not provide any of these three individuals any sort of FERPA or HIPPA waiver to be allowed access to Mr. and medical records which are protected by law.

510.    Instead of providing the information Mr. Addahoumi had requested, Defendants Liggett and Grewe printed dozens of screen clippings from Mr. Addahoumi's Twitter feed and gave these to Mr. Addahoumi's father.   Each screen clipping included Tweets criticizing USC Defendants Liggett, Wiser, Grewe, Olmert, and others.

511.    On the last page of screen clippings, Defendant Liggett included a copy of Mr. Addahoumi's email to her in which he pleaded and begged Defendant Liggett not to suspend him. On this private, personal, and, above all, protected educational and medical document, Defendant Liggett, with sadist sympathy, left a handwritten note, in which she wrote:

"Hassan,

I sincerely believe that you need to take him to a psychiatric hospital immediately.

I know that is hard to hear.

Alisa".

512.    Despite repeatedly denying Mr. Addahoumi's numerous request for any disciplinary allegations, Defendant Liggett went out of her way to not only sanction Mr. Addahoumi with summary suspension, but pursued with sadist fixation his involuntary psychiatric committal.

513.    On May 28, 2014, Defendant Maureen Grewe and Defendant Alisa Liggett again filed yet another Behavioral Intervention Team Incident Report complaining about Mr. Addahoumi's speech. Defendant Grewe stated, "Sammi Addahoumi posted many Twitter tweets in the weeks leading up to May 27 (and continued posting beyond May 27) about USC, specifically Alissa Liggett, Leslie Wiser and a host of other departments, including Student Health Services, the BIT team, USCPD, Student Government and others". (Exhibit G)

514.    Defendant Grewe further wrote, "The tweet he originally included the @UofSCshs (Student Heath Services) handle in, he said, '@UofSCshs & the Behavioral Intervention Team will PAY for Targeting Innocent Araba. Muslims. Academic Freedom. 4IsraeL" He also attached a legal document to this tweet". (Exhibit G)

515.    Defendant Grewe also stated, "His other tweets accuse Alisa Liggett and others of targeting him and discriminating against him. He said in a later post, '@USCPD @UofSCshs @ACLU Alissa Liggett is guilty of so many crimes. We will start with today's harassment from LIGGETT.' He attached photos of Alissa at her desk as well as phone numbers that he insinuated were hers."

516.     Further, Defendant Grewe stated, "Some of his tweets sounded menacing and almost threatening, like the one about @UofSCshs & the BIT team paying for targeting...". (Exhibit G)

517.     Defendant Grewe also included, "He posted another photo of Alisa and said, 'I will wait 2divulge Alisa Liggett's BELLIGERENT & blatant lies & false statements till business hours 2morrow'".

518.     In regards to whether there were any effects/impacts of the behavior, Defendant Grewe alleged, "From the tone and wording of some of his messages, he sounds like he may be threatening individuals at the university. But the only individuals who can see his ranting posts are his followers, and he only has 44 followers". (Exhibit G)

519.     Defendant Grewe admits, "I reported the behavior to Alissa Liggett, and she asked me to submit this BIT report. I also contacted USC Media Relations, who contacted USCPD, and I contacted the Counseling and Human Development Center so they were aware Sammi was posting about his situation".

520.     In regards to any relationship to Mr. Addahoumi, Defendant Grewe states, " I don't know him, but I clicked on his profile after he included @UofSCshs in one of his tweets and saw all the things he was saying about the university and specific individuals."

521.     This complaint was assigned the case number 2013187501 (Exhibit G).

522.     Defendant Grewe "followed" Mr. Addahoumi on Twitter to further harass him. (Exhibit)

523.     At best Defendant Grewe negligently misrepresents the facts, and at worst Defendant Grewe knowingly and willfully fabricated multiple USC Behavioral Intervention Team Incident Reports for the purpose of maliciously disseminating false accusations instigating unwarranted investigations, both criminal and disciplinary, into Mr. Addahoumi's Constitutionally protected Free Speech.

524.    On Feburary 6, 2015 USC employee Andrew Schramm filed a Behavioral Intervention

Team Incident Report about Mr. Addahoumi's speech.  In this report, Schramm alleged,

"Yesterday, after the shooting, an individual who I believe is a current or prior student

(@delimansc; Sammi Addahoumi) responded to my Tweet regarding the shooting with several

unusual tweets." (Exhibit J)

525.    Andrew Schramm further wrote, "I have attached a Word document with screenshots of

the tweets as well as screenshots of a blog to which there's a link on his Twitter page that

includes rants about USC. After consulting (with the Center for Teaching Excellence), she

recommended completing a BIT report. I don't believe that the content is actionable but may

reflect concerning, hostile attitudes that merit continued monitoring." (Exhibit J)

526.    Regarding any "Personal, emotional, or behavioral concerns for this student", Schramm

noted, "Unusual behavior" and "Psychosis". (Exhibit J)

527.    Regarding any effects or impacts of Mr. Addahoumi's speech, Schramm complained that,

"The individual's tweets are concerning, particularly the picture of a professor's office". (Exhibit

J)

528.    Regarding any other information about Mr. Addahoumi that might be relevant, Mr.

Schramm alleged, "After I attended an "Active Shooter Training" here at USC last year, I

tweeted something about it and this individual also responded then to my tweet. His response

was odd in a similar manner to the ones in the attached document, but I cannot find it at this

time." (Exhibit J)

529.     Regarding Schramm's relationship to Mr. Addahoumi, Schramm noted, "He follows me

on Twitter". (Exhibit J)

530.    As a result of Andrew Schramm's reporting of Mr. Addahoumi's protected speech, the BIT Incident Report was assigned the case number 2014171501 and investigated by the Defendants..

531.    Defendants do not allege that they excluded Mr. Addahoumi from the USC classroom as a "threat to others," as there exists no evidence, nor has any evidence ever existed, that Mr. Addahoumi is, or ever was, such a threat.

532.    Any alleged threat to others would have to be real and imminent, based upon an individualized assessment of the precise nature and likelihood of the risk posed by Mr. Addahoumi, and supported by a reasonable medical judgment gained through informed consent.

533.    Nor can Defendants exclude Mr. Addahoumi from the campus based upon any alleged, and or perceived threat to himself, as harm to self is not a valid consideration under Title II, the FHA or the Rehab Act.

534.    The law does not distinguish between discrimination on the basis of disability and disability based conduct. Thus, Defendants' exclusion of Mr. Addahoumi because of his behavior (his speech) is tantamount to exclusion because of his disability and a pretext thereof.

535.    Because self-harm and suicidal ideation are regarded as the results of mental disability, the USC BIT policy has a disparate impact on USC students who are regarded as having a mental illness.

536.    Further, Defendants suggest that the very conditions that qualify Mr. Addahoumi as a person regarded as having a disability also disqualify him for readmission to the classroom.

537.    This amended complaint alleges that Defendants regarded Mr. Addahoumi as having a disability, that there is a voluminous record of Defendants regarding Mr. Addahoumi as having a disability, and that Defendants regard him as having a perceived disability.

538.      These are the three alternate grounds to establish disability under all three statutes.

539.      Despite being displaced from his classroom since October 2013, Plaintiff has continued to perform well academically, thereby making him "qualified" to access the USC classroom and campus.

540.      Most importantly, Mr. Addahoumi had absolutely no history of assaultive, violent, aggressive or combative behavior.

541.       As Defendants point out, given his conduct, the Defendants were not concerned for the safety of others.

542.      Here, there is no history of harm to others.

543.       Here, there is no history of mental illness, nor any intellectual disability.

544.      Defendants do not even allege that he will harm others.

545.       Defendants do not deny that Mr. Addahoumi's history of mental illness began when Defendants started to regard him as having a disability.

546.      Students that are not disabled or have a history of disability and students not perceived as disabled are not required to provide documentation of continued participation in mental health treatment on a monthly basis, or to allow the USC Behavioral Intervention Team case manager to conduct monthly mental health assessments.  Unlike students that do not have a disability or a record of disability, or are not regarded as having a disability, Mr. Addahoumi is subject to additional sanctions for failure to comply with these conditions.

547.       Although the imposition of these conditions constitutes further discrimination in violation of the Fair Housing Act, the Americans with Disabilities Act and the Rehab Act, in order to obtain readmission to the classroom, Mr. Addahoumi has fulfilled all demands in good faith.

548.     Mr. Addahoumi was extremely distraught by receipt of the letters charging him, suspending him, and barring him from the campus and the dormitory.  He did not know what to do. He feared that he had ruined his life and academic career.

549.      The barring order meant that Mr. Addahoumi would be treated like a criminal. Mr. Addahoumi's name was placed on a list of individuals barred from the University that was circulated to University police and all University buildings and dorms as well as faculty, professors, and administrators. The other individuals on the list are barred due to disciplinary charges such as rape, sexual assault, physical abuse, destruction of property, theft, ect. Many of the individuals who staff the desks at dorms and University buildings are USC students. These USC students were informed of Mr. Addahoumi's barring.

550.     The barring order meant that Mr. Addahoumi could no longer attend his classes. He could not visit friends or professors on campus or in the dorms. He also could not attend any University events or events at the Walker Center for International Studies, even if they were open to the general public, such as University sporting events, events sponsored by University student organizations, or performances at the Colonial Center auditorium.

551.     For example, and most concerning, Mr. Addahoumi cannot attend the May 2017 high school graduation ceremony of his younger, and only, brother, Jamel Addahoumi, held on USC property, at the Colonel Center. He could not utilize campus counselors or mental health professionals for his perceived mental disability.

552.     By mandating Mr. Addahoumi receive treatment, USC clearly regarded him as being disabled yet visiting student disability services or student counseling was in violation of the barring order.  He could not even meet with University personnel to discuss his situation and options.

553.    The University of South Carolina knew or should have known that this was against the best interests of Mr. Addahoumi, and was likely to exacerbate his perceived condition and cause him great emotional distress. USC did not act to prevent the possibility of suicide, or self-harm, or harm to others, as its actions actually heightened this risk. Instead, USC sought only to protect itself from adverse publicity or liability should its treatment of Mr. Addahoumi become public.

554.    The USC Police Department and University Specialty Clinics and its agents were complicit in this scheme, as they not only shared information with the University, but also provided unlimited free access to confidential medical, educational, financial, and disciplinary records to absolutely anyone Defendants deemed "to have a need to know"

555.    These individuals shared and used these records for investigations, while barring Mr. Addahoumi from accessing these records or even informing him of the existence of such records.

556.    Defendants repeatedly denied or ignored Mr. Addahoumi's repeated requests for his "BIT" record, including, but not limited to, incident reports, investigation reports, and any evaluation reports from his forced psychological assessments mandated by the Defendants and USC BIT.

557.    May 18, 2016, two days after this complaint was filed, Defendants provided Mr. Addahoumi with selective records.

558.    A proper response to these BIT incident reports would involve prompt, fair, and impartial discipline for instances of physical misconduct, true threats, and harassment, while fostering an environment in which offensive speech would be answered with more speech.

559.    The USC Behavioral Intervention Team has chosen to go further, deploying administrators to conduct an "investigation" of the incidents and, after finding Mr. Addahoumi

"responsible" or "guilty," summoned him for a "hearing" or a "counseling" discussion, which may more closely resembled a reprimand than an enlightening exchange of views.

560.    The USC Behavioral Intervention Team procedures were used as tools not only for imposing some form of political or intellectual orthodoxy, but also for policing politeness or civility. The USC BIT invited law-enforcement authorities and administrators, who are likely to be wary of expression that can cause conflict of any kind, to scrutinize Mr. Addahoumi's activism, debate, and political speech regarding every ideology and viewpoint. Yet the essential elements of free discourse, whether on campus or off, require that people have right to offend or to cause conflict through speech.

561.    Defendants cannot assert that Mr. Addahoumi is not otherwise qualified under § 504 and the ADA because his alleged conduct violates the Student Code of Conduct, and obliquely suggest that his conduct makes him a "direct threat" to the health and safety of others.

562.    When questions of safety are involved in determining whether an individual is "qualified" for purposes of the ADA, a person may be excluded from a program or activity or from housing only if he or she poses a "direct threat" to the health or safety of others.

563.    A "direct threat" is defined as "a significant risk to the health or safety of others . . . ." 28 C.F.R. Pt. 35, App. A, § 35.104 (definition of "qualified individual with a disability"); 24 C.F.R. §100.202(d).

564.    Direct threat to self is an invalid consideration under the FHA, Title II of the ADA, or §504.

565.    The ADA and the Fair Housing Act place the burden of proof on Defendants to demonstrate that Mr. Addahoumi poses a direct threat.  Hargrave v. Vermont, 340 F. 3d 27, 35 (ADA); Roe v. Housing Authority of Boulder, 909 F.Supp. 814 (D.Colo. 1995)(FHA).

566.     The allegations properly before the court do not support any claim that Mr. Addahoumi is a threat to any other person.  Defendants miss or ignore the point of the "direct threat" provision of § 504 and the ADA.

567.     In *Hargrave*, the Second Circuit said: "It is unclear whether the 'direct threat' defense applies outside of the employment context."  340 F. 3d at 36.  The Court went on to reject the argument that a danger to self is a direct threat which makes a person not "otherwise qualified" within the meaning of the ADA and § 504.

568.     Defendants have attempted to argue that Mr. Addahoumi's claim of discrimination fails because Mr. Addahoumi was evicted for an alleged disruption (his conduct) and not because of discrimination based on his perceived disability.

569.     In essence, Defendants' claim is that their policy is neutral. In Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565 (2d Cir. 2003), the Second Circuit stated, "[T]o establish discrimination under either the FHAA or the ADA, Plaintiff has three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." Id at 573.

570.     This Amended Complaint establishes a cause of action on each of these three grounds. Mr. Addahoumi's Amended Complaint here alleges that Defendants actions constitute intentional discrimination (i.e. that their policy is not neutral) and in the alternative that their policy has a disparate impact on people with disabilities and people Defendants perceive to be disabled.

571.     Mr. Addahoumi specifically alleges that "Defendants' actions constitute intentional discriminatory treatment based on Mr. Addahoumi's perceived disability.  Defendants' actions also have a disparate impact on persons who suffer from mental illness and persons perceived to suffer mental illness.

572.     The Amended Complaint alleges that Defendants' conduct policy of suspending and evicting people who are regarded as disabled has discriminatory intent; that Defendants' policy is not neutral; and that it in fact does take into account any mental handicap behind the behavior regarded as "erratic".

573.     The policy is not neutral because it requires that a person who attempts what is regarded as erratic to be evaluated by a school psychologist or his or her designated counselor prior to returning to the USC campus.

574.     This policy does not require the same of students not regarded by the Defendants as having a disability.

575.     The evidence clearly shows Defendants discriminate against people with mental illnesses, or people they regard as having mental illnesses, such as Mr. Addahoumi.  In any case, the issue of Defendants' intent is a question of fact.

576.     The ADA prohibits discrimination "by reason of" disability.  42 U.S.C. § 12132. Discrimination by reason of disability includes not only discrimination based on an impairment itself but also discrimination based on the effects of an impairment, whether those include the effects on the person himself or the effects on others.  School Bd. of Nassau County v. Arline, 480 U.S. 282 & n.7 (1987) (interpreting the ADA's predecessor, § 504 of the Rehabilitation Act).

577.      In *Arline*, the Court noted that the disability at issue, tuberculosis, "gave rise" not only to an impairment but also to contagious effects, and § 504 prohibited discrimination based on the contagious effects of the disability.  Id at 282.

578.     Defendants cannot contend that they evicted Mr. Addahoumi from campus because of his "erratic" conduct, not his perceived disability. This is exactly the type of discrimination based on

disability-caused conduct that is prohibited. See Teahan v. Metro-North C. R. Co., 951 F.2d 511, 517 (2d Cir. 1991)( "an employer "relies" on a handicap when it justifies termination based on conduct caused by the handicap.") See also Humphrey v. Memorial Hosps. Ass'n, 239 F.3d 1128, 1140 (9th Cir. 2001)("For purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination."); Laporta v. Wal-Mart Stores, Inc., 163 F. Supp. 2d 758, 768-769 (D. Mich. 2001)(rejecting the conduct/disability dichotomy and the argument that Plaintiff was fired for her refusal to appear for work on November 10, not on account of a disability)

579.    In Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 143 (2d Cir. 1995), the Second Circuit found that a teacher's discharge because of performance inadequacies was in fact discharge based on disability when the performance inadequacies resulted from the disability.

580.    See also, McKenzie v. Dovala, 242 F.3d 967, 974 (10th Cir. 2001)(the denial of employment based on the Plaintiff's conduct, including cutting her wrists, was improper because Plaintiff was protected by the ADA from adverse employment action based on conduct related to her illness as long as she did not pose a direct threat); Humphrey, 239 F.3d at 1140 (a jury could reasonably find a causal link between absenteeism and OCD disability).

581.    Even if this Court were to find that Defendants' Student Health Condition Disturbances Policy, Staf6.29, is neutral, as they contend, and does not reflect the intent to discriminate against students with the handicap of depression, the policy still has a disparate impact on people with depression.

582.    The disparate impact analysis focuses on facially neutral policies or practices that may have a discriminatory effect. Tsombanidis, 352 F.3d at 574. To show that a seemingly neutral policy has a discriminatory effect, the Plaintiff must prove the practice "actually or predictably

results in ... discrimination." Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 90 (2d Cir. 2000).

583.    Mr. Addahoumi has alleged that Defendants' policy has a disparate impact on people with mental illnesses.  This Court can take judicial notice that erratic behavior cannot be regarded as a classic symptom of depression and cannot be perceived to overwhelmingly occur because of mental disability.  "Congress has recognized that youth suicide is a public health tragedy linked to underlying mental health problems…." Garrett Lee Smith Memorial Act of 2004, Pub. L. No. 108-355, 118 Stat. 1404, §2 Findings, (8).  See also articles cited in the Garrett Lee Smith Memorial Act of 2004 at §2 (9).18.

584.    The Amended Complaint therefore states a cause of action that Defendants had engaged in intentional discrimination and that their policies have a disparate impact on students with mental illnesses and on students regarded as mentally ill.

585.    The USC BIT casted a wide net, inviting reports of any offensive speech, on virtually any topic, for any reason. The result was that Mr. Addahoumi's speech on political and social subjects, which was likely (and may have been intended) to offend, was reported to law enforcement and student conduct administrators, and the USC BIT served to alert administrators to specific individuals, such as Mr. Addahoumi, who would "benefit" most from "counseling" or mandated psychological assessment.

586.    For a college to claim the authority to protect the delicate ears of immature listeners, so as to force its students to submit without complaint to invasion of their bodies, minds, and privacy is self-evidently ridiculous.  Accordingly, "a public educational institution exceeds constitutional bounds… when it 'restrict[s] speech or association simply because it finds the

views expressed by [students] to be abhorrent.'" Christian Legal Soc'y Chapter of Univ. of Cal. v. Martinez, 561 U.S. 661, 683–84 (2010) (quoting Healy, 408 U.S. at 187–88).

587.     This institutionalized surveillance of Mr. Addahoumi's statements of all political persuasions, whether on campus or online, has rightfully exposed USC and Defendants to the prospect of these costly First Amendment claims, and it has encouraged an illiberal culture of anonymously reporting students or faculty for subversive or offensive speech—on hundreds of campuses across the country.

588.      For example, after the landmark public school case, Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), the Southern District of Texas refused to extend the reach of the school beyond the "schoolhouse gate," and noted that remedies exist outside of school for dealing with students' behavior. No citizen, whether a student or not, deserves to have the government monitoring his expression.

589.     Public universities such as USC cannot justify the suppression of student speech on the Internet unless it has some tangible impact on campus. Even then, colleges may only subject students to discipline for online unprotected speech, such as true threats, harassment, and defamation. The University of South Carolina did not prove that Mr. Addahoumi's speech fell into any of those unprotected categories. Rather, the USC BIT simply claimed an unlimited right to regulate Mr. Addahoumi's speech online based on whether the speech offended or "concerned" someone else. The First Amendment does not permit such a result.

590.     Broad applications of the term "concerning behavior" have diminished serious misconduct by equating Mr. Addahoumi's political squabbles and caustic speech with violent criminal conduct. Such political criticism can hardly be placed under the same umbrella as true threats of violence. Yet this is precisely what the USC Behavioral Intervention Team has done.

"Concerning Behaviors" include speech or expressive conduct that is not necessarily criminal or in violation of applicable policy.

591.     In targeting speech that may cause "alarm, anger, or fear," or that might otherwise offend on the basis of a proscribed subject, USC has expressly set its sights on constitutionally protected speech. All speech is presumptively protected by the First Amendment unless it falls within certain narrow exceptions carved out by the Supreme Court: incitement to immediate violence; so-called "fighting words"; harassment; true threats and intimidation; obscenity; child pornography; and defamation.

592.     Speech is not unprotected simply because it is offensive, insulting, causes anger, or is viewed as prejudiced or as "concerning" or "distressed", "disturbed" or "dysregulated". As Mr. Addahoumi's speech did not fall within one of the listed exceptions, it is protected speech.

593.     It is not mere speculation that Mr. Addahoumi's core political speech, academic discourse, and outspoken activism has become the subjects of Behavioral Intervention Team reports.  The USC BIT has implemented broad definitions of "concerning behavior" to expressly invite reports of protected speech, including a broad range of political speech, and they have done so without any regard to Mr. Addahoumi's First Amendment rights.

594.     Each time the USC Behavioral Intervention Team embarked upon an investigation or intervention, or mandated meetings, forced counseling, or involuntary psychiatric assessments with Mr. Addahoumi, it exposed the institution and its administrators to claims under the First Amendment.

595.     The First Amendment does not simply restrict the government from expressly penalizing or prohibiting speech. It also prohibits "adverse government action against an individual because of First Amendment freedoms." When the University of South Carolina Behavioral Intervention

Team departed from the *Laird* baseline by mounting investigations or interventions with Mr. Addahoumi, they expose themselves to this First Amendment retaliation claim. This exposure isn't limited to legal action against the university; because many First Amendment principles are so well established under the law, members of the USC Behavioral Intervention Team risk being held personally liable for their actions in Mr. Addahoumi's circumstances.

596.     To mount a First Amendment retaliation claim, Mr. Addahoumi has demonstrated three things: "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." Whether government conduct has an adverse effect is determined by an objective standard: if the retaliatory conduct "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." The retaliatory conduct need not be successful, as the cause of action is intended to address "conduct that tends to chill [speech], not just conduct that freezes it completely."

597.     To the extent that the USC BIT is used to better understand students' perspectives, to prepare general programming to constituents of the institution, or to provide resources to consenting students, these goals are unobjectionable on First Amendment grounds. But the reality is that the USC Behavioral Intervention Team is generally intended to deter offensive speech and conduct. Their goal is to chill speech that the institution or its constituents find offensive, unkind or "concerning".

598.     Each time the USC Behavioral Intervention Team Defendants intervened directly or indirectly with Mr. Addahoumi, the risk of exposing the university to First Amendment claims increased.  The USC BIT submitted speech to the review of police and campus conduct

administrators, who launched an "investigation" and brought "charges" against the "respondent",

Mr. Addahoumi, who was summoned for a "hearing" and found "guilty", or "responsible".

599.     This is the language of punitive systems, not educators, and it is likely to be perceived as

such by students and by courts as it was for Mr. Addahoumi. Simply calling a quasi-punitive

response system "educational" doesn't make it so.

600.     Even the public pronouncement that an investigation of Mr. Addahoumi was underway—

particularly when conducted by law enforcement—did itself have a chilling effect.  While

universities need not remain silent about offensive speech, going "beyond simple vocal

condemnation" and implying that particular instances of protected speech may be punished is a

violation of the First Amendment.

601.     The Supreme Court's perspective in Bantam Books, Inc. v. Sullivan (1963) is instructive.

There, the state of Rhode Island established a commission whose goal was to, among other

things, "educate the public" about books and printed materials it viewed as obscene, acting as a

gatekeeper to "investigate and recommend the prosecution" of persons found to be distributing

obscene materials.

602.     The commission promulgated lists of "objectionable" publications to police departments

and, when booksellers were reportedly selling objectionable material, the commission sent them

notices suggesting that the commission had the power to recommend prosecution if materials

were found to be obscene. The Supreme Court held that the commission's claim that it simply

"exhort[ed]" publishers to avoid distributing obscenity, and could not itself punish booksellers,

was "untenable":

          "It is true that [the] books have not been seized or banned by the State, the Commission is

          limited to informal sanctions—the threat of invoking legal sanctions and other means of

coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications …".

603.    The University of South Carolina Behavioral Intervention Team is arguably quite comparable to the Rhode Island commission discussed in Bantam Books. While they might protest that they are intended not to punish speech but to discourage "erratic" speech contrary to the values of the institution, even if that speech is protected, the USC BIT is nevertheless intended to chill speech. By using the language, tools, administrators and counselors associated with disciplinary systems, the USC BIT functions to intimidate, not educate.

604.    While such a system could have struck an appropriate balance by, among other things, limiting its definitions of reportable conduct to speech unprotected by the First Amendment, he USC Behavioral Intervention Team Defendants did not. This prospect of a retaliation claim should alarm other colleges and universities. The central question of such a claim—whether the conduct would deter a person of ordinary firmness from continuing to speak—is fact-based, meaning it's unlikely to be resolved before summary judgment, increasing universities' legal exposure.

605.    Additionally, many of the scattered decisions on what meets the "ordinary firmness" test are based in the context of government employment, where the government's interest is given substantially more weight, than in the context of retaliation against a non-employee.

606.    Finally, because the USC Behavioral Intervention Team keeps opaque records documenting their interventions with reported speakers such as Mr. Addahoumi (discussed

above), USC and Defendants have a diminished ability to argue that such interventions provided meaningful education, as opposed to a chilling instruction to stop speaking.

607.    In particular, subjecting someone to an investigation because of his expressive activities has long been held to violate the First Amendment.  Investigations can violate the First Amendment even where "no legal sanction is involved" and despite the fact that the government "has imposed no tax, established no board of censors, instituted no licensing system." *United States v. Rumely*, 345 U.S. 41, 57 (1953) (Douglas, J., concurring); *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957) (plurality) (the investigative process may impinge "upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas, particularly in the academic community"). *See Gibson v. Florida Legis. Investigation Comm.*, 372 U.S. 539, 556-57 (1963).

608.    Subjecting members of a university community to official inquiry because of their speech is particularly chilling because "[s]cholarship cannot flourish in an atmosphere of suspicion and distrust." *Sweezy*, 354 U.S. at 250. As the Supreme Court stressed nearly six decades ago, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*

609.    These principles fully apply even when the investigation is conducted for the ostensible purpose of policing civil discourse and preventing "harassment" or "concerning" behavior. In *Rodriguez*, for example, the Ninth Circuit upheld a community college's decision not to investigate or sanction a professor for sending three racially-charged emails through the school's email system despite complaints from prominent members of the community and other employees. *Rodriguez*, 605 F.3d at 706 ("No disciplinary action was taken against [the professor], and no steps were taken to enforce the district's anti-harassment policy.").

610.     In the face of demands that the professor be punished, the school's president and its chancellor instead sent an email to the school community and issued a press release saying that, while they disagreed with the individual's messages, initiating action "could seriously undermine our ability to promote true academic freedom." Id. Reasoning that First Amendment principles must guide the application of anti-discrimination policies, the Ninth Circuit agreed, expressing "doubt that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment …." Id. At 709-10. See also Sigma Chi Fraternity, 993 F.2d at 393 (university anti-harassment policy must satisfy First Amendment scrutiny).

611.     A school's investigation of student speech can be particularly chilling when doing so involves the explicit or implicit threat of punishment or rebuke by those in positions of power. Even a "verbal censure" from a school official has been ruled to be sufficient to create a First Amendment claim (and to deny a qualified immunity defense) because it "cannot help but have a tremendous chilling effect on the exercise of First Amendment rights." Holloman, 370 F.3d at 1268-69. See also Constantine, 411 F.3d 500-01 (adversely manipulating student exam schedule in reaction to student criticism constitutes adverse action for First Amendment purposes).

612.     The test in such cases is not whether a particular student was cowed by an official inquiry, but rather poses an objective question – whether a student of "reasonable firmness" would likely be chilled by the encounter. Id. at 500 ("The cause of action targets conduct that tends to chill such activity, not just conduct that freezes it completely.").

613.     The First Amendment requires universities seeking to investigate student speakers for possible violations of anti-harassment policies to employ the least restrictive means of achieving their objectives. Strict scrutiny is the applicable standard because requests for the

government to silence offensive speech are inherently content-based. E.g., Saxe, 240 F.3d at 206 ("[W]hen antidiscrimination laws are 'applied to … harassment claims founded solely on verbal insults, pictorial or literary matter, the statute[s] impose[] content-based, viewpoint-discriminatory restrictions on speech.'") (citation omitted). This is because "[l]isteners' reaction to speech is not a content neutral basis for regulation." Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 134 (1992); Rock for Life, 411 F. App'x at 552 (same).

614.  Central to the case at hand, any regulation that seeks to shield individuals from psychological damage necessarily "focuses only on the content of the speech and the direct impact [it] has on its listeners. The emotive impact of speech on its audience is not a 'secondary effect.'" Boos v. Barry, 485 U.S. 312, 320-21 (1988). However, "if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55 (1988) (emphasis added).

615.  Such regulations are subject to "the most exacting scrutiny." Boos, 485 U.S. at 321; Saxe, 240 F.3d at 206-07. This demanding standard requires the government to prove its efforts are necessary to serve a compelling interest. United States v. Playboy Entm't Grp., 529 U.S. 803, 813 (2000).

616.  Thus, when anti-discrimination or anti-harassment laws seek to regulate offensive words or symbols, the government is required to prove that the expression was "so severe, pervasive, and objectively offensive, and that [it] so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 651 (1999); Saxe, 240 F.3d at 205-06. See also Faragher v. City of Boca Raton, 524

U.S. 775, 786-87 (1998) (Title VII is not violated by the "mere utterance of an … epithet which engenders offensive feelings" unless so "severe or pervasive as to alter the conditions of … employment").

617.    Once this high threshold is met, the government still must show it is using the least restrictive means to achieve its purpose. Playboy Entm't Grp., 529 U.S. at 813.

618.    The need for strict scrutiny is especially important in the present case where a governmental policy may be employed as a form of "heckler's veto." Because "[c]ourts have recognized a heckler's veto as an

619.    Mr. Addahoumi has been extremely patient with the school and their overreaction to a student who did exactly what the school told him to do after dictating that he needed help for his perceived disability, which was to go to the USC Specialty Clinics and meet with Defendant Frierson.

620.    Mr. Addahoumi took USC's recommendation, involuntarily allowed himself to be "assessed" by Defendant Frierson, and then USC suspended him. There is obviously something wrong with this with this scenario. Mr. Addahoumi attended USC to earn his Political Science degree with a minor in Islamic World History. Mr. Addahoumi did not attend USC to become a free-range inpatient of USC.

621.    Keeping in mind that graduating from USC was the most important thing in the world to him, imagine how he felt being told he was suspended, and remember that he had no family or friends present at the moment to console him.  Defendants had conspired with multiple members of Mr. Addahoumi's family. It was nothing less than Defendants intention to see him involuntarily committed to a psychiatric ward.

622.    Mr. Addahoumi was far from proud to be forced into the USC Behavioral Intervention Team program, but to his credit, he was not too ashamed to admit that he suffered discrimination and harassment due to his perceived disability. Far from being depressed, or to telling his family and friends that he had been discriminated, Mr. Addahoumi chose instead emphasize he had only one single class required to take before graduating from USC.

623.    However, what self–esteem Mr. had preserved until the afternoon of May 16, 2014 was utterly and totally demolished by that letter from Defendants Grewe and Liggett, and he immediately regretted being forced to seek "help" for what Defendants regarded to be his disability. He was angry and confused, because suspension felt far more shameful compounded with the stigma of Defendants labeling as Mr. Addahoumi disabled.

624.    Mr. Addahoumi was, never, as hopeless and ashamed as when he was after receiving that letter from Defendants Grewe and Liggett.  He also felt betrayed by the very institutions and individuals to whom he had turned to in confidence, though involuntarily, and that deceived Mr. Addahoumi and his family, who were purposely led to believe that he would receive treatment, help, and understanding for his perceived disability.

625.    Defendants must account for why a student's thought and speech were prosecuted as a crime at USC – even when the only action he actually took was toward self-preservation. Defendants must account for why there is no difference in the code applied between the University's handling of a students regarded as disabled – in this case, Mr. Addahoumi's extensive involvement with the USC BIT - and a student that is or charged with a threat or violent crime against another student, faculty member employee.

626.    Above all, USC Defendants must account for how their collective practices and resource expenditures detailed in Mr. Addahoumi's pleadings reconcile with the tragic murder of USC

professor Dr. Raja Fayad by Sunghee Kwon.  Had Defendants not harassed Mr. Addahoumi with such hypervigilance, they would have had the time and resources to actually served their alleged purpose, to help students and faculty in true distress such as Dr. Fayad and Sunghee Kwan

627.    The University of South Carolina professor who was gunned down at his desk by his ex-wife had filed multiple reports with campus police and other agencies before the shooting. Fayad's ex-wife had been showing up to his USC classroom to watch him teach, disrupt to his class, and harass him.

628.    According to the USCPD incident report, Raja Fayad, 45, said "there was an Asian female who had no business being in there." He added that he was "uncomfortable with the female."

629.    Dr. Charles Bennett, a close friend of Fayad's and professor at the University of South Carolina said "She'd been disrupting his classes, she'd come into class, she'd sit in the back of the room. The students realized she was not a student here," he said

630.    According to Dr. Bennett, Raja had submitted the police report to the campus initially not saying it was his ex-wife, "just saying somebody", Bennett said. "And when they asked Raja what can happen to you, Raja said, 'I might get bad grades on my school teaching because she's disrupting my classroom.' "

631.    Released by the university and pulled from Dr. Fayad's USC Blackboard faculty email account, an email exchange shows Kwon's repeated and pervasive attempts to contact Dr. Fayad in order to convince him to cede his stake in their house.  Few of Fayad's responses to this exchange are listed in the release, except a missive to Kwon to stop messaging his USC account.

632.     An internal review commissioned by Defendant Pastides after the February 5, 2015 shooting goes on to note that "occasional technical failures in timely and reliable communication" between the university and the USC community may have prolonged fears of an existing threat on campus. In addition, emergency sirens and radio alerts were "not deployed in accordance with university protocols."

633.     On February 5, 2015, Mr. Addahoumi walked from his Sammi's Deli location in 5 Points towards the USC Admissions Office to speak with Michael Jinette, a longtime customer, friend, and trusted advisor.  Mr. Addahoumi had fulfilled all demands placed on his readmission to the university.   At approximately 1pm, Mr. Addahoumi received an email from USC stating "SHORS FIRED".  Mr. Addahoumi assumed this to me "shots fired", and as such was very alarmed.  As a soon as Mr. Addahoumi received the email, he decided away from USC campus, and instead walked to the Wendy's restaurant on Assembly Street.

634.      Mr. Addahoumi ordered a bowl of chili and sat down inside Wendy's to eat.  After roughly 15 minutes, USCPD officers approached Mr. Addahoumi and commanded him to step outside where Defendant Newton then arrested Mr. Addahoumi for allegedly trespassing, despite the fact that Mr. Addahoumi did not trespass.   Defendant Newton did not witness Mr. Addahoumi trespass nor did Defendant Newton have a warrant to arrest Mr. Addahoumi.

635.     Mr. Addahoumi had contacted Defendant Bedford on multiple occasions in efforts to proceed with the readmission process. For example, on October 9, 2014, Defendant Bedford wrote:

"Hello Gary,

 Below are the next steps for Sammi:

1.      You are to receive further evaluation and treatment by a psychiatrist. You must comply with the psychiatrist's treatment plan which will likely include regular follow-up appointments and psychiatric medication. Documentation verifying that you are compliant with all treatment plans will be required. Please choose one of the following providers:

a.      Jesse Raley, MD at Midlands Psychiatry (http://www.jesseraleymd.com/)

b.      Elizabeth Jeffords with Palmetto Psychiatric (803-782-9280)

2.      Prior to your initial evaluation, you must release the information from Dr. Frierson's assessment to the psychiatrist of your choice

3.      Prior to returning to campus you must demonstrate abstinence from illicit substances by agreeing to three separate drug screens to be obtained at times determined by the university. Additional random drug screens will be required should you return to campus.

Please let me know if you need clarification or assistance.

Sincerely,

Tim Bedford, Ed.S., LPC

Case Manager for the Behavioral Intervention Team

University of South Carolina
901 Sumter Street, Suite 201
Columbia, SC 29208
Office: 803.777.4333/ Fax 803.777.1393
Bedford@mailbox.sc.edu


636.      on December 3, 2014, Mr. Addahoumi's prior counsel Gary White wrote the following:

"Dear Mr. Bedford

Sammi recently saw Dr. Steele and had a pleasant visit.

Sammi feels and appears more calm and oriented.  Have you been in communication with Dr. Steele?

What are the next steps Sammi needs to take to complete his studies?

with best regards,

gary".


637.

638.     Mr. Addahoumi had contacted Defendant Bedford on multiple occasions in efforts to proceed with the readmission process.  For example, on January 23, 2015, Mr. Addahoumi's prior counsel Gary White wrote the following:

639.     "Dear Mr. Bedford:

What is our next step to get Sammi enrolled and finished with school?

We were under the impression, that having consulted with a doctor and regained his composure, he could now complete his studies.

Sincerely,

gary white". (Exhibit)

640.     On January 28, 2015 Defendant Bedford respond to the request from Mr. Addahoumi in an email that included an attached letter. In the email Defendant Bedford wrote:

"Mr. White,

I've attached the original letter which was sent to Sammi this past May. This letter outlines the steps Sammi must take before he is eligible to return.

The only thing we've received from the psychiatrist so far is confirmation that Sammi attended an initial appointment. We also need verification that Dr. Steele received Dr. Frierson's records and we need to see Dr. Steele's treatment recommendations (which will be required).

Once we've received Dr. Steele's treatment recommendations and documentation that Sammi is complying with treatment, we can then discuss the next steps.

Thank you.

Tim Bedford, Ed.S., LPC

Case Manager for the Behavioral Intervention Team

University of South Carolina
901 Sumter Street, Suite 201
Columbia, SC 29208
Office: 803.777.4333/ Fax 803.777.1393
Bedford@mailbox.sc.edu".

641.     In the email described above, Defendant Bedford makes two new demands not previously stated in any suspension letter, document, or communications with Mr. Addahoumi. First Defendant Bedford stated "The only thing we've received from the psychiatrist so far is confirmation that Sammi attended an initial appointment.". Defendants previously demanded only documentation to prove that Mr. Addahoumi was compliant to treatment recommendations made by psychiatrist Dr. Daniel Steele.

642.     In his psychiatric assessment and evaluation of Mr. Addahoumi, Dr. Steele clearly wrote the following treatment plan recommendations:

"I have reviewed his recent medical records from Dr. Robinson which do show a negative urine drug screen, therefore I will forego checking any further lab work at this time.  I explained to patient that I believe that he does not currently suffer with any significant mental illness that would hinder him from continuing his studies at USC.  He is not currently exhibiting significant

symptoms consistent with a mood disorder, and he does not give a clear history of symptoms consistent with a mood disorder…I encouraged him to continue a regular exercise routine to help with his minor anxiety symptoms.  At this time, I will be referring him back to his primary care physician, Dr. William Robinson, but I did explain to him that I will be glad to see him in the future should he have problems."

643.    As required by Defendant's previous demands, Mr. Addahoumi released this private mental health record to the USC Office of Student Conduct.    USC Behavioral Intervention Team Defendants disagreed with Dr. Steele's assessment that Mr. Addahoumi was not mentally ill and did not require powerful and dangerous psychiatric drugs.  Although this assessment perfectly mirrored that of Dr. Lara Sheehi, as well as that of Dr. Bryant Kilbourne, this "clean bill of mental health" directly contradicted Defendants own negligent misdiagnosis that Mr. Addahoumi was a violent psychotic with serious mental disabilities. Mr. Addahoumi has absolutely no history of violence and, prior to the actions and fabrications of Defendants, Mr. Addahoumi had absolutely no history of mental illness

644.    The admission requirements mandated by Defendant Bedford are not published by the university and even the university admissions office was unaware where the readmission policy could be found.  The university's actions in presenting Mr. Addahoumi with a behavioral contract that has many elements related to mental health resulted in Mr. Addahoumi being "regarded" as having a disability, and is thus entitled to the protections afforded to an individual with a disability.

645.    USC BIT Defendants demonstrated that they perceived the student to have a mental impairment as reflected in elements of the behavioral contract mandated by Defendant Bedford.

Thus, USC BIT Defendants, through their actions, established the disability status of Mr. Addahoumi.

646.    Defendant Bedford suddenly made the new demand "We also need verification that Dr. Steele received Dr. Frierson's records and we need to see Dr. Steele's treatment recommendations (which will be required). Defendants were provided Dr. Steele's report and treatment recommendations.  Dr. Steele's treatment plan for Mr. Addahoumi clearly states that there are no treatment plan recommendations.

647.    On May 7, 2015 Mr. Addahoumi's previous counsel Gary White wrote the following letter to Defendant Liggett, Dean Mary Fitzpatrick, and other USC officials. Mr. White wrote:

Dear Dean Fitzpatrick:

Mr. Addahoumi was an MBA candidate in the Political Science Department, when his senior year, he became the target of the Behavioral Intervention Team, which expressed some rather vague, unspecific and probably defamatory concerns to Mr. Addahoumi's family as well as to himself.

Mr. Addahoumi and his family made every attempt to address these nebulous concerns, to no avail. Mr. Addahoumi was expelled from school and banned from campus. He tried to reapply for school but was told a hold has been placed on him.

We have since had several meetings with Alicia Leggett and emails to Tim Bedford, at her instruction, in an attempt to learn what steps were necessary to have him readmitted, so he could complete his MBA. We had felt these terms had been met, with Psychiatric Evaluation of John C. Steele, M.D. that, "… he does not currently suffer with any significant mental illness that would hinder him from continuing his studies at USC" (copy attached).

We have one concern, completing Mr. Addahoumi's studies. We would prefer to do that through USC, rather than litigation, but the family feels they are being stone walled and subjected to a shell game. Further, the vagueness of the allegations against Mr. Addahoumi raise inferences of political and academic intolerance and discrimination.

This view is further promoted by the Specialty Clinic's refusal to provide Mr. Addahoumi copies of his medical records, which we believe a violation of his rights.

(copy attached)

What does Mr. Addahoumi need to do in order to complete his studies?

Sincerely,

Wm. Gary White, III

cc: Alisa Liggett

   Craig Stanley".


648.    The effect of Mr. Addahoumi's story – and others like his – must have a profound impact on not only on USC's credibility as a counseling service, but the very model that the USC Behavioral Intervention Team. The NABITA BIT model, developed and operating at USC, is advertised to:


649.    The court should direct that USC review its policies and procedures with regard to students facing perceived psychiatric emergencies to avoid a situation in the future where the University's actions, rather than being perceived as beneficial, may create additional stress and frustration for students and their families.

650.    Had Mr. Addahoumi known how he would be treated by Defendants, he never would have attended a single mandated Behavioral Intervention Team meeting, counseling, or assessments. In fact, the charges, investigations, dozens of mandated meetings, surveillance and the behavior of the USC Behavioral Intervention Team institution prevented Mr. Addahoumi from focusing on his perceived condition, much less his studies.

651.    Rather, Defendants actions threw on Mr. Addahoumi a huge feeling of failure and shame, which, needless to say, pushed Mr. Addahoumi into an actual state of emotion, economic, social, familial, and mental distress.  The facts guarantee that Defendants did Mr. Addahoumi no favor by removing him from his closest friends, classmates, professors, campus resources, and sending him home to an empty house, unaware of how or why or under what pretext he was even suspended.  The Court must guarantee USC Defendants will do no future student such a favor by doing the same to him or her.

652.     According to USC policies and procedures all students who disagree with the findings or sanctions provided by the conduct administrator or hearing officer who presided over their case have the opportunity to have their case heard at a Carolina Judicial Council (CJC) Hearing. Students may also take their case to a CJC Hearing if they feel it would be fairer to have students or a panel decide the case.

653.    Mr. Addahoumi requested a Carolina Judicial Council Hearing on three separate occasions. Each time, and thereafter, Defendant Liggett denied, then ignored, Mr. Addahoumi's requests for a Carolina Judicial Hearing.  Defendants always provide such a CJC hearing to students upon request who is not regarded as having a disability.

654.    At all times described herein, Mr. Addahoumi was regarded by Defendants as having a disability as defined by the ADA, Section 504, and FHAA.

655.    As a result of defendants' unlawful, intentional, and willful actions described above, Mr. Addahoumi has suffered, continues to suffer, and will in the future suffer, great and irreparable loss and injury, including but not limited to humiliation, embarrassment, emotional distress, and discrimination in participation in the services, programs, and activities at the University of South Carolina, and the deprivation of his right to equal housing opportunities, resources, and privileges due to his perceived handicap.

656.    In evicting Mr. Addahoumi from the campus, excluding him from the classroom for the Summer 2014, Fall 2014, Spring 2015, Summer 2015, Fall 2016, and Spring 2016 semesters, and conditioning his re-admission on unlawful terms, Defendants intentionally discriminated against Mr. Addahoumi based on his disability, his record of disability or perceived disability. Defendants' policies and actions also have a disparate impact on persons who suffer from mental illness.

657.    Defendants' policies do not further, in theory or practice, a legitimate bona fide governmental interest and no alternative would serve the interest with less discriminatory effect. Finally, Defendants' refusal to provide an accommodation in its rules, policies, practices or services constitutes a separate violation of Mr. Addahoumi's rights.

## CLAIMS

### Investigations Violated Mr. Addahoumi's First Amendment Rights

658.    Mr. Addahoumi has pleaded that Defendants' investigations of his protected Free Speech burdened First Amendment rights by initiating an official inquiry that favored complainants and threatened significant penalties without constitutionally-required procedures.

659. Defendants' pre-bundled responses are classic bureaucratic doublespeak, or that which USC labels and markets as, "Verbal Judo". Defendants' carefully crafted statements argue USC could not possibly have violated Mr. Addahoumi's First Amendment rights because his Free Speech was "exempt" from their policies, while objecting they *had* to investigate the events under federal law, but then claim they didn't really do an "investigation," while protesting that they kept it "brief."

660. This "Verbal Judo" wordplay is exacerbated by an obsession about whether it is correct to call what Defendants sent Mr. Addahoumi a "Notice of Charge," despite the fact that those words appeared on the face of each and every letter and notice.   However, it matters not how Defendant's letters are officially designated – the constitutional violations arise from the obligations in the letters, notices, emails and mandated psychiatric treatments themselves, not from whether Defendants competently managed the ministerial task of attaching a form.

661. The Supreme Court has long held it necessary to "look through forms to the substance" in recognition that informal censorship may sufficiently inhibit speech in violation of the First Amendment as to warrant injunctive relief.  Bantam Books v. Sullivan, 372 U.S. 58, 66-67 (1963) (violation found even though "books have not been seized or banned by the State, and no one has been prosecuted").

662. Defendants' letters, notices, and emails – whatever Defendants prefer to call or label them– imposed a number of obligations on Mr. Addahoumi, and, by extension, Mr. Addahoumi's family and relatives.  The BIT letters each required a minimum of four mandated psychological assessment or judicial meetings, the dates and times of which were dictated to Mr. Addahoumi without his input, much less his consent.   Despite

repeated requests for a CJC conduct hearing, Mr. Addahoumi was involuntarily forced to comply with Defendants' demands lest he actually provide Defendants an actionable violation of "failure to comply".

663. Three essential points are beyond dispute: (1) Mr. Addahoumi's exercise of free expression on the USC campus is fully protected by the First Amendment, (2) USC anti-discrimination policies and Behavioral Intervention Team policies must be enforced within First Amendment limits; and (3) administrative action that chills speech violates the First Amendment even without any sanctions.

664. The command of the due process clause of the fourteenth amendment is that no state shall deprive any person of life, liberty or property without due process of law. The Supreme Court, in Board of Regents v. Roth and Matthews v. Eldridge, laid out the framework for determining when the protections of due process are applicable.

665. The Roth test addresses the threshold question of whether the nature of the interest at stake invokes the due process clause at all. The inquiry, then, is "to see if the interest is within the Fourteenth Amendment's protection of liberty and property. The Supreme Court has never decided the issue of whether college students have liberty or property interests at stake in a campus disciplinary hearing, but it is possible to extrapolate Supreme Court assent through the case of Board of Curators of the University of Missouri v. Horowitz.

666. In Horowitz, the majority, by adjudicating the merits of the case, assumed that a student could assert a liberty or property interest where a campus academic hearing might result in dismissal from college.

667.    The Court has generally found liberty interests to include "freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."

668.    The pursuit of an academic degree at a college unquestionably falls into several of these categories, as the right to pursue happiness, the right to contract for enrollment, and the right to acquire useful knowledge. A nexus is formed between liberty and property interests because, while the freedom of contract is a liberty interest, the contract produced creates a property-based right.

669.    Support for the proposition that students have a property interest in their education can also be found in numerous federal court cases, usually based upon the contractual exchange of tuition for education.

670.    With respect to liberty interests, a persuasive analogy comes from Wisconsin v. Constantineau, a Supreme Court case which held that liberty interests are invoked "[w]here a person's good name, reputation, honor, or integrity is at stake."

671.    Even as the Court seemed to narrow this stigma concept five years later, when it wrote in Paul v. Davis, that "reputation alone, apart from some more tangible interest such as employment, is neither `liberty' or `property' by itself sufficient to invoke the procedural protection of the Due Process Clause", it is important to note that the stigma of disciplinary action is frequently accompanied by other, more palpable deprivations.  In fact, courts have been of one voice in holding that campus disciplinary hearings provide

the opportunity for significant deprivation, and thus a nexus of liberty and property interests is clearly present.

672.    Defendants' decision to "summarily" suspend, or "administratively" suspend Mr. Addahoumi produced two different types of liberty deprivations.   The first type, identified repeatedly in Mr. Addahoumi's pleadings, came from findings of guilt or "responsibility". It is not hard to see how USC's campus hearings, in which the outcomes included suspension or dismissal, resulted in long-term or permanent damage to Mr. Addahoumi's honor and reputation.  While disciplinary actions on college campuses are usually closed to the public, it is a rare event when the results of a hearing, much less the circumstances of an investigation, are not known to the student to some extent, as was such the case here.

673.    The second type of liberty deprivation is the type of stigma repeatedly identified in Mr. Addahoumi's claims, which occurs when a suspended or expelled student attempts to transfer to or temporarily attend another school, or apply to graduate school.  Most college and graduate school applications require disclosure of serious disciplinary infractions. Such candor will result at most schools in a denial of the application.

674.     Thus, students who have been suspended or expelled may, in fact, be wholly deprived of the liberty to complete their undergraduate education at another school, to pursue later graduate study, or even their chosen careers. In January of 2017, nearly three years after being suspended by Defendants, Mr. Addahoumi applied for admission to Benedict College in Columbia, S.C.

675.    However, Benedict College, like the majority of U.S. campuses, requires that any transfer student be eligible for enrollment in the institution from which they are transferring. Because of the current USC disciplinary hold on Mr. Addahoumi's

registration, enacted and sustained by Defendants, Mr. Addahoumi was informed by Benedict College that his admission application could not be processed.

676.     In an additional act of vindictive spite, Defendants annotated Mr. Addahoumi's official USC transcript with a notification that Mr. Addahoumi was suspended for disciplinary reasons.  The annotation reads: "This student was suspended from the University for disciplinary reasons.  Please refer to student's disciplinary record".

677.     Even probation, used as a punishment in many campus hearings for first offenses, often involves limiting a student's participation in various campus activities, restricting a student's access to certain university buildings, or requiring participation in some type of counseling or community service. Mr. Addahoumi was put on "probation" by Defendant Liggett and restricted from attending his POLI 391 class by Defendants Wiser and Liggett.

678.     The Plaintiff in this case, Mr. Addahoumi wanted to start a dialogue with his fellow students about a wide range of controversial topics related to subject matter discussed in various classes, but learned the sad lesson that you can't even talk about free speech these days without getting into trouble. On multiple occasions, Mr. Addahoumi exercised his right to free speech at the University of South Carolina when he utilized his Blackboard student email account to discuss controversial issues.

679.      These discussions went well, but when a few individuals complained that they were offended and felt "concerned" the University promptly began multiple investigations of Mr. Addahoumi's speech even though his speech was not only academic in nature, but directly related to topics discussed or examined in various classes and coursework.

680.    This case highlights the concerns of commentator Wendy Kaminer that "[w]hat we are seeing is not just phobias about language. We have gone way beyond political correctness and are seeing a real decline in critical thinking".

681.    This case also illustrates how campus bureaucracies like the USC Behavioral Intervention Team can favor grievance culture over the free exchange of ideas, and why structuring USC policies to nurture and encourage complaints about speech contributes to a mistaken belief by some that there is an American right not to be offended.

682.    The USC BIT unfortunately serves to perpetuate and reinforce this mindset by enforcing polices that regulate and sanction student speech based on broad and nebulous terms using BIT procedures that favor those who complain over the rights of speakers.

683.    Fortunately, courts have not suffered similar confusion. It has long been the law that "the mere dissemination of ideas – no matter how offensive to good taste – on a state university campus may not be shut off in the name alone of 'conventions of decency.'" Papish v. Bd. of Curators of Univ. of Mo., 410 U.S. 667, 670 (1973).

684.    It is firmly settled that "a state may not directly prohibit offensive speech," Rosen v. Port of Portland, 641 F.2d 1243, 1249 n.10 (9th Cir. 1981), and the Supreme Court has made clear that the government may not seek to excise "offensive word[s] from the public vocabulary." Cohen v. California, 403 U.S. 15, 22-23 (1971). This is true even when censorship masquerades as an anti-discrimination or safety measure, for "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001). In bringing this lawsuit, Mr. Addahoumi seeks to ensure that USC adheres to these bedrock constitutional principles

685.    Mr. Addahoumi asked Defendant Liggett several times why he was required to attend numerous mandated BIT meetings to answer for his speech and publications since the expressions of speech had been approved by the University in advance, as protected academic speech.

686.    Mr. Addahoumi added that he would not agree to a mediated resolution, mandated counseling, or any other type of "plea bargain" as a result of any complaints because he had done nothing wrong by exercising his right to protected expressions of free speech in the academic context.

687.    Mr. Addahoumi's repeated requests to Defendants Liggett and Schneider set forth several actions the University would need to take to prevent its policies from chilling the exercise of constitutionally-protected speech. Specifically, Mr. Addahoumi's multiple requests repeatedly sought to terminate the numerous proceedings and obtain commitments from Defendants that no further actions would be taken and no sanctions imposed, against Mr. Addahoumi because of his protected expressions of free speech.

688.    Mr. Addahoumi's requests asked that the complaints be expunged from his University records; and he sought written clarification of how the University policies are to be interpreted and applied so as not to conflict with Mr. Addahoumi's First Amendment rights.

689.    Although no such procedure is described in USC policies, Defendant Liggett repeatedly characterized her mandated meetings with Mr. Addahoumi as a "pre-investigation" designed to determine the "context" of Mr. Addahoumi's speech.   In response to Mr. Addahoumi's questions about why he had to attend numerous mandated meeting to justify and defend his exercise of free expression, Defendant Liggett repeatedly

responded that her investigations were prompted by "confidential" complaints, which she described as "serious" and "concerning", that had been submitted to her office and USC Behavioral Intervention Team. Defendant Liggett asked no questions about the content or context of Mr. Addahoumi's expressions of protected free speech, whether there had been any confrontations, or whether any of the complainants had gone "too far."

690.    Rather, Defendant Liggett's questions focused on what Mr. Addahoumi was trying to achieve, what his message was, and how it related to particular classroom discussions or coursework. Defendants Liggett, Grewe, Schneider, Bedford and Sheppard reviewed Mr. Addahoumi's multiple requests and complaints, but made either no commitment how the University would respond, or ignored Mr. Addahoumi's requests and demands completely.

691.    In particular, Mr. Addahoumi's requests to Defendants Liggett and Schneider sought a commitment that the University would not find illegal discrimination, harassment, or disruption had occurred unless his behavior in question was severe, pervasive, and objectively offensive.

692.    The University's BIT policy and its harassment policy apply to Mr. Addahoumi's protected free speech, and give no assurances that Mr. Addahoumi would not face future enforcement if he engaged in similar speech in the future. Additionally, Defendants' actions did not terminate the complainants' ability under University policies to pursue remedies against Mr. Addahoumi for exercising his right to protected free speech, and did not

commit to removing notations of the complaints in University records for Mr. Addahoumi.

**CAUSES OF ACTION**

**COUNT I**

**As-Applied Violation of Plaintiff's Rights to Free Speech**

**Under the First and Fourteenth Amendments**

**(42 U.S.C. § 1983)**

**(all Defendants)**

693.     Mr. Addahoumi repeats and re-alleges each of the foregoing allegations in this Complaint.

694.     The First and Fourteenth Amendments extend to campuses of state colleges and universities.  Healy v. James, 408 U.S. at 180.

695.     The First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times v. Sullivan, 376 U.S. 254, 270 (1964).

696.     Our institutions of higher learning play a central role in a system of freedom of expression because "[t]he college classroom with its surround- ing environs is peculiarly the 'marketplace of ideas.'" Healy, 408 U.S. at 180.

697.     In this regard, "[t]he first danger to liberty lies in granting the State the power" to limit freedom of expression in contravention of the "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 835 (1995).

698.     To say that Mr. Addahoumi cannot even discuss controversial free speech without triggering complaints and an investigation under USC's policies is an affront to both the mission of the University and to the purpose of the First Amendment. "[T]he mere

dissemination of ideas – no matter how offensive to good taste – on a state university campus may not be shut off in the name alone of 'conventions of decency.'" Papish v. Board of Curators of Univ. of Mo., 410 U.S. 667, 670 (1973).

699.    The Supreme Court has long recognized that "words are often chosen as much for their emotive as cognitive force," and that "we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." Cohen v. California, 403 U.S. 15, 26 (1971).

700.    The First Amendment forbids the government from censoring speech based on "personal predilections," and "the State has no right to cleanse the public debate to the point where it is grammatically palatable to the most squeamish among us." Id. at 21, 25. "There is no categorical 'harassment exception' to the First Amendment's free speech clause." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001).

701.    By investigating Mr. Addahoumi's involvement in matters of Free Speech, the USC Behavioral Intervention Team and Defendants have explicitly and implicitly chilled Mr. Addahoumi's free expression as well as that of all USC students. "Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference in these matters." Sweezy v. State of N.H., 354 US. 234, 249 (1957).

702.    The Supreme Court has long recognized the "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association" that is the "more immediate and substantial" result of governmental investigations into lawful expressive activities.  Gibson v. Florida Legis. Investigation Comm., 372 U.S. 539, 556-57 (1963).

703.    To require Mr. Addahoumi or other students to submit to an official inquiry about their Free Speech based on claims that other students felt "offended" or "concerned" subjects Mr. Addahoumi to a "heckler's veto."  However, the courts have long made clear that the First Amendment prevents speakers from being silenced or sanctioned simply because listeners may object to their speech. Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 134 (1992); Bible Believers v. Wayne Cty., Mich., 805 F.3d 228 (6th Cir. 2015) (en banc).

704.    Defendants' USC Behavioral Intervention Team incident reports acknowledged that the basis for conducting their investigations into Mr. Addahoumi's protected Free Speech were complaints regarding the content of Mr. Addahoumi's speech pursuant to USC policies.

705.    The Defendants' repeated decisions to further pursue sanctions against Mr. Addahoumi does not preclude the same complainants from seeking formal sanctions against him under the same pretexts.

706.    Defendants' actions violated clearly established First Amendment rights of which reasonable university administrators would be aware.  Defendants Liggett, Grewe, Schneider, and Bedford cannot deny that (1) they sent multiple emails to containing a "Notice of Charge" to Mr. Addahoumi under University of South Carolina ("USC") policies governing formal student complaints; (2) they summoned Mr. Addahoumi to multiple meetings with Defendant Liggett to explain and justify Mr. Addahoumi's protect free speech  (3) they ignored Mr. Addahoumi's multiple requests and demands for a less restrictive approach to protect First Amendment interests; or (4) that deciding to pursue the numerous investigations further did not terminate the Defendants' ability to seek

penalties outside of the BIT and Office of Student Conduct, such as reporting Mr. Addahoumi to the FBI and other law enforcement agencies multiple times.

707.    Defendants violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Mr. Addahoumi under 42 U.S.C. §1983.

708.    The doctrine of qualified immunity protects government officials only "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In this case, Defendants cannot legitimately claim qualified immunity because: (1) Mr. Addahoumi's First Amendment rights were well-established at the time of the events, and (2) Defendants' actions of subjecting Mr. Addahoumi to dozens of investigations, before first evaluating the facial invalidity of the complaints violated those rights. See, e.g., Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 315-21 (4th Cir. 2006).

709.    The denial of constitutional rights is irreparable injury per se, and Mr. Addahoumi is entitled to declaratory and injunctive relief.

710.    Additionally, Mr. Addahoumi experienced emotional injury as a consequence of being denied his First Amendment rights.

711.    The extent of Defendants' First Amendment violations may be best understood by recognizing at the outset that the constitutional rights they violated have been well-established for nearly seven decades. Given the clarity of the law and the undisputed facts, Mr. Addahoumi's free speech, in which he sought to inform fellow students about

political, social, and religious controversies in an academic context, is unquestionably constitutionally protected.

712.    The First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1960). This commitment is uniquely critical in our institutions of higher learning because universities and their "surrounding environs" are "peculiarly the 'marketplace of ideas.'" Healy v. James, 408 U.S. 169, 180 (1972). For this reason, the "first danger to liberty lies in granting the State the power" to limit freedom of expression on campuses in contravention of the "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 835 (1995).

713.    The deep irony of this case is that Mr. Addahoumi was seeking to preserve the university setting as a true marketplace of ideas when he repeatedly faced both the threat of official sanctions and actual sanctions themselves.  But Mr. Addahoumi's right to do so is well established even when the speech at issue is harsh or may be subjectively characterized as "harassing" or "disruptive", "concerning", or "erratic".

714.     Defendants try to avoid this point by distorting the nature of the right at issue, asserting that Mr. Addahoumi's protected free speech somehow caused safety and even mental health concerns. Rather, Mr. Addahoumi argues that university policies promoting civility, safety, or mental health must be written and applied in conformity with First Amendment standards. The problem in this case is that Defendants applied a process that heavily favored complainants against speakers, forcing Mr. Addahoumi to justify the exercise of a fundamental right or face the risk of punishment.

715.    The relevant First Amendment principles limiting USC's actions are well established. In Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir. 1993), for example, the Fourth Circuit held that the First Amendment precluded the university from sanctioning a fraternity that put on an "ugly woman" skit with sexist and racist overtones, including one member in black face. Nearly 250 students signed a petition complaining about the skit, and the school found the fraternity had created a hostile learning environment for women and blacks, incompatible with the university's mission.

716.    The court agreed that the university had a substantial interest in maintaining an educational environment free from discrimination and racism, but held that in attempting to meet these objectives, "'the manner of [its action] cannot consist of selective limitations upon speech.'" Id. at 393 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 392 (1992)).

717.    In such cases, the university must accomplish its goals "in some fashion other than silencing speech on the basis of viewpoint." Id. See also Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir. 1985). The principles set forth in Sigma Chi Fraternity poignantly apply in this case, where Mr. Addahoumi engaged in multiple sincere attempts to open a dialogue about academic, social, political, and religious controversies that have riveted other campuses. For if the First Amendment protects "crude skits" that were admitted to be "an exercise of teenage campus excess" as in Sigma Chi Fraternity, 993 F.2d at 389-90, then it most assuredly envelops the speech at issue here. "[T]he right to free speech … includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." Bible Believers

v. Wayne Cty., 805 F.3d 228, 243 (6th Cir. 2015) (en banc) (quoting Hill v. Colorado, 530 U.S. 703, 716 (2000)).

718.    Any other rule "'would effectively empower a majority to silence dissidents simply as a matter of personal predilections,'" and the government might be inclined to "regulate" offensive speech as "'a convenient guise for banning the expression of unpopular views.'" Id. (quoting Cohen v.California, 403 U.S. at 21, 26.   Dressing the policy in the "harassment"  or "mental health" rubric does not alter the analysis because "[t]here is no categorical 'harassment exception' or 'mental health exception' to the First Amendment's free speech clause."  Saxe, 240 F.3d at 204; Bair v. Shippensburg Univ., 280 F. Supp. 2d 357, 372 (M.D. Pa. 2003) (constitutional problems cannot be avoided by "[s]imply utilizing buzzwords applicable to anti-discrimination legislation"). "First Amendment principles must guide our interpretation of the right to be free of purposeful workplace harassment." Rodriguez v. Maricopa Cty. Cmty. Coll. Dist., 605 F.3d 703, 709 (9th Cir. 2010); Sigma Chi Fraternity, 993 F.2d at 393.

719.    Accordingly, any regulation of harassment or "concerning" speech to prevent a hostile or unsafe learning environment must be drafted and applied with narrow specificity to avoid violating the First Amendment. Cohen v. San Bernardino Valley Coll., 92 F.3d 968, 972 (9th Cir. 1996); College Republicans at San Fran. St. Univ. v. Reed, 523 F. Supp. 2d 1005 (N.D. Cal. 2007).

720.    First Amendment concerns are heightened where the school's anti-harassment policies, BIT policies, and complaint processes favor complainants over speakers, as they do at USC. This is because "[h]istorically, one of the most persistent and insidious threats to first amendment rights has been that posed by the 'heckler's veto,' imposed by the

successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order." Berger, 779 F.2d at 1001.

721.    The problem of the heckler's veto has been "a recurring theme in first amendment litigation," id., and courts have recognized it as an impermissible form of content-based speech regulation for nearly seven decades. Terminiello v. City of Chicago, 337 U.S. 1, 3-5 (1949). See Rock for Life-UMBC v. Hrabowski, 411 F. App'x 541, 554 (4th Cir. 2010).

722.    In short, "constitutional rights may not be denied simply because of hostility to, or "concern" about, their assertion or exercise." Watson v. City of Memphis, 373 U.S. 526, 535 (1963). While the Fourth Circuit has observed that "this 'veto' has probably been most frequently exercised through legislation responsive to majority sensibilities," it has recognized that "the same assault on first amendment values of course occurs when as here it is exercised by executive action responsive to the sensibilities of a minority." Berger, 779 F.2d at 1001.

723.    There can be no serious argument that Mr. Addahoumi's rights were not well-established, or that a competent administrator could be unaware of these rights. The cases cited above and clear Fourth Circuit precedent did far more than give Defendants "fair warning" that Mr. Addahoumi's rights were clearly established. Hope v. Pelzer, 536 U.S. 730, 739-40 (2002).

724.    Thus, there is no basis for granting qualified immunity. E.g., Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1275 (11th Cir. 2004) (finding it clearly established that expression is not "removed from the realm of constitutional protection simply because the students cloaked their disagreement in the guise of offense or disgust" and denying qualified immunity). See also Ridpath, 447 F.3d at 313; Tobey v. Jones, 706 F.3d 379,

392-94 (4th Cir. 2013) (finding First Amendment rights established by decades-old precedent even without prior case on the same facts).

725.     Defendants' actions violated Mr. Addahoumi's First Amendment rights . Defendants cannot assert there was no constitutional violation because they did repeatedly prevent Mr. Addahoumi from exercising his freedom of speech and they did much more than merely engaged Mr. Addahoumi in what they call a "pre-investigation" that was "educational".

726.     Mr. Addahoumi implores the court not to ignore the fact that Defendants initiated multiple invasive investigation processes pursuant to USC policies that (1) forced Mr. Addahoumi to respond in order to justify speech in a pre-approved academic setting; (2) threatened Mr. Addahoumi with significant punishment if found to violate school policies; (3) failed to employ the least restrictive means of regulation and thereby substantially chilled protected speech; (4) imposed a "gag order" on Mr. Addahoumi, prohibiting them from discussing the matter with complainants or others in the university community, while placing no similar restriction on the complainants; and (5) failed to terminate the matter under its established policies, leaving in place an ongoing chilling effect. Placing such burdens on the exercise of protected speech plainly violates the First Amendment.

**COUNT II**

**Facial Challenge to Violation of Right to Free Speech Under Mr. Addahoumi's First and**

**Fourteenth**

**Amendment Rights (42 U.S.C. § 1983)**

**(all Defendants)**

727.     Mr. Addahoumi repeats and re-alleges each of the foregoing allegations in this Complaint.

728.     The First Amendment does not permit the government to subject speech to overly broad regulation. Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). Any regulation that does so is invalid "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression [.]" Virginia v. Hicks, 539 U.S. 113, 118-19 (2003).

729.     USC's Student Non-Discrimination and Non-Harassment Policy, STAF 6.24, and Emotional Disturbances Policy (BIT policy), STAF 6.26, are unconstitutional because they prohibit "unwelcome" and "inappropriate" or "erratic" and "concerning" speech, including "objectionable epithets, demeaning depictions," "unwelcome and inappropriate letters, telephone calls, electronic mail, or other communication," "repeated inappropriate personal comments," speech that employs "sexual innuendos and other sexually suggestive  or provocative behavior," and even "concerning", "suggestive or insulting gestures or sounds."

730.     In addition, under the Carolinian Creed, members of the community are obliged not to engage in behavior that may "compromise or demean the dignity of individuals or groups," including such things as taunting, teasing, baiting, ridiculing or insulting others. None of these terms are narrowly limited or defined.  While Defendants will argue that the Carolina Creed is not an enforceable policy, Defendants cannot deny that the Carolina Creed is fused into the mission statements of the USC Office of Student Conduct, whose polices are enforced and where enforced against Mr. Addahoumi by Defendants.

731.    In addition, the University of South Carolina Behavioral Intervention Team policy, also referred to as "Staf629: Student Health Condition Disturbances Policy", outlines how the university "may respond to any disturbances by a student that may be related to a health condition or concern."   Disruptive behaviors that may be related to a health condition include but are not limited to: "Overt, self-injury behaviors", "threats of self-injury behaviors", "threats of injury to other persons", threats of damage to property, or interference with normal operations or activities of the university, its students, faculty, and staff".

732.    Also prohibited by STAF629 are "acts indicating the student is out of contact with reality and/or unaware of the consequences of his/her actions".

733.    Such "acts" include a "demand on campus support services and resources to an extent that disrupts or interferes with normal operations or activities of the university, its students, faculty, and staff", or a demand on campus support services and resources to an extent that creates a financial burden for the university substantially beyond what is typical on a per student basis".

734.    Also, the USC Behavioral Intervention Team policy, or Staf629, states that sanctions can also be implemented "when all other referrals and options have been exhausted" and by "failure to comply with individualized treatment recommendations when treatment may be reasonably expected to ameliorate the problematic behavior of the student".

735.    The Behavioral Intervention Team, "when made aware of such behaviors, will work with the Counseling and Human Development Center, University Housing, and any other offices necessary to determine the best course of action for the university and the involved

students according to the procedures outlined in the Behavioral Intervention Team protocol."

736.     In truth, however, the University of South Carolina Behavioral Intervention Team protocol cannot be found at www.sc.edu/BIT, as there exists no publically available protocol.

737.     This "action may include a student's immediate removal from the university or from University Housing. The university, through the Behavioral Intervention Team, may additionally require a student to engage in a cooperative, committed relationship with a counselor, the university psychiatrist, or with an appropriate outside counseling or psychiatric agency as a condition of continuing as a student at the university".

738.     The university "may also require that a student provide assessment information and verification regarding adherence to treatment recommendations from an outside counselor, counseling agency, or psychiatrist to the Behavioral Intervention Team.  The Behavioral Intervention Team will make a determination regarding the student's status".

739.     "Any other departments, faculty, and staff determined to have a "need to know" will be notified by a representative of the Behavioral Intervention Team".  Examples of staffs with a "need to know" include: University Housing, the Office of Student Conduct, Student Disability Services, Student Health Services, appropriate medical personnel, Student Financial Aid and Scholarships, International Programs for Students, and Law Enforcement and Safety.

740.     The Behavioral Intervention Team will "notify the student as soon as is reasonably possible" regarding their decisions; and the student will be "given an opportunity to speak with a counselor or mental health professional as soon as reasonably possible".

741.    In cases "determined to warrant immediate action", a representative of the Behavioral Intervention Team shall "contact the Vice President for Student Affairs to initiate an emergency removal from the University".

742.    The current STAF629 policy covers "significant university disturbances caused by mental health Conditions".   By singling out and profiling for mental health conditions, the policy broadens the definition of targeted speech to "any type of health conditions that causes a significant university disruption".

743.    Further, the policy focuses the definition of the behaviors to include any disruptions. The university's Behavioral Intervention Team is made up of police, counselors, health professionals and student affairs administrators.

744.    By subjecting speech to possible review and punishment based on such expansive terms, USC policies such as Staf629 (BIT policy), the Carolina Creed, and USC "computer misuse" policy stifle robust debate and disregard the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." Sullivan, 376 U.S. at 270.

745.     Furthermore, the STAFF 6.29 policy (BIT policy) impermissibly imposes "special prohibitions on those speakers who express views on disfavored subjects," namely those whose opinions are believed to "unwelcome" or "inappropriate" or "erratic" or "concerning" or containing "sexual innuendo and other sexually suggestive or provocative behavior." R.A.V. v. City of St. Paul, 505 U.S. 377, 391 (1992).

746.    The broad and undefined terms of STAF 6.24, STAF 6.29, and the Carolinian Creed vest Defendants and other University officials, staff, and even students, with unbridled discretion in their ability to review and restrict student speech.

747.    The University of South Carolina's policies governing expression, specifically the USC Behavioral Intervention Team policy (STAF6.29), are unconstitutionally overbroad, do not serve a significant governmental interest, are not narrowly drawn, and impermissibly restrict student and student expression. They burden far more speech than is necessary to serve the asserted interest of minimizing discrimination and harassment at the university.

748.    Defendants' policies also are unconstitutionally vague in violation of the First Amendment and of the due process guarantee of the Fourteenth Amendment to the U.S. Constitution. A state enactment also is void for vagueness if the prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion. Grayned v. City of Rockford, 408 U.S. 104, 108 1972). The terms of STAF 6.24, STAF 6.29, and the Carolinian Creed are generalized, subjective, and incapable of precise definition or application. The policy does not define the nebulous terms that can be used to restrict speech.

749.    As a direct result of the Defendants' Student Non-Discrimination and Non-Harassment Policy, Student Health Conditions Disturbances Policy (STAF6.29), the Computer Misuse Policy, and the Carolinian Creed, Mr. Addahoumi and other students and faculty at USC are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

750.    As a consequence of the Defendants' violation of Mr. Addahoumi's and other similarly situated students and faculty's First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury per se, Mr. Addahoumi is entitled to

declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## COUNT III
## 42 U.S.C. § 1983: PROCEDURAL AND SUBSTANTIVE DUE PROCESS
## (ALL DEFENDANTS)

751.    Mr. Addahoumi realleges each fact set forth in paragraphs of this complaint and incorporates them herein by reference.

752.    The Due Process Clause of the Fourteenth Amendment, guarantee that no person shall be deprived of life, liberty or property without due process of law.

753.    Students at public universities enjoy protected property interests in their education such that due process must be afforded them prior to the denial of those interests.  At a minimum, this includes notice and an opportunity to be heard. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Bd. of Curators v. Horowitz*, 435 U.S. 78, 86 (1978).

754.    At no time have Defendants provided Mr. Addahoumi with these essential rights.

755.    In light of the Defendants' retaliatory actions and the injuries to Mr. Addahoumi arising therefrom, the State of South Carolina's procedures will not

provide Mr. Addahoumi with an adequate pre- or post-deprivation remedy to cure the erroneous deprivation of his property rights and liberty interests

756.   Because the law is clearly established in this area, and because Defendants had (and have) fair warning that denying Mr. Addahoumi the right to a public education, as well as a fair and open hearing prior to expelling him from USC was unconstitutional, Defendants are liable for violating Mr. Addahoumi›s rights protected by the Fourteenth Amendment.

757.   The denial of constitutional rights is irreparable injury *per se*, and Mr. Addahoumi is entitled to declaratory and injunctive relief.  In addition, Mr. Addahoumi is entitled to damages to be determined by an impartial jury.

## COUNT IV

## 42 U.S.C. § 1983: PROCEDURAL AND SUBSTANTIVE DUE PROCESS

### (INDIVIDUAL DEFENDANTS IN PERSONAL CAPACITY)

758.    Mr. Addahoumi realleges each fact set forth in paragraphs of this complaint and incorporates them herein by reference.

759.    The Due Process Clause of the Fourteenth Amendment guarantee that no person shall be deprived of life, liberty or property without due process of law.

760.    Students at public universities enjoy a protected property interest in their education such that due process must be afforded them prior to the

denial of those interests.  At a minimum, this includes notice and an

opportunity to be heard.  See Goss v. Lopez, 419 U.S. 565, 574 (1975); Bd.

of Curators v. Horowitz, 435 U.S. 78, 86 (1978).

761.     At no time have Defendants provided Mr. Addahoumi with these

essential rights.

762.     Because the law is clearly established in this area, and because

Defendants had (and have) fair warning that denying Mr. Addahoumi the

right to a public education, as well as a fair and open hearing prior to

expelling him from USC was unconstitutional, Defendants are individually

liable for violating Mr. Addahoumi's rights protected by the Fourteenth

Amendment.

763.     The denial of constitutional rights is irreparable injury per se, and Mr.

Addahoumi is entitled to declaratory and injunctive relief and to

compensatory damages to be determined by an impartial jury.  In addition,

Mr. Addahoumi is entitled to punitive damages for Defendants willful and

malicious violation of his Due Process rights.


COUNT V

BREACH OF CONTRACT

(Board of Trustees)

764.    Mr. Addahoumi realleges each fact set forth in paragraphs of this complaint and incorporates them herein by reference.

765.    The Board s and USC s policies and provisions in the USC student handbook, as well as contracts for student housing, establish a binding agreement between these Defendants and each USC student.

766.    Incorporated into this agreement is Defendants obligation to follow the procedures they have established for student discipline and expulsion.

767.    Defendants failed to follow these binding procedures.

768.    Defendants actions in failing to provide the procedures and rights guaranteed by their own policies have imposed substantial economic harm upon Mr. Addahoumi, who has lost the academic benefits of the classes he was unable to complete, has suffered reputational harm, has been forced to bear the financial burden of enrolling at another public university at great expense, and has been forced to relocate to outside of Columbia to continue his studies.

769.    Defendants  actions constitute breach of contract, and Mr. Addahoumi is entitled to compensatory damages to be determined by an impartial jury.

COUNT VI

42 U.S.C. § 1983: INDIVIDUAL LIABILITY

FREE SPEECH CLAUSE VIOLATION

(INDIVIDUAL DEFENDANTS IN PERSONAL CAPACITY)

770.    Mr. Addahoumi realleges each fact set forth in paragraphs 1 through 83 of this complaint and incorporates them herein by reference.

771.    Mr. Addahoumi's activities on cnn.com, via his email, and on campus were speech acts protected from infringement by the First Amendment of the U.S. Constitution.

772.    Defendants  actions in conspiring to expel Mr. Addahoumi from USC were taken in retaliation for Mr. Addahoumi's exercise of his First Amendment freedoms.

773.    Defendants  stated reasons for expelling Mr. Addahoumi from USC were pretextual and had no rational basis, being wholly contradicted by the views of mental health professionals, communicated to Defendants, that Mr. Addahoumi posed no threat to self or others at any time.

774.    Because the law is clearly established in this area, and because Defendants had (and have) fair warning that expelling a student from a public university in retaliation for the exercise of First Amendment freedoms is unconstitutional, the individual Defendants are personally liable in their individual capacities for violating Mr. Addahoumi's First Amendment rights.

775.     The denial of constitutional rights is irreparable injury per se, and Mr. Addahoumi is entitled to declaratory and injunctive relief and to compensatory damages to be determined by an impartial jury.  In addition, Mr. Addahoumi is entitled to punitive damages for Defendants willful and malicious violation of his First Amendment rights.

**COUNT VII**

Facial Challenge to Violation of Right to Free Speech

Under Mr. Addahoumi's First and Fourteenth Amendment Rights

(42 U.S.C. § 1983) – Student Health Conditions Disturbances Policy

(all Defendants)

776.     Mr. Addahoumi repeats and re-alleges each of the foregoing allegations in this Complaint.

777.     Through policy and practice, including enforcement of STAF 3.17, STAF 6.29, and STAF 3.25, Defendants have promulgated and enforced a de facto censoring policy that prohibits free expression on all but a tiny fraction of sanctioned topics on the University of South Carolina campus despite the fact that the university has many open areas, sidewalks, and online forums that are suitable for expressive activities.

778.     Restricting all First Amendment activity to designated "non-concerning expressions" impermissibly restricts student expression, does not serve a significant government interest, and is unconstitutionally overbroad.

779.     Students have a First Amendment right to engage in expressive activities and to distribute written materials in the public areas of a state college without obtaining advance permission from government officials. Widmar v. Vincent, 454 U.S. 263, 267 n.5 (1981); Papish v. Board of Curators of Univ. of Mo., 410 U.S. 667 (1973).

780.     A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality. Berger v. City of Seattle, 569 F.3d 1029, 1037 (9th Cir. 2009).

781.      Advance notice and permitting requirements are presumptively invalid because of the significant burden they place on free speech. The Supreme Court has labeled prior restraint on speech as "the essence of censorship." Near v. Minnesota, 283 U.S. 697, 713 (1931). Such restrictions are "the most serious and the least tolerable on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976).

782.     Any such permitting requirement violates the First Amendment unless it contains narrow, objective, and definite standards to guide the licensing authority. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969).

783.      Restrictions on expressive activity are void for vagueness if their terms are not clearly defined such that a person of ordinary intelligence can readily identify the standards to be applied. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

784.     Regulations that grant an administrative body or government official unfettered discretion to regulate the licensing of activities protected by the First Amendment are unconstitutional. Kunz v. New York, 340 U.S. 290, 294 (1951).

785.     Such unrestricted discretion increases the likelihood that the government official may discriminate based upon the content of the "speech" or the viewpoint of the speaker. City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 763-64 (1988).

786.     Regulations requiring expressions not be "erratic" as a condition authorizing public speaking are prior restraints on speech that are presumptively unconstitutional. Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992).

787.     Any regulation that imposes a fee upon the exercise of First Amendment rights must be content-neutral, strictly limited to recouping actual administrative costs, and bounded by narrowly drawn, reasonable and definite standards.

788.     Through policy and practice Defendants have promulgated and enforced a Student Health Conditions Disturbances policy that prohibits free expression on all but a fraction of sanctioned topics on the USC campus, despite the fact that the University has many open areas, sidewalks, and online forums that are suitable for expressive activities.

789.     Defendant Pastides is responsible for USC's administration and policy-making and has ultimate authority to approve the Student Health Conditions Disturbances policy challenged herein.

790.     Defendant Pruitt authorized the Student Health Conditions Disturbances policy challenged herein.

791.     As a consequence of the Defendants' violation of Mr. Addahoumi's and other similarly situated students' First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury per se, Mr. Addahoumi is entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**COUNT VIII**

**Declaratory Judgment and Injunction**

**(28 U.S.C. § 2201, et seq.)**

792.      Mr. Addahoumi repeats and re-alleges each of the foregoing allegations in this Complaint.

793.      An actual controversy has arisen and now exists between Mr. Addahoumi and Defendants concerning Mr. Addahoumi's rights under the United States Constitution. A judicial decla- ration is necessary and appropriate at this time as to Counts I through II above.

794.      Mr. Addahoumi is seeking a judicial determination of his rights against Defendants as they pertain to Mr. Addahoumi's right to speak without being subjected to unconstitutional speech policies that impose prior restraints on speech, give school officials unfettered discretion whether to allow expression and under what conditions, and that are vague, overbroad, and not narrowly tailored to serve a substantial governmental interest.

795.      To prevent further violation of Mr. Addahoumi's constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the University of South Carolina's Student Non-Discrimination and Non-Harassment Policy, Student Health Conditions Disturbances Policy, Computer Misuse Policy, and the Carolinian Creed are unconstitutional, both on their face, and as applied to Mr. Addahoumi.

796.      To prevent further violation of Mr. Addahoumi's constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the University of South Carolina's Free Speech Zone Policy unconstitutional on its face.

797.    Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, this Court should issue a permanent injunction prohibiting the Defendants from enforcing their restrictions on Mr. Addahoumi's expressive activities as well as other USC faculty and students' expressive activities to the extent they are unconstitutional, to prevent the ongoing violation of Mr. Addahoumi's constitutional rights.

798.    As Mr. Addahoumi, University of South Carolina faculty and students are suffering irreparable harm from continued enforcement of unconstitutional policies, monetary damages are inadequate to remedy their harm, and the balance of equities and public interest both favor a grant of injunctive relief.


## COUNT IX

### (Defamation)

799.    Mr. Addahoumi realleges the paragraphs where consistent herewith as if stated verbatim herein.

800.    The direct charges, insinuations and actions that Mr. Addahoumi was untrustworthy, guilty of "erratic behavior" and Code of Conduct violation, criminal behavior, and was unfit and unqualified in studies have been published and republished throughout the community at large by the defendants and other officials of the defendant Board of Trustees.

801.    The defendant Defendants have ratified these defamatory statements and insinuations by word and act.

802.    The persons to whom such defamatory insinuations by defendants were published are Mr. Addahoumi's fellow classmates, professors, and peers within the USC community,

many of which communications were made for the sole purpose of harming the Mr.Addahoumi and without any justification.

803.     Furthermore, such defamatory insinuations have been published and republished to several law enforcement and governmental agencies and academic institutions, damaging his reputation among those persons and inhibiting Mr. Addahoumi's ability to earn money in that field as well as damaging his reputation.

804.     Such a portrayal promulgated by the Defendants about the Mr. Addahoumi is false, known to be false, made with malicious intent to harm Mr. Addahoumi, in reckless disregard of the truth and is defamatory per se charging Mr. Addahoumi with unfitness for his studies or profession; further, that the above constitutes defamation by actions as well as words and is actionable under the laws of the State of South Carolina.

805.     As a direct and proximate result of the aforesaid defamation, Mr. Addahoumi's professional and personal reputation has been damaged, Mr. Addahoumi's ability to earn a living in the community has been hindered, Mr. Addahoumi has missed graduation and the benefits and earnings associated with the same, Mr. Addahoumi has suffered emotional distress, mental anguish, humiliation and embarrassment and Mr. Addahoumi has also suffered the loss of future earnings.


COUNT X

FOR A FIFTH AND SEPARATE CAUSE OF ACTION

AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

(Civil Conspiracy)

806.    Mr. Addahoumi realleges paragraphs where consistent herewith as if stated verbatim herein.

807.    The individual Defendants herein and others met, conspired and schemed to harm Mr. Addahoumi.

808.    The Defendants acted outside of the scope of their employment and in abuse of their positions to harass the Mr. Addahoumi on a day-to-day basis resulting in the denial graduation and the destruction and/or concealment of exculpatory evidence tending to show that Mr. Addahoumi was not guilty of "computer misuse" as the Defendants had charged.

809.    The Defendants harassed and continue to harass Mr. Addahoumi on the basis of their own personal agendas, motivated in part to safeguard their own professional reputations from due criticism.

810.    Defendants used, and continue to use, the USC Behavioral Intervention Team to track, surveil, monitor, and harass Mr. Addahoumi.   Each of the USC Defendants utilized the BIT enterprise to open a flow of communication between police, local agencies, academic officials, campus mental health resources and student affairs administrators.   The USC BIT was and continues to function in the background of Mr. Addahoumi's educational, personal, and professional life, collecting and relaying libelous, slanderous, and defaming information.   The USC BIT enterprise was, and continues to be, essential to prevent placing Mr. Addahoumi in any future educational institution.

811.    By abusing their positions, a watershed was created regarding the Mr. Addahoumi's prior treatment and subsequent treatment as a USC student which has escalated to the present day treatment of Mr. Addahoumi as set forth in this complaint.

812.    That the preceding paragraphs to a great degree illustrate the hatred, ill will and personal agenda of the individual Defendants acting outside the course and scope of their duties to inflict the special damages which have occurred and to cause Mr. Addahoumi harm.

813.    Such actions have isolated Mr. Addahoumi in his lifelong field of service, employment, and academic opportunities.

814.    Further, as part of their combination to harm Mr. Addahoumi, the individual defendants used their positions within USC to encourage lower-level staff and other students to unnecessarily monitor Mr. Addahoumi in a hyper-vigilant manner for any perceived mistakes and missteps in his studies; such is entirely out of the day-to-day scope of these Defendants' duties and the university's policies.

815.    The foregoing conduct amounts to an unlawful civil conspiracy to deprive Mr. Addahoumi of his rights and to specially harm Mr. Addahoumi for which the individual Defendants, named herein, are liable.

816.    Said civil conspiracy has directly and proximately caused Mr. Addahoumi to be ostracized, isolated and essentially black-listed in his community; it has caused Mr. Addahoumi to suffer increased stress and anxiety, and forced him to incur the costs, fees and reasonable attorney's fees of prosecuting this action.

**CAUSE OF ACTION**

**COUNT XI**

**Discrimination in a Public Accommodation in Violation of the ADA 42 U.S.C. § 12181 et. seq**.

817.    Mr. Addahoumi repeats the allegations of all of the above paragraphs as if fully set forth herein.

818.    As described above, the USC Defendants' actions and practices - charging Mr. Addahoumi with violations of University rules, suspending him from school, evicting him from his classroom, and blocking access to campus resources, barring him from the University, threatening to arrest him for trespassing if he entered USC property, and imposing discriminatory conditions upon his readmission - violate Title III of the ADA Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq.

819.    Defendants mistakenly believe that Mr. Addahoumi has a mental impairment that substantially limits one or more of his major life activities such that Mr. Addahoumi is otherwise unqualified for attendance at its public accommodation.

820.    Defendants' actions and practices described above constitute unlawful discrimination under 42 U.S.C. § 12182(a) and (b), in that Defendants have discriminated against Mr. Addahoumi on the basis of Mr. Addahoumi's perceived disability, with regard to the full and equal enjoyment of Defendants' goods, services, facilities, privileges, advantages, or accommodations.

821.    Defendants' actions and practices described above also constitute unlawful discrimination under the various subparts of 42 U.S.C. § 12182(b)(1)(A), and § 12182(b)(2)(A).  Defendants have excluded Mr. Addahoumi from participation in and denied him the opportunity to participate in or benefit from their programs, services and activities based upon fear, speculation and stereotype about his perceived disability. 42 U.S.C.A. § 12102(2)(c).

822.    Defendants have treated Mr. Addahoumi unequally compared to students that do not have a disability. Defendants have also used criteria and methods of administration that have the effect of subjecting Mr. Addahoumi to discrimination on the basis of his perceived disability, and that have the purpose or effect of defeating or substantially impairing the accomplishment of the objective of its program with respect to individuals with disabilities and in particular with respect to Mr. Addahoumi.

823.    Additionally, Defendants have failed to provide a reasonable accommodation under the Americans with Disabilities Act that would enable Mr. Addahoumi meaningful access to Defendants' services, programs or activities. Defendants' decisions, inter alia, to deny Mr. Addahoumi's requests to drop the charges against him, to allow him to return to school and to provide the student judicial hearing he requested, and to dissolve the barring order, amount to a failure to accommodate Mr. Addahoumi's disability.

824.    As a result of Defendants' violations of the Americans with Disabilities Act, Mr. Addahoumi was damaged, as detailed above.  This claim is brought against the USC Defendants under the Americans With Disabilities Act of 1990, as amended, 42 U.S.C

## CAUSE OF ACTION

## COUNT XII

### Violation of the Americans with Disabilities Act of 1990

825.    Mr. Addahoumi repeats the allegations of all of the above paragraphs as if fully set forth herein.

826.    The Defendants' actions and practices described above violate Title II of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12132 et seq.  In particular, the Defendants' actions and practices described above constitute unlawful discrimination under 42 U.S.C. § 12131 and 42 U.S.C. § 12132, in that University of

South Carolina Board of Trustees is a public entity subject to Title II of the ADA, and the University of South Carolina Behavioral Intervention Team Defendants are responsible for administering a public entity subject to Title II of the ADA.

827.    Defendants have discriminated against Mr. Addahoumi by excluding him from participation in and denying him the opportunity to participate in or benefit from their programs, services and activities.  Defendants have treated Mr. Addahoumi unequally to students that are not disabled, do not have a history of or are not regarded as disabled.

828.    Defendants have also used criteria and methods of administration that have the effect of subjecting him to discrimination on the basis of disability or perceived disability, and that have the purpose or effect of defeating or substantially impairing the accomplishment of the objective of its program with respect to individuals with disabilities and in particular with respect to Mr. Addahoumi.

829.    Additionally, Defendants have failed to provide a reasonable accommodation under the Americans With Disabilities Act that would enable Mr. Addahoumi meaningful access to Defendants' services.

830.    As a result of Defendants' violations of the Americans With Disabilities Act, Mr. Addahoumi has been injured, as detailed above. § 12181 et seq.

## CAUSE OF ACTION

## COUNT XIII

Violation of Section 504 of the Rehabilitation Act of 1973 29 U.S.C. § 794 et seq.

831.    Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

832.    As described above, USC Defendants' actions and practices - charging Mr. Addahoumi with violation of University rules, suspending him from school, evicting him from the classroom, barring him from the University, threatening to arrest him for trespassing if he entered USC property, and imposing discriminatory conditions upon his readmission - violate Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794 et seq. ("Section 504").

833.    In particular, the University of South Carolina, is a covered entity for purposes of Section 504 of the Rehabilitation Act because it operates a program or activity receiving federal funds.

834.    Defendants, in their actions and practices described above, have discriminated against Mr. Addahoumi, and excluded him from participation in, and denied him the benefits of, Defendants' programs, services and activities because of Mr. Addahoumi's perceived disability.

835.    Additionally, Defendants have failed to provide a reasonable accommodation under the Section 504 of the Rehabilitation Act that would enable Mr. Addahoumi meaningful access to Defendants' services, programs or activities. Defendants' decisions inter alia to deny Mr. Addahoumi's requests to drop the charges against him, to allow him to return to school and the classroom, and to dissolve the barring order, amount to a failure to accommodate Plaintiff's disability.

836.    As a result of Defendants' violations of Section 504, Plaintiff was damaged, as detailed above.  This claim is brought against all USC Defendants.

**CAUSE OF ACTION**

**COUNT XIV**

**Violation of the Fair Housing Amendments Act**

**42 U.S.C. § 3604(f)**

837.     Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

838.     As described above, USC Defendants' actions and practices - charging Mr. Addahoumi with violation of University rules, evicting him from his classroom, imposing discriminatory conditions upon his readmission, and otherwise severing him from the USC community, violate the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq.

839.     In particular, Defendants have violated the Mr. Addahoumi's rights under 42 U.S.C. § 3604(f) by discriminating in the rental or otherwise making unavailable or denying a classroom in the Criminal Justice School to Plaintiff because of his perceived handicapped status; and by discriminating in the terms, conditions or privileges of rental of a dwelling and in the provision of services or facilities in connection with such dwelling, such as USC classrooms, library, sports facilities, or health services, because of Mr. Addahoumi's perceived handicapped status.

840.     Defendants' actions constitute intentional discriminatory treatment based on disability.  Defendants' actions also have a disparate impact on all individuals with mental disabilities. Additionally, Defendants have failed to provide a reasonable accommodation under the Fair Housing Act that would enable Mr. Addahoumi meaningful access to Defendants' services or facilities.

841.     Defendants, individually, and/or through the actions of their agents, have violated the Mr. Addahoumi's rights under 42 U.S.C. § 3604(f)(3)(B) by denying Mr.

Addahoumi's request for a reasonable accommodation and as a result, have excluded him based upon fear, speculation and stereotype about his perceived disability.

842.     As a result of Defendants' violations of the Fair Housing Amendments Act, Mr. Addahoumi has been injured, as detailed above.  This claim is brought against all USC Defendants.

**CAUSE OF ACTION**

**COUNT XV**

**VIOLATION OF 42 U.S.C. § 3604(f):**

**FAILURE TO PROVIDE REASONABLE ACCOMMODATION**

843.     Mr. Addahoumi repeats the allegations of the above paragraphs as if fully set forth herein.

844.     Mr. Addahoumi's request for a reasonable accommodation with regard to Defendants' rules, policies, practices and services constituted a request for a reasonable accommodation under the Fair Housing Amendments Act, 42 U.S.C. § 3604(f)(3)(B).

845.     Mr. Addahoumi's request to return to the classroom for the Fall 2013 and Fall 2014 semesters constituted a request for a reasonable accommodation under the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B).

846.     Defendants' failure to consider Mr. Addahoumi's appeals for readmission to the classroom and their decision to deny his readmission amount to a failure to accommodate Mr. Addahoumi's perceived disability.

847.     Defendants' decision to conditionally allow Mr. Addahoumi a "Pass/Fail" research paper after evicting Mr. Addahoumi from the classroom does not constitute an effective accommodation of Mr. Addahoumi's perceived disability.  Rather, the conditions imposed on him constitute further discrimination on the basis of his perceived disability.

848.     Mr. Addahoumi agreed to the conditions, without prejudice to his right to contest their legality, because readmission to the classroom was an essential component of improving his mental health and ensuring his continued high academic standing.

849.     The accommodations Mr. Addahoumi requested, through counsel, were reasonable and were necessary to afford Mr. Addahoumi equal opportunity to use of classrooms and other resources and amenities of USC.

850.     The accommodations proposed would not have imposed an undue financial or administrative burden on the Defendants and did not require a fundamental alteration in the nature of their programs.

851.      Defendants, individually, and/or through the actions of their agents, have violated Mr. Addahoumi's rights under 42 U.S.C. § 3604(f)(3)(B) by denying Mr. Addahoumi's request for a reasonable accommodation and as a result, have excluded him based upon fear, speculation and stereotype about his perceived disability.

852.     As a result of Defendants' failure to provide reasonable accommodation in violation of the Fair Housing Amendments Act, Mr. Addahoumi has been injured, as detailed above.

## CAUSE OF ACTION

## COUNT XVI

### Intentional Infliction of Emotional Distress

853.   Mr. Addahoumi repeats the allegations of all of the above paragraphs as if fully set forth herein.

854.   As described above, USC Defendants' conduct - charging Mr. Addahoumi with violation of University rules, evicting him from his classroom, suspending him from

school, barring him from the University, and threatening to arrest him for trespassing if he entered USC property for exercising his right to free expression, and because he sought to refuse unnecessary mental health treatment, was intentional and reckless.

855.   USC Specialty Clinics and Defendants' conduct in disclosing confidential medical information to USC officials, and cooperating with USC Defendants in the use of that confidential medical information to harm and punish Mr. Addahoumi was intentional and reckless and in knowing disregard of Mr. Addahoumi's rights.

856.   As described above, Defendants' conduct was extreme and outrageous, and beyond the bounds of decency. Defendants' behavior caused severe emotional distress to Mr. Addahoumi.  As a direct and proximate result of Defendants' behavior, Mr. Addahoumi did suffer severe emotional distress.   This claim is brought against all Defendants.

**CAUSE OF ACTION**

**COUNT XVII**

**Common Law Invasion of Privacy**

857.   Mr. Addahoumi repeats the allegations of all of the above paragraphs as if fully set forth herein.

858.   In treating Mr. Addahoumi, the USC Counseling Center, the USC Behavioral Intervention Team, the USC Police Department, the USC Student Conduct Office, and the USC Specialty Clinics Defendants became aware of individually identifiable health information about Mr. Addahoumi.

859.   The Defendants disclosed Mr. Addahoumi's confidential medical information to USC and administrative, professional, and even student staff at USC without the knowing and voluntary consent of Mr. Addahoumi.

860.    In diagnosing Mr. Addahoumi, treating him, referring him for further evaluation, and by monitoring his progress, Defendant Richard Frierson and other Defendants became aware of individually identifiable health information about Mr. Addahoumi.

861.    Defendant Richard Frierson, the USC Behavioral Intervention Team, and USC Defendants disclosed Mr. Addahoumi's confidential information to Defendants' administrative, professional, and even student staff, including but not limited to, professors, student interns and or student teachers, parents, family, law enforcement, threat assessment team members, Associate Vice President and Dean of Students, Assistant Deans, support staff, and other administrative and professional staff and contractors.

862.    This information was shared without the knowing and voluntary consent of Mr Addahoumi.

863.    Therefore, Defendants violated Plaintiff's rights to privacy under state law. As a result, Plaintiff was damaged, as detailed above.  This claim is brought against all Defendants.

**CAUSE OF ACTION**

**COUNT XVIX**

**Breach of Confidential Relationship**

864.    Mr. Addahoumi repeats the allegations of all of the above paragraphs as if fully set forth herein.

865.     In diagnosing, referring, and treating Mr. Addahoumi, and monitoring his progress, the USC Behavioral Intervention Team Defendants established a confidential physician–patient relationship with Mr. Addahoumi.

866.    The USC Behavioral Intervention Team Defendants disclosed that information to Mr. Addahoumi's father, uncle, aunt, and administrative, professional, and even student staff at the University of South Carolina and local and national enforcement without the knowing and voluntary consent of Mr. Addahoumi.

867.    In diagnosing Mr. Addahoumi, treating him, referring him for further evaluation, and by monitoring his progress, the USC Behavioral Intervention Team Defendants established a confidential physician–patient relationship with Mr. Addahoumi.

868.    Defendant Liggett  and/or the USC Behavioral Intervention Team Defendants disclosed that information to Defendants' administrative and professional staff, including but not limited to the Associate Vice President and Dean of Students, the Assistant Dean of Students, the Executive Vice President for Academic Affairs, the Assistant Director of Academic Affairs, the Office of Student Judicial Services, the Community Director, the USC Police officers, University Police Department staff, the Office of Student Judicial Services, , the Director of Academic Advising & Student Services, the Special Assistant to the Dean of Students, and with other administrative, professional, and even student staff.

869.    This information was shared without the knowing and voluntary consent of Mr. Addahoumi. Therefore, Defendants breached Mr. Addahoumi's confidential relationship. As a result, Mr. Addahoumi was damaged as detailed above. This claim is brought against all Defendants.

## REMEDIES and PRAY FOR RELIEF

869.  WHEREFORE, Mr. Addahoumi respectfully requests that the Court enter judgment on his behalf on all counts contained herein, and grant him the following relief:

(a) Declaratory judgment that Defendants' conduct violated Mr. Addahoumi's rights. In particular, that the Court declare the actions of Defendants complained of herein to be in violation of: the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq; the Fair Housing Amendments Act, 42 U.S.C. § 3604(f); that Defendants intentionally or recklessly inflicted emotional distress upon Mr. Addahoumi, and violated Mr. Addahoumi's state common law rights to privacy, and his physician patient confidential relationship.

(b) Injunctive relief permanently enjoining Defendants, their agents, employees, and successors from discriminating on the basis of perceived disability against Mr. Addahoumi or any persons in violation of the aforementioned acts;

(c) Appropriate compensatory and punitive damages be awarded to Mr. Addahoumi and against Defendants, in an amount to be determined by the jury;

(d) Prejudgment and post-judgment interest on all damages;

(e) Correction of all records to restore Mr. Addahoumi's academic standing and expungement of all inaccurate and nebulous information about Mr. Addahoumi from Defendants' records; reenrollment of Mr. Addahoumi to USC and reinstatement of Mr. Addahoumi's academic status to his previous position before his unlawful suspension.

(f) Reasonable attorneys' fees and costs; and

(g) Such other relief as the court shall deem just and proper.

s/Sammi H. Addahoumi
Sammi H. Addahoumi
910 Lacy Street
Columbia, South Carolina 29201
(p) 803.741.4845
delimansc@gmail.com
June 19, 2017                          Plaintiff

# EXHIBIT A

Case 201221240l



UNIVERSITY OF
SOUTH CAROLINA

Reported by

Incident Report
Submitted on April 23, 2013 at 11:20:42 am EDT

Type:          **Conduct Incident Report**
Urgency:       **Normal**

Incident Date:      **2013-04-23**
Incident Time:
Incident Location:  **On campus classroom Gambrell 201**

Name:
Title:
Email:
Phone:
Address:



Reasons for Report

BIT-Erratic behavior, Disruptive Activity

Involved persons

Sammi Addahoumi ()                                        addahoumi@email.sc.edu
Alleged                            Male

Incident description

I received this morning (April 23, 2013) a phone call from an adjunct instructor, ⬛ who is teaching a
Political Science course for us in the Evening School schedule (POLI E483 Middle East Politics, which meets MW at
5:30 in Gambrell Room 201). ⬛ expressed considerable concern about a student in his class, Sammi
Addahoumi, who I believe is an undergraduate major in Political Science. My understanding is that this student, who
is in part Libyan, has had considerable outside-the-classroom contact with the instructor, reflecting at least in part the
student's interest in Middle East politics and the instructor's background ⬛ is among other things the brother of
a former Israeli Prime Minister). My understanding is that this relationship was non-problematic. But, ⬛ said this
morning, "something has changed," this student has become in the past "six weeks or so" very "vitriolic" and agitated,
and has "expressed hatred" at the instructor and Israel apparently both inside and outside the classroom. ⬛
said that the student at least once "yelled and screamed in the classroom," and has recently been "emailing students
in the class" attacking/criticizing ⬛. I asked specifically if ⬛ felt threatened or fearful and while I did not get
a straight answer, I think he does feel threatened; although what ⬛ explicitly expressed was concern for the
student, not for himself.

*Pending IR #USC8308291397*
*Submitted from 129.252.70.24 and routed to Office of Student Conduct (General Account)*

# EXHIBIT B



UNIVERSITY OF
SOUTH CAROLINA

August 14, 2013

BEHAVIORAL INTERVENTION TEAM

Sammi Addahoumi
Sent electronically to addahoum@email.sc.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2013004501

Dear Mr. Addahoumi,

The University of South Carolina is concerned about the well-being of all of its students. I have received information that you may have been engaged in behavior(s) that have caused some concern about your safety, health and/or well-being in the USC community. I hope that your situation is improving. The university has a Behavioral Intervention Team (BIT) and policies regarding acute health and safety incidents, behaviors that are self-injurious, and behaviors that are disruptive to the mission of the university.

Due to these concerns and policies, you must meet attend two meetings. The first meeting you will be assessed by a counselor in the Counseling and Human Development Center (CHDC). The second meeting will be with a member of the BIT. Your first meeting is in the CHDC with counselor, Lara Sheehi on the 7th floor of the James F. Byrnes building to begin your assessment on August 16, 2013 at 2:00 pm. Students must arrive 15 minutes early to the CHDC to complete paperwork. You should inform the receptionist that you received a BIT letter. Your second meeting is with a BIT member so that we can answer any questions and explain the concern and the next steps. This second meeting is on August 16, 2013 at 4:00 pm with Alisa Liggett in the Byrnes Building Suite 201 (901 Sumter St.).

The total assessment will conclude after four meetings at intervals to be determined by a counselor at the CHDC. After you have been assessed by a counselor at the CHDC, the university's Behavioral Intervention Team will discuss the situation and make a determination that takes into consideration your best interest as well as the best interest of the University community.

Only information regarding your attendance and compliance with this request will be shared with members of the BIT. The content of any counseling sessions will only be shared with the members of the BIT with your consent or in accordance with the counselor's professional and legal standards and guidelines.

If you are already seeing a provider and would prefer to have him/her verify that you are engaged and attending your appointments, please call him/her at 803-777-5223 and request that they contact us with any information that you are willing to release.

*"PROMOTING CIVILITY, INTEGRITY, AND THE IDEALS SET FORTH IN THE CAROLINIAN CREED TO FOSTER A BETTER LIVING AND LEARNING ENVIRONMENT IN THE UNIVERSITY COMMUNITY"*

JAMES F. BYRNES BUILDING • 901 SUMTER STREET SUITE 201 • COLUMBIA, SOUTH CAROLINA 29208
803/777-4333 • FAX 803/777-1393 • HTTP://WWW.SC.EDU/BMV

AN AFFIRMATIVE ACTION / EQUAL OPPORTUNITY INSTITUTION

Case 2013187501



**UNIVERSITY OF SOUTH CAROLINA**

Behavioral Intervention Team Incident Report
Submitted on April 7, 2014 at 5:03:08 pm EDT

| | |
|---|---|
| Type: | **Behavioral Intervention Team Incident Report** |
| Urgency: | **Normal** |
| | |
| Incident Date: | **2014-04-07** |
| Incident Time: | **1:00 pm** |
| Incident Location: | **On campus - other 1501 Senate Street Columbia, SC** |

Reported by

Name:
Title:
Email:
Phone:
Address:



Involved Parties

**Sammi Addahoumi ()**            1983-02-07                     803-237-6116
BIT                                               Male

Incident Description

\* Description
On 04-07-2014 two concerned students arrived at USCPD to report a suspicious e-mail sent by an ex-classmate (Addahoumi). The e-mail included a link to a CNN iReport article that Addahoumi wrote. In the article, Addahoumi accuses his previous USC Instructor (Leslie Wiser) of committing murder, among other conspiracies. Addahoumi has sent e-mails to the entire class (CRJU T491). The CNN iReport link is http://ireport.cnn.com/docs/DOC-1117362. USCPD case number is 14-00723. USCPD also has a copy of the article on file.

\* Are there any effects/impacts of the behavior?
The two students who complained stated that they feel uncomfortable being in the same class as Addahoumi. The statements in the CNN iReport article could negatively affect the named parties.

\* Have you made any attempts to address the behavior? How did the individual respond to the attempts?
No.

\* Do you have any other information about the individual that might be relevant?
No.

\* What is your relationship to the student?
NA

\* What is the purpose of this report?
I am concerned about someone

Attachments

tomsponsellerandcolumbiascdeservebetterthanieslieg.wiserjr.cnnireport.htm

*Pending IR #00011542*
*Submitted from 129.252.14.19 and routed to Tim Bedford (Behavioral Intervention Team Case Manager)*

# EXHIBIT C

CU& 2013187501



U N I V E R S I T Y  O F
**SOUTH CAROLINA**

**Reported by**

Behavioral Intervention Team Incident Report
Submitted on May 6, 2014 at 10:20:15 am EDT

Type:        **Behavioral Intervention Team Incident Report**
Urgency:     **Normal**

Incident Date:      **2014-05-05**
Incident Time:      **4:30 pm**
Incident Location:  **On campus - other disturbing email**

Name:
Title:
Email:           
Phone:
Address:

Involved Parties

**Sammi Addahoumi (01000732)**                    addahoum@email.sc.edu        (803) 237-8116
                        Male

Incident Description

\* Description
I received a disturbing email from Sammi yesterday (will forward to osc@sc.edu), which included a link to a writing he apparently authored. Sammi's behavior has become increasingly odd in the past year, but yesterday's email came after no contact with him since early January. The piece of writing he attached in this email contained many elements which raised my level of concern, for many reasons. Also, it contained references to a number of faculty as well as references to statements made by Dr. Pastides.

Frankly, all of this could signify nothing, but it could also be very significant. I am also going to make a all to the above number to give a "heads up" on this report.

\* Are there any effects/impacts of the behavior?
see above

\* Have you made any attempts to address the behavior? How did the individual respond to the attempts?
see above

\* Do you have any other information about the individual that might be relevant?
see above

\* What is your relationship to the student?
see above

\* What is the purpose of this report?
I am not sure

*Pending IR #00011783*
*Submitted from 129.252.70.23 and routed to Tim Bedford (Behavioral Intervention Team Case Manager)*

# EXHIBIT D

Case 2013187501



# UNIVERSITY OF SOUTH CAROLINA

Behavioral Intervention Team Incident Report
Submitted on April 7, 2014 at 5:03:08 pm EDT

Type: **Behavioral Intervention Team Incident Report**
Urgency: **Normal**

Incident Date: **2014-04-07**
Incident Time: **1:00 pm**
Incident Location: **On campus - other 1501 Senate Street Columbia, SC**

Reported by

Name:
Title:
Email:
Phone:
Address:

## Involved Parties

**Sammi Addahoumi ()**          1983-02-07                    803-237-6116
BIT                             Male

## Incident Description

\* Description
On 04-07-2014 two concerned students arrived at USCPD to report a suspicious e-mail sent by an ex-classmate (Addahoumi). The e-mail included a link to a CNN iReport article that Addahoumi wrote. In the article, Addahoumi accuses his previous USC instructor (Leslie Wiser) of committing murder, among other conspiracies. Addahoumi has sent e-mails to the entire class (CRJU T491). The CNN iReport link is http://ireport.cnn.com/docs/DOC-1117362. USCPD case number is 14-00723. USCPD also has a copy of the article on file.

\* Are there any effects/impacts of the behavior?
The two students who complained stated that they feel uncomfortable being in the same class as Addahoumi. The statements in the CNN iReport article could negatively affect the named parties.

\* Have you made any attempts to address the behavior? How did the individual respond to the attempts?
No.

\* Do you have any other information about the individual that might be relevant?
No.

\* What is your relationship to the student?
NA

\* What is the purpose of this report?
I am concerned about someone

## Attachments

tomsponsellerandcolumbiascdeservebetterthanleslieg.wiserjr.cnnireport.htm

*Pending IR #00011542*
*Submitted from 129.252.14.19 and routed to Tim Bedford (Behavioral Intervention Team Case Manager)*

5/11/2016    https://imexds-useast-001.s3.amazonaws.com/uscosjp/efc/00144371?response-cache-control=must-revalidate%2C post-check%3D0%2C pre-check%3...

Quick Print

**BIT**
**2013173001** → heard with 2013187501    **BIT**

# Sammi  Hassan  Addahoumi

| | | | |
|---|---|---|---|
| **GENDER:** | Male | **DOB:** | 1983-02-07 |
| **SID:** | F39404713 | **ETHNICITY:** | Not Hispanic or Latino; WH |
| **HOUSING:** | Off Campus | **ROOM:** | |
| **ATHLETICS:** | Not Athlete | **GREEK:** | Alpha Tau Omega Inactive |
| **HONORS:** | Not Honors | **ROTC:** | Not Veteran |
| **CLASSIFICATION:** | Senior | **MAJOR:** | Political Science |
| **GPAs:** | Last: 0.000   Cume: 2.247 | **EMAIL:** | addahoum@email.sc.edu |

**ACADEMIC ADVISOR:**

**LOCAL INFO**

**Address:**  1621 Main St Apt A  Columbia  SC  29201-2817

**Local Phone:**  8033196941  **Cell Phone:**  8033196941

**PERMANENT INFO**

**Address:**  1621 Main St Apt A  Columbia  SC  29201-2817

**Phone:**  8033191867

**Emergency Contact:**

**INCIDENT:** 2014-03-15   3:44 am    email
Description: Mr. Addahoumi sent me an email threatening to sue me if I did not give him a passing grade for a paper he submitted in the email. The paper refers to me as a sociopath and dishonest. The level of hate demonstrated in the paper and its rambling nature are disturbing. Given the wide mood swings I have observed, especially between our last meeting and the 3/15 email, I have serious concerns about Mr. Addahoumi's stability. You may recall that Mr. Addahoumi was removed from my class during the Fall semester because of his disruptive behavior. I agreed to allow him to finish the course by submitting a paper. I thought he and I had agreed on a topic, and I have earlier email documentation of my guidance to him. I had

not made a demand for the paper's submission.

I an now concerned for my safety and that of my family.

I have not responded to Mr. Addahoumi's email.

I can attach documents (including documentation of guidance for his assignment) but I do not see a place on this form to do so. The 3/15 email follows: "███████, I wish things could have been different. Here is the paper which i owe you . As were discussed no rubric for the paper, I took it upon myself to tell the story that explains exactly why you did not want me in your class. Truth is very very dangerous. This is passing paper. IF you decide to make things difficult by failing me, you can add one more lawsuit that you will face in the city if Columbia. I wish you well. And I wish we could have beautiful music together instead of this awful noise. Sammi Addahoumi"

**REPORTED BY:** ███████████████████

**CHARGES:** BIT-Erratic behavior

**TAGS:**

**REFERRED BY:** ██████

**NOTES**

_____

_____

The information contained on these pages is privileged and confidential information intended solely for the individual or entity who has accessed it for official purposes and by lawful means. Any dissemination, distribution, or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (803) 777-4333 and return the original message to us via the U.S. Postal Service at 901 Sumter St. Columbia, SC 29201, without retaining a copy.

# EXHIBIT E

Case 2013187501



UNIVERSITY OF
SOUTH CAROLINA

Reported by

Behavioral Intervention Team Incident Report
Submitted on April 6, 2014 at 6:34:42 pm EDT
Last modified April 7, 2014 at 9:44:13 am EDT

Type:                      Behavioral Intervention Team Incident Report
Urgency:                   Normal

Incident Date:             2014-04-06
Incident Time:             10:00 am
Incident Location:         Off campus Online Message

Name:          
Title:
Email:
Phone:
Address:

**Involved Parties**

Sammi Addahouml (F39404713)        1983-02-07       addahoum@email.sc.edu        8033196941
Alleged                            Male             Off Campus

**Incident Description**

* Description
Although I am a faculty member, I recently took Arabic 201 for credit at USC. I received a very distressing mass email from a student who was in that class via Blackboard. My reading of the email is that it shows signs of mental distress and may indicate that the student has impaired judgment. The email mentions another instructor at USC.

I do not have any professional qualifications to judge the student's state of mind, but as a faculty member I am very concerned.

The email consisted only of a link to this website:

http://ireport.cnn.com/docs/DOC-1117362

Here is the text of the article at that link:

Tom Sponseller and Columbia, SC Deserve Better than Leslie G. Wiser, Jr.

My name is Sammi Addahoumi and I am a friend of Jon Sponseller. I own and operate the Sammi's Deli chain of restaurants here in Columbia, South Carolina, where I was born, raised, and have lived all of my life. I have absolutely no reason to lie. People are dying needless deaths. While it is too late for me to save Capt. James E. Chaffin, or Tom Sponseller, or Mandy Kennedy, all of them my neighbors, I have found proof beyond a reasonable doubt that those responsible will strike again and no one is safe, save those who know I have no reason to lie. Mandy Kennedy was my neighbor and she did not deserve to die. The tire marks I saw across her lifeless face was so an cruel and unusual a punishment that it was and is a crime of war. Her death was a murder, and it is part of a civil conspiracy against every single citizen in the City of Columbia. Because Columbia, SC is failed state, worse even than Mogadishu, we have modernization yet zero development. For, while the level of patronage and graft of both respective shadow governments are exactly equal, at least in Somalia the football stadiums, or rather, soccer stadiums, have sidewalks so that the most helplessly miserable people on earth don't get mowed down by heavy traffic.
This makes them the second most miserable and helpless people on earth, for Columbia, SC is a place where poor people like Mandy Kennedy, or not so poor people like Tom Sponseller can be murdered by the warlords, enriched by the Hospitality and Tourism dollars, stolen in the same fashion that the City of Columbia Police Department steals donated Thanksgiving Turkey Dinners from the homeless mission in Columbia. There is no sidewalk, no bicycle lane,

# EXHIBIT F

Case 20|3|87501



UNIVERSITY OF
SOUTH CAROLINA

Reported by

Name:
Title:
Email:
Phone:
Address:

Behavioral Intervention Team Incident Report
Submitted on May 25, 2014 at 4:59:22 pm EDT

Type:          **Behavioral Intervention Team Incident Report**
Urgency:       **Normal**

Incident Date:     **2014-05-25**
Incident Time:
Incident Location:  **Off campus**

Involved Parties

**Sammi Addahoumi ()**          Male          delimansc@yahoo.com          (803) 319-6941
BIT

Incident Description

* Description
The above listed USC student, Sammi Addahoumi, has made a significant amount of postings to twitter regarding conspiracy theories and may be dealing with untreated mental health issues. This report is to make sure that the University is aware of this student's activity online and for them to determine whether or not he is a risk to his own safety or the safety of campus.

"How did NSA& @UofSC "Prof."Leslie Wiser take controlOFColulmbiaCity PoliceDepartment?
http://ireport.cnn.com/docs/DOC-1117362 ... Sabotage pic.twitter.com/NXqR5FA78P" 2:11 PM - 25 May 2014

"Fear Nothing&they can take nothing from you.Stay human or die trying.Arabists MUST interpret MORE than words. Worlds." - 11:04 AM - 25 May 2014
https://twitter.com/delimansc/status/470581147739492352

Addahoumi posted a copy of letter previously sent to him by the Office of Student Conduct in the below tweet.

"So @JodyBarrWIS USC "Professor"Leslie G. Wiser,Jr Wiser"retired"NEWARK NJ FBI 2escapeMUSLIM
HARASSMENT investigation pic.twitter.com/yVXKpfEtTt" - 11:15 PM - 24 May 2014
https://twitter.com/delimansc/status/470402800338624512

* Are there any effects/impacts of the behavior?
N/A

* Have you made any attempts to address the behavior? How did the individual respond to the attempts?
N/A

* Do you have any other information about the individual that might be relevant?
N/A

* What is your relationship to the student?
N/A

* What is the purpose of this report?
I am concerned about someone

# EXHIBIT G

Case 2013187501



UNIVERSITY OF
SOUTHCAROLINA

Reported by

Name:
Title:
Email:
Phone:
Address:



Behavioral Intervention Team Incident Report
Submitted on May 28, 2014 at 1:49:17 pm EDT

Type:          **Behavioral Intervention Team Incident Report**
Urgency:       **Normal**

Incident Date:     **2014-05-27**
Incident Time:
Incident Location:  **CSD Network United States**

Involved Parties

**Sammi Addahoumi ()**
Alleged                          Male

Incident Description

* Description
Sammi Addahoumi posted many Twitter tweets in the weeks leading up to May 27 (and continued posting beyond May 27) about USC, specifically Alissa Liggett, Leslie Wiser and a host of other departments, including Student Health Services, the BIT team, USCPD, Student Government and others. The tweet he originally included the @UofSCshs (Student Heath Services) handle in, he said, "@UofSCshs & the Behavioral Intervention Team will PAY for Targeting Innocent Arabs. Muslims. Academic Freedom. 4Israel." He also attached a legal document to this tweet. His other tweets accuse Alissa Liggett and others of targeting him and discriminating against him. He said in a later post, "@USCPD @UofSCshs @ACLU Alissa Liggett is guilty of so many crimes. We will start with today's harassment from LIGGETT." He attached photos of Alissa at her desk as well as phone numbers that he insinuated were hers. Some of his tweets sounded menacing and almost threatening, like the one about @UofSCshs & the BIT team paying for targeting...

He posted another photo of Alissa and said, "I will wait 2divulge Alisa Liggetts BELLIGERENT &blatant lies & false statements till business hours 2morrow.

* Are there any effects/impacts of the behavior?
From the tone and wording of some of his messages, he sounds like he may be threatening individuals at the university. But the only individuals who can see his ranting posts are his followers, and he only has 44 followers.

* Have you made any attempts to address the behavior? How did the individual respond to the attempts?
I reported the behavior to Alissa Liggett, and she asked me to submit this BIT report. I also contacted USC Media Relations, who contacted USCPD, and I contacted the Counseling and Human Development Center so they were aware Sammi was posting about his situation.

* Do you have any other information about the individual that might be relevant?
No

* What is your relationship to the student?
I don't know him, but I clicked on his profile after he included @UofSCshs in one of his tweets and saw all the things he was saying about the university and specific individuals.

* What is the purpose of this report?
I am just reporting this so that BIT is aware but not necessarily requesting action be taken

# EXHIBIT H

## ADDAHOUMI, SAMMI HASSAN - Pt#: 01000732 - DOB: 2/7/1983 - Sex: Male - Age: 33

**ADDAHOUMI, SAMMI HASSAN**   Pt #: 01000732   DOB: 2/7/1983   Age: 30 yrs   Sex: Male
5/24/2013 11:00 AM  with  SHEEHI, LARA  for  **MH BIT NON-AOD INITIAL**
Encounter #: A2085913-80

### VISIT NOTE

**Data:**
Sammi arrived on time for his Non-AOD BIT session. It took him approximately 30 minutes to complete his paperwork, however, so we began the session approximately 30 minutes in. Sammi had particular questions re: the confidentiality agreement in the intake package, highlighting that he had not come to the CHDC out of his own accord, i.e., he was mandated by OSC via BIT as a result of a complaint from a professor. Explained confidentiality to Sammi, as well as some of the questions he had re: the paperwork, e.g., if he was going to be charged for a session, etc. Also validated his worries re: people having access to his records, especially as an Arab male in the United States in the current sociopolitical culture. Explained to him how his records are protected by law, nonetheless.

Sammi reports that this current BIT session is a result of him raising his voice in class when a professor of his failed to mention an essential point in history re: Lebanese confessional violence and equated the civil strife in Lebanon with the "Muslims not being able to get along with the Christians." Sammi reports that he felt this message was inaccurate and a dangerous one to give to American students who already have been taught that Muslims are the root of all problems. Sammi reports that he had never had difficulty with this professor in the past, despite the professor being the brother of Ehud Olmert, the prime minister of Israel (i.e., having a particular agenda and bias while teaching a Middle Eastern class). Sammi acknowledges that his frustration made him raise his voice, however, he indicates that he did not yell and felt as though "he had won, because the second I raised my voice louder than his, it seemed like I was this angry Arab man, oh watch out." He believes that his professor "used the system" (i.e., BIT) against him for this reason. He denies any retaliation via grading by his professor.

Sammi denies any current or past HI or SI, plan, or intent. He indicates having had no difficulty with any professors in the past and in fact having students inquire about some of his points after the class. He reports having been broadsided by this report. Sammi indicates that he works for his father's business, a chain of deli's around Columbia. He has recently returned to school after having taken a break for some time to work with his father. He states that he has been very happy at school, has been doing well, and is surprised that this situation has come up.

**Assessment:**
Sammi was oriented to all spheres. He was cooperative despite being somewhat put off by the complaint by his professor and being distrustful of the university system. He specifically placed this within the environment of fear and distrust related to his being a Muslim Arab who is also outspoken. Sammi acknowledged his raising his voice in class and recognizes that the dynamic of the class made this happen, but is very respectful of his professors and the university system and recognizes any wrongdoing on his part. It is important to note that the professor Sammi was in class with is a very well-known and powerful Zionist that was an important functionary of the Israeli government; it appears that these dynamics may have also been at play in the classroom.

**Plan:**
After assessment today, it does not appear that Sammi needs any further f/u via BIT. He indicates willingness to come back at his own volition if needed and was given my card and contact information. He signed a release form to allow me to contact OSC re: his attendance and my recommendations. No further f/u is necessary at this time.

**Axis I**

Deferred Diagnosis (799.9)

**Encounter Code**
Professional:        MH BIT NON-AOD INITIAL (90832)

Signed by Lara Sheehi on 5/24/2013 4:20:47 PM

Student Health Services                                              Printed 5/12/2016 by watsoncs

# EXHIBIT I

case 2013004501



**U N I V E R S I T Y   O F**
**SOUTH CAROLINA**

Reported by

Name:
Title:
Email:
Phone:
Address:



Behavioral Intervention Team Incident Report
Submitted on August 13, 2013 at 12:03:04 pm EDT
Last modified August 14, 2013 at 9:16:27 am EDT

| | |
|---|---|
| Type: | **Behavioral Intervention Team Incident Report** |
| Urgency: | **Normal** |
| Incident Date: | **2013-08-13** |
| Incident Time: | **10:30 am** |
| Incident Location: | **On campus - other Police Department front lobby** |

**Involved Parties**

**Sammi Addahoumi (F39404713)**      1983-02-07      addahoum@email.sc.edu      8033196941
                                                                           Off Campus

**Incident Description**

• Please provide a detailed description of the incident/behaviors you have observed. Use specific, concise, and objective language. Forward any additional information to the Office of Student Conduct at osc@sc.edu with the subject heading BIT. Please call 803-777-4333 if you have additional questions.
Mr. Addahoumi arrived at USCPD to check on the status of a report that he filed in April 2013 for a bicycle that was stolen from Thomas Cooper Library. Addahoumi also provided me with a new date that the incident occurred. He also stated that he completed his own investigation and showed me pictures of the bike rack and a call box camera at the incident location. I told him I would check on the status of his report and return to speak with him momentarily.

When I returned I informed Addahoumi that due to the length of time since the incident, video was no longer available from the new date that he provided. Addahoumi had a difficult time understanding that the video was gone and became upset claiming that the police did not want to take time to help him with his case.

Addahoumi then proceeded to describe a scenario where a student had "had enough" and became an Active Shooter in a building on campus. Addahoumi then claimed that "there would be clues" and that video footage would appear from our system showing the suspect's behaviors months and years prior to the incident. I then informed him again that unfortunately, we have a limited capacity for video on our system and that video is purged after a certain period. Addahoumi then informed me that he was in Benghazi during Summer 2013. He mentioned how police do not investigate crimes there and he proceeded to show me a picture of an apparent bomb scene. He then enlarged the picture and zoomed in on a camera located on the corner of the building. Addahoumi then stated that Benghazi officials claimed they could not locate a suspect.

Addahoumi then continued to talk about his case claiming that a member of Parking Services or Landscaping took his bicycle because it was expensive. I asked him if he had any proof and he could not provide any. Addahoumi then mentioned that he was a "mad man" and that he wished the police would take "five minutes" to investigate his case. I spoke to him a little longer about the video footage and he left the location.

• Are there any effects/impacts of the behavior?
When Addahoumi mentioned the Active Shooter scenario it raised my alarm because that is not typically a scenario that will spontaneously be thought of when someone is trying to explain their point. I became more alarmed when Addahoumi showed me the picture of the bomb scene in Benghazi to further explain his point about video footage.

• Have you made any attempts to address the behavior? How did the individual respond to the attempts?
N/A

# EXHIBIT J

Case 2014171501



U N I V E R S I T Y   O F
**SOUTH CAROLINA**

Behavioral Intervention Team Incident Report
Submitted on February 6, 2015 at 5:38:47 pm EST
Last modified February 9, 2015 at 9:38:56 am EST

| | |
|---|---|
| Type: | **Behavioral Intervention Team Incident Report** |
| Urgency: | **Normal** |
| | |
| Incident Date: | **2015-02-06** |
| Incident Time: | |
| Incident Location: | **Off campus** |

**Reported by**

Name:
Title:
Email:
Phone:
Address:



**Involved Parties**

| | | | |
|---|---|---|---|
| **Sammi Addahoumi (F39404713)** | 1983-02-07 | addahoum@email.sc.edu | 8033196941 |
| Alleged | Male | Off Campus | |

**Incident Description**

* Description
Yesterday, after the shooting, an individual who I believe is a current or prior student (@delimansc; Sammi Addahoumi) responded to my Tweet regarding the shooting with several unusual tweets. I have attached a Word document with screenshots of the tweets as well as screenshots of a blog to which there's a link on his Twitter page that includes rants about USC. After consulting with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (with the Center for Teaching Excellence), she recommended completing a BIT report. I don't believe that the content is actionable but may reflect concerning, hostile attitudes that merit continued monitoring.

* Personal, emotional, or behavioral concerns for this student. Check any that apply.
Unusual behavior, Psychosis

* Are there any effects/impacts of the behavior?
The individual's tweets are concerning, particularly the picture of a professor's office.

* Have you made any attempts to address the behavior? How did the individual respond to the attempts?
No.

* Do you have any other information about the individual that might be relevant?
After I attended an "Active Shooter Training" here at USC last year, I tweeted something about it and this individual also responded then to my tweet. His response was odd in a similar manner to the ones in the attached document, but I cannot find it at this time.

* What is your relationship to the student?
He follows me on Twitter

* What is the purpose of this report?
I am concerned about someone

**Attachments**

bitreportscreenshots.docx

# EXHIBIT K

case 2013187501

**From:** donot-reply@mailbox.sc.edu [mailto:donot-reply@mailbox.sc.edu]
**Sent:** Wednesday, May 21, 2014 4:01 PM
**To:**

**Subject:** Behavioral Intervention Team Incident Report

| | |
|---|---|
| Student Full Name (First, Middle, Last): | Sammi Addahoumi |
| Last 4 digits of SSN ID (if available): | 2375 |
| Student Email Address (if available): | delimansc@yahoo.com |
| Reporter's Name: | |
| Reporter's Title | |
| Reporter's Phone | |
| Reporter's Email Address | |
| Reporter's Relation to the Student | |
| Incident Date | 5/16/2014 |
| Incident Time | 3:45 PM |
| Incident Location | phone conversation |
| Incident Description | Sammi had scheduled an appointment with me for the above time. He didn't come but called me instead. I thought the appointment would be to plan for the one course he had left to complete his degree. This was not the case. During our conversation, Sammi's focus rambled from topic to topic. It was very difficult to ascertain exactly what assistance he wanted from me. After a conversation that lasted approximately 1 hour, he seemed to want me to write a letter (on letterhead - he did keep emphasizing this) that said that due to "clerical error" or "administrative error," I had advised him for a minor (Islamic world Studies) that did not exist, which led to taking classes he didn't need, both of which are simply not the case. He kept saying he wanted this letter for the bursar's office so he could get a refund of some kind for the spring 2014 semester. When I told him I couldn't write this letter because the minor did exist, he was skeptical. |
| Effects/Impacts of Behavior | n/a |
| Attempts to Address the | During our lengthy conversation, I did attempt to refocus Sammi's attention on what he needed to complete to graduate (3 hours in math/analytical |

Behavior

reasoning). He did share that he didn't know when or if he could complete his degree (I had noticed the "adminstrative suspension" note on his transcript when I reviewed his transcript in preparation for our meeting). In response, I shared that ▆▆▆▆▆ and I would be ready to assist him with this.

Last January, Sammi expressed concern over the lack of courses available for the Islamic Studies minor (Note: actually, over the course of just 2 semesters, there were 13 different courses for this minor - only six courses are required to complete the minor). I mentioned then that he could change his minor to a cognate. Folowing our meeting, he met with ▆▆▆▆▆ for a senior check and two days later, met with ▆▆▆▆▆ and told him that he wanted to switch his minor to a cognate. Both ▆▆▆ and I re-arranged his course work to best utilize all courses in his curriculum, and he made some adjustments to his schedule. I had no contact with Sammi until the email he sent me several weeks ago, which I forwarded as a part of an earlier BIT report). When he called me on 5/16, he kept referring back to that time in January. He did not seem to remember that he chose to change his minor to a cognate. Also during our conversation on 5/16, he was very concerned that we (me , judicial affairs, the poli sci dept, others at USC, etc...) all knew details about his situation with judicial affairs (& was incredulous and skeptical when I assured him I did not know the details - only of his administrative suspension, which was on his transcript). He did state that he believed the university was purposefully, albeit secretly, dismantling Islamic studies at USC and indicated that he knew that I was aware of this (as were others?) but we either couldn't say or were afraid to admit this. There was also quite a bit of other "rambling" during the phone conversation: he wanted to help advance student knowledge about the Middle East, particularly Libya; he wanted to help me advise students, particularly about the real situation in the Middle East (as opposed to what courses here were teaching); multiple comments about particular faculty and courses; his belief that judicial affairs is punishing him for his beliefs and his refusal to see a "shrink" and "pee in a cup" for anyone; people in the bookstore had been told by someone (?) to watch for him; his future hope of coming here to graduate school so he could "educate" people about the Middle East; etc.

Any Other
Relevant
Information

# EXHIBIT L

# EXHIBIT M

# EXHIBIT N

# EXHIBIT O

# EXHIBIT P

# EXHIBIT Q

# Exhibit R

# EXHIBIT S

# EXHIBIT T

# EXHIBIT U

# EXHIBIT V

# EXHIBIT W

# EXHIBIT X

# EXHIBIT Y

...rolled in the class to fill academic requirements but such a thing requires academics and not special interests monopolizing the learning environment.

Here is the truth:
Somehow all of this escapes his lecture on the topic and he refused to allow me to present it as contradicting his conflicted interest, and forced me to leave the classroom.

http://www.theguardian.com/world/2012/mar/20/fbi-informant

*Pending IR #00009857*
*Submitted from 129.252.106.41 and routed to Tim Bedford (Behavioral Intervention Team Case Manager)*

Case 2013063501



UNIVERSITY OF
**SOUTH CAROLINA**

Behavioral Intervention Team Incident Report
Submitted on October 11, 2013 at 9:47:27 am EDT

| | |
|---|---|
| Type: | **Behavioral Intervention Team Incident Report** |
| Urgency: | **Critical** |

| | |
|---|---|
| Incident Date: | **2013-10-11** |
| Incident Time: | **8:15 am** |
| Incident Location: | **On campus classroom Currell College 203** |

Reported by

| | |
|---|---|
| Name: | **Sammi Hassan Addahouml** |
| Title: | **Student** |
| Email: | **addahoum@email.sc.edu** |
| Phone: | **8032376116** |
| Address: | **910 Lacy Street** |

Involved Parties

Leslie Wiser ()                                 Wiserjr@mailbox.sc.edu            8037776503

Incident Description

* Description
"Professor" or rather Agent Wiser, has direct conflict of interests in teaching a class on "terrorism". He is an FBI
agent who also contracts as a private security consultant based on his involvement with the FBI.

In regarding the subject matter, he has targeted Islam and Arabs using populist and widely discounted sources rather
than academically credible and widely available material.

Such an involvement with the FBI or other organizations has led any and all lectures to be merely regurgitation of
overly biased, discriminatory, and agenda led opinion rather fact.

Instead of being a judge or non biased 3rd party, his his teaching the class in relation to the one sided perspective of
parties interested in persecuting Arab and Muslims. It is a class of biased opinions and dis proven allegations rather
than academic facts.

* Are there any effects/impacts of the behavior?
Students are lied to repeatedly, making the learning environment impossible without a critical assessment of his
teaching materials and lectures based on widely agreed upon academic criteria.

* Have you made any attempts to address the behavior? How did the individual respond to the attempts?
Repeated attempts have been made with no effect, despite reluctantly addressing obvious discrepancies when they
have been brought to light only under after my own suggestion based on my own intensive reviews of the wide
ranging subject matter.

The truth only comes out when I bring it out. His lectures are biased to the point of targeting Muslim, Arab, or even
African American students.

* Do you have any other information about the individual that might be relevant?
All of his material is provided by the FBI or associated agencies, resulting in far from academic elements, even a
market or profit driven approach that perpetuates stereotypes to further FBI interests.

We should be learning how to protect the constitution rather than learning from agencies seeking to weaken it.

* What is your relationship to the student?

# EXHIBIT Z

Case 2013187501



UNIVERSITY OF
SOUTHCAROLINA

April 22, 2014

Student Conduct and Academic Integrity
Division of Student Affairs and Academic Support

Sammi Addahoumi
Sent electronically to addahoum@email.sc.edu

Hi Sammi,

I am concerned since I emailed you this information, which you were expecting, last Wednesday and haven't heard from you. My concern is that you will not make this appointment, which took maneuvering since Dr. Frierson didn't have openings for weeks. There is no uncertainty that this appointment should be your number one priority to staying in school.

I cannot be more clear Sammi, if you do not attend, you will be suspended on Friday. It's too easy, and you're too mature to just let it go by. Especially after you looked me in the eye and said that you knew it would be beneficial and that you would "do anything . . . go to counseling every week". I fear this disappearing could be your pattern, but the stakes are too high for that in this scenario.

You asked me to call your father, which I did. I am trying, but if you know now that you are not going to go, please have the courtesy to tell me so that Dr. Frierson can open that appointment time for people who are trying to see him.

Friday, April 25
9am
3555 Harden Street Extension, suite 301
If transportation is an issue, please let me know.

Thank you,
Alisa

James F. Byrnes Building • 901 Sumter Street, Suite 201 • Columbia, South Carolina 29208
803/777-4333 • Fax 803/777-1393 • http://www.sc.edu/osc/
An Equal Opportunity Institution